**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 3 0 2022

TAMMY H. DOWNS, CLERK

By:_____
                        DEP CLERK

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| STATE OF ARKANSAS, *ex rel.* LESLIE RUTLEDGE, ATTORNEY GENERAL,<br><br>*Plaintiff,*<br><br>vs.<br><br>SYNGENTA CROP PROTECTION AG;<br>SYNGENTA CORPORATION;<br>SYNGENTA CROP PROTECTION, LLC;<br>AND CORTEVA, INC.,<br><br>*Defendants.* | Case No. 4:22-cv-1287-BSM |

## COMPLAINT

The State of Arkansas, *ex rel.* Leslie Rutledge, Attorney General (the "State" or "Plaintiff"), brings this action in its proprietary capacity and in its capacity as *parens patriae*, against Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC ("Syngenta") and Corteva, Inc. ("Corteva"), and alleges as follow:

### I.    INTRODUCTION

1.    Arkansas farmers are the backbone of Arkansas' economy. Agriculture is Arkansas' largest industry, contributing $16 billion annually to the state's economy and employing 243,000 citizens. The state's diverse landscape and climate produce a wide variety of agricultural products, giving it the nickname, *The Natural State*. Statewide, there are approximately 49,000 farms spread across 14.3 million acres.

This case assigned to District Judge **Miller**
and to Magistrate Judge **Harris**

Agriculture is prominent in all of Arkansas' counties and 97% of Arkansas' farms are family-owned.

2.     Arkansas farmers rely heavily on crop-protection products (commonly known as "herbicides," "pesticides," and "fungicides") to improve crop yields and provide food security to all Americans. These crop-protection products include key "active ingredients" that are manufactured by Syngenta and Corteva (collectively "Defendants"). These "active ingredients" are incorporated into the crop-protection products Arkansas farmers must use to protect their crops from damage caused by insects, weeds, and fungi.

3.     Arkansas farmers annually purchase tens of millions of dollars of crop-protection products manufactured by Defendants. Defendants are two of the world's largest chemical companies. In 2021 alone, Syngenta's worldwide crop-protection product sales were approximately $13.5 billion,[1] while Corteva's worldwide crop-protection product sales were $7.3 billion.[2] Arkansas farmers have for years paid, and continue to pay, tens of millions of dollars more than they lawfully should for these crop-protection products because of so-called "loyalty programs" implemented by each Defendant.

4.     Defendants use their monopoly power to perpetuate unlawful

---

[1] Media Release, *Syngenta Group reports 2021 performance, growing 23%, with $28.2 billion sales*, https://www.syngentagroup.com/sites/syngenta-group/files/media/syngenta-news/220331-syngenta-groupfyr-2021-en.pdf.

[2] News Release 4Q 2021, *Corteva Delivers Strong Fourth Quarter and Full-Year 2021 Results Led by Broad-Based Execution, Provides 2022 Guidance (2022)*, https://investors.corteva.com/static-files/1d7c9b00-eefa-4938-b15fb2277a5e4a68#:~:text=Crop%20Protection%20net%20sales%20were%20approximately%20247.3%20billion%20for%20full,a%201%25%20unfavorable%20portfolio%20impact.

exclusionary schemes to suppress generic competition and maintain their monopolies.

5.     Congress enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition. Defendants, Syngenta and Corteva, initially develop, patent, and register the "active ingredients" used in crop-protection products. They may then exploit the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years.

6.     After patent and regulatory exclusivity periods expire, generic manufacturers may enter the market with equivalent products containing the same "active ingredients" and relying upon the same toxicology and environmental impact data. Unimpeded competition from generic products predictably leads to dramatic price reductions. This regulatory structure thus incentivizes innovation, while encouraging price competition—all of which benefits Arkansas farmers.

7.     Defendants systematically undermine and frustrate the goals of this system. When exclusivity periods for crop-protection products expire and generic manufacturers threaten to launch lower-priced competing products, Defendants utilize their so-called "loyalty programs" to exclude generic manufacturers from the traditional distribution channel, which serves as critical links between manufacturers and farmers.

8.     Under their respective "loyalty programs," Defendants provide substantial payments to distributors in exchange for selling certain amounts of

Defendants' crop-protection products and restricting sales of generic crop-protection products made by competing manufacturers. Defendants promise distributors a complex set of incentive payments based on the distributors' purchases of branded crop-protection products, under one critical condition: the distributors must limit their purchases of comparable generic products to a set percentage share. Defendants term this a "rebate" for "loyalty." In substance, however, these are exclusionary payments to distributors. Defendants pay a portion of their elevated profits to distributors in exchange for the distributors excluding Defendants' generic competitors, resulting in near exclusivity for Defendants.

9.      Defendants' "loyalty programs" are designed to hinder the entry and expansion of generic manufacturers, resulting in, among other things, supracompetitive pricing, which costs Arkansas farmers millions of dollars in unlawful overcharges annually. Distributors participate in and comply with Defendants' "loyalty programs", as the loss of the payments distributors receive from the "loyalty programs" would otherwise have severe financial consequences.

10.      Only a small number of large distributors dominate the sale of crop-protection products in the United States. These distributors readily exclude generic pesticides from their distribution lists. Each Defendant's scheme almost entirely forecloses generic competitors from efficient distribution of their products. This prevents generic competitors from making significant sales to national distributors, which collectively account for the majority of U.S. crop-protection product sales.

11.      Each Defendant expressly designs its "loyalty program" to maintain its

ability to price its products above competitive levels while still retaining a large market share. Defendants thus enjoy outsized profits during the "post-patent" period, when prices would otherwise fall substantially. Defendants' ability to maintain out-sized profits, supracompetitve prices, and inflated market share cost Arkansas farmers millions of dollars annually.

12.     Defendants' schemes have dissuaded generic manufacturers from entering markets encumbered by "loyalty programs" and forced generic manufacturers to exit the market. Even when they offer competitive products, generic manufacturers are relegated to selling limited volumes, often through undesirable, less efficient channels of distribution.

13.     Absent Defendants' unlawful conduct, Defendants would face increased generic competition, which would lead to increased choice and lower prices for Arkansas farmers. Arkansas farmers would save millions of dollars annually when paying for essential crop-protection products if Defendants' so-called "loyalty programs" were shut down.

14.     As a result of Defendants' conduct, Defendants have restrained competition, maintained unlawful monopolies, and harmed Arkansas farmers by reducing choices for these farmers and costing them millions of dollars in overcharges.

## II.    PARTIES

### A.    Plaintiff

15.     Plaintiff, State of Arkansas, is a sovereign state.  Leslie Rutledge is the

Attorney General of the State of Arkansas, the chief legal officer for the State, and brings this action on behalf of the people of the State of Arkansas to protect the State, the State's agencies and subdivisions, its general economy, and its citizens. The Attorney General has authority under federal and state law, including without limitation, Sections 3 and 16 of the Clayton Act (15 U.S.C. §§ 14 and 26); Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2); the Arkansas Unfair Practices Act (Ark. Code Ann. § 4-75-301, *et seq.*); and the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. § 4-88-101, *et seq.*), to bring this action.

16.    The State brings this action in its *parens patriae* capacity to protect its quasi-sovereign interest in Arkansas' economic marketplace and the well-being of its citizens and seeks injunctive relief, and to recover actual and/or compensatory damages, punitive damages, restitution, and civil penalties for losses incurred by the State and all natural persons residing in the State, pursuant to the Clayton Act, the Sherman Act, the Arkansas Unfair Practices Act, and the Arkansas Deceptive Trade Practices Act.

### B.    Defendants

17.    Defendant SYNGENTA CORP PROTECTION AG is a Swiss aktiengesellschaft (public limited company) based in Basel, Switzerland. China National Chemical Company (ChemChina) acquired Syngenta in 2017, and then ChemChina merged with Sinochem Group Co., Ltd. as of May 2021 to both be subsidiaries of Sinochem Holdings Corporation Ltd., which is a state-owned Chinese company based in Beijing, China. Syngenta Crop Protection AG has its North

American headquarters in Greensboro, NC.

18.     Defendant SYNGENTA CORPORATION is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware.

19.     Defendant SYNGENTA CROP PROTECTION, LLC is a corporate affiliate of Syngenta Crop Protection AG and is headquartered in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is licensed to do business in Arkansas and can be served via its registered agent, C.T. Corporation System, at 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201.

20.     Defendant CORTEVA, INC. is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). Corteva is a corporation organized and existing under the laws of the State of Delaware. It is licensed to do business in Arkansas and can be served via its registered agent, C.T. Corporation System, at 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201.

## III.   JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 16 of the Clayton Act (15 U.S.C. § 26), as

well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). This Court's exercise of supplemental jurisdiction over Plaintiff's state law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

### B.     Personal Jurisdiction

22.     This Court also has personal jurisdiction over each Defendant because each is engaged in substantial activity in Arkansas, pursuant to Ark. Code Ann. § 16-4-101.

23.     Defendants' general business practices and the unfair methods of competition alleged herein are activities in or affecting "commerce" within the meaning of Section 1 of the Clayton Act (15 U.S.C. § 12).

### C.     Venue

24.     Venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b), (c) and (d) and Ark. Code Ann. § 4-75-319. Each Defendant is found, resides, transacts business, and/or has agents in the State of Arkansas and this District, and a portion of the affected commerce described herein has been carried out in the State of Arkansas and this District.

## IV.     INDUSTRY BACKGROUND

### A.     Crop-Protection Products

25.     A pesticide is a chemical used to kill or control a "pest"—a disease, weed, insect, or other unwanted organism. The vast majority of pesticides sold in the United States, including in Arkansas, are used for crop protection.

26.     Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops. Pesticides used for crop protection are referred to herein as "crop-protection products." Crop-protection products are vitally important inputs for Arkansas farmers. Use of effective crop-protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

27.     Crop-protection products fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target nematodes (roundworms)); and fungicides, which target fungal diseases.

28.     A crop-protection product contains at least one active ingredient, which is the chemical substance that kills or controls the targeted pest. Active ingredients are combined with inert components such as water, adjuvants, surfactants, and in some cases other active ingredients, to formulate finished crop-protection products. Finished crop-protection products that contain only one active ingredient are referred to as "straight goods," while products containing two or more active ingredients are called "mixtures."

29.     An active ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished crop-protection product. Active ingredients sold in this form require additional processing before they can be used by farmers in finished crop-protection products.

30.     Several criteria serve to distinguish active ingredients from each other. These include the pest(s) targeted by an active ingredient; the effectiveness of an

active ingredient at controlling the targeted pest, which is often measured in terms of crop yield improvements; the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an active ingredient may be used; and the performance of an active ingredient under prevailing climate and weather conditions.

31.    Each active ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While active ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or in a given condition. Farmers may prefer one active ingredient over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different active ingredient.

**B.    Crop-Protection Product Manufacturers**

32.    Crop-protection product manufacturers create, market, and sell crop-protection products. They may synthesize the active ingredients for their formulated products in their own facilities or purchase the active ingredients from other chemical manufacturers.

33.    A crop-protection product manufacturer that researches, develops, and patents new active ingredients is known as a "basic" manufacturer. Defendants

Syngenta and Corteva are basic manufacturers, and they are among the largest crop-protection product manufacturers in the United States and globally.

34.    Generic manufacturers primarily sell crop-protection products containing active ingredients initially developed by basic manufacturers and as to which patent and regulatory exclusive-use periods have expired (sometimes called "post-patent" active ingredients). More than a dozen generic manufacturers sell crop-protection products in the United States.

### C.    The Regulatory Process for Crop-Protection Products

35.    The Congressionally enacted patent and regulatory framework governing crop-protection products rewards innovation by granting the developer of a new active ingredient protection from competition in that active ingredient for a period of years. However, the governing legal framework also contains mechanisms intended to facilitate generic entry and price competition when exclusivity periods end.

36.    When a basic manufacturer develops a new active ingredient, it can apply for U.S. patent protection for a term beginning when the patent issues and expiring twenty years after the initial patent application.

37.    The basic manufacturer also benefits from exclusive rights under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). To ensure the safety of crop-protection products, FIFRA requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") of detailed toxicology and environmental impact data prior to the sale or distribution of any pesticide in the

United States.

38.     Following EPA approval of a new active ingredient, the original registrant receives the exclusive right to cite the data it submitted in support of the active ingredient for a baseline period of ten years. This regulatory exclusive-use period often extends beyond the basic manufacturer's patent term and effectively extends the basic manufacturer's right to be the exclusive supplier of products containing that active ingredient.

39.     When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with crop-protection products containing the same active ingredient. Those products may be generic equivalents of branded crop-protection products or may combine multiple active ingredients to create new mixtures. A generic entrant must apply to register its product for sale in the United States under FIFRA, but FIFRA permits generic entrants to rely on data that the original registrant submitted to the EPA. The original registrant, in turn, may be entitled to receive "data compensation payments" from the generic firm, depending on the timing of the generic entrant's reliance on the data. This reflects FIFRA's objective of facilitating generic entry and thus encouraging competition.

### D.     The Traditional Distribution Channel

40.     In general, crop-protection product manufacturers sell to distributors that in turn sell to (and in some cases are integrated with) a much larger number of retail outlets dispersed across the country in close proximity to farmers. This path to

market is referred to as the traditional distribution channel, or just "the channel". Sales through the traditional distribution channel account for approximately 90% of crop-protection product sales in the United States. Just seven distributors account for over 90% of sales through the traditional channel, and thus account for approximately 80% or more of all sales of crop-protection products in the United States.

41.     Selling through distributors is the most efficient way for a crop-protection product manufacturer to reach farmers. Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing. Additionally, distributors provide manufacturers access to a network of retail and farmer customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a crop-protection product manufacturer can reach thousands of retailers, and in turn, hundreds of thousands of farmers. Distributors also provide scale and services that would require substantial investments for a manufacturer to replicate. Therefore, crop-protection product manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

### E.     Life Cycle Management of Crop-Protection Products

42.     Generic crop-protection products are generally sold at significantly lower prices than equivalent branded products. Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given active

ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that active ingredient to decline. This in turn causes the associated profits of basic manufacturers to decline.

43.    In response to actual or expected generic entry, Defendants have employed certain strategies designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on the prices and market shares of branded products. Most commonly, Defendants utilized so-called "loyalty programs" to accomplish these unlawful restraints.

## V.    DEFENDANTS' UNLAWFUL CONDUCT

44.    Defendants each operate so-called "loyalty programs" designed to severely limit the distribution of competing generic products, and ultimately, Arkansas farmers' ability to purchase more affordable generics. Each Defendant designed and administers its loyalty program with the purpose, intent, and expectation of impeding generic competition; thereby maintaining market prices and branded market share at levels higher than would otherwise prevail in a competitive market. Each does so for its own benefit and for the benefit of its distributor partners.

45.    Under each respective loyalty program, Defendants offer substantial exclusion payments to distributors conditioned on distributors limiting purchases of generic crop-protection products containing specified post-patent active ingredients.

46.    Defendants' loyalty programs are designed to marginalize generic manufacturers and enable Defendants to retain share while pricing their crop-protection products above competitive levels. As to active ingredients that are the

primary focus of this Complaint, each Defendant has substantially achieved these goals. Through its loyalty program, each Defendant has substantially impeded generic manufacturers from providing effective competition and has maintained prices for crop-protection products above competitive levels.

### A.    Syngenta's Loyalty Program

47.    Syngenta refers to its loyalty program as the "Key AI" program. Syngenta operates this program with both distributors and retailers.

48.    Syngenta's Key AI program for distributors is implemented through written marketing agreements with participating distributors.

49.    Syngenta's loyalty program is designed to maintain supracompetitive profits, which it shares in part with its distributor and retailer partners. The supracompetive profits achieved by Syngenta damage Arkansas farmers. Syngenta accomplishes this by restricting access to the traditional distribution channel for generic products, thereby elevating both its market prices and share.

### B.    Corteva's Loyalty Program

50.    Corteva's loyalty program is also implemented through written marketing agreements with participating distributors and requires distributors to meet loyalty thresholds for specified active ingredients to receive exclusion payments.

51.    Corteva's loyalty program is designed to maintain supracompetitive profits, which it shares in part with its distributor and retailer partners. The supracompetive profits achieved by Corteva damage Arkansas farmers. Corteva accomplishes this by restricting access to the traditional distribution channel for

generic products, thereby elevating both its market prices and share.

### C.    Operation of and Adherence to Loyalty Programs

52.    For many years, each Defendant has maintained loyalty-program agreements with a group of distributors that collectively comprise a vast portion of all crop-protection product sales in the United States, including in Arkansas.

53.    Defendants' agreements with participating distributors require distributors to meet very high loyalty thresholds for each active ingredient in exchange for receiving exclusion payments from Defendants.

54.    Additionally, Syngenta's Key AI program also requires retailers to meet very high loyalty thresholds generally in exchange for receiving exclusion payments from Syngenta.

55.    Each Defendant enters into loyalty-program agreements with most leading distributors. This fact is widely known in the industry, and gives participating distributors increased confidence that no significant competing distributor will undercut them by partnering closely with low-priced generic manufacturers.

56.    Through these and other acts, Defendants have disincentivized distributors from dealing with generic manufacturers, lest they risk missing loyalty thresholds. In fact, in in some instances, distributors will not purchase from generic manufacturers at all. Defendants have strictly enforced the terms of their loyalty programs. Thus, the consequences of missing a loyalty threshold can be incredibly severe. Distributors often decline to purchase or promote generic products or defer

purchases of generic products until the end of the season, which allows them to minimize the risk of inadvertently missing a loyalty threshold due to late-season returns or shifts in demand.

**D.     Relevant Syngenta Active Ingredients**

57.    Syngenta's loyalty program applies to active ingredients that are threatened by generic competition. These include the three Syngenta active ingredients that are the primary focus of this Complaint: azoxystrobin, mesotrione, and metolachlor (together with Corteva active ingredients, identified below, "Relevant AIs").

58.    *Azoxystrobin*. Azoxystrobin is a broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases and has annual global sales of over $1 billion.

59.    Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Both Syngenta's exclusive-use period under FIFRA and relevant patent protection for azoxystrobin have expired.

60.    Under its loyalty program, Syngenta has made exclusionary payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products to Arkansas farmers.

61.    Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of azoxystrobin products and as a result has maintained supracompetitive prices for azoxystrobin products. Following the expiration of Syngenta's patent exclusivity, a number of

generic manufacturers introduced azoxystrobin products in the United States. Generic azoxystrobin products were priced significantly below Syngenta's existing azoxystrobin crop-protection products. In spite of this, generic manufacturers have struggled to make inroads with distributors, thus preventing accessibility to generic products and forcing Arkansas farmers to purchase azoxystrobin products from Syngenta at supracompetitive prices.

62.    To meet the loyalty program threshold, distributors strictly manage their generic azoxystrobin open space under the loyalty program, steer their Arkansas farmers towards Syngenta's azoxystrobin products, and stop selling generic products once their open space is used up even though Arkansas farmers continue to demand lower-priced azoxystrobin products. As a result, generic manufacturers seeking to sell crop-protection products containing azoxystrobin have found distributors unwilling to purchase more than minimal amounts of their products.

63.    At least one generic manufacturer decided against introducing an azoxystrobin product altogether due to the lack of market access created by Syngenta's loyalty program.

64.    Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing azoxystrobin than would prevail in a competitive market.

65.    *Mesotrione*. Mesotrione is a widely used corn herbicide.

66.    Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Both Syngenta's exclusive-use

period under FIFRA and relevant patent protection for mesotrione have expired.

67.    Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic mesotrione products to Arkansas farmers.

68.    Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of mesotrione products.

69.    To meet the loyalty program threshold, distributors strictly manage their generic mesotrione open space under the loyalty program and curtail marketing efforts associated with generic mesotrione. Some distributors have removed generic mesotrione products from their price lists altogether due to loyalty program considerations. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic mesotrione (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

70.    Two generic manufacturers delayed or terminated their planned mesotrione entry due to loyalty-program concerns.

71.    Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing mesotrione than would prevail in a competitive market.

72.    *Metolachlor*. Metolachlor (used herein to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, each as described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain

sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugarbeets.

73.    The original metolachlor compound was developed, patented, and registered with the EPA by a Syngenta predecessor company in or about 1976, and Syngenta's relevant patent protection for that compound expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor.

74.    Both Syngenta's exclusive-use period under FIFRA and relevant patent protection for s-metolachlor have expired. A patent held by Syngenta relating to s-metolachlor manufacturing processes has also expired.

75.    Under its loyalty program, Syngenta has made exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic metolachlor products to Arkansas farmers.

76.    Syngenta's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of metolachlor products.

77.    To meet the loyalty program threshold, distributors strictly manage and allocate their generic metolachlor open space and steer their customers toward loyalty-compliant metolachlor products, despite Arkansas customer demand for lower-priced generic products that exceeds the available open space. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic metolachlor, despite generic products being of sufficient quality and supply.

78.    Although generic manufacturers introduced products containing original metolachlor in or about 2003, they were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products as a result of Syngenta's loyalty program. More recent attempts by generic manufacturers to enter the market for the sale of crop-protection products containing s-metolachlor have likewise been marginalized by Syngenta's loyalty program.

79.    Syngenta's prices remain significantly above competitive levels. Syngenta's loyalty program has resulted in higher prices for crop-protection products containing metolachlor than would prevail in a competitive market.

### E.    Relevant Corteva Active Ingredients

80.    Corteva's loyalty program applies to active ingredients that are threatened by generic competition. These include three Corteva active ingredients that are the primary focus of this Complaint: rimsulfuron, oxamyl, and acetochlor (together with Syngenta active ingredients, identified above, "Relevant AIs").

81.    *Rimsulfuron*. Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes.

82.    Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Both Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA have expired.

83.    Prior to the 2017 Dow-DuPont merger that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its own loyalty program.

84. Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products to Arkansas farmers.

85. Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron products to Arkansas farmers. Generic manufacturers have registered rimsulfuron products in the United States, but the marketing efforts of these manufacturers have generally been stifled due to Corteva's loyalty program.

86. As a result of the incentives created by Corteva's loyalty program, distributors carefully manage and allocate their generic rimsulfuron open space under Corteva's loyalty program, with some removing generic rimsulfuron products from their price lists altogether. Generic manufacturers have thus been unable to make significant sales through the traditional distribution channel.

87. Because of its loyalty program, Corteva has been maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.

88. Corteva's prices remain significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing rimsulfuron than would prevail in a competitive market.

89. **Oxamyl**. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco.

90.    Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Both Corteva's relevant patent protection for oxamyl and the exclusive-use period under FIFRA have expired.

91.    A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Given Corteva's plant outage, generic entrants were at first relatively successful.

92.    However, through the use of its loyalty program, Corteva has made exclusionary payments to distributors in order to deter them from marketing significant volumes of competing, lower-priced generic oxamyl products. Corteva's conduct effectively reversed the initial gains generic manufacturers made in selling crop-protection products containing oxamyl. Generic sales volumes plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices.

93.    Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of oxamyl products. After Corteva placed oxamyl into its loyalty program distributors began managing their compliance with the oxamyl loyalty threshold, and drastically curtailed their purchases of generic oxamyl. Loyalty-program constraints have thus prevented distributors from purchasing more than minimal amounts of generic oxamyl (or in some cases, any at all) despite generic products being of sufficient quality and supply

availability.

94.     Corteva's prices are significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing oxamyl than would prevail in a competitive market.

95.     ***Acetochlor***. Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane.

96.     The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the U.S. registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties.

97.     Both the relevant patent protection for acetochlor and the exclusive-use period under FIFRA have expired.

98.     Under its loyalty program, Corteva has made exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic acetochlor products.

99.     Corteva's loyalty program has substantially impeded generic manufacturers from providing effective competition in the sale of acetochlor products to Arkansas farmers. As a result of the incentives created by Corteva's loyalty program, distributors strictly manage compliance with the acetochlor loyalty thresholds by limiting and/or outright refusing to purchase acetochlor products from generic manufacturers. Loyalty-program constraints have prevented distributors

from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

100.    Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. Corteva's loyalty program has deterred generic manufacturers from introducing acetochlor products in the United States or from offering innovative new products.

101.    Corteva's prices remain significantly above competitive levels. Corteva's loyalty program has resulted in higher prices for crop-protection products containing acetochlor than would prevail in a competitive market.

## VI.    DEFENDANTS' MARKET AND MONOPOLY POWER

102.    The evidence demonstrates that at all times relevant to this Complaint, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, metolachlor, and with respect to crop-protection products containing those Relevant AIs.

103.    The evidence also demonstrates that at all times relevant to this Complaint, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, and with respect to crop-protection products containing those Relevant AIs. At all times relevant to this Complaint, Corteva has had market power with respect to acetochlor and with respect to crop-protection products containing acetochlor.

104.    Direct evidence of each Defendant's monopoly and market power includes each Defendant's ability to price Relevant AIs and crop-protection products containing those Relevant AIs above competitive levels, and to exclude competition

from generic manufacturers through operation of its loyalty program.

105.   Each Defendant's monopoly and market power is also shown through circumstantial evidence, including dominant or substantial market shares in relevant markets with substantial barriers to entry.

106.   For the purposes of assessing the competitive effects of Defendants' conduct, each relevant market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor: (a) a relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and (b) a relevant product market(s) also exists that is no broader than EPA registered crop-protection products for sale in the United States that contain the active ingredient.

107.   As to each Relevant AI, allegations herein relating to product markets, including market share and foreclosure allegations, apply to both sets of product markets described above. As used herein, the term "Relevant Market" refers to each of the markets described above.

108.   For each Relevant AI, absent the restraints imposed by Syngenta's or Corteva's loyalty programs, unconstrained competition from generic crop-protection product manufacturers would have a significant and non-transitory downward effect on prices in the applicable Relevant Market.

109. Each Relevant AI has particular characteristics and uses that differentiate it from other active ingredients.

(a)   ***Azoxystrobin***. Azoxystrobin can be used across all major row crops, which simplifies pesticide management. Syngenta also claims that azoxystrobin has growth-enhancing effects not proven in other active ingredients.

(b)   ***Mesotrione***. Compared to other similar herbicide active ingredients mesotrione has superior efficacy and crop safety, and a low use rate.

(c)   ***Metolachlor***. Compared to other, similar herbicide active ingredients, metolachlor has superior water solubility, and so tends to perform better in dry conditions. Metolachlor also outperforms other active ingredients in warmer conditions, is more "crop friendly," and can be used on a broader spectrum of crops.

(d)   ***Rimsulfuron***. Compared to other, similar herbicide active ingredients, rimsulfuron can be used on a broader range of crops, controls a wider spectrum of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate. Further, rimsulfuron is inexpensive to produce compared to other, similar herbicide active ingredients.

(e)   ***Oxamyl***. Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the

root level or mixed into the soil. Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

      (f)    ***Acetochlor***. Compared to other similar, herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions. Acetochlor also tends to have better weed control early in the growing season and is more effective against certain weed species.

110.   For each Relevant AI, other active ingredients are not close enough substitutes to prevent Syngenta or Corteva from maintaining prices of crop-protection products containing the Relevant AI above competitive levels.

111.   The relevant geographic market as to all products is the United States. Crop-protection products are largely sold and regulated on a nationwide basis and because the EPA must approve and register all crop-protection products prior to sale or distribution in the United States, Arkansas farmers may not lawfully use crop-protection products manufactured and labeled for use outside the United States.

112.   There are substantial barriers to entry into each Relevant Market. Entry is difficult, costly, and time-consuming. Potential generic manufacturers face significant capital, technical, regulatory, and legal barriers. Those barriers include obtaining registration from the EPA, developing manufacturing processes, sourcing active ingredients, and paying data compensation costs to the initial active ingredient registrant. Additionally, Syngenta's and Corteva's use of loyalty programs impose a substantial barrier to entry by limiting generic manufacturers' access to the traditional distribution channel.

113.   Syngenta has maintained dominant shares of the U.S. Relevant Markets for azoxystrobin, mesotrione, and metolachlor.

114.   Corteva has maintained dominant shares of the U.S. Relevant Markets for rimsulfuron and oxamyl.

115.   Corteva has maintained a substantial share of the U.S. Relevant Market for acetochlor.

## VII.   EACH DEFENDANT'S CONDUCT HAS HARMED COMPETITION AND CONSUMERS

116.   Through operation of its so-called "loyalty program," each Defendant has harmed competition and consumers, including Arkansas consumers. Each Defendant has also harmed competition through other anticompetitive conduct deployed in conjunction with loyalty programs. Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from the applicable Relevant Markets, has caused generic competitors to exit the applicable Relevant Markets or to abandon plans to enter, and has significantly impaired the competitiveness of generic competitors that have been able to enter. Each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and choice for farmers in the applicable Relevant Markets.

117.   Each Defendant's anticompetitive conduct may substantially lessen competition or tend to create or maintain monopolies in the Relevant Markets.

118.   Each Defendant's anticompetitive conduct has harmed competition and end-consumers—including Arkansas farmers—both within and outside the applicable Relevant Markets.

119.   Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

120.   Each Defendant's unlawful conduct is ongoing. Each Defendant continues to operate its loyalty program, including by enforcing loyalty thresholds and making exclusion payments to distributors and retailers for meeting these thresholds. Absent injunctive relief by this Court, each Defendant will likely continue to harm competition and the public interest.

A.    **Each Defendant's Unlawful Conduct Has Substantially Foreclosed Generic Manufacturers from Each Applicable Relevant Market**

121.   A seller can harm competition and consumers in circumstances such as those present here by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution services.

122.   The most efficient channel of distribution for each Relevant Market is the traditional distribution channel. Each Defendant's so-called "loyalty program" has almost entirely foreclosed generic manufacturers from access to the traditional channel. With respect to each Relevant Market, this exclusion of generic competitors from the traditional channel has harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

123.   By excluding generic competitors from the traditional channel, each

Defendant's loyalty program has foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all crop-protection product sales are made through the traditional channel (over 90%), a high proportion of the traditional channel participates in Defendants' loyalty programs, and Defendants' loyalty programs have high market share thresholds. Thus, each Defendant's program has effectively foreclosed generic competitors from a substantial percentage of each applicable Relevant Market.

124. Generic manufacturers of crop-protection products containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Markets for the last five years.

125. A seller's program of offering and providing exclusion payments to distributors can foreclose equally efficient competitors from the market and harm competition in circumstances such as those present here. This is true even when distributors do not agree or otherwise commit, in advance, to meet the share threshold that the seller specifies as a condition to payment. The prospect of receiving a payment—as well as the prospect of other profit opportunities associated with the market-wide exclusion of generics—can, in circumstances such as those present here, serve as a sufficient incentive to induce distributors to participate in the program and to limit or forgo purchases from competitors.

126. Distributors adhere to Defendants' loyalty-program thresholds in significant part due to the prospect of receiving substantial payments under these programs. In addition, structural features of each Defendant's loyalty program

promote adherence. Taken together with Defendants' strict enforcement efforts, Defendants' loyalty programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers. Distributors' incentive to comply with loyalty-program thresholds is enhanced by the fact that substantially all major distributors participate in the programs. The Defendants know distributors profit more when prices to retailers and farmers are higher, and the distributors' collective participation in the loyalty programs has the effect of maintaining higher prices to retailers and farmers.

127.   A seller's program of offering and providing exclusion payments to distributors can benefit the participating distributors and harm end-consumers (Arkansas farmers), including by enabling distributors to retain exclusion payments, in circumstances such as those present here. There are several scenarios in which distributors will not pass on exclusion payments to end-consumers. There are also various means by which a seller can—and each Defendant does—discourage distributors from passing on exclusion payments to end-consumers.

128.   The "loyalty-program's" complexity, lack of transparency to farmers and generic manufacturers, and deferred payment timing aid distributors in retaining exclusion payments as profit rather than passing them on to Arkansas farmers in the form of reduced downstream pricing.

129.   A seller's program of offering and providing exclusion payments to distributors can, in circumstances such as those present here, exclude equally efficient competitors from the market and harm competition even when the seller's

net price for the product, after accounting for the payments, is not below the seller's cost of producing the product.

130.   As a result of Defendants' respective loyalty programs, distributors have severely limited their purchase, promotion, and sale of generic crop-protection products containing each applicable Relevant AI. To meet applicable loyalty thresholds, distributors have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward Defendants' branded products.

131.   As a result of Defendants' respective loyalty programs, distributors have declined to buy more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under Defendants' respective loyalty programs. This unwillingness is caused by the limited open space available under the applicable Syngenta or Corteva loyalty program. According to one generic manufacturer, this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements. In contrast, when selling products containing active ingredients that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all of their sales through traditional-channel distributors.

132.  With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva loyalty program, generic manufacturers would make significantly more sales to distributors, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit Arkansas farmers.

133.  In the absence of Defendants' respective loyalty programs, sales of generic crop-protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs. Arkansas farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

134.  In the applicable Relevant Markets (azoxystrobin, mesotrione, and metolachlor), Syngenta has added an additional layer of foreclosure to that created by its distributor program through its retail loyalty program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

**B.    Each Defendant's Unlawful Conduct Has Prevented Generic Entry and Expansion and Caused Generic Exit**

135.  Each Defendant's so-called "loyalty program" has prevented, delayed, and diminished entry and expansion by generic manufacturers of crop-protection products containing applicable Relevant AIs, and caused generic exit as to products

containing applicable Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

136.   Multiple generic manufacturers that have assessed the competitive landscape and evaluated whether to enter a particular Relevant Market have concluded that entry is not economically feasible due to the artificial constraints created by applicable Syngenta or Corteva loyalty programs.

137.   In some cases, Syngenta's or Corteva's loyalty program has caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product or stop offering a product containing the Relevant AI altogether.

138.   In the absence of Defendants' respective loyalty programs, generic manufacturers would compete more effectively for more sales in each Relevant Market.

## C.   Each Defendant's Unlawful Conduct Has Resulted in Fewer Innovative Products

139.   Each Defendant's so-called "loyalty program" has reduced the ability and incentive of generic manufacturers to bring new differentiated crop-protection products containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

140.   Generic manufacturers often create new active-ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-active-ingredient components of crop-protection product sales in ways that are beneficial to farmers.

141.    Because of the barriers to entry created by Syngenta's and Corteva's respective loyalty programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. Likewise, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using active ingredients that are subject to either Defendant's loyalty program.

142.    In the absence of Defendants' respective loyalty programs, there would be more innovative products from generic manufacturers in the applicable Relevant Markets, leading to more farmer choice.

### D.    Each Defendant's Unlawful Conduct Has Resulted in Supracompetitive Prices

143.    Each Defendant's loyalty program has resulted in higher prices to retailers and farmers for crop-protection products containing applicable Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion with access to efficient distribution would otherwise impose on prices in markets for crop-protection products containing Relevant AIs.

144.    Generic crop-protection products are generally priced lower than branded equivalents, and as to each Relevant AI, Arkansas farmers pay more for crop-protection products containing these active ingredients because the applicable loyalty program artificially limits the availability of lower-priced generic alternatives. In many cases, Arkansas farmers must buy the more expensive, branded product because that is what is available and/or what is promoted by the

traditional distribution channel, and not because that is what they prefer. Defendants' loyalty programs thus result in unmet and unrealized demand for lower-priced equivalent generic products.

145.   When generic manufacturers are able to access the market for an active ingredient, they put downward pressure on the prices of branded products containing that active ingredient, and exert more pressure as the access achieved increases. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the active ingredient, including higher-end mixture products. Defendants' loyalty programs, however, inhibit generic manufacturers' ability to access relevant markets and thus limit downward pricing pressure from generic competition.

146.   Even where generic manufacturers enter and sell at low prices to distributors, Defendants' loyalty programs result in higher prices to Arkansas farmers by limiting the amount of generic product available. This in turn enables distributors or retailers to price generic products just under branded products and to maintain branded prices, thus preventing the full benefits of generic price competition from flowing to farmers.

147.   In countries where loyalty programs for crop-protection products do not exist, generic manufacturers have been able to compete more effectively and farmers pay correspondingly lower prices.

148.   Even where generic manufacturers have been able over time to enter a given Relevant Market and have provided some measure of price competition,

Defendants' loyalty programs have limited the effects of this competition. Defendants' respective price responses, and responses of prices more generally in the applicable Relevant Market, have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

## VIII.   EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

149.    Any applicable statute of limitations for the State has been tolled with respect to any claims and rights of action that the State has as a result of the unlawful combination and conspiracy, anticompetitive conduct, and illegal monopolistic conduct alleged herein. Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy, anticompetitive conduct, and illegal monopolistic conduct.

150.    The State was not placed on actual or constructive notice of Defendants' illegal monopolistic conduct, anticompetitive conduct, and the conspiracy alleged herein until, at the earliest, when the FTC filed its complaint on September 29, 2022. Specifically, the FTC's complaint set forth the findings of its ongoing investigation into the Defendants and made public, allegations that Defendants' loyalty programs restrained competition and caused higher prices, among other harms. Defendants effectively, affirmatively, and fraudulently concealed their unlawful conduct from the State.

151.    Defendants maintain and enforce strict confidentiality provisions in agreements with distributors that describe loyalty programs. Distributors' contracts also contain strict confidentiality provisions, prohibiting the disclosures of prices

retailers pay to wholesalers for crop-protection products.

152.   Accordingly, the State had virtually no visibility into Defendants' loyalty programs, or their unlawful conduct expressly designed to maintain supracompetitive crop-protection product prices and inflated market shares.

## CLAIMS FOR RELIEF

### COUNT I
### UNLAWFUL CONDITIONING OF PAYMENTS
### IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

153.   The State restates, realleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

154.   Each Defendant has provided payments in the form of rebates in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms. This conduct may substantially lessen competition or tend to create monopolies in each applicable Relevant Market, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

155.   The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as, enjoining Defendants from engaging in similar conduct in the future.

### COUNT II
### UNREASONABLE RESTRAINTS OF TRADE
### IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

156.   The State restates, realleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

157.    Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms and/or participation in "loyalty programs" are unreasonable restraints of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

158.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and distributors did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for crop-protection products containing the Relevant AIs principally but not exclusively, by designing and enforcing loyalty programs that prevented and continue to prevent competing generic manufacturers from entering the market and/or efficiently distributing their products.

159.    Defendants' agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms artificially raise, fix, maintain, and/or stabilize prices for crop-protection products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

160.    Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms has had the following effects, among others:

(a) Price competition in the sale of crop-protection products has been restrained, suppressed, and/or eliminated throughout the United States,

including Arkansas;

(b) Prices for crop-protection products sold by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States, including Arkansas; and

(c) Consumers, including Arkansas farmers, who purchased Defendants' crop-protection products have been deprived of the benefits of free and open competition.

161.    Consumers, including Arkansas farmers, who purchased crop-protection products have been injured and damaged, and will continue to be injured and damaged, in their business by having paid more for crop-protection products than they would have paid and will pay in the absence of Defendants' loyalty programs.

162.    The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as, enjoining Defendants from engaging in similar conduct in the future.

### COUNT III
### UNLAWFUL MONOPOLIZATION
### IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

163.    The State restates, realleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

164.    At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, metolachlor, and mesotrione.

165.    At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for rimsulfuron and oxamyl.

166.    Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct—including (i) entering and maintaining agreements with distributors and retailers that contain loyalty requirements; (ii) enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties for disloyalty; and (iii) providing "rebates" for the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in all applicable Relevant Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

167.    The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as, enjoining Defendants from engaging in similar conduct in the future.

### COUNT IV
### VIOLATIONS OF THE ARKANSAS UNFAIR PRACTICES ACT
### (MONOPOLIES GENERALLY, ARK. CODE ANN. § 4-75-301, *et seq.*)

168.    The State restates, realleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

169.    The State represents itself and all natural persons residing in the State through its *parens patriae* authority and seeks relief for both herein.

170.    Each Defendant's acts as alleged herein constitute an unlawful monopoly or attempt to monopolize trade or commerce in Arkansas in violation of the AUPA, Monopolies Generally, Ark. Code Ann. § 4-75-301, *et seq*.

171.    Defendants' agreements with distributors and retailers, as alleged herein, for the sale of crop-protection products that condition exclusion payments on

compliance with "loyalty" are in violation of the AUPA, Monopolies Generally, Ark. Code Ann. § 4-75-301, *et seq.*

172.    Defendants' acts as alleged herein, allowed them to maintain and use their monopoly power to regulate or fix prices of crop-protection products through a course of anticompetitive and exclusionary conduct to maintain the price of crop-protection products in violation of the AUPA, Monopolies Generally, Ark. Code Ann. § 4-75-301, *et seq.*

173.    These violations directly and/or indirectly injured the State and its citizens. Accordingly, the State, on behalf of it itself and *parens patriae* for all citizen within the state, seeks all relief available under the AUPA.

174.    The State is entitled to and seeks relief, including a permanent injunction, actual damages, restitution, and civil penalties on behalf of the State, and actual damages and restitution on behalf of all natural persons residing in the state as *parens patriae* under the AUPA, Ark. Code Ann. § 4-75-301, *et seq.*

## COUNT V
## VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICE ACT
### (ARK. CODE ANN. § 4-88-101, *et seq.*)

175.    The State restates, realleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

176.    The State represents the state and all natural persons residing in the state.

177.    Defendants' acts as alleged herein violate, and the State is entitled to relief, under the Arkansas Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101,

*et seq.*

178.    The crop-protection products described herein are "goods" as defined under Ark. Code Ann. § 4-88-102(4).

179.    Defendants are "person[s]" as defined under Ark. Code Ann. § 4-88-102(5). The State of Arkansas is a "person" as defined under Ark. Code Ann. § 4-88-102(5).

180.    The selling of crop-protection products are "services" as defined under Ark. Code Ann. § 4-88-102(7).

181.    Defendants' actions alleged herein constitute deceptive and unconscionable trade practices, in violation of Ark. Code Ann. § 4-88-107(10).

182.    Defendants' have engaged, and continue to engage in unconscionable, false, and deceptive acts and practices in business, commerce, and trade by maintaining and using its monopoly power through a course of anticompetitive and exclusionary conduct, including (a) entering and maintaining agreements with distributors and retailers for the sale of crop-protection products that conditioned exclusion payments on loyalty, (b) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty, and (c) providing "rebates" for the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in all applicable Relevant Markets; in violation of Ark. Code Ann. § 4-88-107(10).

183.    Defendants' acts constitute deceptive and unconscionable trade practices as they affected, fixed, controlled, and maintained artificially high market

price for crop-protection products and allowed Defendants to control and maintain dominate market share, all which caused ascertainable losses to the State and Arkansas farmers.

184.    Defendants' unconscionable and deceptive acts and practices were likely to, and, did in fact, deceive reasonable Arkansas consumers.

185.    The State seeks a permanent injunction prohibiting Defendants from engaging in any deceptive and unlawful practices under Ark. Code Ann. § 4-88-104 and § 4-88-113(a)(1).

186.    The State seeks an order suspending or forfeiting Defendants' franchises, corporate charters, or other licenses, permits, or authorizations to do business in the State under Ark. Code Ann. § 4-88-113(b).

187.    But for Defendants' deceptive and unconscionable trade practices, the State and its consumers would not have expended millions of dollars on supracompetitive priced crop-protection products. As a direct and proximate cause of Defendants' conduct, Arkansas consumers have suffered ascertainable losses, for which restitution is required, along with other relief under Ark. Code Ann. § 4-88-113(a)(2)(A).

188.    As a direct and proximate result of Defendants' violations, the State is entitled to civil penalties of up to $10,000 for each violation resulting from Defendants' unlawful conduct, along with investigation and litigation costs, expenses for expert witnesses, and attorney's fees and costs under Ark. Code Ann. § 4-88-113(a)(3) and (e).

189.    As a direct and proximate result of Defendants' conduct, Defendants are directly and jointly and severally liable to the State for all damages and civil penalties, the recovery of which is sought herein.

## PRAYER FOR RELIEF

**WHEREFORE**, the State of Arkansas, *ex rel.* Leslie Rutledge, Attorney General, prays for entry of judgment against the Defendants for all the relief requested herein and to which the State may otherwise be entitled, specifically, but without limitation as follows:

A.    The Court determine that Defendants' conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14;

B.    The Court determine that Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    The Court determine that Defendants' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.    The Court determine that Defendants' conduct violates the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, *et seq.*;

E.    The Court determine that Defendants' conduct violates the Arkansas Deceptive Trade Practice Act, Ark. Code Ann. § 4-88-101, *et seq.*;

F.    That each Defendant is permanently enjoined from engaging in its unlawful conduct;

G.    That each Defendant is permanently enjoined from engaging in similar and related conduct in the future as to all crop-protection products and active ingredients;

H.    The State shall recover all actual damages and/or restitution that may be owed to the State and its consumers affected by Defendants' conduct, pursuant to the AUPA, Ark. Code Ann. § 4-75-315(a) and (b);

I.    Require Defendants to pay all restitution that may be owed to Arkansas consumers affected by Defendants' unlawful acts and practices, pursuant to Ark. Code Ann. § 4-88-113(a)(2)(A);

J.    Impose civil penalties to be paid to the State by Defendants in the amount of up to $10,000 for each violation of the ADTPA proved at a trial of this matter, pursuant to Ark. Code Ann. § 4-88-113(a)(3);

K.    Suspend or revoke Defendants' authorization to do business in the State of Arkansas, pursuant to Ark. Code Ann. § 4-88-113(b);

L.    The State shall recover all of the State's costs in its investigation and litigation, including but not limited to, expert witness fees and attorney's fees and costs, pursuant to Ark. Code Ann. § 4-88-113(e), and other state laws;

M.    The State shall be awarded restitution, damages, disgorgement, penalties and all other legal and equitable monetary remedies available under the state laws set forth in this Complaint and the general equitable powers of this Court in an amount according to proof;

N.    The State shall be awarded punitive damages as Defendants are liable for compensatory damages and Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably result in injury or damage and that Defendants continued the conduct with malice or reckless disregard of the consequences, pursuant to Ark. Code Ann. § 16-55-206;

O.    The State shall be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint; and;

P.    The State shall be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances;

## **DEMAND FOR JURY TRIAL**

The State demands a trial by jury on all causes of action so triable.

Respectfully submitted,

**LESLIE RUTLEDGE**
**ATTORNEY GENERAL**

By *W. Lawrence Deas*
W. Lawrence Deas
Liston & Deas, PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157-8659
Telephone: (601) 981-1636
lawrence@listondeas.com

Amanda J. Wentz, ABN 2021066
**Assistant Attorney General**
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 682-1178
Facsimile: (501) 682-8118
amanda.wentz@Arkansasag.gov