# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| STATE OF ARKANSAS, *ex rel.* TIM GRIFFIN, ATTORNEY GENERAL, | |
| *Plaintiff*, | |
| vs. | Case No. 4:22-cv-1287-BSM |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., | |
| *Defendants*. | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................4

    A.    The Parties ...........................................................................................4

    B.    The Crop Protection Industry................................................................5

    C.    Defendants' Rebate Programs ...............................................................7

    D.    Relevant AIs.........................................................................................8

           1.    Syngenta AIs ...........................................................................8

           2.    Corteva AIs .............................................................................8

    E.    Supply Agreements Between Syngenta and Corteva...............................9

PLEADING STANDARDS.......................................................................................9

    A.    Lack of Personal Jurisdiction ................................................................9

    B.    Improper Venue ...................................................................................9

    C.    Failure to State a Claim......................................................................10

ARGUMENT .......................................................................................................10

I.       THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS .............10

    A.    The Clayton Act Does Not Authorize
         Personal Jurisdiction Over Any Defendant.........................................11

           1.    Personal Jurisdiction Pursuant to Section 12
                Is Lacking Over the Syngenta Defendants.................................11

                a.    Section 12 Does Not Provide a Basis for
                      Personal Jurisdiction Over LLCs
                      Such as Syngenta Crop Protection, LLC .......................................11

                b.    Syngenta Corp. and Syngenta Crop Protection AG
                      Neither Inhabit Nor Transact Business in This District................13

           2.    Section 12 Personal Jurisdiction Is Lacking as to Corteva ........17

    B.    This Court Lacks Personal Jurisdiction Over Defendants
         Under Arkansas' Long-Arm Statute ...................................................24

           1.    General Jurisdiction Is Lacking Over Each Defendant..............24

           2.    Specific Jurisdiction Is Lacking Over Each Defendant .............25

i

II.    VENUE DOES NOT LIE IN THIS DISTRICT FOR DOMESTIC DEFENDANTS.......28

    A.    Venue Does Not Lie Under Section 12 of the Clayton Act...................................28

    B.    Venue Does Not Lie for Domestic
        Defendants Under the General Venue Statute .......................................................28

III.    THE AMENDED COMPLAINT FAILS
    TO STATE A FEDERAL ANTITRUST CLAIM............................................................30

    A.    Plaintiff Fails to Plead Anticompetitive
        Exclusive Dealing Under the Price-Cost Test ......................................................30

        1.    Predominantly Price-Based Rebate
              Programs Are, as a Matter of Law, Procompetitive..................................30

        2.    Defendants' Rebate Programs Are
              Predominantly, if Not Exclusively, Price-Based .......................................32

        3.    Plaintiff Fails to Plead Facts Plausibly Showing a
              Market-Allocation Agreement Between Syngenta and Corteva...............35

    B.    Plaintiff Fails to Plead a Plausible Product Market .............................................37

        1.    Plaintiff Fails to Properly Plead an AI-only Relevant Market..................38

              a.    Plaintiff Fails to Properly Plead Reasonable
                     Interchangeability or to Explain the Exclusion of Well-
                     Known Alternatives ......................................................................38

              b.    Plaintiff's Allegations Also Fail Under Brown Shoe
                     and the Hypothetical Monopolist Test ("HMT")..........................45

        2.    Plaintiff Fails to Properly Plead an Alternative Relevant Market ............47

        3.    Neither Market Plausibly Accounts for
              Competitive Realities Embraced by the Amended Complaint .................49

    C.    The Federal Antitrust Claims Should Be
        Dismissed for Failure to Plead Proximate Causation ...........................................51

        1.    Legal Standards.........................................................................................53

              a.    Proximate Causation Is an Essential Element of a
                     Federal Antitrust Claim Seeking Damages *or* Injunctive
                     Relief.............................................................................................53

               b.    Proximate Causation Requires a Direct Injury ..............................55

        2.    Plaintiff's Failure to Plead Proximate Causation Is
               Fatal to Its Claims Under the Federal Antitrust Statutes ..........................56

               a.    Plaintiff Sues on Behalf of Indirect Purchasers ............................56

               b.    The Alleged Injuries Are Indirect and Speculative.......................57

IV. THE AMENDED COMPLAINT FAILS
TO STATE A CLAIM UNDER STATE LAW ................................................................60

 A. The Arkansas Unfair Practices Act (AUPA) Claim Fails .....................................60

  1. Subsection 309 Is Limited to Horizontal Agreements ..............................61

  2. Subsection 309 Is Limited to
Agreements That Fix Price or Restrict Output ..........................................63

  3. Subsection 309 Requires the Plaintiff to
Define a Plausible Product Market ............................................................65

  4. Defendants Lack the "Predatory Intent to Damage and
Destroy Competition" Necessary to Violate Arkansas Law......................65

  5. Defendants' Alleged Conduct Does Not Exceed
the Defendants' Common-Law Privilege to Compete...............................66

 B. The Arkansas Deceptive Trade Practices Act Claim Fails ...................................67

CONCLUSION...........................................................................................................................68

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Acre v. Spindletop Oil & Gas Co.*,
 2009 WL 4016116 (E.D. Ark. Nov. 18, 2009) ........................................................ 66

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
 592 F.3d 991 (9th Cir. 2010) ................................................................................... 33

*Alpha Shoe Serv. v. Fleming Cos.*,
 849 F.2d 352 (8th Cir. 1988) ................................................................................... 58

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
 585 U.S. 33 (2018) .................................................................................................... 62

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019) ....................................................................................... 52, 55

*Ark. Parole Bd. v. Johnson*,
 2022 Ark. 209, 654 S.W.3d 820 ............................................................................... 61

*Armco Steel Co., L.P. v. CSX Corp.*,
 790 F. Supp. 311 (D.D.C. 1991) ....................................................................... 15, 23

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ................................................................... 10, 17, 34, 65

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
 459 U.S. 519 (1983) ........................................................................................... 52, 60

*Atl. Richfield Co. v. USA Petroleum Co.*,
 495 U.S. 328 (1990) .................................................................................................. 31

*Audio Car Stereo, Inc. v. Little Guys, Inc.*,
 2004 WL 3019298 (N.D. Ill. Dec. 28, 2004) .......................................................... 63

*BankAmerica Corp. v. United States*,
 462 U.S. 122 (1983) .................................................................................................. 12

*Banks v. Jones*,
 239 Ark. 396, 390 S.W.2d 108 (1965) ..................................................................... 16

*Beam v. Monsanto Co.*,
 259 Ark. 253, 532 S.W.2d 175 (1976) ..................................................................... 60

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................... 10, 36, 37

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
    582 U.S. 255 (2017) ............................................................. 26

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ......................................................... 30, 31

*Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*,
    42 F.4th 948 (8th Cir. 2022) ............................... 9, 24, 25, 26

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...............................................37, 38, 39, 45

*Bruner v. Republic Acceptance Corp.*,
    191 F. Supp. 200 (E.D. Ark. 1961) .............................. 10, 13, 19

*B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*,
    439 F.3d 653 (10th Cir. 2006) ........................................... 54

*Burlington Indus., Inc. v. Maples Indus., Inc.*,
    97 F.3d 1100 (8th Cir. 1996) ............................................ 27

*Campanelli v. Image First Unif. Rental Serv. Inc.*,
    2016 WL 4729173 (N.D. Cal. Sept. 12, 2016) ................... 17

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) ........................................... 56

*In re Canadian Imp. Antitrust Litig.*,
    470 F.3d 785 (8th Cir. 2006) ............................................ 54

*Cargill, Inc. v. Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) .................................................... 54, 65

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ............................................ 32

*Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*,
    2012 WL 511485 (W.D. Ark. Feb. 15, 2012) ..................... 65

*Cohen v. Newsweek, Inc.*,
    312 F.2d 76 (8th Cir. 1963) .............................................. 10

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ...................................... 32, 33

*Cooper Realty Invs., Inc., v. Ark. Contractors Licensing Bd.*,
    355 Ark. 156, 134 S.W.3d 1 (2003) .................................. 60

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) .................................................... 24, 25

*Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C.*,
   994 F. Supp. 1078 (S.D. Iowa 1998) ................................................. 44

*Dever v. Hentzen Coatings, Inc.*,
   380 F.3d 1070 (8th Cir. 2004) ........................................................ 9

*Dickinson v. SunTrust Mortg., Inc.*,
   2015 WL 1868827 (E.D. Ark. Apr. 23, 2015) ................................ 67, 68

*Doshier v. Twitter, Inc.*,
   417 F. Supp. 3d 1171 (E.D. Ark. 2019) ......................................... 29

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
   136 F.3d 554 (8th Cir. 1998) ...................................................... 37, 38

*DSM Desotech Inc. v. 3D Sys. Corp.*,
   749 F.3d 1332 (Fed. Cir. 2014) ................................................... 39

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) .................................................................. 30, 31

*Eisai Inc. v. Sanofi-Aventis U.S., LLC*,
   2014 WL 1343254 (D.N.J. Mar. 28, 2014), *aff'd*, 821 F.3d 394 (3d Cir. 2016) ................. 8

*Empire Merchs., LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018) ....................................................... 53

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
   44 F.4th 959 (10th Cir. 2022) .................................................... 31, 34

*Epps v. Stewart Info. Servs. Corp.*,
   327 F.3d 642 (8th Cir. 2003) ..................................................... 15, 16

*Everett v. Dykes*,
   2021 WL 4148068 (E.D. Ark. Sept. 13, 2021) ............................... 10

*Fitzgibbons v. Hill-Rom Co.*,
   2012 WL 12548936 (D.S.D. June 28, 2012) ................................. 9

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) ................................................................. 25

*FTC v. BINT Operations LLC*,
   595 F. Supp. 3d 740 (E.D. Ark. 2022) ........................................ 9

*FTC v. Sanford Health*,
   926 F.3d 959 (8th Cir. 2019) ..................................................... 45

*FTC v. Staples*,
   970 F. Supp. 1066 (D.D.C. 1997) .............................................. 48

*FTC v. Syngenta Crop Prot. AG,*
 2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ................................................ *passim*

*FTC v. Sysco Corp.,*
 113 F. Supp. 3d 1 (D.D.C. 2015) ........................................................... 46

*Ft. Smith Light & Traction v. Kelley,*
 94 Ark. 461, 127 S.W. 975 (1910) ............................................. 62, 63, 64

*Ginsburg v. InBev NV/SA,*
 623 F.3d 1229 (8th Cir. 2010) ................................................... 56, 57, 58

*Gomillion v. Univ. of Ark. for Med. Scis.,*
 2016 WL 183654 (E.D. Ark. Jan. 14, 2016) ........................................ 65

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.,*
 392 U.S. 481 (1968) .......................................................................... 59

*Health Care Equalization Comm. of Iowa Chiropractic Soc. v. Iowa Med. Soc.,*
 501 F. Supp. 970 (S.D. Iowa 1980), *aff'd sub nom. Health Care Equalization Comm. of the Iowa Chiropractic Soc. v. Iowa Med. Soc.,* 851 F.2d 1020 (8th Cir. 1988) ......................... 19

*Hemi Grp., LLC v. City of New York, N.Y.,*
 559 U.S. 1 (2010) ............................................................................ 54

*Hicks v. PGA Tour, Inc.,*
 897 F.3d 1109 (9th Cir. 2018) ............................................................ 46

*Holmes v. SIPC,*
 503 U.S. 258 (1992) ......................................................................... 55

*Ill. Brick Co. v. Illinois,*
 431 U.S. 720 (1977) ......................................................................... 52

*Inline Packaging, LLC v. Graphic Packaging Int'l, LLC,*
 351 F. Supp. 3d 1187 (D. Minn. 2018)................................................. 32

*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee,*
 456 U.S. 694 (1982) ........................................................................22

*Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.,*
 196 F.3d 818 (7th Cir. 1999) ............................................................. 55

*It's My Party, Inc. v. Live Nation, Inc.,*
 811 F.3d 676 (4th Cir. 2016) ............................................................. 51

*Joe v. Union Pac. R.R.,*
 2021 WL 4200878 (E.D. Ark. Sept. 15, 2021) ...................................... 25

*JS Ints., Inc. v. John Hafner & Assocs.,*
 2017 WL 5653873 (E.D. Ark. Feb. 10, 2017) ....................................... 10

vii

*Kansas v. UtiliCorp United, Inc.*,
  497 U.S. 199 (1990) ................................................................................ 55

*Kinco, Inc. v. Schueck Steel, Inc.*,
  283 Ark. 72, 671 S.W.2d 178 (1984) ............................................... 66, 67

*Kingsepp v. Wesleyan Univ.*,
  763 F. Supp. 22 (S.D.N.Y. 1991) ............................................................ 12

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) .................................................................. 56

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
  725 F.3d 718 (7th Cir. 2013) ................................................................. 13

*Krantz v. Bloomberg L.P.*,
  2022 WL 2102111 (C.D. Cal. Jan. 19, 2022) ......................................... 17

*Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*,
  2022 WL 16635130 (E.D. Ark. Nov. 2, 2022) ....................................... 67

*Lawson v. Simmons Sporting Goods, Inc.*,
  2019 Ark. 84, 569 S.W.3d 865 ............................................................... 11

*LePage's Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ................................................................... 33

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ..................................................................... 52, 53, 55

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) ....................................................... *passim*

*London Luxury, LLC v. Walmart, Inc.*,
  2024 WL 1025125 (W.D. Ark. Mar. 8, 2024) ........................................ 68

*Lovett v. GM Corp.*,
  975 F.2d 518 (8th Cir. 1992) .................................................................. 55

*Lyons v. Philip Morris Inc.*,
  225 F.3d 909 (8th Cir. 2000) ............................................................ 54, 58

*Mahaska Bottling Co. v. PepsiCo Inc.*,
  271 F. Supp. 3d 1074 (S.D. Iowa 2017) ................................................ 43

*Martin v. U.S. EEOC*,
  19 F. Supp. 3d 291 (D.D.C. 2014) ......................................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .......................................................................... 30, 31

*McAvoy v. Tex. E. Transmission Corp.*,
    185 F. Supp. 784 (W.D. Ark. 1960) ...................................................................19

*McDonald v. Johnson & Johnson*,
    722 F.2d 1370 (8th Cir. 1983) .......................................................................... 55

*McDowell v. UPS, Inc.*,
    2022 WL 17543352 (W.D. Ark. Dec. 8, 2022) .................................................. 25

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) .......................................................................... 33

*Midwest Commc'ns v. Minn. Twins, Inc.*,
    779 F.2d 444 (8th Cir. 1985) ............................................................................ 55

*MNG 2005, Inc. v. Paymentech, LLC*,
    2020 WL 6582660 (E.D. Mo. Nov. 9, 2020)......................................................18

*Monsanto Co. v. Spray–Rite Serv. Corp.*,
    465 U.S. 752 (1984) ......................................................................................... 36

*Morgan v. Ponder*,
    892 F.2d 1355 (8th Cir. 1989) .......................................................................... 66

*Moyer v. Jackson*,
    2023 WL 5417828 (D. Minn. Aug. 2, 2023)......................................................22

*Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n, Inc.*,
    498 F. Supp. 510 (D. Md. 1980) ................................................................ 15, 22

*Newbauer v. Jackson Hewitt Tax Serv. Inc.*,
    2019 WL 1398172 (E.D. Va. Mar. 28, 2019) ................................................... 28

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................................... 12

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ........................................................................... 32

*Office Machs., Inc. v. Mitchell*,
    95 Ark. App. 128, 234 S.W.3d 906 (2006) ...................................................... 66

*Orange Theatre Corp. v. Rayherstz Amusement Corp.*,
    139 F.2d 871 (3d Cir. 1944) ............................................................................. 12

*In re Packaged Seafood Prod. Antitrust Litig.*,
    2020 WL 2747115 (S.D. Cal. 2020) ................................................................ 27

*Pangaea, Inc. v. Flying Burrito LLC*,
    647 F.3d 741 (8th Cir. 2011) ............................................................................ 11

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ................................................. 44

*Porous Media Corp. v. Pall Corp.*,
   186 F.3d 1077 (8th Cir. 1999) ................................... 40, 41, 48

*Ports Petroleum Co. of Ohio v. Tucker*,
   323 Ark. 680, 916 S.W.2d 749 (1996) .......................... 60, 65

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ................................................. 38

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
   631 F.2d 10 (2d Cir. 1980) ................................................... 52

*Richards v. Aramark Servs., Inc.*,
   108 F.3d 925 (8th Cir. 1997) ................................................. 9

*Ripplemeyer v. Nat'l Grape Co-op. Ass'n, Inc.*,
   807 F. Supp. 1439 (W.D. Ark. 1992) ................................... 38

*Rush v. Savchuk*,
   444 U.S. 320 (1980) ........................................................... 14

*Sahm v. Avow Corp.*,
   2023 WL 8433158 (E.D. Mo. Dec. 5, 2023) ....................... 14

*S.D. Collectibles, Inc. v. Plough, Inc.*,
   952 F.2d 211 (8th Cir. 1991) ............................................... 58

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
   642 F.3d 608 (8th Cir. 2011) ......................................... 32, 34

*Seaboard Rice Milling Co. v. Chi., R.I. & P. Ry. Co.*,
   270 U.S. 363 (1926) ........................................................... 13

*S.F. Comprehensive Tours, LLC v. Tripadvisor, LLC*,
   2021 WL 4394253 (D. Nev. Sept. 24, 2021) ...................... 12

*Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*,
   2023 WL 7089906 (D. Colo. Oct. 26, 2023) ...................... 12

*Simpson v. Wright Med. Grp., Inc.*,
   2018 WL 1570795 (E.D. Ark. Mar. 30, 2018) .................... 16

*Skalla v. Canepari*,
   2013 Ark. 415, 430 S.W.3d 72 ........................................... 67

*Spectrum Pharms., Inc. v. Burwell*,
   824 F.3d 1062 (D.C. Cir. 2016) ........................................... 6

x

*Stahl v. U.S. Dep't of Agric.*,
    327 F.3d 697 (8th Cir. 2003) ........................................................... 41

*Steen v. Murray*,
    770 F.3d 698 (8th Cir. 2014) ........................................................... 29

*Steinbuch v. Cutler*,
    518 F.3d 580 (8th Cir. 2008) ........................................................... 16

*Stern Fish Co. v. Century Seafoods, Inc.*,
    254 F. Supp. 151 (E.D. Pa. 1966) ..................................................... 19

*Stewart v. Advanced Med. Revs., Inc.*,
    2018 WL 11446391 (E.D. Ark. Aug. 2, 2018) ...................................... 14

*Stonebridge Collection, Inc. v. Carmichael*,
    791 F.3d 811 (8th Cir. 2015) ........................................................... 68

*In re Surescripts Antitrust Litig.*,
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ................................................. 33

*United Specialty Ins. Co. v. Wheeler*,
    2023 WL 2653387 (W.D. Mo. Mar. 27, 2023) ...................................... 29

*United States v. E. I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................... 39, 42

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ....................................................................... 46

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................... 35

*United States v. Scophony Corp. of Am.*,
    333 U.S. 795 (1948) ........................................................ 13, 18, 20, 24

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ....................................................................... 63

*Vallone v. CJS Sols. Grp., LLC*,
    9 F.4th 861 (8th Cir. 2021) ............................................................. 25

*Verma v. Jefferson Hosp. Ass'n*,
    2007 WL 4468689 (E.D. Ark. Dec. 17, 2007) ...................................... 65

*Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*,
    646 F.3d 589 (8th Cir. 2011) ..................................................... 15, 16

*Walden v. Fiore*,
    571 U.S. 277 (2014) ................................................................. 25, 27

*Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*,
　319 Ark. 214, 891 S.W.2d 30 (1995) ......................................................... 60

*Westinghouse Elec. Corp. v. Gulf Oil Corp.*,
　588 F.2d 221 (7th Cir. 1978) .................................................................... 63

*Williams v. Emps. Mut. Cas. Co.*,
　845 F.3d 891 (8th Cir. 2017) .................................................................... 41

*World Skating Fed. v. Int'l Skating Union*,
　357 F. Supp. 2d 661 (S.D.N.Y. 2005) ....................................................... 12

*Wright v. Waste Pro USA Inc.*,
　2019 WL 3344040 (D.S.C. July 25, 2019) ............................................... 17

*Zeavision, LLC v. Bausch & Lomb Inc.*,
　2022 WL 17092453 (E.D. Mo. Nov. 21, 2022) ...................................... 11, 17, 18

*ZF Meritor, LLC v. Eaton Corp.*,
　696 F.3d 254 (3d Cir. 2012) .................................................................. 31, 33

### STATUTES & RULES

15 U.S.C. § 12(a) ........................................................................................ 12

15 U.S.C. § 15 ............................................................................................. 54

15 U.S.C. § 22 .................................................................................... *passim*

15 U.S.C. § 26 ............................................................................................. 54

28 U.S.C. § 1391 ............................................................................. 2, 28, 29

40 C.F.R. § 152.113(b) ................................................................................. 6

Ark. Code Ann. § 4-20-115 ................................................................... 21, 25

Ark. Code Ann. § 4-27-1501(a) ...................................................................21

Ark. Code Ann. § 4-75-301 *et seq.* ....................................................... 60, 61

Ark. Code Ann. § 4-75-309 ................................................................... 60, 61

Ark. Code Ann. § 4-75-310 ........................................................................ 61

Ark. Code Ann. § 4-75-319 ........................................................................ 28

Ark. Code Ann. § 4-88-107(a)(10) ...........................................................60, 67

Ark. Code Ann. § 16-4-101 ............................................................. 10, 11, 24

Ark. Code Ann. § 25-16-706 ...................................................................... 61

Fed. R. Civ. P. 9(b) ............................................................................................ 67

Fed. R. Civ. P. 12(b)(2) ...................................................................................... 9

Fed. R. Civ. P. 12(b)(3) ...................................................................................... 9

Fed. R. Civ. P. 12(b)(6) ................................................................................. 9, 10

<u>OTHER AUTHORITIES</u>

Acuron Herbicide, SYNGENTA, https://www.syngenta-us.com/herbicides/acuron)................48, 49

DOJ & FTC, Merger Guidelines (2023) ................................................ 45, 47

EPA Reg. No. 264-1066 (2020)................................................................44

EPA Reg. No. 352-768 (2020)..................................................................47

EPA Reg. No. 352-837 (2020)..................................................................47

EPA Reg. No. 352-853 (2020)..................................................................47

EPA Reg. No. 432-1604 (2020)................................................................47

EPA Reg. No. 524-614 (2015)..................................................................44

EPA Reg. No. 63588-92 (2012)................................................................43

EPA Reg. No. 89167-91 (2020)................................................................44

Keystone LA, Corteva Agriscience, https://www.corteva.us/products-and-solutions/crop protection/keystone-la.html)................................................................48

Letter from Tim Griffin, Attorney General, Arkansas, to Northrup King Seed Co., Syngenta Seeds LLC, & United Agent Group, Inc. (Oct. 17, 2023), arkansasag.gov/wp-content/uploads/2023-10-17-Syngenta-ChemChina-Enforcement-Letter.pdf ........................14

Lumax EZ Herbicide, SYNGENTA, https://www.syngenta-us.com/herbicides/lumax-ez) ............48

*In re Novartis AG, et al.*, Dkt. No. C-3979 (FTC Nov. 1, 2000) ..................................43

Op. Ark. Att'y Gen. No. 96-271 (1996) ................................................................61, 62

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (3d. ed. 2007)......................................40

Press Release, Tim Griffin, Attorney General, Arkansas, *Attorney General Griffin Collects $280,000 Fine From Chinese State-Owned Syngenta Seeds, LLC* (Nov. 9, 2023), https://arkansasag.gov/news_releases/attorney-general-griffin-collects-280000-fine-payment-from-chinese-state-owned-syngenta-seeds-llc/ ...........................................15

Realm Q, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop protection/realm-q.html)................................................................42

*United States v. Inbev NV/SA*, 73 Fed. Reg. 71,682 (DOJ Nov. 25, 2008) ...................................56

Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (together, "Syngenta" or the "Syngenta Defendants")[1] and Corteva, Inc. ("Corteva"; together with Syngenta, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint filed by the Attorney General of Arkansas on behalf of Plaintiff State of Arkansas ("Plaintiff").

## PRELIMINARY STATEMENT[2]

This lawsuit seeks to condemn Defendants' loyalty rebate programs—which offer optional price discounts for certain of Defendants' crop protection products—because Defendants' rebates have allegedly frustrated competing generic manufacturers. But rebate programs that reduce prices to above-cost levels, such as those alleged here, are ***procompetitive as a matter of law***. That Defendants' price cutting through rebates has exerted market pressures on competitors is not anticompetitive; it is the essence of competition.

Plaintiff's claims should be dismissed for six principal reasons.

*First*, there is no personal jurisdiction under Section 12 of the Clayton Act or Arkansas' long-arm statute over any Defendant. Section 12 does not apply to limited liability companies such as Syngenta Crop Protection, LLC, Corteva Agriscience, LLC and Corteva Agriscience MCS, LLC, and Plaintiff cannot otherwise avail itself of Section 12 as no Defendant is an "inhabitant" of or transacts business of a substantial and continuous nature in the Eastern District of Arkansas.

---

[1] In most places, the amended complaint does not differentiate between the three Syngenta entities, but rather refers to them together as "Syngenta." *See infra* Point I.A.1.b.

[2] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted. Citations in the form "¶ _" or "¶¶ _" refer to the amended complaint (ECF No. 72). "Ex." refers to an exhibit to Defendants' Motion to Dismiss the Amended Complaint, filed contemporaneously with this memorandum of law.

Moreover, governing Supreme Court precedent prohibits the exercise of personal jurisdiction pursuant to Arkansas' long-arm statute over any Defendant in this case.  Defendants are not "at home" in Arkansas—none is incorporated or headquartered in the State—and Plaintiff's claims do not "arise from or relate to" any alleged contacts between any Defendant and Arkansas.

*Second*, venue does not lie in this District for Plaintiff's claims against the domestic Defendants.[3]  Plaintiff invokes the venue provision of Section 12 of the Clayton Act and the general venue statute, 28 U.S.C. § 1391.  But, again, Plaintiff fails to satisfy Section 12's requirements.  And under the general venue statute, venue does not lie as to the domestic Defendants—Corteva, Inc. (including its subsidiaries, Corteva Agriscience, LLC and Corteva Agriscience MCS, LLC), Syngenta Crop Protection, LLC, and Syngenta Corp.—because none is subject to personal jurisdiction in this action and no "substantial part of the events … giving rise to the claim[s]" occurred in this District.

*Third*, Plaintiff's federal antitrust claims should be dismissed because Defendants' price cutting through market share rebates—which yields non-predatory prices—is not anticompetitive under the applicable price-cost test.  Under this test, if price is the predominant feature of allegedly exclusionary market share rebates or discounts, courts will not condemn the pricing as anticompetitive, regardless of alleged market power or purported effects, so long as the reduced prices are above cost—and thus not "predatory."  Here, Plaintiff plausibly pleads neither a non-price exclusionary feature of Defendants' rebate programs nor predatory prices.

---

[3] All Defendants except Syngenta Crop Protection AG are incorporated and headquartered within the United States.  ¶¶ 22-24, 34.

The decision by the District Court for the Middle District of North Carolina in a different lawsuit challenging Defendants' rebates **undermines** Plaintiff's claims. The North Carolina court determined that plaintiffs in that action had adequately alleged certain non-price exclusionary features of Defendants' rebate programs, which prevented the North Carolina court from concluding that the programs are procompetitive as a matter of law. But that decision rested on factual allegations of purported "coercion" of program participants that are notably **absent** from Plaintiff's complaint here. Not only does Plaintiff fail to allege facts showing that program participants were coerced to participate, the Amended Complaint affirmatively pleads that they were **independently incentivized** to do so based on their own economic self-interest.

*Fourth*, the federal antitrust claims should be dismissed for the independent reason that Plaintiff alleges legally defective product markets. Under black-letter antitrust law, claims of anticompetitive exclusion require allegations showing market power within a properly defined product market. A properly defined market must reflect commercial realities by embracing "reasonably interchangeable" substitutes in consumer use. Plaintiff's improper market definitions fail to meet this standard. In particular, Plaintiff's primary relevant market—based on a product's "active ingredient" ("AI") rather than growers' use of the product—is too narrow, because no facts are pleaded excluding pesticides containing different AIs as reasonable substitutes. Plaintiff fudges this issue by alleging that pesticides based on the same AI are **closer** substitutes—but that slippery standard, baselessly pleaded here, is not the legal test.

*Fifth*, the federal antitrust claims should be dismissed for lack of proximate causation. Proximate causation is an essential element of federal antitrust claims, regardless of whether the claims seek damages (which Plaintiff's claims do not) or seek injunctive relief (which Plaintiff's claims do). Here, there are several independent economic actors that operate between

Defendants and end users, and the "overcharges" supposedly paid by end users are passed along, if at all, ***indirectly***.  Plaintiff does not allege that the rebates restrain generic manufacturers' sales ***directly*** to the allegedly injured end users.  To the contrary, the purportedly "inflated" prices for Defendants' products faced by end users should make generic manufacturers' "lower-priced" products more attractive to those end users.  These allegations negate the essential element of proximate causation.

*Sixth*, the amended complaint fails to state a claim under Arkansas antitrust and consumer protection statutes.  Each of those statutes is a penal statute that departs from the common law, and thus Arkansas Supreme Court precedent requires that the statutes be "strictly construed" in favor of Defendants.  For multiple reasons, Plaintiff cannot overcome this hurdle.  The due process clause of the Arkansas Constitution prohibits liability for price cutting absent predatory intent to damage and destroy competition, which is not pleaded here.  Moreover, Plaintiff fails to plead one or more essential elements of each of the statutes—such as price-fixing or limiting supply, sales by Defendants within Arkansas, or a misleading consumer-oriented act by Defendants.

## BACKGROUND[4]

### A.  The Parties

Plaintiff State of Arkansas asserts its claims in its proprietary capacity and in its *parens patriae* capacity "for losses incurred and to prevent further loss by the State and all natural persons residing in the State," respectively.  ¶¶ 20-21.  As to the proprietary claims, the amended complaint does not assert that any state entity paid any overcharge, much less identify any such

---

[4] As the rules require, Defendants assume the truth of the well-pled allegations of the Plaintiff's First Amended Complaint.  Allegations cited herein are not necessarily true; Defendants reserve the right to contest them.

entity.  As to the *parens patriae* claims, the amended complaint asserts that "farmers" paid

"overcharges" for crop protection products.  ¶ 15.

The Syngenta Defendants and their affiliates are collectively involved in discovery,

research, development, manufacture, and sale of crop protection products—although Plaintiff's

amended complaint ignores differences in the way that each of the Syngenta Defendants is or is

not involved in some or all of these activities.  ¶¶ 49-50.  Corteva is separately involved in

discovery, research, development, manufacture, and sale of crop protection products.  *Id*.

Although Plaintiff has sued the Syngenta Defendants and Corteva together, the Syngenta entities

have no corporate affiliation with Corteva.

### B.  <u>The Crop Protection Industry</u>

Crop protection products are "vitally important inputs for Arkansas farmers" because

they "dramatically increase crop yields and quality."  ¶ 42.  Defendants and other manufacturers

formulate "finished" crop protection products by combining at least one active chemical—the

AI—with inert components like "water, adjuvants, surfactants, and in some cases, other Active

Ingredients[.]"  ¶ 44.  Some crop protection products, called "mixtures," contain two or more

AIs.  *Id.*  Each AI has a "mode of action," and different AIs that "share a common mode of

action tend to have similar use cases[.]"  ¶ 47.

A patent and regulatory framework governs the sale and distribution of crop protection

products in the United States.  ¶¶ 54-55.  The Federal Insecticide, Fungicide, and Rodenticide

Act "provides for a ten-year exclusivity period to the basic manufacturer for the sale and

manufacture of a new formulation of a pesticide[.]"  *Id.*

After an AI's patent and exclusivity period expire, generic manufacturers may sell

generic versions of existing products or "create new [AI] mixtures."  ¶¶ 55, 236.  Plaintiff alleges

that the regulatory scheme for crop protection products is "similar to that provided by the Hatch-

Waxman Act for pharmaceutical products." ¶ 8. Plaintiff ignores, however, the critical difference: the Hatch-Waxman Act requires generics to be "***equivalent in all material respects***" to the original patented drug, while the regulatory scheme for crop protection products does not. *Compare Spectrum Pharms., Inc. v. Burwell*, 824 F.3d 1062, 1066 (D.C. Cir. 2016) (a generic drug must be "equivalent in all material respects to the pioneer drug" to obtain FDA approval), *with* 40 C.F.R. § 152.113(b) (a generic pesticide "and its proposed use" must be "identical or substantially similar to" a registered pesticide and use ***or*** the differences must "not significantly increase the risk of unreasonable adverse effects on the environment"). Plaintiff claims that "[g]eneric manufacturers are capable of producing the same crop protection products as basic crop-protection product manufacturers" and that "[g]eneric products are essentially the same products as the name brand." ¶ 58. But Plaintiff does not allege facts to support these conclusory characterizations, and conspicuously does not allege that generic products provide the same consistency, services, or overall value provided by Defendants' products.[5]

Defendants do not sell their products directly to farmers in Arkansas. Rather, "[i]n general, crop-protection product manufacturers sell to distributors that in turn sell to retail outlets" that in turn sell to farmers. ¶ 59. This "traditional distribution channel" accounts for about 90% of all U.S. sales of crop protection products, branded and generic, with seven "traditional" distributors handling approximately 70% of all crop protection product sales. ¶¶ 62-64. (Plaintiff does not allege anything about the distribution channels that have existed in

---

[5] To the contrary, Plaintiff implicitly concedes that the quality and supply availability of generics are *not* equivalent to Defendants' products. ¶¶ 129, 143, 227 (vaguely alleging that generics have "sufficient" quality and supply availability). Generic products "are generally sold at significantly lower prices[,]" but Plaintiff ignores how Defendants' value-added services, higher quality products, and other product advantages contribute to these price differences. ¶ 67. Likewise, Plaintiff acknowledges that "lower-end brands" and "higher-end" brands exist, but disregards the broader implications of these quality differences on competition despite recognizing how "vitally important" effective crop protection is for farmers. ¶¶ 42, 241.

Arkansas specifically during the relevant time period.)  Plaintiff contends that selling to distributors is "the most efficient way … to reach farmers[,]" while conceding that generic manufacturers can and do "circumven[t]" traditional distributors through "direct sales to local retailers or farmers."  ¶ 66.  Plaintiff also alleges that "demand for crop-protection products is relatively inelastic," meaning that "Arkansas farmers do not buy more if the price of crop-protection products drops or less if the price goes up."  ¶ 78.

### C.    Defendants' Rebate Programs

For decades, Defendants have offered year-end rebates to dealers of their crop protection products that meet a threshold negotiated annually for the purchase or sale of products containing certain AIs.  ¶¶ 74-75, 85-88, 93, 95-97.  Defendants typically include in their programs AIs whose patent or FIFRA exclusivity have expired as a tool to compete against generics.  ¶ 80. Eligibility for annual rebates is calculated by considering the "percentage of the distributor's or retailer's total purchases or sales of a Defendant's brand name crop protection product containing the specified Active Ingredient as compared with total sales of products with that Active Ingredient."  ¶ 74.[6]  The rebate thresholds and amounts can differ by year, by AI, and by distributor. ¶¶ 88-89, 95, 97.

---

[6] For Syngenta's program, the rebate threshold for each AI is calculated as follows:

$$\frac{\text{Qualification-eligible products}}{\text{Qualification-eligible products + Non-Syngenta products}}$$

¶ 87. Eligible products include "Syngenta-branded products and certain non-Syngenta products for which the [AI] is sourced from Syngenta[.]"  *Id.*  Other products, including products containing an AI sourced from Syngenta, are "neutral" and count "in neither the numerator nor the denominator."  *Id.*

Corteva calculates its rebate thresholds similarly "by measuring the distributor's purchases of the Relevant AI from Corteva as a percentage of the distributor's total purchases of the Relevant AI," excluding "neutral" products from the calculation.  ¶ 96.

The amended complaint rhetorically disparages Defendants' rebates as "exclusion payments" (*e.g.*, ¶ 101), but concedes that they are, in fact, "payments in the form of rebates[.]" ¶ 287.[7]  Defendants' rebates allegedly "have disincentivized distributors or retailers from dealing with generic manufacturers," which would otherwise attract interest through their own products' allegedly lower prices.  ¶ 106.  Not all distributors meet their thresholds, but no penalty results; others exceed them, but the rebate percentage does not increase.  ¶¶ 101, 108.

Syngenta's rebate program for retailers is "similar," except retailers earn rebates by choosing to meet the threshold (without written agreements).  ¶ 91.  Retail rebates generally equal "5% of total eligible purchases of covered Syngenta products."  *Id.*

D.    **Relevant AIs**

1.    **Syngenta AIs**

Plaintiff focuses on three Syngenta AIs: azoxystrobin, mesotrione, and metolachlor (including s-metolachlor).  ¶¶ 110-111, 122, 135.  Azoxystrobin is a "broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases[.]"  ¶ 111.  Herbicides mesotrione and metolachlor protect corn, and metolachlor also protects a variety of other crops.  ¶¶ 122, 135.  Plaintiff alleges that Syngenta added each AI to its rebate program following entry by lower-priced generics.  ¶¶ 112, 116-117, 123, 126-127, 137, 140-141.

2.    **Corteva AIs**

Plaintiff focuses on three Corteva AIs:  acetochlor, oxamyl, and rimsulfuron.  ¶ 149.  Acetochlor is an "herbicide that is used predominantly on corn[.]"  ¶ 171.  Oxamyl is an "insecticide and nematicide used primarily on cotton and potatoes[.]"  ¶ 162.  Rimsulfuron is an

---

[7] That rebates are conditional does not negate that they are, as a matter of law, discounts.  *See Eisai Inc. v. Sanofi-Aventis U.S., LLC*, 2014 WL 1343254, at *28 (D.N.J. Mar. 28, 2014) (rejecting as "semantics" the plaintiff's characterization of loyalty discounts as "disloyalty penalties"), *aff'd*, 821 F.3d 394 (3d Cir. 2016).

"herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts and tomatoes." ¶ 150. Plaintiff alleges that Corteva added each AI to its rebate program following entry by lower-priced generics. ¶¶ 151, 157-158, 163, 165, 169, 173, 177-178.

     **E.**     <u>**Supply Agreements Between Syngenta and Corteva**</u>

Corteva makes a mixture containing mesotrione, which Syngenta exclusively supplies under an agreement providing that Corteva's product is "neutral" under Syngenta's rebate program. ¶¶ 87, 184. Syngenta also exclusively supplies s-metolachlor to Corteva under a similar agreement. ¶ 147.

**<u>PLEADING STANDARDS</u>**

     **A.**     <u>**Lack of Personal Jurisdiction**</u>

Federal Rule of Civil Procedure 12(b)(2) requires dismissal of an action when a plaintiff fails to "plea[d] sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022); *see also, e.g., Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) ("If the complaint does not allege sufficient facts on which personal jurisdiction can rest, then the complaint is factually deficient.").

     **B.**     <u>**Improper Venue**</u>

"Venue requirements exist for the benefit of defendants." *Richards v. Aramark Servs., Inc.*, 108 F.3d 925, 928 (8th Cir. 1997). Federal Rule of Civil Procedure 12(b)(3) requires dismissal when venue is improper in the forum district. "When the moving party bases the motion to dismiss on Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), the court reviews the motion as a 12(b)(6) motion." *Fitzgibbons v. Hill-Rom Co.*, 2012 WL 12548936, at *3 (D.S.D. June 28, 2012). "Once a defendant raises the issue of proper venue by motion, the

burden of proof is on the plaintiff to sustain venue." *FTC v. BINT Operations LLC*, 595 F. Supp. 3d 740, 754 (E.D. Ark. 2022) (citing *Cohen v. Newsweek, Inc.*, 312 F.2d 76, 78 (8th Cir. 1963)).

### C.    <u>Failure to State a Claim</u>

Federal Rule of Civil Procedure 12(b)(6) requires dismissal when a plaintiff fails to plead facts sufficient to state a claim that is "plausible on its face." *JS Ints., Inc. v. John Hafner & Assocs.*, 2017 WL 5653873, at *1 (E.D. Ark. Feb. 10, 2017) (Miller, J.) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim is plausible when the plaintiff pleads factual content that would allow a court to draw the reasonable inference that a defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Legal conclusions" are "not entitled to the presumption of truth" and must be supported by factual allegations demonstrating the grounds for a plaintiff[']s entitlement to relief." *Everett v. Dykes*, 2021 WL 4148068, at *2 (E.D. Ark. Sept. 13, 2021) (citing *Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 555).  Given "[t]he costs of modern federal antitrust litigation," antitrust cases should not progress to "discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Twombly*, 550 U.S. at 558.

## <u>ARGUMENT</u>

## I.    THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

Plaintiff contends that this Court has personal jurisdiction over each Defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Arkansas' long-arm statute, Ark. Code Ann. § 16-4-101(b).  ¶ 37.  Section 12 of the Clayton Act authorizes service of process in any district in which a defendant corporation "is an inhabitant, or wherever it may be found." 15 U.S.C. § 22.  In order to avail itself of that service provision, Plaintiff must first satisfy Section 12's venue clause, which provides for venue only in a judicial district "whereof [the defendant corporation] is an inhabitant … [or] wherein it may be found or transacts business." *Bruner v. Republic*

*Acceptance Corp.*, 191 F. Supp. 200, 203 (E.D. Ark. 1961) ("[T]he service features of section [12] come into play only if venue is chosen properly."); *see also*, *e.g.*, *Zeavision, LLC v. Bausch & Lomb Inc.*, 2022 WL 17092453, at *2-3 (E.D. Mo. Nov. 21, 2022). Arkansas' long-arm statute permits the exercise of personal jurisdiction "to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101; *see Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84, 6, 569 S.W.3d 865, 869-70 (citing Ark. Code Ann. § 16-4-101); *Pangaea, Inc. v. Flying Burrito LLC*, 647 F.3d 741, 745 (8th Cir. 2011). As shown below, the Court lacks personal jurisdiction over any Defendant under either Section 12 of the Clayton Act or Arkansas's long-arm statute. As a result, the amended complaint should be dismissed in its entirety as to each Defendant.

### A.    The Clayton Act Does Not Authorize Personal Jurisdiction Over Any Defendant

Because venue is not proper under Section 12 of the Clayton Act, Plaintiff may not avail itself of Section 12's national service of process provision, which is necessary to establishing personal jurisdiction under Section 12. As a threshold matter, Section 12 applies only to corporations, and thus cannot confer jurisdiction over limited liability companies such as Syngenta Crop Protection, LLC. As to the remaining Defendants, Plaintiff fails to plead facts showing that each Defendant either (1) "is an inhabitant" of the Eastern District of Arkansas, or (2) "may be found or transacts business" in the District. 15 U.S.C. § 22.

### 1.    Personal Jurisdiction Pursuant to Section 12 Is Lacking Over the Syngenta Defendants

#### a.    Section 12 Does Not Provide a Basis for Personal Jurisdiction Over LLCs Such as Syngenta Crop Protection, LLC

Section 12 does not afford a basis for personal jurisdiction, as a matter of law, over Syngenta Crop Protection, LLC because Section 12 does not apply to limited liability

companies.[8]  When interpreting the Clayton Act, "[t]he starting point, as always, is the language

of the statute." *BankAmerica Corp. v. United States*, 462 U.S. 122, 128 (1983).  By its plain

terms, Section 12 of the Clayton Act is titled "District in which to sue ***corporation***" and states

that "[a]ny suit, action, or proceeding under the antitrust laws ***against a corporation*** may be

brought" where it is an inhabitant or where it "may be found or transacts business." 15 U.S.C. §

22.  Thus, the unambiguous language of the statute does not reach LLCs, which are distinct from

corporations.  In accord with the statute's plain language, "[m]ultiple district courts and the Third

Circuit have … excluded limited liability companies from Section 12 of the Clayton Act."  *S.F.*

*Comprehensive Tours, LLC v. Tripadvisor, LLC*, 2021 WL 4394253, at *5 (D. Nev. Sept. 24,

2021) (citing *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 875 (3d Cir.

1944)).[9]

        This conclusion is reinforced by analysis of the statutory context.  *See*, *e.g.*, *Nken v.*

*Holder*, 556 U.S. 418, 426 (2009) ("[S]tatutory interpretation turns on the language itself, the

specific context in which that language is used, and the broader context of the statute as a

whole.").  Elsewhere, the Clayton Act defines "persons" to include corporations and

associations, *see* 15 U.S.C. § 12(a), reinforcing that Section 12's specific use of "corporations"

in isolation necessarily excludes other types of organizations.

        Accordingly, Plaintiff is precluded from relying on Section 12 of the Clayton Act to

establish personal jurisdiction over Syngenta Crop Protection, LLC.

---

        [8] Plaintiff concedes that Syngenta Crop Protection, LLC is a limited liability company—not a corporation.
*See* ¶ 24 ("Syngenta Crop Protection, LLC is a limited liability company ….").

        [9] *See also*, *e.g.*, *Shat Acres Highland Cattle, LLC v. Am. Highland Cattle Ass'n*, 2023 WL 7089906, at *10
n.3 (D. Colo. Oct. 26, 2023).  Courts have gone further and declined to apply Section 12 to other types of non-
corporate defendants.  *World Skating Fed. v. Int'l Skating Union*, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005)
("Section 12 as written, and as interpreted, does not apply to entities that simply share common attributes with
corporations."); *Kingsepp v. Wesleyan Univ.*, 763 F. Supp. 22, 25 (S.D.N.Y. 1991) (collecting cases).

**b.      Syngenta Corp. and Syngenta Crop Protection AG**
**Neither Inhabit Nor Transact Business in This District**

For Section 12 to confer jurisdiction, Syngenta Corp. and Syngenta Crop Protection AG

must either (1) be "inhabitants" of or (2) transact business of a substantial and continuous nature

in the Eastern District of Arkansas.  15 U.S.C. § 22.  The amended complaint is devoid of any

such allegations.

Under the first prong of this test, a corporate defendant is an inhabitant of the Eastern

District of Arkansas only if the defendant is incorporated there.  *See*, *e.g.*, *KM Enters., Inc. v.*

*Glob. Traffic Techs., Inc.*, 725 F.3d 718, 725 (7th Cir. 2013).  Under the second prong, as

explained by the Supreme Court, "the practical, everyday business or commercial concept of

doing or carrying on business of any substantial character [is] the test of venue."  *United States v.*

*Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948).  Venue under Section 12 may not "be

predicated upon any corporate contacts with the forum district, regardless of how slight,

minimal, or sporadic those contacts may be."  *Bruner*, 191 F. Supp. at 203.  Instead, the business

transacted by the defendant within the District must be substantial and continuous.  *See id.* at

203, 205 (holding that defendant's in-district activities were insufficiently substantial or

continuous to confer venue where it had purchased notes executed in the forum district, received

and sent money by mail to the forum district, and corresponded and visited with business

partners in the state).

Plaintiff concedes that Syngenta Corp. and Syngenta Crop Protection AG are

incorporated and based outside of Arkansas.  ¶¶ 22-23.  As such, neither Defendant is a resident

of Arkansas and therefore neither can be an "inhabitant" of the Eastern District of Arkansas

under Section 12.  *See KM Enters.*, 725 F.3d at 725; *cf. Seaboard Rice Milling Co. v. Chi., R.I. &*

*P. Ry. Co.*, 270 U.S. 363, 366 (1926) ("[A] corporation [is], within the meaning of the

13

jurisdictional statutes, a resident of the State in which it is incorporated, and not a resident or

inhabitant of any other State, although it may be engaged in business within such other State.").

Nor do Syngenta Corp. or Syngenta Crop Protection AG transact business of a substantial

and continuous character in the Eastern District of Arkansas. Indeed, neither of these Defendants

maintain any business operations in the state of Arkansas nor have any employees based there.

Ex. 17, Decl. of Cheryl Quain ("Quain Decl.") at ¶¶ 4-6.

Plaintiff relies entirely on group pleading to try to establish personal jurisdiction over the

Syngenta Defendants, referring to contacts with Arkansas by "Syngenta" or "Defendants." This

fails to satisfy Plaintiff's burden of alleging facts showing that personal jurisdiction under

Section 12 is satisfied for each Defendant. *See Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980)

(holding that a personal jurisdiction analysis of "the defending parties together" was improper

and stressing that "the requirements of International Shoe … must be met as to each defendant");

*Sahm v. Avow Corp.*, 2023 WL 8433158, at *6 (E.D. Mo. Dec. 5, 2023) ("[P]leadings that

indiscriminately lump defendants together in asserting jurisdictional allegations will not support

finding personal jurisdiction over any one defendant."); *Stewart v. Advanced Med. Revs., Inc.*,

2018 WL 11446391, at *5 (E.D. Ark. Aug. 2, 2018) (Miller, J.) ("Each defendant's contacts with

the forum State must be assessed individually.").

Moreover, Plaintiff's group pleading of "Syngenta's" purported activity within Arkansas

demonstrably does not concern either Syngenta Corp. or Syngenta Crop Protection AG. Plaintiff

alleges, for instance, that, until recently, "Syngenta owned 160 acres of land in Craighead

County that it had owned since 1988" and "over 38" employees worked at the site. ¶¶ 32-33.

But, as the Attorney General has publicly confirmed, the site was not owned by either Syngenta

Corp. or Syngenta Crop Protection AG. Quain Decl. at ¶ 7; *see also* Letter from Tim Griffin,

Attorney General, Arkansas, to Northrup King Seed Co., Syngenta Seeds LLC, and United Agent Group, Inc. (Oct. 17, 2023), arkansasag.gov/wp-content/uploads/2023-10-17-Syngenta-ChemChina-Enforcement-Letter.pdf (confirming the site was owned by Northrup King Seed Co., "a brand of Syngenta Seeds").[10]  In other instances, Plaintiff alleges that "Syngenta employs multiple sales representatives in the State," was "recently hiring" employees in the state, and has "appl[ied] for and receive[d] pesticide production registrations … from the Arkansas Department of Agriculture."  ¶¶ 263-264, 270.  But Syngenta Corp. and Syngenta Crop Protection AG have no employees in Arkansas, are not hiring any employees in Arkansas, and have registered no crop protection products in Arkansas.  Quain Decl. at ¶¶ 5-6, 8.  Plaintiff also claims that "[e]ach Defendant" is a member of the Arkansas Crop Protection Association ("ACPA").  ¶¶ 255, 257.  Neither Syngenta Corp. nor Syngenta Crop Protection AG is a member of the ACPA.[11]  Quain Decl. at ¶ 9.

Plaintiff's allegations fall far short of what is required to impute the in-state contacts of an entity to its affiliate.  "[P]ersonal jurisdiction can be based on the activities of the nonresident corporation's in-state subsidiary … only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego."  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d at 648-49 (8th Cir. 2003); *Viasystems, Inc. v. EBM-Papst St. Georgen*

---

[10] *See also* Press Release, Tim Griffin, Attorney General, Arkansas, Attorney General Griffin Collects $280,000 Fine From Chinese State-Owned Syngenta Seeds, LLC (Nov. 9, 2023), arkansasag.gov/news_releases/attorney-general-griffin-collects-280000-fine-payment-from-chinese-state-owned-syngenta-seeds-llc.

[11] In any event, mere membership in a trade association, or the fact that a defendant shares a corporate officer with a trade association, is insufficient to show that a defendant "transacts business" in the district for the purposes of Section 12.  *See Nat'l Constructors Ass'n*, 498 F. Supp. at 525.  Instead, Plaintiff must show that the trade association was acting as a Defendant's "business agent" and was engaged in "discrete commercial activities integral to the conduct of [the Defendant's] business."  *Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 319-20 (D.D.C. 1991).

*GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011) (attributing an entity's activities to a parent for personal jurisdiction "always require[s] a degree of control and domination by the parent corporation"); *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008) ("[M]ere ownership of subsidiary is insufficient to justify personal jurisdiction."). It is firmly established under Arkansas law that "[t]he corporate veil should not be pierced easily." *Simpson v. Wright Med. Grp., Inc.*, 2018 WL 1570795, at *6 (E.D. Ark. Mar. 30, 2018) (citing *Banks v. Jones*, 239 Ark. 396, 400, 390 S.W.2d 108, 111 (1965)); *see also Epps*, 327 F.3d at 649 ("Piercing the fiction of a corporate entity should be applied with great caution.").

Here, Plaintiff alleges only that "Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG" (¶ 23) and that "Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG" (¶ 24). Nowhere does Plaintiff allege facts showing that Syngenta Corp. or Syngenta Crop Protection AG owns any entity, much less dominates or controls any specific entity operating in the Eastern District of Arkansas. Mere allegations that the Syngenta Defendants, as part of a larger "Syngenta Group," (¶¶ 22, 25, 26, 32) prepare Financial Reports containing consolidated crop protection product sales (¶ 27); utilize the same logo, website, and marketing strategy (¶ 28); and that certain employees identify themselves as working for multiple Syngenta entities (¶¶ 29, 31), are not enough to show the type of domination and control required for an alter-ego approach to imputing an in-state subsidiary's contacts to the parent companies. *See, e.g., Viasystems*, 646 F.3d at 596-97; *Simpson*, 2018 WL 1570795, at *6 (rejecting Plaintiff's reliance on filings that hold defendants out as an integrated whole and explaining that "courts have recognized that companies may omit distinctions between related corporate entities in their … filings, and still insist on these distinctions when haled into court.").

16

Plaintiff attempts to plead around this well-settled limit on imputing jurisdictional contacts by alleging that "[t]he Syngenta Group" operates as a "single enterprise" (¶ 25) or "integrated whole" (¶ 27), but courts routinely reject the use of a "single enterprise" theory as the basis to establish personal jurisdiction. *See, e.g., Krantz v. Bloomberg L.P.*, 2022 WL 2102111, at *5 (C.D. Cal. Jan. 19, 2022); *Wright v. Waste Pro USA Inc.*, 2019 WL 3344040, at *11 (D.S.C. July 25, 2019); *Campanelli v. Image First Unif. Rental Serv. Inc.*, 2016 WL 4729173 at *7 (N.D. Cal. Sept. 12, 2016).

Plaintiff's remaining allegation that "[e]ach Defendant is found, resides, is an inhabitant of, transacts business, and/or has agents in the State of Arkansas and this District" (¶ 38) is conclusory and unsupported and thus should not be credited. *See, e.g., Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."); *Zeavision*, 2022 WL 17092453, at *3 ("[C]onclusory allegations and speculations are insufficient [to plead personal jurisdiction] where no other allegations provide plausible factual support.").

### 2.    Section 12 Personal Jurisdiction Is Lacking as to Corteva

For the same impermissible group pleading purposes described above, Plaintiff lumps together Corteva, Inc. with non-parties Corteva Agriscience, LLC and Corteva Agriscience, MCS LLC.[12]  As discussed below, each of Plaintiff's jurisdictional allegations—which are themselves insufficient to satisfy the requirements of Section 12—apply only to Corteva Agriscience, LLC and Corteva Agriscience MCS, LLC.  To actually establish jurisdiction over

---

[12] For the same reasons discussed in Section I.A.1.a above, Section 12 does not afford a basis for personal jurisdiction over Corteva Agriscience, LLC or Corteva Agriscience MCS, LLC because Section 12 does not apply to limited liability companies. *See supra* at 12-13.  In any event, neither Corteva Agriscience, LLC or Corteva Agriscience MCS, LLC is named as a defendant, and Plaintiff alleges no facts that would allow the Court to impute the in-state contacts of an entity to its affiliate. *See supra* at 16-17.

Corteva *itself,* the amended complaint must sufficiently plead that Corteva is either (1) an

"inhabitant[]" of or (2) transacts business of a substantial and continuous nature in the Eastern

District of Arkansas for Section 12 to confer jurisdiction.  15 U.S.C. § 22.  The amended

complaint fails to adequately plead either factor.

A corporate defendant is an inhabitant of the Eastern District of Arkansas only if the

defendant is incorporated there.  *See supra* at 13.  As stated in the amended complaint, Corteva

"is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana."  ¶ 34.

Accordingly, Corteva is not an "inhabitant" of the Eastern District of Arkansas for Section 12

purposes.

Alternatively, a corporate defendant incorporated outside the Eastern District of Arkansas

must transact substantial and continuous business in the district to be haled there under Section

12.  *See supra* at 14.  The alleged contacts supporting such finding must be ***district-specific***

rather than statewide.  *See Zeavision,* 2022 WL 17092453, at *2 (holding that "a claim of

transacting business within the entire State of Missouri fails to satisfy the requirements under the

Clayton Act.").  Courts have declined to exercise jurisdiction when a complaint fails to address

Section 12 or sufficiently allege business of a substantial character in the district.  For example,

in *MNG 2005, Inc. v. Paymentech, LLC*, the court observed:

> Plaintiff has not addressed Section 12 or in any way tethered its jurisdictional claims to
> the Clayton Act. Plaintiff certainly has not argued that venue is proper under Section 12.
> Even construing Plaintiff's complaint liberally, there is no allegation that G2 transacts
> business "of any substantial character" in this district, as required to establish venue
> under the Clayton Act.

2020 WL 6582660, at *3 n.3 (E.D. Mo. Nov. 9, 2020) (citing *Scophony Corp. of Am.*, 333 U.S.

at 807).

For a party to transact business of a "substantial character," there must be "certainly more than a few isolated and peripheral contacts with the particular judicial district." *Health Care Equalization Comm. of the Iowa Chiropractic Soc. v. Iowa Med. Soc.*, 501 F. Supp. 970, 980 (S.D. Iowa 1980), *aff'd* 851 F.2d 1020 (8th Cir. 1988) (quoting *Stern Fish Co. v. Century Seafoods, Inc.*, 254 F. Supp. 151, 153 (E.D. Pa. 1966)); *see also Bruner*, 191 F. Supp. at 203 ("But, although the statute is to be given a liberal construction, it does not go so far as to permit venue to be predicated upon any corporate contacts with the forum district, regardless of how slight, minimal, or sporadic those contacts may be. The business transacted must be of a substantial character, and it must have some degree of continuity. Mere isolated or sporadic contacts are not sufficient.").

In *Bruner*, the court refused to find Section 12 satisfied when a finance company purchased notes that had been executed in Arkansas, received and remitted moneys "by mail using ordinary banking channels," and corresponded with dealers and note markers in the state. 191 F. Supp. at 205. The court in *Bruner* characterized the corporate contacts it evaluated as less substantial than those assessed in *McAvoy v. Texas E. Transmission Corp.*, 185 F. Supp. 784, 785 (W.D. Ark. 1960). In *McAvoy*¸ a citizen of Arkansas filed a personal injury suit against three foreign corporate defendants, including Rockwell Manufacturing Company, a Pennsylvania corporation. *Id*. Rockwell manufactured and sold valves, meters, and power tool equipment through a number of separate divisions, four of which had regional and district offices that sold products into Arkansas. *Id*. at 786. Rockwell maintained no products, warehouses or offices in Arkansas and engaged in no direct advertising in Arkansas publications. *Id*. Rockwell's traveling salesman distributed literature to prospective customers in Arkansas, received and addressed customer complaints, and solicited orders from customers, which were "transmitted to

19

higher authority for acceptance or rejection." *Id*. at 787.  Rockwell also conducted "school" for customers making large initial purchases, dispatched service employees to supervise the installation of a large purchase and set up a display of its products at the Southwest Water Works Convention held in Little Rock.  *Id*.  Rockwell employed one employee who lived in Arkansas, whose territory included the northern two-thirds of the state, while other Rockwell salesmen operated in Arkansas from other states.  *Id*.  Considering these numerous contacts, the court nevertheless declined to exercise jurisdiction over Rockwell, holding that its "Arkansas operations are properly characterized essentially as interstate sales of manufactured products based upon solicitations made in Arkansas, the sales and solicitations being accompanied by incidental promotional, service, and repair activities."  *Id*. at 788-90.

Like those contacts found insufficient to confer jurisdiction in *Bruner* and *McAvoy*, Plaintiff's allegations fail to establish that Corteva conducts "substantial and continuous business" in the Eastern District of Arkansas under Section 12.  Plaintiff was required to plead facts sufficient to show that Corteva conducted everyday business in the district from a practical perspective.  *See Scophony Corp. of Am*., 333 U.S. at 807 ("[T]he practical, everyday business or commercial concept of doing or carrying on business of any substantial character [is] the test of venue.").  But in fact, so far as Defendants can tell, Plaintiff marshals only six disparate allegations concerning Corteva's alleged activity in the Eastern District of Arkansas.  All of these allegations, whether examined individually or collectively, and whether attributed to Corteva itself or impermissibly to its subsidiaries, fail to satisfy Section 12:

*Allegations concerning business registration / service agent*: Plaintiff asserts that Corteva's principal business address is listed as 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201, and all three Corteva entities' registered agent for service of process is

listed as C T Corporation System, 320 South Izard Street, Little Rock, Arkansas 72201.  ¶ 34.  It

is true that, under the Arkansas Business Corporation Act of 1987, a foreign corporation may not

"transact business" until it obtains a certificate of authority from the Arkansas Secretary of State.

Arkansas Code § 4-27-1501(a).  However, "transacting business" for purposes of § 4-27-501 is

not the same as conducting "substantial and continuous business" for purposes of Section 12.  In

fact, the statute itself notes numerous activities that "do not constitute transacting business"

within the meaning of § 4-27-1501(a), including among others: (i) maintaining, defending, or

settling any proceeding; (ii) carrying on other activities concerning internal corporate affairs; (iii)

soliciting or obtaining orders, whether by mail or through employees or agents or otherwise, if

the orders require acceptance outside this state before they become contracts; (iv) owning,

without more, real or personal property; and (v) transacting business in interstate commerce.

That Corteva and its subsidiaries have registered with the Secretary of State of Arkansas

consistent with § 4-27-1501(a) in no way establishes that Corteva is conducting activities

constituting "substantial and continuous business" in the Eastern District of Arkansas.  Likewise,

the Arkansas legislature has made clear that the presence of a registered agent in a particular

district does not determine appropriate venue.  Arkansas Code § 4-20-115 ("The appointment or

maintenance in this state of a registered agent does not by itself create the basis for personal

jurisdiction over the represented entity in this state.  The address of the agent does not determine

venue in an action or proceeding involving the entity.").

        _Allegations concerning prior settlements / waiver of jurisdiction_: Plaintiff alleges that

Corteva settled two unrelated cases in the Eastern District, *Jones v. Corteva*, No. 3:21-cv-00237-

DPM (E.D. Ark.) and *Boothe Farms, Inc. v. Dow Chem. Co.*, No. 3:19-cv-00264-DPM (E.D.

Ark.), and never moved to dismiss those actions for lack of personal jurisdiction.  ¶ 35.  But

Corteva's prior settlement of two unrelated actions without asserting a jurisdictional defense is of no moment. Courts have held that personal jurisdiction is waivable on a case-by-case basis. *See Moyer v. Jackson*, 2023 WL 5417828, at *6 n.6 (D. Minn. Aug. 2, 2023) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–04 (1982)). Stated differently, the waiver of personal jurisdiction in one matter does not waive personal jurisdiction in another matter. *Id.* ("[T]he question of whether a defendant is subject to specific personal jurisdiction in a Forum A for Case A is materially different than the question of whether the same defendant is subject to specific personal jurisdiction in Forum A for Case B."). In any event, the fact that Corteva (or its predecessor entity) appeared in Arkansas to defend a lawsuit hardly qualifies as "transacting business" for Section 12 purposes.

*Allegations concerning participation in trade associations / participation in trade conferences*: Plaintiff states that Corteva is a "corporate sustaining" member of the Arkansas Crop Protection Association (ACPA), based in Little Rock, Arkansas (¶¶ 256-257) and separately, that a Corteva employee was a member of the 2024 Arkansas Crop Management Conference Program Committee in North Littlerock, Arkansas. (¶ 258). That Corteva or its alleged employees—who are actually employed by Corteva Agriscience, LLC—served as members of the ACPA or participated in trade association activity within the Eastern District of Arkansas is unavailing. In fact, the ACPA website makes clear that it is "Corteva Agriscience," not Corteva, that is an ACPA member.[13] Regardless, courts have been clear that mere membership in a trade association is insufficient to show that a defendant "transacts business" in the district for the purposes of Section 12. *See Nat'l Constructors Ass'n v. Nat'l Elec.*

_____

[13] Sustaining Members, ARK. CROP PROTECTION ASSOC., https://acpanews.com/corporate-sustaining-members/.

*Contractors Ass'n, Inc.*, 498 F. Supp. 510, 525 (D. Md. 1980).  Instead, Plaintiff must show that the trade association was acting as defendant's "business agent" and was engaged in "discrete commercial activities integral to the conduct of [Defendant's] business."  *See Armco Steel Co.*, 790 F. Supp. at 319-20.  Plaintiff's allegations fall far short of this standard.

<u>*Allegations concerning activity of Corteva employees*</u>: Plaintiff further alleges that Corteva employs numerous crop protection sales and service staff in Arkansas and posted a job opening for a retail manager in Northeast Arkansas.  ¶ 265.  In fact, those Arkansas-based employees are employees of Corteva Agriscience, LLC and include: (i) a District Sales Leader responsible for the Southern U.S. Crop Protection Team, who lives in Northeast Arkansas and has sales responsibilities over a regional area of three states; (ii) a Territory Manager living in South Arkansas who has sales responsibilities in counties throughout Arkansas; and (iii) a Senior Sales Consultant living in Central Arkansas who has sales responsibilities in counties throughout Arkansas.  Ex. 18, Decl. of Dana Eddis ("Eddis Decl.") at ¶ 3.  None of these employees report to any physical location located in the State of Arkansas but rather report to Corteva headquarters in Indianapolis, Indiana.  *Id.*  Corteva, Inc. has no employees in Arkansas.  *Id.* Similarly, the Northeast Arkansas job posting pleaded by Plaintiff relates to regional responsibilities and involves Corteva's seed business, which is unrelated to the allegations in this case.  *Id*. ¶ 4.  These employees' contacts with the Eastern District fall short of those found insufficient to confer jurisdiction in *McAvoy*.

<u>*Allegation concerning research facility in West Memphis, Arkansas*</u>: Finally, Plaintiff pleads a bare allegation that Corteva has a research facility in West Memphis, Arkansas.  ¶ 266.  But this allegation, standing alone, provides no basis to assert jurisdiction in the Eastern District.  The amended complaint contains no details concerning what this research station consists of,

whether it is continuously staffed or operated, or what, if any, connection it has to Corteva's commercial or crop protection operations.  Moreover, the amended complaint does not specify which Corteva entity owns the facility—in fact, it is EIDP, Inc.  Eddis Decl. at ¶ 5.  This too falls far short of establishing the "commercial concept of doing or carrying on business of any substantial character."  *See Scophony Corp. of Am.*, 333 U.S. at 807.

**B.    This Court Lacks Personal Jurisdiction Over Defendants Under Arkansas' Long-Arm Statute**

Personal jurisdiction also may not be exercised over any Defendant pursuant to Arkansas' long-arm statute, Ark. Code Ann. § 16-4-101(b), Plaintiff's alternative asserted basis for personal jurisdiction (¶ 37).

**1.    General Jurisdiction Is Lacking Over Each Defendant**

As the Eighth Circuit has explained, "[t]he relevant conduct and connections for the due process analysis depend on whether personal jurisdiction is alleged to be general or specific." *Zazzle*, 42 F.4th at 951-52.  General jurisdiction requires that a defendant be "essentially at home" in the forum state.  *Id*.  A corporation is "at home" in Arkansas if it is incorporated or maintains its principal place of business in the state.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

Plaintiff pleads facts showing that this Court lacks general jurisdiction over Defendants. Each Defendant is headquartered and incorporated outside Arkansas (¶¶ 22-24, 34), and thus no Defendant is "at home" in Arkansas.  *Daimler*, 571 U.S. at 137.  Plaintiff asserts jurisdiction based on the allegation that two Defendants (Syngenta Crop Protection, LLC and Corteva, Inc.) are "licensed" or "registered" to do business in Arkansas and can be served in Arkansas via their registered agents.  ¶¶ 24, 34.  But that allegation is insufficient to establish general jurisdiction over the Defendants.  *See McDowell v. UPS, Inc.*, 2022 WL 17543352, at *4 (W.D. Ark. Dec. 8,

2022) ("[E]ven if a Moving Defendant is registered in Arkansas … , simply being registered in Arkansas does not render that defendant 'at home' in Arkansas such that it is subject to exercise of the Court's general personal jurisdiction.") (citing Ark. Code Ann. § 4-20-115); *Joe v. Union Pac. R.R.*, 2021 WL 4200878, at *4 (E.D. Ark. Sept. 15, 2021) ("Plaintiff also argues that UPS has accepted personal jurisdiction by appointing a registered agent in Arkansas to accept service of process on its behalf.  However, the Arkansas legislature, in effect, nullified that argument by passing Arkansas Code § 4-20-115.").  As such, Plaintiff may not argue that general jurisdiction is available.

## 2.  <u>Specific Jurisdiction Is Lacking Over Each Defendant</u>

As the Supreme Court has repeatedly emphasized, specific jurisdiction can be exercised only on the basis of a defendant's own contacts with a forum State that arise from or relate to the plaintiff's claim.  *See*, *e.g.*, *Daimler*, 571 U.S. at 118 (specific jurisdiction "encompasses cases in which the suit arises out of or relates to the defendant's contacts with the forum"); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (reasoning that only "contacts that the defendant *himself* creates with the forum" State potentially support jurisdiction) (emphasis in original).  Further, the phrase "relates to" in the requirement that the plaintiff's claims must arise out of or relate to the defendant's contacts with the forum "incorporates real limits, as it must to adequately protect defendants foreign to a forum."  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021).  "Personal jurisdiction must be determined on a claim-by-claim basis."  *Vallone v. CJS Sols. Grp., LLC*, 9 F.4th 861, 865 (8th Cir. 2021).  Thus, while specific jurisdiction could potentially reach defendants that are not "at home" in a state, it does so "only as to a narrower class of claims, namely those that arise out of or relate to the defendant's contacts with the forum."  *Zazzle*, 42 F.4th at 952.  Absent sufficient claim-related contacts, "specific jurisdiction

is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 264 (2017).

The Eighth Circuit uses five factors to guide the analysis of a defendant's own contacts with the forum that "arise out of or relate to" each claim against that defendant: "(1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Zazzle*, 42 F.4th at 952. "The first three factors are of primary importance and the fourth and fifth factors carry less weight." *Id.*

Plaintiff fails to plead facts showing that this Court has specific jurisdiction over any Defendant. Indeed, Plaintiff has failed to plead any ***claim-related*** contact between a Defendant and Arkansas.

According to the amended complaint, each Defendant's allegedly wrongful conduct is "design[ing] and administer[ing] … each of its Loyalty Programs with the purpose, intent, and expectation of impeding generic competition" (¶ 72), but Plaintiff does not allege ***any*** facts showing that any Defendant "designed and administered" its rebate program in Arkansas. To the contrary, each Defendant's headquarters is ***outside*** Arkansas. ¶¶ 22-24. As this Court encapsulated the allegations of Plaintiff's original complaint, "Syngenta made business decisions related to the loyalty programs in North Carolina, Corteva made those decisions in Indiana and Delaware, and Arkansas farmers purchased defendants' crop-protection products in Arkansas." ECF No. 50 at 3-4.

At most, Plaintiff alleges that Defendants' crop protection products are registered for sale and sold in Arkansas. But the mere registration and sale of Defendants' products in Arkansas is ***not*** claim-related, because Plaintiff does not allege that the registration or sale of these products

is wrongful.  In any event, Plaintiff's complaint is devoid of allegations regarding any "contacts that [a] defendant [*itself*] creates with [Arkansas]" in connection with these sales.  *Walden*, 571 U.S. at 284.  To the contrary, Plaintiff alleges that there are two levels in the traditional distribution chain that stand between Defendants and farmers in Arkansas.  ¶¶ 59, 62, 65-66.  Plaintiff alleges, for example, that (unidentified) distributors—not Defendants—are responsible for "warehousing, transport[ing] … and marketing" crop protection products.  ¶ 66.  Plaintiff's allegations that Defendants are manufacturers that "sell[] goods through non-parties in the state of Arkansas … are insufficient to establish personal jurisdiction" here.  *See Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1103 (8th Cir. 1996).  Further, Plaintiff asserts that the alleged "relevant markets" for crop protection products are nationwide, and not specific to Arkansas.  ¶ 196, 204.  This allegation undermines any suggestion that Defendants' sales into these posited markets—by selling finished products to distributors and selling ingredients to other manufacturers (¶¶ 45, 59)—are specific to Arkansas.  *See In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 2747115, at *5 (S.D. Cal. May 26, 2020) (holding "effects from the nation-wide" conduct "create no connection to any particular forum").

Nor are (conclusory) allegations that Arkansas farmers paid an "overcharge" (¶ 15) for Defendants' crop protection products sufficient to establish specific jurisdiction.  As the Supreme Court held in *Walden*, harm within the forum state does not suffice to establish personal jurisdiction because focusing on harm—even foreseeable harm—"impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  571 U.S. at 289.

The allegations fail as to the Syngenta Defendants for the additional reason that Plaintiff impermissibly lumps together all three entities—Syngenta Corp., Syngenta Crop Protection AG,

and Syngenta Crop Protection, LLC—as "Syngenta" throughout its complaint.  *See supra* Point

I.A.1.b.

## II.    VENUE DOES NOT LIE IN THIS DISTRICT FOR DOMESTIC DEFENDANTS

Plaintiff argues that venue lies in this District under 15 U.S.C. § 22, 28 U.S.C. §§

1391(b)-(d), and Ark. Code Ann. § 4-75-319.  ¶¶ 38-39.[14]  A plaintiff that sues multiple

defendants must allege facts showing that venue is proper for each defendant.  *See Newbauer v.*

*Jackson Hewitt Tax Serv. Inc.*, 2019 WL 1398172, at *4 (E.D. Va. Mar. 28, 2019) (15 U.S.C.

§ 22); *Martin v. U.S. EEOC*, 19 F. Supp. 3d 291, 301 (D.D.C. 2014) (28 U.S.C. § 1391).  But the

amended complaint is devoid of factual allegations supporting venue under any of these

provisions for any of the domestic Defendants—Syngenta Corp., Syngenta Crop Protection,

LLC, and Corteva, Inc. (¶¶ 23-24, 34).

### A.    Venue Does Not Lie Under Section 12 of the Clayton Act

As shown above, the amended complaint fails to satisfy Section 12's venue requirements

for any Defendant.  *See supra* Point I.A.

### B.    Venue Does Not Lie for Domestic Defendants Under the General Venue Statute

"[T]he general venue statute [28 U.S.C. § 1391] allows cases to be brought in a judicial

district where a defendant resides (if all reside in the same state), where a substantial part of the

events or property is located, or where a court has personal jurisdiction over a defendant if the

---

[14] Arkansas law provides that any action brought by Plaintiff "containing claims of federal law violations … shall be brought in the appropriate federal court."  Ark. Code Ann. § 4-75-319.  Therefore, venue fails under that provision for the same reasons that it fails under the Clayton Act (15 U.S.C. § 22) and the general federal venue statute (28 U.S.C. § 1391).

other provisions do not apply." *United Specialty Ins. Co. v. Wheeler*, 2023 WL 2653387, at *4 (W.D. Mo. Mar. 27, 2023).[15]

For this purpose, a corporate defendant "shall be deemed to reside … in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question," 28 U.S.C. § 1391(c)(2), where personal jurisdiction is analyzed under the long-arm statute of the state in which the district sits. *See Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1175 (E.D. Ark. 2019). In determining whether "a substantial part of the events or omissions giving rise to the claim occurred" in this District, "the court's focus must be on relevant activities of the defendant in the forum state, not on the effect of those activities on the plaintiff in the forum state." *Steen v. Murray*, 770 F.3d 698, 702-03 (8th Cir. 2014).

As shown above, Plaintiff has failed to plead facts showing that any Defendant is subject to personal jurisdiction in Arkansas. *See supra* Point I. Therefore, Plaintiff has failed to establish that any Defendant "resides" in this District, is a "resident" of Arkansas, or "is subject to the court's personal jurisdiction with respect to [this] action" for purposes of Section 1391(b)(1) or (b)(3). For the same reasons that personal jurisdiction fails, Plaintiff has also failed to plead facts showing that "a substantial part of the events or omissions giving rise to the claim occurred" in this District for purposes of Section 1391(b)(2). *Steen*, 770 F.3d at 702. Accordingly, these provisions are not a basis for venue for any domestic Defendant.

---

[15] Although Syngenta Crop Protection AG, as "a defendant not resident in the United States[,] may be sued in any judicial district," 28 U.S.C. § 1391(c)(3), there are multiple other reasons why the claims against this entity should be dismissed, as demonstrated herein, including for lack of personal jurisdiction. Its inclusion in this action does not impact the venue analysis as to the other defendants, as "joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." *Id.*

III.    **THE AMENDED COMPLAINT FAILS
TO STATE A FEDERAL ANTITRUST CLAIM**

A.    **Plaintiff Fails to Plead Anticompetitive
Exclusive Dealing Under the Price-Cost Test**

1.    **Predominantly Price-Based Rebate
Programs Are, as a Matter of Law, Procompetitive**

Plaintiff's federal antitrust claims should be dismissed because Defendants' price cutting through above-cost market share rebates is not anticompetitive under the applicable price-cost test. To the contrary, it is well established that "cutting prices to increase business is 'the very essence of competition.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

Plaintiff alleges that Defendants violate Section 3 of the Clayton Act and Sections 1 and 2 of the Sherman Act because Defendants' rebate programs allegedly condition rebate payments to distributors and retailers on the distributors and retailers "not us[ing] or deal[ing] in the goods of generic competitors in accordance with 'loyalty' terms." ¶ 287; *see also id.* ¶¶ 290-292, 299. Where, as here, "a firm uses a single-product loyalty discount or rebate to compete with similar products," price typically "predominates over other means of exclusivity," and courts apply the price-cost test to evaluate whether the allegedly exclusionary conduct is potentially anticompetitive. *See Eisai, Inc. v. Sanofi-Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016); *see also FTC v. Syngenta*, 2024 WL 149552, at *14 ("[T]he price-cost test applies at least where a pricing practice itself operates as the exclusionary tool, regardless of how the plaintiff styles its allegations.").

Under the price-cost test, "alleged conduct may only be illegal if the price is set below the cost." *Id.* at *12 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993)). Price cutting *is* competition, *Eastman Kodak,* 504 U.S. at 478, so "when price

is the clearly predominant mechanism of exclusion, … the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 275 (3d Cir. 2012); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.").[16]  Although the price-cost test might "miss some anticompetitive above-cost pricing," the Supreme Court nevertheless "fashion[ed] this formalistic approach" in recognition of the fact that it is "'beyond the practical ability of a judicial tribunal' to ascertain whether above-cost pricing is anticompetitive 'without courting intolerable risks of chilling legitimate price-cutting.'"  *FTC v. Syngenta*, 2024 WL 149552, at *13 (M.D.N.C. Jan. 12, 2024) (quoting *Brooke Grp.*, 509 U.S. at 273).  Indeed, the Supreme Court has cautioned that in analyzing price-cutting cases, courts are to take particular care to avoid "mistaken inferences," as they "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594; *accord Brooke Grp.*, 509 U.S. at 226.

Plaintiff does not—and cannot—allege that Defendants' post-rebate prices are below cost, which Plaintiff appears to acknowledge (¶ 222).  Therefore, Plaintiff must allege facts showing that Defendants' programs exclude competitors predominantly through non-price mechanisms of coercion to avoid dismissal under the price-cost test.  *See FTC v. Syngenta*, 2024 WL 149552, at *14-19.

---

[16] Plaintiff alleges that the rebates here are similar to the rebates used by brand-name drug manufacturers in their dealings with pharmacy benefit managers.  ¶¶ 10-11.  Notably, however, the Tenth Circuit has held that, absent non-price means of coercion, PBM rebate payments "exemplified vigorous price competition" and "may prove harm to one or more competitors, but … do nothing to satisfy [the plaintiff's] burden to prove harm to the competitive process and thereby harm [to] consumers."  *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 1000 (10th Cir. 2022).

## 2.    Defendants' Rebate Programs Are Predominantly, if Not Exclusively, Price-Based

Where, as here, Defendants' post-rebate prices are above cost, and the only consequence for missing share thresholds under Defendants' rebate programs is not receiving a price discount, the price-cost test requires dismissal of Plaintiff's exclusive dealing claims.

Plaintiff fails to plead facts showing that the purported exclusionary effect of Defendants' rebate programs is predominantly based on non-price coercive features.  Instead, the amended complaint is devoid of factual allegations showing that Defendants employed *any* non-price mechanism of coercion to exclude competitors.

Indeed, the amended complaint alleges none of the non-price coercive features that courts have found necessary to deem market-share rebate programs anticompetitive.  For example, Plaintiff does *not* allege any of the following:

- that any Defendant insisted on contractual provisions requiring exclusive dealing, *FTC v. Syngenta*, 2024 WL 149552, at \*17 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 456 (6th Cir. 2007)),[17]

---

[17] Plaintiff includes a single sentence in its complaint alleging that Corteva's loyalty offers "typically contain[] a term that if the distributor does not meet its thresholds for every one of the products in the loyalty offer, it forfeits its loyalty payments for all products."  ¶ 98.  However, because the share discounts are still the "centerpiece of the bundled discounts," price remains the predominant method of exclusion and the price cost test applies.  *See Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612-13 (8th Cir. 2011) (granting summary judgment for share-based discount program despite allegations of bundling).  In any event, Plaintiff's single-sentence allegation fails to sufficiently state a claim for bundling.  Plaintiff does not even identify the bundled goods, let alone whether Corteva "sells a bundle of goods or services for a lower price than [Corteva] charges for the goods or services purchased individually."  *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1206 (D. Minn. 2018) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008)).  Moreover, because actionable bundling "cannot exist unless two separate product markets have been linked," Plaintiff's failure to identify the bundled products and their markets is necessarily fatal to its claim.  *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000).

- that any Defendant imposed obligations on customers "to purchase a set percentage of products from the defendant," *id.* (citing *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 n.2 (9th Cir. 2010)),

- that any Defendant's discounts involved tying or bundling, *id.* (citing *Eisai*, 821 F.3d at 405; *LePage's Inc. v. 3M*, 324 F.3d 141, 157-58 (3d Cir. 2003)),

- that any Defendant employed contractual "provisions aggravating existing barriers to enter the market," *id.* (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 836 (11th Cir. 2015); *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 645 (N.D. Ill. 2022)),[18] or

- that any Defendant made threats "to retract unpaid rebates or claw back discounts from prior years," *id.* (citing *McWane*, 783 F.3d at 820-21), or to "cut off supply," *id.* (citing *ZF Meritor*, 696 F.3d at 278).

Not only does Plaintiff fail to allege facts showing that dealers are coerced into meeting loyalty thresholds through non-price features of the rebate programs, Plaintiff affirmatively negates coercion by alleging that dealers have an independent profit motive for selling Defendants' branded products instead of "lower priced" generic products. In particular, Plaintiff alleges that distributors and retailers earn a "greater profit on the name-b[r]and product" than on a generic product. ¶ 79. Plaintiff further alleges that "Arkansas farmers do not buy more if the price of crop-protection products drops or less if the price goes up." ¶ 78. These allegations explain that dealers have a profit motive independent of rebates to sell Defendants' branded

---

[18] Plaintiff's conclusory allegation that Defendants' "use of loyalty programs impose a substantial barrier to entry by limiting generic manufacturers' access to the traditional distribution channel" is belied by their allegations elsewhere in the amended complaint that generic manufacturers have indeed been able to enter the marketplace, *see*, *e.g.*, ¶¶ 194, 208, 242. *See Concord Boat Corp.*, 207 F.3d at 1059-60 (holding that plaintiffs failed to show "significant barriers to entry" where a new competitor had entered the market recently).

products rather than generic products and—together with the absence of alleged facts showing coercion—confirms that dealers are not coerced into meeting rebate thresholds.

Plaintiff alleges that "[e]ach Defendant regularly exercises the contractual right to withhold exclusion payments" (¶ 105) and that Defendants "enforc[ed] and threaten[ed] enforcement" of the prescribed conditions (¶ 299), but the mere allegation that a distributor "simply lost its negotiated discount" does not amount to non-price coercive conduct.  *See Bard,* 642 F.3d at 612; *EpiPen*, 44 F.4th at 998 (10th Cir. 2022) (noting that the plaintiff "fail[ed] to demonstrate coercion because the loss of an additional discount was the only consequence … faced").  Nor is Defendants' exercise of such rights even absolute: Plaintiff acknowledges that distributors do not always meet program thresholds, and that Defendants sometimes grant exceptions for missed thresholds, even without "good cause."  ¶ 105.

Plaintiff fails to plead facts plausibly showing that any Defendant has coerced dealers into excluding competing generic products.  Instead, Plaintiff vaguely alleges that Defendants have "enforced" unspecified "terms" of their rebate programs by "canceling distribution contracts, delaying access to new products, *or* withholding product allocation during a supply shortage."  ¶ 105.  But no allegations of fact connect these alleged actions to a Defendant's rebate program, much less to any dealer's dealings with competing generic products.  In this factual vacuum, there is no plausible basis to consider the alleged actions exclusionary.  Indeed, the alleged actions are, on their face, "not only compatible with, but indeed … more likely explained by, lawful … free-market behavior."  *Iqbal*, 556 U.S. at 680.  Further, because Plaintiff employs improper group pleading—referring to "Defendants" and "their" rebate programs—there is no basis to conclude that any particular Defendant engaged in any of the (non-exclusionary) alleged actions.  These unsupported allegations, like Plaintiff's conclusory

allegation that Defendants "threaten[ed] penalties for disloyalty" (¶¶ 299, 319), do not suffice to plead coercion.

This conclusion is supported by the District Court for the Middle District of North Carolina's decision on Defendants' motions to dismiss in the related government action pending there. *See FTC v. Syngenta*, 2024 WL 149552, at *30. While the North Carolina court declined to dismiss the government plaintiffs' antitrust claims on price-cost test grounds, the court did so based on factual allegations that are absent from this Arkansas-focused amended complaint. *Id.* at *17 ("Here, [the government plaintiffs] have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at this pleading stage."). In contrast to the North Carolina plaintiffs, for example, Plaintiff fails to allege facts relating to exclusionary threats to distributors. *Id.* To the contrary, Plaintiff's allegations as to demand for crop protection products from Arkansas farmers and profit incentives of distributors and retailers (¶¶ 78-79) affirmatively establish that, at least with respect to distribution and sale of crop protection products related to Arkansas, distributors and retailers are independently incentivized to sell the Defendants' products and are by no means coerced. Plaintiff's claims should be dismissed on this basis, as well as each of the other independent bases described herein, none of which is foreclosed by the North Carolina decision.

### 3.  Plaintiff Fails to Plead Facts Plausibly Showing a Market-Allocation Agreement Between Syngenta and Corteva

Plaintiff alleges two agreements under which Syngenta exclusively supplies Syngenta AIs (mesotrione and s-metolachlor, respectively) to Corteva for use in certain mixture products. ¶¶ 132-134, 147-148, 183-186. But Plaintiff pleads no facts showing that either of these supply agreements has a substantial effect on competition. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("[A]n exclusive deal affecting a small fraction of a market

clearly cannot have the requisite harmful effect upon competition[.]").  Plaintiff alleges that Syngenta negotiated the mesotrione supply agreement with Corteva in response to the competitive "threat[s]" from both "generic entry" and Corteva's ability to self-supply.  ¶ 132. And Plaintiff also admits that the "presence of generic products in the market has caused Syngenta to reduce prices of" both its mesotrione and metolachlor products "to some degree." ¶¶ 131, 146.  These facts demonstrate competition in action—and undermine Plaintiff's argument that Syngenta's loyalty program forecloses generic competition.

From these unremarkable agreements, Plaintiff jumps to the conclusion that Defendants entered into a broader market allocation agreement, in which they "agreed not to produce each other's [AI]."  ¶ 183; *see* ¶ 186.  But Plaintiff fails to plead facts plausibly showing the existence of an illegal market-allocation agreement.  Plaintiff pleads no facts plausibly showing that each Defendant "had a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768 (1984), or that each Defendant's conduct was more consistent with an unlawful agreement than with "independent [lawful] action," *Twombly*, 550 U.S. at 557.

To the contrary, Plaintiff pleads facts affirmatively showing "an obvious alternative explanation," *id.* at 567, for Defendants allegedly not producing each other's AIs: it is not their business model to manufacture off-patent AIs developed by other manufacturers.  The amended complaint explains that crop protection manufacturers are "divided into" two distinct categories based on their fundamental business model: "basic" manufacturers and "generic" manufacturers. ¶ 49.  Basic manufacturers such as Defendants "research, develop, patent, market, and sell new [AIs]."  ¶¶ 49-50.  Defendants are ***not*** generic manufacturers, which "only manufacture and sell crop-protection products containing [AIs] that other basic manufactures have developed."  ¶ 56;

*see also* ¶¶ 49, 58.  In addition, Plaintiff alleges that there are "economies of scale" to producing

crop protection products, which give the basic manufacturer that invests in an AI an advantage

over manufacturers of generic versions of the AI.  ¶ 194.  These allegations supply "an obvious

alternative explanation" for why Defendants allegedly do not produce each other's AIs, and this

explanation undermines any inference of an "illegal agreement."  *Twombly*, 550 U.S. at 567.[19]

### B.  Plaintiff Fails to Plead a Plausible Product Market

Every antitrust claim Plaintiff alleges requires allegations sufficient to support a

cognizable relevant market.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962); *see

also Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[I]n

order to state a Sherman Act claim under either section 1 or section 2, the plaintiff must identify

a valid relevant market.").  "Without a well-defined relevant market, a court cannot determine

the effect that an allegedly illegal act has on competition."  *Little Rock Cardiology Clinic PA v.

Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009).  "It is the plaintiff's burden to define the

relevant market."  *Supervalu*, 136 F.3d at 560.

Here Plaintiff proposes two alternative (and contradictory) markets: (1) each Relevant AI

itself, in both its finished and technical-grade form, and (2) crop protection products that contain

each Relevant AI.  ¶ 196.  With respect to the first proposed market, Plaintiff asserts that each

Relevant AI—azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor—has

unique characteristics that differentiate it from other AIs, and indeed, all other crop protection

products.  ¶ 48.  With respect to the second proposed market, Plaintiff alleges that every crop

---

[19] Notably, Plaintiff does not even attempt to allege that Corteva or Syngenta had the capacity or intent to produce each other's AIs as a viable alternative to the supply agreements in question.

protection product competes with every other crop protection product containing the same Relevant AI. ¶ 196. Neither alleged market withstands scrutiny.

### 1.    <u>Plaintiff Fails to Properly Plead an AI-only Relevant Market</u>

Plaintiff cannot sustain its first, narrowly-drawn market, as it fails to address reasonable interchangeability, cross-elasticity of demand, and other "practical indicia" of a valid relevant market. *Cf. Brown Shoe Co.*, 370 U.S. at 325; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

### a.    <u>Plaintiff Fails to Properly Plead Reasonable Interchangeability or to Explain the Exclusion of Well-Known Alternatives</u>

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co.*, 370 U.S. at 325; *see also Baptist Health*, 591 F.3d at 597 ("[T]he general issue when determining the relevant product market concerns the choices available to consumers."); *Ripplemeyer v. Nat'l Grape Co-op. Ass'n, Inc.*, 807 F. Supp. 1439, 1461 (W.D. Ark. 1992) ("The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendants' products or services."). "The relevant product market includes all reasonably interchangeable products." *Supervalu*, 136 F.3d at 560 (citing *Queen City Pizza*, 124 F.3d at 436).

Plaintiff does not begin to address all of the crop protection products that are reasonably interchangeable within the single AIs in its proposed AI-only markets.  Plaintiff asserts that "crop-protection products with other Active Ingredients that kill or control the same pest are not reasonably interchangeable with Defendants' products from the point of view of the end-user" because "each Relevant AI works better under certain conditions than others, and has characteristics other than price that would be important to the consumer."  ¶¶ 197, 198.  But for each of the Relevant AIs, Plaintiff provides, at most, *two sentences* that describe a few general characteristics vaguely in comparison to "other, similar herbicide active ingredients" (for metolachlor, mesotrione, rimsulfuron, and acetochlor) and "other, similar insecticide active ingredients" (for oxamyl) (¶¶ 48(a)(ii)-(b)(iii)).  With respect to azoxystrobin, Plaintiff notes only that "Syngenta also claims that azoxystrobin has growth-enhancing effects not proven in other active ingredients," (¶ 48(a)(i)) implausibly suggesting that "growth-enhancing effects" is the only relevant characteristic for fungicides.  Plaintiff fails to explain why the referenced "other" active ingredients are not "reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  Many of Plaintiff's proffered reasons for differentiating the Relevant AIs are simply alleged advantages they have over other products.  *See, e.g.*, ¶ 48(b)(ii) (alleging that oxamyl is "safer for crops and better for soil health than other, similar insecticide [AIs]").  At most, these are unsupported, summary assertions of product differentiation—but product differentiation does not define market boundaries.  *Brown Shoe Co.*, 370 U.S. at 327 (rejecting a narrow market definition premised on "price/quality" and "age/sex" differences between shoes because "the boundaries of the relevant market must be drawn with sufficient breadth to include … competing products"); *DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1339 (Fed. Cir. 2014) ("When products are

not identical or fungible, they still may be in the same market as differentiated products … 'Most courts correctly define the presumptive market to include similar products, though differentiated by brand or features.'" (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 563d at 389 (3d. ed. 2007)).  Indeed, it is because there is competition among "reasonably interchangeable" products that manufacturers strive to differentiate their offerings.

Plaintiff alleges in conclusory terms that "there are often differences in performance and other reasons why one Active Ingredient cannot readily replace or be interchangeable with another Active Ingredient for a given application or in a given condition." ¶ 47.  But Plaintiff fails to include factual allegations supporting its exclusion of products that treat the same weeds and pests, on the same crops, by the same mode of action, at the same site of action and from the same chemical family.  To the contrary, the documents incorporated by reference into the amended complaint support the existence of many indisputable alternatives for each of the Relevant AIs.  Specifically, the amended complaint invokes the 2024 University of Arkansas' Recommended Chemicals for Weed and Brush Control (the "MP44") (*see* ¶¶ 275-277), the 2024 University of Arkansas' Insecticide Recommendations for Arkansas (the "MP144") (*see* ¶ 274) and the 2024 University of Arkansas Division of Agriculture Research & Extension Program's Plant Disease Control Products Guide (the "MP154") (*see* ¶¶ 272-273).[20]  Each of these documents is "necessarily embraced by the pleadings" and is therefore properly considered on a motion to dismiss. *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999).  As

---

[20] Relevant excerpts of the MP44, MP144, and MP154 are submitted herewith as Ex. 14, 15, and 16 respectively.  All citations to Exs. 14-16 refer to the internal page numbers.

is evident from these documents and other judicially noticeable materials,[21] there are numerous

reasonably interchangeable alternatives for each relevant AI that Plaintiff fails to address:

Acetochlor:  one of many Seedling Shoot Growth Inhibitors and a Long-chain Fatty Acid (*i.e.*, lipid) Inhibitor (Group 15) from the acetamide family.  *See* Ex. 14 at 11, 14; Ex. 1. Plaintiff's "acetochlor market" not only excludes other herbicides with the same "site of action" as acetochlor from different chemical families (*e.g.*, pyroxasulfone and cycloate), but also it excludes herbicides from the exact same chemical family (*e.g.*, metolachlor and dimethenamid).  *See* Ex. 14 at 11, 14; Ex. 1; *see also* Ex. 3 ("Other preemergence corn herbicides which provide weed control similar to acetochlor include dimethentamid-P …, s-metolachlor …, pendimethalin … and many others.")

Oxamyl: one of many nematicides, an acetylcholinesterase inhibitor (Group 1A) from the carbamate family.  *See* Ex. 15 at 18, 23; Ex. 4.  Plaintiff's "oxamyl market" not only excludes other pesticides with the same mode of action as oxamyl from the organophosphate chemical families (*e.g.*, acephate, chlorpyrifos, and dicrotophos), but also it excludes products of the same carbamate family (*e.g.*, aldicarb, carbaryl, thiodicarb, and methomyl).  *See* Ex. 15 at 18-22; Ex. 13 at 3-4, 7-8, 23; *see also* Ex. 5 (listing alternatives to oxamyl for boll weevil control).

Rimsulfuron: one of many Amino Acid Synthesis Inhibitors, and an ALS Inhibitor (Group 2) from the Sulfonylurea family.  *See* Ex. 14 at 11-12; Ex. 1.  Plaintiff's "rimsulfuron market" not only excludes other herbicides with the same mode of action (*i.e.*, Group 9 EPSP Synthase Inhibitors like glyphosate), but also it excludes products in different chemical families with the same "site of action" (*e.g.*, imazethapyr and cloransulam), and from the same chemical family (*e.g.*, mesosulfuron, halosulfuron, and thifensulfuron).  *See* Ex. 14 at 11-12, 14; Ex. 1; Ex. 13 at 9, 13, 19; *see also* Ex. 6 (listing products labeled for same uses as rimsulfuron).

Azoxystrobin: one of many strobilurin fungicides (Group 11).  *See* Ex. 16 at 7-8. Plaintiff's "azoxystrobin market" excludes products from the same chemical family (*e.g.*, fluoxastrobin, pyraclostrobin, picoxystrobin, and trifloxystrobin).  *See id.*; Ex. 7; Ex. 8.

Mesotrione: one of many herbicides, mesotrione is a Group 27 HPPD inhibitor.  *See* Ex. 14 at 11, 14.  Plaintiff's "mesotrione market" not only excludes other products with the same "site of action" (*e.g.*, isoxaflutole and topramezone), but also it excludes products

_____

[21] The Court may consider "materials that are part of the public record or do not contradict the complaint" and "materials that are necessarily embraced by the pleadings."  *Porous Media* 186 F.3d at 1079.  Courts have taken judicial notice of facts at the motion to dismiss stage when they are beyond meaningful dispute and available public sources demonstrate consensus. *See Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 904 (8th Cir. 2017) (holding that the district court did not abuse its discretion when relying on an EPA fact sheet to take judicial notice of the physical characteristics of radium); *see also Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (holding that, in a dispute between farmers and the USDA concerning debt write-down agreements, related instructions to farmers published in the Code of Federal Regulations and an Administrative Notice referenced by plaintiff's complaint "properly could be considered by the district court in ruling on a motion to dismiss").

41

from the same chemical family (*e.g.*, tembotrione and bicyclopyrone).  *See* Ex. 14 at 11, 14; Ex. 1; Ex. 9; Ex. 10.

Metolachlor: one of many "pre-emergent herbicides," metolachlor (like acetochlor) is a Seedling Shoot Growth Inhibitor and a Long-chain Fatty Acid (*i.e.*, lipid) Inhibitor (Group 15) from the acetamide family.  *See* Ex. 14 at 11, 14; Ex. 1.  Plaintiff's "metolachlor market" not only excludes other products with the same "site of action" (*e.g.*, pyroxasulfone and cycloate), but also it excludes products from the same chemical family (*e.g.*, acetochlor and dimethenamid).  *See* Ex. 14 at 11, 14; Ex. 1; Ex. 3; Ex. 11; Ex. 12.

Plaintiff's sources also disclose a far broader, more realistic market—one that includes many "products that have reasonable interchangeability for the purpose for which they are produced."  *Little Rock Cardiology*, 591 F.3d at 596 (quoting *du Pont*, 351 U.S. at 404).  For example, the MP44 broadly classifies herbicides by the crop they are applied to and whether they are preemergent or post-emergent herbicides.  These classifications further confirm the overlapping uses across active ingredients with both the same and different modes of action, sites of action, and chemical families.  For example, in the preemergent soybean herbicides group, the MP44 lists Syngenta's Dual Magnum (a single-AI metolachlor product); BASF's Outlook (a single-AI dimethenamid-p product), and Bayer's Warrant (a single-AI acetochlor product).  *See* Ex. 14 at 14, 42.  Likewise, the MP144 lists oxamyl alongside acephate and dicrotophos, which have the same mode of action but come from different chemical families, as treating several of the same insects on cotton crops.  *See* Ex. 15 at 76-77, 82-83.  Moreover, the MP44 lists both Corteva's Resolve Q (a rimsulfuron and thifensulfuron-methyl mixed product) and Syngenta's Callisto (a single-AI mesotrione product) as post-emergent corn herbicides despite the fact that the applicable Relevant AIs have entirely different modes of action.  Ex. 14 at 14-15, 67.  Glyphosate, an active ingredient that, as described above, has the same mode of action as rimsulfuron with a different site of action, is also listed as a post-emergent corn herbicide.  *Id.* at 67.

These broader categories are consistent with prior efforts to define the relevant market, and these prior market definitions underscore the implausibility of Plaintiff's theory.  *See Mahaska Bottling Co. v. PepsiCo Inc.*, 271 F. Supp. 3d 1054, 1075-76 (S.D. Iowa 2017) (dismissing claims for failure to plausibly define the relevant product market and citing prior inconsistent FTC market definition).  Specifically, the FTC—the antitrust agency that Plaintiff relied upon in drafting its original and amended complaint—itself previously defined a broader market for "corn herbicides for pre-emergent control of grasses," which included the AIs metolachlor, acetochlor, and dimethenamid.  Compl. at 3, *In re Novartis AG, et al.*, Dkt. No. C-3979 (FTC Nov. 1, 2000).[22]  This transaction (which formed Syngenta) involved one company that marketed metolachlor and one that marketed acetochlor, and the FTC found there to be such competition between these AIs that the FTC required the divestiture of one of them for the transaction to close, and acetochlor was divested to a Corteva predecessor.  *See* Complaint, *In re Novartis AG, et al.*, Dkt. No. C-3979 at ¶¶ 10-11 (FTC Nov. 1, 2000); Decision and Order, *In re Novartis AG, et al.*, Dkt. No. C-3979 at 9-11 (FTC Nov. 1, 2000).  By contrast, Plaintiff asserts that metolachlor and acetochlor are in entirely different markets, and Plaintiff does not mention dimethenamid at all, even though it is identified as a reasonable substitute for acetochlor and metolachlor in the documents underlying Plaintiff's amended complaint.

Official materials from the federal agency charged with regulating crop protection products, the EPA, raise similar challenges for Plaintiff.[23]  For example, the amended complaint alleges rimsulfuron is in its own market (¶ 48(b)(i)), but it does not explain why thiencarbazone

---

[22] Since that enforcement action, the AI pyroxasulfone also has been labeled for use as a corn herbicide for preemergent control of grasses.  EPA Reg. No. 63588-92 at 9-10 (2012).

[23] *See* Ex. 13.

is not reasonably interchangeable with rimsulfuron.  According to the EPA, thiencarbazone, like

rimsulfuron, is an herbicide that may be used on a wide variety of crops including corn, peanuts,

and potatoes that may be applied pre- or postemergence using multiple application methods.

EPA Reg. No. 264-1066 at 5, 9-11 (2020).  Similarly, Plaintiff does not explain why

flumetsulam, a pre- and postemergence corn herbicide with multiple methods of application that

can be used on a variety of weeds, is not substitutable for acetochlor.  EPA Reg. No. 524-614

at 9, 22, 25-26 (2014).  Nor does Plaintiff explain why methomyl, an insecticide used on cotton,

potatoes, and other crops, with multiple methods of application, is not substitutable for oxamyl.

EPA Reg. No. 89167-91 at 5-8, 16, 19-20 (2020).  The same is true for each of the Syngenta AIs.

*See*, *e.g.*, Ex. 8 (EPA-approved labels for fungicides based on AIs that, like azoxystrobin, can be

used on a wide variety of crops including corn and soybean); Ex. 10 (EPA-approved labels for

herbicides based on AIs that, like mesotrione, can be used on crops like field corn, seed corn,

popcorn, and sweet corn); Ex. 12 (EPA-approved labels for herbicides based on AIs that, like

metolachlor, can be used for weed control on a wide variety of crops, including corn, cotton, and

soybean).

　　　　Courts—including in this Circuit—routinely dismiss complaints lacking factual

allegations sufficient to exclude reasonably interchangeable substitutes from the proposed

relevant market.  *See Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517

(8th Cir. 2018) (affirming dismissal when proposed relevant market failed to "include all

interchangeable mail-order pharmacy services in its relevant market"); *Baptist Health*, 591 F.3d

at 597-98 (affirming dismissal when proposed relevant market omitted potential cardiology

patients based on their method of payment); *Davies v. Genesis Med. Ctr. Anesthesia &*

*Analgesia, P.C.*, 994 F. Supp. 1078, 1098 (S.D. Iowa 1998) (affirming dismissal where plaintiffs

made "no allegations that physician anesthesiologists who offer anesthesiology services … are not interchangeable with other physician anesthesiologists").[24]  Properly alleging a market takes work:  a plaintiff has to lay out potential substitutable products and assert facts to support whether they fall within the market.  Plaintiff's amended complaint does not even attempt to do this, and its failure to plead a plausible explanation for excluding reasonable substitutes from its relevant market is fatal to its claims.

<b>b.     Plaintiff's Allegations Also Fail Under <i>Brown Shoe</i><br>and the Hypothetical Monopolist Test ("HMT")</b>

Beyond failing to allege facts sufficient to exclude reasonably interchangeable substitutes, Plaintiff disregards all other established principles for defining markets.  To determine a relevant market, courts may analyze indicia like "industry or public recognition of the market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers or prices, sensitivity to price changes, and specialized vendors."  *Brown Shoe Co.*, 370 U.S. at 325.  In particular, courts assess cross-elasticity of demand, or how "consumers will shift from one product to the other in response to changes in their relative costs."  *Baptist Health*, 591 F.3d at 596.

To evaluate cross-elasticity of demand for the purpose of defining the relevant market, courts apply the "hypothetical monopolist test."  *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019).  The hypothetical monopolist test ("HMT") asks whether a hypothetical monopolist of the alleged product market could profitably impose a "'small but significant and nontransitory' increase in price" ("SSNIP").  DOJ & FTC, Merger Guidelines § 4.3.A (2023).

---

[24] Defendants acknowledge that the United States District Court for the Middle District of North Carolina denied Defendants' motions to dismiss, pleaded on similar grounds, in the related action.  *See FTC v. Syngenta*, 2024 WL 149552, at *8-12.  However, as discussed *supra* Point III.A.2, the amended complaint at issue in this Motion contains a number of different allegations and, of course, applies the law of the Eighth Circuit (rather than Fourth Circuit).

The HMT predicts whether substitutes to the product in question will constrain the price, making a SSNIP unprofitable for the hypothetical monopolist. *Id.* If so, those substitutes are added to the relevant product market and the test begins again. *Id.*

Apart from alleging a haphazard selection of differences between the Relevant AIs and unspecified "other … active ingredients" (¶¶ 48(a)(i)-(b)(iii)), Plaintiff does not address any of the *Brown Shoe* factors. Plaintiff alleges no facts suggesting the Relevant AIs are recognized as a separate economic entity, require unique production facilities, serve distinct customers, command distinct prices, demonstrate sensitivity to price changes, or rely on specialized vendors when compared to similar active ingredients. The reason is simple: Rather than supporting Plaintiff's contrived relevant market, these factors instead support including other active ingredients in Plaintiff's relevant market. *See United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities."); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015) ("[A] product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same."). To the contrary, as discussed above, the MP44, MP144, and MP154 documents incorporated by reference into the amended complaint evidence industry recognition of undisputable alternatives for each of the Relevant AIs and the lack of any recognized submarket.

Moreover, Plaintiff makes no factual allegations concerning the cross-elasticity of demand between the Relevant AIs and reasonably interchangeable alternatives. Instead, Plaintiff makes the conclusory assertion that "there is no cross-elasticity of demand between Relevant AIs and other Active Ingredients in the same category based upon price." ¶ 199. But a conclusory assertion that an alleged market satisfies an HMT is insufficient, especially where known

alternatives are not even tested.  *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1122 (9th Cir. 2018).  Plaintiff has not pleaded facts showing that a proper application of the HMT would exclude the many alternatives listed above.  In fact, Plaintiff deliberately ignores substitute products for the Relevant AIs identified in documents cited in the amended complaint, and Plaintiff alleges neither the quantitative nor qualitative evidence required to satisfy the HMT. *See* DOJ & FTC, Merger Guidelines § 4.3.C (2023).

<b>2.      Plaintiff Fails to Properly Plead an Alternative Relevant Market</b>

Plaintiff's alternative relevant market includes all EPA-registered crop protection products that contain the same Relevant AI.  Whereas Plaintiff's AI-only market wrongfully excluded reasonably interchangeable crop protection products, its alternative market dramatically overcorrects by encompassing crop protection products that happen to include the same AI regardless of their use or function.

Under Plaintiff's alternative market definition, every crop protection product competes in the same market with every other crop protection product containing the same relevant AI— regardless of the crop protection product's function, intended use, physical and performance characteristics, or composition (including its concentration of the relevant AI).  However, distinct crop protection products containing the same AI may not be substitutes if they are labeled for different uses.  For example, different products containing the same AI— rimsulfuron—are labeled for the suppression and control of different weeds, and for the application to different crops.  *Compare* EPA Reg. No. 352-853 at 18-19 (2020), *with* EPA Reg. No. 432-1604 at 8-9 (2020) (listing different weeds controlled); *compare* EPA Reg. No. 352-768 at 1 (2021), *with* EPA Reg. No. 352-837 at 1 (2020) (listing application to different crops). Plaintiff's amended complaint ignores these differences, alleging no facts that address reasonable interchangeability or cross-elasticity of demand to demonstrate its market is properly drawn.  *Cf.*

47

*FTC v. Staples*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (holding that market definition turns on "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other").

Plaintiff's alternative relevant market is further undermined by its own complaint. The amended complaint states that crop protection products "containing two or more active ingredients are called 'mixtures'" (¶ 44) and identifies several of Defendants' mixture products by name, including Corteva's Realm Q (¶¶ 153, 277), Resolve Q (*id.*), Basis (*id.*), and Keystone LA (¶¶ 174, 277) products, as well as Syngenta's Miravis Neo (¶¶ 114, 273), Trivapro (*id.*), Lumax EZ (¶¶ 125, 276), and Acuron (*id.*) products. Several of these products have overlapping active ingredients. For example, Syngenta's Lumax EZ and Acuron products both contain the Relevant AIs mesotrione and s-metolachlor, as well as the active ingredient atrazine.[25] As for Corteva, its Realm Q product contains the Relevant AIs mesotrione and rimsulfuron; its Keystone LA product contains acetochlor and atrazine; and its Resicore XL product contains acetochlor and mesotrione.[26] These products containing overlapping active ingredients represent just a sliver of the universe of herbicide mixtures—indeed, the MP44 notes that there are "too many [field corn herbicide mixtures] to list." Ex. 14 at 71. Yet Plaintiff offers no explanation as to how these and other mixtures containing more than one Relevant AI should be characterized

---

[25] Though the amended complaint carefully avoids identifying the active ingredients in these mixtures, the amended complaint cites Syngenta web pages that disclose the active ingredients. *See* ¶ 125 n.32 (citing Lumax EZ Herbicide, SYNGENTA, https://www.syngenta-us.com/herbicides/lumax-ez); *id.* ¶ 125 n.33 (citing Acuron Herbicide, SYNGENTA, https://www.syngenta-us.com/herbicides/acuron). These materials are "necessarily embraced by the pleadings" and are therefore properly considered on a motion to dismiss. *Porous Media*, 186 F.3d at 1079.

[26] The amended complaint also cites Corteva web pages that disclose the active ingredients in each product. *See* ¶ 153 n.35 (citing Realm Q, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop protection/realm-q.html); ¶ 174 n.40 (citing Keystone LA, Corteva Agriscience, https://www.corteva.us/products-and-solutions/crop protection/keystone-la.html). The MP44 identifies Resicore XL as a product manufactured by Corteva that contains the active ingredients acetochlor, mesotrione, and clopyralid. Ex. 14 at 17.

under its alternative market definition.  In essence, Plaintiff has failed to define a relevant market for this entire category of products, despite identifying it explicitly in the amended complaint.

Here again, Plaintiff has shirked its burden to allege facts tending to demonstrate reasonable interchangeability or cross-price elasticity between products.  *See supra* Point III.B.1.  Plaintiff has pleaded a market that is at best overbroad (defining as competitors crop protection products that happen to include the same AI, regardless of their use or function) and at worst, nonsensical (providing no means of assessing a whole category of crop protection products containing more than one Relevant AI).  Accordingly, Plaintiff's alternative relevant market fails.

### 3.    Neither Market Plausibly Accounts for Competitive Realities Embraced by the Amended Complaint

Plaintiff's failure to adequately account for mixture products is inconsistent with the competitive realities embraced by the amended complaint.  Though Plaintiff repeatedly touts Defendants' efforts to advertise their finished crop protection products (*see*, *e.g.*, ¶¶ 113-114, 124, 138, 152-153, 164), Plaintiff ignores the highly competitive context of these advertisements and the contours of the market in which these finished crop protection products compete.  For example, Plaintiff cites a Syngenta web page advertising the product Acuron.  *See* ¶ 125 n.33.  The same page includes the following graphic comparing Acuron to competing preemergence herbicides:[27]

---

[27] *See* Acuron Herbicide, SYNGENTA, https://www.syngenta-us.com/herbicides/acuron.



Neither of Plaintiff's markets can account for the active ingredient mixes in these competing products.  Acuron contains the active ingredients s-metolachlor, atrazine, mesotrione, and bicyclopyrone.[28]  As for the competing products, the MP44 reveals that:  (a) Resicore is a Corteva mixture product containing the active ingredients acetochlor, mesotrione, and clopyralid; (b) Trivolt is a Bayer mixture product containing the active ingredients isoxaflutole, thiencarbazone, and flufenacet; (c) Verdict is a BASF mixture product containing the active ingredients saflufenacil and dimethenamid; and (d) Surestart II is a Corteva mixture product containing the active ingredients flumetsulam, clopyralid, and acetochlor.  *See* Ex. 14 at 15, 17. Under Plaintiff's theory, however, Acuron does not compete in the same market as Trivolt, Verdict, or Surestart II because those products do not contain any overlapping active ingredients. Resicore and Acuron could compete in the same market to the extent they contain mesotrione, but as noted above, Plaintiff would also have the products in separate acetochlor and metolachlor markets.

---

[28] *See id.*

Moreover, and despite the differing active ingredients in these products, the products all have one thing in common: the MP44 reveals that, by weight, each mixture primarily consists of a different Group 15 active ingredient: acetochlor (Resicore and Surestart II), s-metolachlor (Acuron), dimethenamid (Verdict), and flufenacet (Trivolt).[29] The fact that these competing products share this primary site of action group underscores the failure of Plaintiff's single-AI market to plausibly account for reasonable substitutes by excluding active ingredients with the same site of action as the Relevant AIs.

In sum, Plaintiff's asserted markets fail to plausibly explain the market realities embraced by the amended complaint. These markets in fact are far more consistent with the discussion above—that is, many different products, especially those with similar sites of action, compete in broad herbicide markets. Plaintiff's effort to "gerrymander its way to an antitrust victory" is improper, and Plaintiff's claims should be dismissed. *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

### C. The Federal Antitrust Claims Should Be Dismissed for Failure to Plead Proximate Causation

Plaintiff's claims for injunctive relief under Section 3 of the Clayton Act and under Sections 1 and 2 of the Sherman Act fail to satisfy the bedrock requirement of proximate causation—which also is referred to (imprecisely) as "standing" in some cases.

---

[29] For each product, the MP44 lists each of the active ingredients in that product in the "Common Name" column. *See, e.g.*, Ex. 14 at 17. In the following columns, the MP44 lists information about each active ingredient in the same order, including the weight of each active ingredient and the ingredient's site of action group. *See id.* Accordingly, Resicore contains 2.8 pounds per gallon ("lb/gal") of acetochlor, a Group 15 active ingredient, 0.27 lb/gal of mesotrione, a Group 27 active ingredient, and 0.19 lb/gal of clopyralid, a Group 4 active ingredient. *See id.* Acuron contains 2.14 pounds ("lb") of s-metolachlor, a Group 15 active ingredient, 1 lb of atrazine, a Group 5 active ingredient, 0.06 lb of bicyclopyrone and 0.24 lb of mesotrione, both Group 27 active ingredients. *Id.* Trivolt contains 0.57 lb/gal of isoxaflutole, a Group 27 active ingredient, 0.23 lb/gal of thiencarbazone, a Group 2 active ingredient, and 2.85 lb/gal of flufenacet, a Group 15 active ingredient. *Id.* Verdict contains 0.57 lb of saflufenacil, a Group 14 active ingredient, and 5 lb of dimethenamid, a Group 15 herbicide. *Id.* Lastly, Surestart II contains 0.12 lb/gal of flumetsulam, a Group 2 herbicide, 0.38 lb/gal of clopyralid, a Group 4 herbicide, and 3.75 lb/gal of acetochlor, a Group 15 herbicide.

In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court "incorporat[ed] principles of proximate cause" into the "direct purchaser" rule, barring "indirect purchasers who are two or more steps removed from the violator in a distribution chain" from suing alleged antitrust violators for damages. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). *Illinois Brick* did not address claims for injunctive relief, yet the decision "has a broader significance" beyond damages claims "in indicating that there are inherent limitations in the substantive protection afforded by the antitrust laws," which "exclude claims based on conjectural theories of injury and attenuated economic causality." *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980). As the Supreme Court confirmed in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), **all** causes of action under the federal antitrust laws "incorporate a requirement of proximate causation." *Id.* at 132.

As shown above, Defendants' rebates constitute price competition that cannot give rise to antitrust injury, which is necessary to proximate causation. *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983) ("*AGC*") (holding that an alleged injury "must be analyzed to determine whether it is of the type that the antitrust statute was intended to forestall"). In any event, the end users of crop protection products on whose behalf the State sues—state entities and individual farmers—do not purchase these products **directly** from Defendants, and their alleged injuries are too **remote** from the alleged restraint of trade at the **wholesale** level of the so-called "traditional" distribution channel. Further, there is no allegation of any restraint of trade that prevents generic manufacturers from selling crop protection products **directly** to any end user or through non-"traditional" channels, such as e-commerce distributors.

Finally, the injuries alleged by Plaintiff are speculative at best. Plaintiff argues that distributors do not "pass on" Defendants' rebates "in the form of reduced downstream pricing." ¶¶ 220-221. But Plaintiff does not plausibly allege why the same distributors would, in a hypothetical world without the Defendants' rebate programs, buy more "lower priced" generic products and "pass on" lower prices to Arkansas farmers. To the contrary, the amended complaint's allegations show that it is in dealers' *independent* economic interest to sell Defendants' branded products instead of "lower priced" generic products. In particular, "sales of generic crop-protection products … affect the distributor's or retailer's bottom line" apart from rebates, because for each sale of a generic product "the distributor or retailer loses … the greater profit on the name-b[r]and product." ¶ 79.

For these reasons, Plaintiff has failed to plead proximate causation.

### 1.    <u>Legal Standards</u>

#### a.    <u>Proximate Causation Is an Essential Element of a Federal Antitrust Claim Seeking Damages *or* Injunctive Relief</u>

In *Lexmark*, the Supreme Court confirmed that causes of action under the federal antitrust laws "incorporate a requirement of proximate causation," citing *AGC*, 459 U.S. at 540.

This requirement of proximate causation applies equally to claims seeking damages and claims seeking injunctive relief. In *Lexmark*, the Supreme Court held that proximate causation "is an element of the cause of action," that "must be met in *every* case." 572 U.S. at 134-35 n.6; *see also id.* at 132 ("[W]e generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute."). The Supreme Court applied the proximate causation requirement in *Lexmark* without distinguishing between claims for damages and claims for injunctive relief. *Id.* at 132-40; *see also*, *e.g.*, *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142 (2d Cir. 2018) (affirming dismissal

of claims for damages and injunctive relief under RICO—whose private remedy was modeled

after Clayton Act § 4—because the plaintiff's "theory of causation" would require the court "to

go beyond the first step in the causal chain") (quoting *Hemi Grp., LLC v. City of New York*, 559

U.S. 1, 10 (2010)).

Accordingly, proximate causation must be pleaded and proved for claims for damages

under Section 4 of the Clayton Act and for claims—like Plaintiff's federal antitrust claims—

seeking injunctive relief under Section 16 of the Clayton Act.[30]  Indeed, as the Supreme Court

has explained, "[i]t would be anomalous … to read the Clayton Act to authorize a private

plaintiff to secure an injunction against a threatened injury for which he would not be entitled to

compensation if the injury actually occurred."  *Cargill, Inc. v. Monfort of Colo., Inc.*,

479 U.S. 104, 112 (1986).  "Sections 4 and 16 are thus best understood as providing

complementary remedies for a single set of injuries."  *Id.* at 113; *see also*, *e.g.*, *B-S Steel of Kan.,*

*Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 666 (10th Cir. 2006) (holding that *AGC*'s proximate

causation requirement "applies to actions arising under both section 4 and section 16 of the

Clayton Act").

The Eighth Circuit has agreed that "[i]njunctive relief under § 16 of the Clayton Act is …

available only to plaintiffs who have suffered an injury cognizable under § 4."  *In re Canadian*

*Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (citing *Cargill*, 479 U.S. at 111-13); *see*

*also Lyons v. Philip Morris Inc.*, 225 F.3d 909, 911, 914 (8th Cir. 2000) (affirming the dismissal

of antitrust claims for damages and equitable relief under *AGC* because they "allege[d] an

---

[30] Section 16 of the Clayton Act, which authorizes suits for injunctive relief "against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26, provides the statutory basis for the relief Plaintiff seeks for its claims under Section 3 of the Clayton Act and Sections 1 and 2 of the Sherman Act, ¶ 20.

Section 4 of the Clayton Act, 15 U.S.C § 15, authorizes suits for damages under the federal antitrust laws, which Plaintiff does not seek here.

indirect injury"); *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 452 (8th Cir. 1985)

("[T]he majority of policy considerations applicable to section four standing analysis also apply

to section sixteen standing analysis.").

### b.    Proximate Causation Requires a Direct Injury

Under *Lexmark*, "the proximate-cause requirement generally bars suits for alleged harm

that is too remote from the defendant's unlawful conduct."  572 U.S. at 133.  Under the federal

antitrust statutes, the "directness" of the relationship "between the injury asserted and the

injurious conduct alleged" is "one of [the] central elements" of "Clayton Act causation."  *Holmes

v. SIPC*, 503 U.S. 258, 259, 270 (1992); *see also Lovett v. GM Corp.*, 975 F.2d 518, 520 (8th Cir.

1992) (identifying "the causal connection between the alleged antitrust violation and the harm to

the plaintiff" and "the directness between the injury and the market restraint" as among the so-

called *AGC* factors (quoting *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir.

1983))); *Minn. Twins*, 779 F.2d at 450 n.6 (same).

In the context of antitrust claims for alleged overcharges, the Supreme Court has

incorporated traditional proximate cause principles into the "direct purchaser rule" established in

*Illinois Brick*.  *See*, *e.g.*, *Apple*, 139 S. Ct. at 1520 ("[I]ncorporating principles of proximate

cause into § 4, we have ruled that indirect purchasers who are two or more steps removed from

the violator in a distribution chain may not sue.").  Under the direct purchaser rule, it is the direct

purchaser that, as a matter of law, "**alone** has suffered injury within the meaning of § 4."  *Kansas

v. UtiliCorp United, Inc.*, 497 U.S. 199, 204 (1990).

Notwithstanding this overlap between the direct purchaser rule and the proximate

causation requirement, the need to plead and prove proximate causation is an "independent

obstacle" to plaintiffs seeking damages or injunctive relief under the federal antitrust laws.  *Int'l

Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 823,

828 (7th Cir. 1999) ("The direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of [*AGC*]" present "independent obstacle[s]" to antitrust plaintiffs.); *see also*, *e.g.*, *Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2006) ("[I]n addition to the barrier imposed by the doctrine of *Illinois Brick*, plaintiffs have failed to demonstrate that they have sustained direct antitrust-type injury, as required by … [*AGC*].").  Thus, federal antitrust claims for alleged overcharges—including those seeking injunctive relief—must satisfy both *Illinois Brick*'s direct purchaser rule and *Lexmark*'s proximate cause requirement.[31]

### 2. Plaintiff's Failure to Plead Proximate Causation Is Fatal to Its Claims Under the Federal Antitrust Statutes

#### a. Plaintiff Sues on Behalf of Indirect Purchasers

According to the amended complaint, the asserted "overcharges" (¶ 15) and "higher prices" to farmers (¶¶ 121, 131, 146, 161, 170, 181, 225) originate with Defendants, which allegedly charge "supracompetitive prices" and earn "supracompetitive profits" from their sale of crop protection products.  ¶¶ 18, 84, 99.  The amended complaint alleges that Defendants sell their *finished* crop protection products to distributors (¶ 59), and sell *ingredients*—"technical

---

[31] In *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998), the Eighth Circuit held that plaintiffs who allegedly paid an overcharge directly to the alleged antitrust violator may pursue injunctive relief.  *Id.* at 1172 ("All of the plaintiffs claim to have purchased tickets from Ticketmaster and claim to have paid the monopolistic service fees.  The payment of those fees establishes standing to pursue a claim for injunctive relief.").  *Ticketmaster* provides no support to Plaintiff, who sues on behalf of purchasers that did *not* pay the alleged overcharge directly to any Defendant.

Conversely, the Eighth Circuit in *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010), held that the plaintiffs were *not* entitled to the injunctive relief at issue—divestiture—substantially because of the remoteness of their alleged injuries.  *See id.* at 1234 ("Never has a federal court ordered divestiture at the request of *a private party who was neither a customer nor a competitor of the merging parties*."); *id.* at 1235 ("[B]ecause beer is sold to consumers through a *three-tier distribution system* throughout the United States, brewers develop beer pricing and promotion strategies on a local market basis, based on an assessment of local competitive conditions.  This means that any antitrust injury Plaintiff could prove would be both *speculative* and localized."); *id.* at 1236 ("Hypothetical anticompetitive conduct, speculative monopoly power, and *remote injuries* do not merit the extreme remedy of divestiture.").  Therefore, Plaintiff is not aided by the Eighth Circuit's dicta describing "indirect purchasers" as "private parties who may sue for injunctive relief under § 16 of the Act."  *Id.* at 1233 (citing *Ticketmaster*, 140 F.3d at 1172).

grade" or "manufacturing-use" AIs—to other manufacturers of crop protection products, which "formulat[e]" these AIs into "finished crop-protection products."  ¶ 45.

Defendants' finished crop protection products pass through a three-level distribution channel to reach end users such as farmers.  In this channel—which Plaintiff labels the "traditional" distribution channel (¶¶ 65-66)—Defendants sell to distributors, distributors sell to retailers, and retailers sell to end users.[32]  As in *InBev*, the "traditional" channel is a "three-tier distribution system."  623 F.3d at 1235 (citing 73 Fed. Reg. 71,682, 71,683 (2008)); 73 Fed. Reg. at 71,683 ("Brewers … sell beer to wholesalers (often known as 'distributors'), which, in turn, sell to retailers.").  In this channel, "a relatively small number of distributors" and "thousands of retailers" (¶ 66) stand "between manufacturers and farmers" (¶ 11).[33]

The amended complaint acknowledges that generic manufacturers can and do "circumven[t] the traditional distribution channel," such as through "direct sales to local retailers or farmers," but dismisses these alternatives as less "efficient."  ¶ 66.  The amended complaint ignores non-"traditional" e-commerce distribution—such as through FBN, the "Amazon" of crop protection products.

**b.    The Alleged Injuries Are Indirect and Speculative**

Plaintiff's allegations demonstrate that the claimed injuries to end users (individual farmers and state entities) on whose behalf it sues are too remote from the alleged restraint of trade to establish proximate causation.  The amended complaint does not, and cannot, allege

---

[32] At first, Plaintiff artificially collapses two levels of the supply chain into one by alleging that "[f]armers buy Defendants' crop-protection products directly from distributors or retailers."  ¶ 3.  But Plaintiff later acknowledges and relies on the "traditional" structure.  ¶¶ 59, 65-66.

[33] End users are even more remote from Syngenta's alleged sales of "technical-grade or manufacturing-use active ***ingredient[s]***" to other pesticide manufacturers "to be formulated into a … finished crop-protection product."  ¶ 196.

facts showing that end users of crop protection products purchase them ***directly*** from Defendants. Nor does the amended complaint allege facts showing that Defendants' rebate programs in any way limit generic manufacturers' ability to sell crop protection products ***directly*** to any end user or through e-commerce distribution. Thus, the amended complaint "allege[s] an indirect injury" insufficient to establish proximate causation. *Lyons*, 225 F.3d at 911, 914.

The amended complaint posits that Defendants' rebate programs reduce generic manufacturers' sales of their products ***to distributors*** at the ***wholesale*** level. *See* ¶ 13 (alleging that "***distributors*** … must … exclude or limit ***their purchases*** of comparable generic products"); ¶ 73 (alleging that Defendants' rebates are "conditioned on ***distributors or retailers limiting purchases*** of generic crop-protection products"); ¶ 219 (alleging that Defendants' rebates "incentivize ***distributors*** to meet applicable loyalty thresholds by forgoing or severely limiting ***purchases from generic manufacturers***."); ¶ 227 (alleging that because of Defendants' rebates "***distributors or retailers have declined to buy*** more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers").

Because end users are not "actual market participants" in the allegedly restrained ***wholesale*** marketplace, and because Defendants' rebates do not restrain generic manufacturers' ability to sell products ***directly*** to end users, the State's claims on behalf of end users should be dismissed under the proximate causation requirement of *Lexmark* and *AGC*. *S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991); *see*, *e.g.*, *InBev*, 623 F.3d at 1234 (denying injunctive relief to "a private party who was neither a customer nor a competitor of the [alleged antitrust violators]"); *Alpha Shoe Serv. v. Fleming Cos.*, 849 F.2d 352, 354 (8th Cir. 1988) (affirming dismissal of federal antitrust claims because "the injury did not arise from anticompetitive activity in an economic market ***in which plaintiffs participated***").

Moreover, the alleged injuries to end users, which rest on Plaintiff's conjecture about a world without manufacturer rebates, are speculative at best. Plaintiff alleges that Defendants pay rebates to distributors that, in effect, reduce the price of distributors' direct purchases (¶¶ 84, 99, 116, 127, 141, 157, 166, 177), but that dealers do *not* "pas[s] … on" the rebates "to Arkansas farmers in the form of reduced downstream pricing" and instead "retai[n]" the rebates "as profit." ¶ 221; *see also* ¶ 220. Yet Plaintiff insists that the same dealers that prioritize profits over passing on rebates in the real world nonetheless would sell more "lower priced" generic products to Arkansas farmers in a hypothetical world without rebates. ¶¶ 228-229, 234.

Plaintiff's conjecture is undermined by its own allegations showing that dealers have a profit motive *not* to sell generic products in place of Defendants' branded products. In particular, Plaintiff alleges that "sales of generic crop-protection products … affect the distributor's or retailer's bottom line" apart from rebates, because for each sale of a generic product "the distributor or retailer loses … the greater profit on the name-band product." ¶ 79. Plaintiff further alleges that "Arkansas farmers do not buy more if the price of crop-protection products drops or less if the price goes up," and that demand for crop-protection products does not change as a result of "variations in the price of crop-protection product[s]"—which is referred to as "inelastic" demand. ¶ 78.

The guesswork inherent in Plaintiff's alleged injury defeats proximate causation. As the Supreme Court has explained, the pricing decisions of intermediaries in the supply chain in a "hypothetical" alternative scenario are "virtually unascertainable." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 493 (1968). Yet the injury to end users alleged by Plaintiff rests on speculation about such "virtually unascertainable" hypothetical decisions. Under these circumstances, "the tenuous and speculative character of the relationship between the alleged

antitrust violation and the [plaintiff's] alleged injury" weighs against "judicial enforcement of the [plaintiff's] antitrust claim." *AGC*, 459 U.S. at 545.

Because Plaintiff has failed to plead that the alleged injuries to end users were proximately caused by Defendants' rebate programs, as required by *Lexmark* and *AGC*, its federal antitrust claims should be dismissed.

## IV.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER STATE LAW

The amended complaint also asserts two claims under Arkansas state law.  Count IV asserts a violation of subchapter 3 of the Arkansas Unfair Practices Act ("AUPA"), Ark. Code Ann. § 4-75-301 *et seq*., and Count V asserts a violation of Section 4-88-107(a)(10) of the Arkansas Deceptive Trade Practices Act ("ADTPA"), Ark. Code Ann. § 4-88-107(a)(10).

The AUPA and ADTPA impose demanding, specific requirements on plaintiffs, and are subject to the general principle that "[s]tatutes imposing burdens and liabilities unknown at common law"—including "provisions imposing penalties"—"are strictly construed in favor of those upon whom the burden is sought to be imposed." *Cooper Realty Invs., Inc. v. Ark. Contractors Licensing Bd.*, 355 Ark. 156 at 161-62, 134 S.W.3d 1, 4 (2003).  The Arkansas Supreme Court has applied this canon of construction to both the AUPA and the ADPTA.  *See*, *e.g.*, *Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*, 319 Ark. 214 at 219-20, 891 S.W.2d 30, 34 (1995) (AUPA); *Beam v. Monsanto Co.*, 259 Ark. 253 at 265, 532 S.W.2d 175, 181 (1976) (AUPA); *Ports Petroleum Co. of Ohio v. Tucker*, 323 Ark. at 687, 916 S.W.2d at 753 (1996) (ADTPA).

As explained below, Plaintiff's AUPA and ADPTA claims fail for multiple reasons.

### A.    The Arkansas Unfair Practices Act (AUPA) Claim Fails

The AUPA prohibits two narrow categories of "monopolies": those involving an agreement to "regulate or fix" prices or "fix or limit" supply, *id.* § 4-75-309, and those involving

in-state sales by a defendant at below-cost prices or otherwise intended to harm competitors, *id.* § 4-75-310.[34]  Plaintiff's AUPA claim appears targeted exclusively at subsection 309, alleging that "Defendants' agreements with distributors and retailers … for the sale of crop-protection products … are in violation of the [AUPA]" and "allowed [Defendants] to use and maintain their monopoly power to regulate or fix prices of crop protection products" or "to regulate, fix, or limit the quantities of competing or potentially competing crop-protection products being sold by major distributors and retailers in the State of Arkansas," allegedly "through a course of anticompetitive and exclusionary conduct."  ¶¶ 307-309.[35]

Subsection 309 is—as a prior Arkansas Attorney General concluded in a formal opinion to the Arkansas legislature[36]—"an archaic and little-used statute that has been given narrow applicability by the courts."  Op. Ark. Att'y Gen. No. 96-271, at 3 (1996).[37]

Plaintiff's AUPA claim fails for at least the following five reasons.

### 1.    Subsection 309 Is Limited to Horizontal Agreements

It long has been the law of Arkansas that Subsection 309 prohibits only ***horizontal*** agreements—that is, agreements between competitors at the same level in the chain of

---

[34] Subchapter 3 of the AUPA prohibits a "'monopoly' … whereby any one (1) of the ***purposes or objects mentioned in this subchapter*** is accomplished or sought to be accomplished, or whereby any one (1) or more of the purposes are promoted or attempted to be executed or carried out, or ***whereby the several results described herein*** are reasonably calculated to be produced."  Ark. Code Ann. § 4-75-301.  The purposes, objects, and results referred to therein are identified in sections 4-75-309 and 4-75-310.

[35] The amended complaint does not appear to assert a claim under Subsection 310.  In any event, any such claim would fail because, among other reasons, liability under Subsection 310 requires that the defendant "sell within this state" or "sell … in this state" its "productions."  Ark. Code Ann. § 4-75-310.  As explained above, the amended complaint alleges no sales by Defendants in Arkansas.  *See supra* Points I-II.

[36] The Attorney General is required by statute to "give his or her opinion" on questions posed by certain members of the state legislature or executive branch.  Ark. Code Ann. § 25-16-706.  While the Arkansas Supreme Court is, of course, not bound by these formal opinions, "they can be persuasive."  *Ark. Parole Bd. v. Johnson*, 2022 Ark. 209 at 8, 654 S.W.3d 820, 825.

[37] This formal opinion is available at 1996 Ark. AG LEXIS 286.

production and distribution.  In *Fort Smith Light & Traction*, the Arkansas Supreme Court considered an agreement between a supplier and a distributor of natural gas that gave the supplier the right to set the prices consumers paid.  94 Ark. 461, at 463, 127 S.W. 975, 975 (1910).  The distributor challenged the agreement as "a combination to fix the price of natural gas" in violation of the Arkansas Anti-Trust Act of 1905.[38]  *Id.* at 476, 127 S.W. at 981.  The Arkansas Supreme Court disagreed, holding that the statute "prevent[s] a combination among producing competitors to fix the prices to the detriment of consumers" and that "[t]here was no competition … between [the supplier and the distributor], as … [the distributor] had no natural gas, and the contract was concerning natural gas."  *Id.*, 127 S.W. at 982.[39]  Significantly, a prior Arkansas Attorney General cited this longstanding precedent as an example of the Arkansas Supreme Court giving Subsection 309 "narrow applicability."  Op. Ark. Att'y Gen. No. 96-271, at 3.

Here, Plaintiff challenges "Defendants' agreements with distributors and retailers." ¶ 307.  But its amended complaint alleges no facts showing competition in the sale of crop protection products between any Defendant and distributors or retailers.  To the contrary, the amended complaint affirmatively undermines the existence of such competition.  The amended complaint describes competition between and among "basic manufacturers" such as Defendants and "generic manufacturers."  ¶¶ 49-51.  As to Defendants' relationships with distributors and retailers, the amended complaint alleges that "crop-protection product manufacturers sell to distributors that in turn sell to … retail outlets."  ¶ 59.  As such, Defendants' relationship with

---

[38] As a prior Arkansas Attorney General has explained, Subsection 309 was originally called the "Arkansas 'Anti-Trust Act.'"  Op. Ark. Att'y Gen. No. 96-271, at 3.

[39] The Arkansas Supreme Court's limitation of the statute to horizontal agreements is binding on this Court. *See*, *e.g.*, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018) ("If the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts.").

distributors and retailers is vertical, not horizontal. Thus, "[t]here [is] no competition here …
between [Defendants] and [distributors or retailers] in the supply of [crop protection products]."
*Ft. Smith Light & Traction*, 94 Ark. at 476, 127 S.W. at 982.

Plaintiff's allegations that Defendants entered into technical AI supply agreements for
mesotrione (¶¶ 132-133) and s-metolachlor (¶ 147) fail for the same reason. Under Plaintiff's
own purported market definition, Defendants are not "producing competitors" in the context of
the alleged supply agreements; rather, "[t]here was no competition here … in the supply of
[mesotrione and s-metolachlor]" because Corteva "had no [mesotrione or s-metolachlor] and the
contract was concerning [supply for those AIs]." *Ft. Smith Light & Traction*, 94 Ark. at 476, 127
S.W. at 982. Plaintiff has therefore failed to plead a violation of Subsection 309.

### 2. Subsection 309 Is Limited to Agreements That Fix Price or Restrict Output

Plaintiff has also failed to plead any illegal price-fixing or output limitation, as required
under Section 309. "Price fixing" has a well-established meaning. "[Prices] are fixed because
they are agreed upon." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222-23 (1940).
"Merely alleging that Defendants are capable of maintaining elevated prices and controlling
pricing is not the same as alleging that an actual agreement *to fix prices* exists." *Audio Car
Stereo, Inc. v. Little Guys, Inc.*, 2004 WL 3019298, at *5 (N.D. Ill. Dec. 28, 2004) (rejecting
price-fixing claim due to plaintiff's "fail[ure] to allege the existence of any agreement by
Defendants to fix prices"). The principle applies equally to illegal output limitations—an
agreement to fix or limit supply is required. *See, e.g.*, *Westinghouse Elec. Corp. v. Gulf Oil
Corp.*, 588 F.2d 221, 226 (7th Cir. 1978) ("[A]ll serious attempts to establish a [claim] must
necessarily include an agreement *to restrict output*.").

Plaintiff has failed to allege facts showing that any Defendant agreed with distributors or retailers to fix prices or limit quantities of crop protection products.  Instead, Plaintiff's theory is that Defendants' agreements with distributors condition the payment of rebates on satisfying market share thresholds for each AI.  *See, e.g.*, ¶ 13 ("Defendants promise distributors or retailers a complex set of incentive payments based on their purchases of Defendant's branded crop-protection products, under the critical condition that distributors or retailers must honor their commitment to exclude or limit their purchases of comparable generic products for sale to farmers to a set percentage share"); ¶ 101 ("Defendants' agreements with participating distributors or retailers require distributors or retailers to meet very high loyalty thresholds for each Relevant AI in exchange for receiving exclusion payments from Defendants.").

Plaintiff's allegations of supply agreements between Syngenta and Corteva (¶¶ 132-134, 147-148, 183-186) fare no better.  Plaintiff does not, as it cannot, allege that the agreements include terms concerning consumer prices or consumer supply of any product, much less that the agreements fix prices or limit output, as the AUPA requires.  Rather, Plaintiff alleges merely that "Corteva agreed to buy mesotrione from Syngenta for use in Corteva's mixed crop-protection product" and came to a similar agreement to buy s-metolachlor.  ¶ 184.  Plaintiff describes no more than a "contract of sale," which, as the Arkansas Supreme Court has made clear, the AUPA does not prohibit.  *See Ft. Smith Light & Traction*, 94 Ark. at 476, 127 S.W. at 982.

Under these circumstances, Plaintiff's allegation that "Defendants' acts as alleged herein, allowed them to use and maintain their monopoly power to regulate or fix prices of crop-protection products … [and] to regulate, fix, or limit the quantities of competing or potentially competing crop-protection products" (¶¶ 308-309) is nothing more than a "[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements," which does not

suffice to plead a claim. *Iqbal*, 556 U.S. at 678; *accord, e.g., Gomillion v. Univ. of Ark. for Med. Scis.*, 2016 WL 183654, at *1 (E.D. Ark. Jan. 14, 2016) (Miller, J.).

### 3.     Subsection 309 Requires the Plaintiff to Define a Plausible Product Market

Plaintiff's failure to define a plausible product market is also independently fatal to its AUPA claim. *See Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, 2012 WL 511485, at *4 n.3, *7 (W.D. Ark. Feb. 15, 2012) (holding that plaintiff's AUPA subchapter 3 claim failed for the same reason as its Sherman Act claim—because "the alleged product market asserted by [p]laintiff is invalid due to its narrowness and implausibility"); *Verma v. Jefferson Hosp. Ass'n*, 2007 WL 4468689, at *6 (E.D. Ark. Dec. 17, 2007) ("It is critical to a monopoly claim to define the relevant market."). As explained above, Plaintiff has failed to plead a plausible product market here. *See supra* Point III.B. Its AUPA claim therefore fails.

### 4.     Defendants Lack the "Predatory Intent to Damage and Destroy Competition" Necessary to Violate Arkansas Law

Plaintiff also fails to plead the necessary intent for a violation of Subsection 309. In *Ports Petroleum*, the Arkansas Supreme Court held that the due process clause of the Arkansas Constitution prohibits the imposition of liability for price cutting by sellers absent "predatory intent to damage and destroy competition." 916 S.W.2d, at 755-56. Any statute that imposes liability for price cutting without requiring such intent "violates the due process clause of the Arkansas Constitution and is void and of no effect." *Id.*, 916 S.W.2d at 756.

The essential element of "predatory intent to damage and destroy competition" is informed by the fundamental distinction, also drawn under federal antitrust law, between "permit[ting] vigorous price competition" and "protect[ing] firms from losing profits due to competition." *Id.* at 689, 916 S.W.2d at 754 (citing *Cargill*); *see also Cargill*, 479 U.S. at 110 (invoking "the principle that the [federal] antitrust laws were enacted for the protection of

*competition*, not *competitors*") (emphasis in original).  Thus, intent to compete vigorously may have the incidental result of lost profits to competitors.

Here, Plaintiff has failed to allege facts showing that Defendants offered price-cutting rebates with "predatory intent to damage and destroy ***competition***."  In an attempt to suggest otherwise, the amended complaint adds misleading, out-of-context quotations, allegedly from Defendants' internal documents (*e.g.*, ¶¶ 90, 167, 176).  But those allegations—which show that Defendants engaged in vigorous competition—do not establish that any Defendant "has crossed the elusive line separating aggressive competition from unfair competition."  *See Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir. 1989) (concluding that the jury's verdict finding a Sherman Act Section 2 violation was not supported by sufficient evidence of predatory conduct, and that alleged statements by defendants that "we will not be underbid," "we'll do whatever it takes," and "name your price" "are phrases often legitimately used by business people in the heat of competition").  The absence of predatory intent is fatal to Plaintiff's state statutory claims.

### 5.    Defendants' Alleged Conduct Does Not Exceed the Defendants' Common-Law Privilege to Compete

Plaintiff also fails to overcome the presumption of legality that arises from the "broad" common-law privilege to compete.  *See Acre v. Spindletop Oil & Gas Co.*, 2009 WL 4016116, at *5 (E.D. Ark. Nov. 18, 2009) (citing *Office Machs., Inc. v. Mitchell*, 95 Ark. App. 128, at 130, 234 S.W.3d 906, 908 (2006)).  Under the common law, "[a] defendant seeking to increase his own business ***may cut rates or prices, allow discounts or rebates,*** enter into secret negotiation behind [a competitor's] back, refuse to deal with him or threaten to discharge employees who do, or even refuse to deal with third parties unless they cease dealing with the [competitor], ***all without incurring liability***."  *Id.* (quoting *Kinco, Inc. v. Schueck Steel, Inc.*, 283 Ark. 72 at 77-78, 671 S.W.2d 178, 181 (1984)).  For this reason, this Court has dismissed claims under the

66

AUPA where a plaintiff "has not alleged facts sufficient to show that [a defendant's alleged conduct] constitute[s] behavior that exceeds the scope of [the defendant's] privilege to compete." *Id.*[40]  As shown above, Defendants' rebates are the "essence of competition" because they offer distributors and retailers lower prices as an incentive for buying more of Defendants' crop protection products.  *See supra* Point III.A.  Thus, these rebates fall squarely within the scope of Arkansas' broad competitive privilege.

### B.    The Arkansas Deceptive Trade Practices Act Claim Fails

Plaintiff's claim under Section 4-88-107(a)(10) of the ADTPA requires "a deceptive consumer-oriented act or practice which is misleading in a material respect," *Skalla v. Canepari*, 2013 Ark. 415, at 14, 430 S.W.3d 72, 82; *accord Dickinson v. SunTrust Mortg. Inc.*, 2015 WL 1868827, at *1-2 (E.D. Ark. Apr. 23, 2015) (Miller, J.), and the claim must be pleaded with particularity under Rule 9(b), *see, e.g., Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*, 2022 WL 16635130, at *4 (E.D. Ark. Nov. 2, 2022).  Plaintiff's claim fails in all respects:  the alleged conduct is not "deceptive," "misleading," or "consumer-oriented" under any pleading standard.

The gravamen of Plaintiff's amended complaint is that Defendants offer rebates—the existence of which "is widely known in the industry" (¶ 102)—to distributors and retailers, who need not "agree or otherwise commit, in advance" to Defendants' offer (¶ 218).  Instead of alleging facts showing any "misleading" act (much less a deceptive act), Plaintiff alleges that the prospect of rebates—which decrease the net prices of Defendants' products—***incentivizes*** distributors and retailers to meet market-share thresholds by buying more of Defendants'

---

[40] The privilege applies "in the absence of prohibition by statute, illegitimate means, or some other unlawful element."  *Kinco*, 283 Ark. at 77, 671 S.W.2d at 181.  For that purpose, "[i]t is not enough for [a plaintiff] to allege the conclusion that [a defendant] violated the various elements of the Arkansas Unfair Trade Practices Act" or other state law.  *Acre*, 2009 WL 4016116, at *5.

products instead of competing manufacturers' products. *See*, *e.g.*, ¶ 106. "Absent allegations of a deceptive act or practice, the complaint fails to plead an ADTPA claim upon which relief may be granted." *Dickinson*, 2015 WL 1868827, at *2.

As to the requisite "consumer-oriented" acts, Plaintiff does not allege facts showing sales by Defendants to consumers, statements or advertising to consumers, or any other consumer-oriented act by Defendants relating to the loyalty rebates at issue. Instead, Plaintiff alleges that manufacturers sell final crop protection products to distributors and sell "technical grade" ingredients to other manufacturers. ¶¶ 45, 59. In short, the amended complaint is devoid of any consumer-oriented conduct by Defendants. *See*, *e.g.*, *London Luxury, LLC v. Walmart, Inc.*, 2024 WL 1025125, at *22 (W.D. Ark. Mar. 8, 2024) (dismissing ADTPA claim asserting a "strained interpretation of 'consumer-oriented acts'" based on an allegation that "canceling the parties' contract deprived the consuming public of [plaintiff's products]"); *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015) (explaining that the ADTPA "does not apply to deception and fraud claims regarding business between a manufacturer and its distributor when consumers [were] not deceived or defrauded").

Finally, Plaintiff's ADTPA claim also fails because, for the reasons explained above, Plaintiff fails to allege "predatory intent to damage and destroy competition" and because the Defendants' conduct falls squarely within the scope of Arkansas' broad competitive privilege. *See supra* Point IV.A.4-.5.

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed in its entirety, with prejudice, as to each Defendant.

Date: April 26, 2024

KUTAK ROCK LLP

/s/  Andrew King
Andrew King, Ark. Bar No. 2007176
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3706
Telephone:  (501) 975-3000
Facsimile:  (501) 975-3001
andrew.king@kutakrock.com

Paul S. Mishkin
paul.mishkin@davispolk.com
David B. Toscano
david.toscano@davispolk.com
Daniel J. Thomson
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone:  (212) 450-4292
Facsimile:  (212) 701-5292

*Attorneys for Defendants Syngenta Crop
Protection AG, Syngenta Corporation, and
Syngenta Crop Protection, LLC*


QUATTLEBAUM, GROOMS & TULL PLLC

/s/  Steven W. Quattlebaum

Steven W. Quattlebaum, Ark. Bar No. 84127
John E. Tull III, Ark. Bar No. 84150
Laura L. O'Hara, Ark. Bar No. 2021150
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone:  (501) 379-1700
Facsimile:  (501) 379-1701
squattlebaum@qgtlaw.com
jtull@qgtlaw.com
lohara@qgtlaw.com

David R. Marriott
dmarriott@cravath.com

69

Margaret T. Segall
msegall@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

*Attorneys for Defendant Corteva, Inc.*