UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| STATE OF ARKANSAS, *ex rel.* TIM GRIFFIN, ATTORNEY GENERAL, | ) ) ) | No. 4:22-cv-01287-BSM |
| Plaintiff, | ) ) ) | PLAINTIFF STATE OF ARKANSAS'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| vs. | ) ) ) | |
| SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ................................................................ 4

       A.    Crop-Protection Products with Unique Active Ingredients Are
             Critical to Arkansas's Economy and a Stable Food Supply ......................... 4

       B.    The Crop-Protection Product Industry Relies on the "Traditional
             Distribution Channel" ............................................................................. 6

       C.    Defendants Operate Loyalty Programs and Supply Agreements to
             Exclude Generic Competition ................................................................ 7

       D.    Defendants Directed Activity to Arkansas and Have Harmed
             Arkansas Farmers ................................................................................ 12

III.   MOTION TO DISMISS STANDARDS ................................................ 13

       A.    Arkansas's Allegations Are Plausible on Their Face ................................. 13

       B.    Jurisdiction and Venue Are Proper in This Court ..................................... 14

IV.    ARGUMENT ...................................................................................... 15

       A.    This Court Has Personal Jurisdiction over All Defendants ........................ 15

             1.    Personal Jurisdiction Is Established by Defendants' Contacts
                   with Arkansas Under the Due Process Clause and Arkansas's
                   Long-Arm Statute ......................................................................... 15

                   a.    Personal Jurisdiction over All Defendants Is
                         Authorized by the Due Process Clause and  Arkansas's
                         Long-Arm Statute ................................................................ 15

                   b.    The Closely Intertwined Nature of the Syngenta and
                         Corteva Entities, Respectively, Also Supports Personal
                         Jurisdiction over All Defendants ............................................ 20

             2.    Venue Is Proper in This District ..................................................... 25

                   a.    Venue Is Proper Under the Clayton Act Against the
                         Corporate Defendants ......................................................... 25

b.    Venue Also Is Proper Under the General Venue Statute (28 U.S.C. § 1391(b)-(d)) ......................................... 28

B.    The Complaint States a Federal Antitrust Claim ....................................... 29

    1.    Arkansas's Antitrust Claims Are Properly Analyzed Under the Rule-of-Reason Standard ............................................................. 29

    2.    Product Market ...................................................................................... 35

        a.    The Court Should Decline Defendants' Invitation to a Judicial Fact-Finding Mission ............................................... 36

        b.    Under Any Standard, Plaintiff's Product Markets Are Adequately Pleaded ............................................................... 37

            (1)    Principles of Market Definition ................................. 38

            (2)    The Relevant AI Markets Are Properly Pleaded ....... 41

    3.    Arkansas Has Properly Pleaded Causation ..................................... 47

        a.    Defendants' Conspiracy Reaches Arkansas Farmers and Consumers ..................................................................... 50

        b.    The Indirect-Purchaser Rule Does Not Apply To Injunctive Relief .................................................................... 51

        c.    Arkansas Farmers and Consumers Suffered Antitrust Injury ....................................................................... 53

        d.    Arkansas Farmers' and Consumers' Harm Was Proximately Caused by Defendants' Conspiracy ................. 54

C.    The State's Claims Under State Law Are Properly Pled ........................... 58

    1.    The Complaint States a Claim Under the Arkansas Unfair Practices Act .......................................................................................... 59

        a.    Section 309 Is Not Limited to Horizontal Agreements ........ 59

        b.     The Complaint Alleges Defendants' Attempts to Regulate the Price of Their Products and Amount of Generic Products in the Market ............................................ 62

        c.     The Complaint States Predatory Intent to Damage and Destroy Competition and Exceeds Defendants' Common Law Privilege to Compete..................................... 65

     2.     The State's Deceptive Trade Practices Act Claim Is Proper ........... 67

V.     CONCLUSION .................................................... 70

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allcare Specialty Pharmacy, LLC v. OptumRX, Inc.*,
    2017 WL 5571356 (E.D. Ark. Apr. 6, 2017) ............................................... 67

*Alpha Shoe Serv. v. Fleming Cos.*,
    849 F.2d 352 (8th Cir. 1988) ................................................. 57, 58

*Anderson v. Dassault Aviation*,
    361 F.3d 449 (8th Cir. 2004) ...............................................*passim*

*Anthony v. Slaid*,
    52 Mass. 290 (1846)................................................................. 53

*Antoon v. Securus Techs., Inc.*,
    2017 WL 2124466 (W.D. Ark. May 15, 2017) ................................. 3, 67, 68

*Apple Inc. v. Pepper*,
    587 U.S. __, 139 S. Ct. 1514 (2019)...................................... 49, 50

*Ark. Dep't of Fin. & Admin. v. Trotter Ford, Inc.*,
    2024 Ark. 31, 685 S.W.3d 889 (Ark. 2024) ............................... 62

*Ashcroft v. Iqbal*,
    556 US 662 (2009)...................................................................... 13

*Ashley Cnty., Ark. v. Pfizer, Inc.*,
    552 F.3d 659 (8th Cir. 2009) ............................................. 14

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)................................................................ 55

*B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*,
    439 F.3d 653 (10th Cir. 2006) ........................................... 53

*Baptist Health v. Murphy*,
    365 Ark. 115, 226 S.W.3d 800 (Ark. 2006) .......................... 3, 67, 68, 69

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ............................................. 13

*Bredberg v. Long*,
    778 F.2d 1285 (8th Cir. 1985) ............................................ 27

**Page**

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*,
582 U.S. 255 (2017) ................................................................ 15

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ................................................................ 30

*Brothers. & Sisters in Christ, LLC v. Zazzle, Inc.*,
42 F.4th 948 (8th Cir. 2022) ..................................................... 16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........................................................... *passim*

*Bruner v. Republic Acceptance Corp.*,
191 F. Supp. 200 (E.D. Ark 1961) .............................................. 27

*Burch v. Goodyear Tire & Rubber Co.*,
554 F.2d 633 (4th Cir. 1977) ..................................................... 47

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ................................................................ 20

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) ....................................... 26,52, 51

*Cargill, Inc. v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ................................................................ 52

*Cmty. Publishers, Inc. v. Donrey Corp.*,
892 F. Supp. 1146 (W.D. Ark. 1995) .......................................... 54

*Commonwealth v. Russell Stover Candies, Inc.*,
1993 WL 145264 (E.D. Pa. May 6, 1993) ..................................... 48

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ................................................................ 49

*Curtis Lumber Co. v. La. Pac. Corp.*,
618 F.3d 762 (8th Cir. 2010) ............................................... 3, 67

*Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*,
702 F.3d 472 (8th Cir. 2012) ..................................................... 15

**Page**

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ........................................................ 38

*Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*,
  89 F.3d 519 (8th Cir. 1996) ........................................................ 16

*Doshier v. Twitter, Inc.*,
  417 F. Supp. 3d 1171 (E.D. Ark. 2019) ................................... 14, 15

*Double D Spotting Serv., Inc. v. Supervalue, Inc.*,
  136 F.3d 554 (8th Cir. 1990) ..................................................... 36, 41

*E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*,
  637 F.3d 435 (4th Cir. 2011) ...................................................... 36, 41

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
  273 U.S. 359 (1927) .................................................................... 25

*Epps v. Stewart Information Services Corp.*,
  327 F.3d 642 (8th Cir. 2003) ..................................................... 21

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  592 U.S. 351 (2021) .............................................................. *passim*

*Freeman v. Toyota Motor Sales, USA, Inc.*,
  2020 WL 7041810 (E.D. Mo. Nov. 30, 2020) ............................ 14

*Ft. Smith Light & Traction Co. v. Kelley*,
  94 Ark. 461, 127 S.W. 975 (Ark. 1910) ................................. 60, 61

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013) .................................................................... 38

*FTC v. BINT Operations LLC*,
  595 F. Supp. 3d 740 (E.D. Ark. 2022) ............................. 27, 28, 29

*FTC v. Meta Platforms Inc.*,
  No. 5:22-cv-04325-EJD (N.D. Cal. Jan. 31, 2023) ................... 46

*FTC v. Sanford Health*,
  926 F.3d 959 (8th Cir. 2019) ..................................................... 40

**Page**

*FTC v. Shkreli*,
581 F. Supp. 3d 579 (S.D.N.Y. 2022)................................................................ 39, 40, 41

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) .............................................................................. 47

*FTC v. Syngenta Crop Prot. AG*,
2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ......................................................*passim*

*FTC v. Syngenta Crop Protection AG*,
No. 1:22-cv-00828-TDS-JEP (M.D.N.C. Oct. 5, 2023) ............................................. 35

*Gannon Int'l, Ltd. v. Blocker*,
2011 WL 111885 (E.D. Mo. Jan. 13, 2010) ................................................................ 37

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir. 1987) ...................................................................................... 47

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004)......................................................................................... 39

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) ..................................................................................... 52

*Hager v. Ark. Dep't of Health*,
735 F.3d 1009 (8th Cir. 2013) ..................................................................................... 13

*Hawkeye Gold, LLC v. China Nat'l Materials Indus. Import & Export Corp.*,
89 F.4th 1023, 1030 (8th Cir. 2023) ...................................................................... 1, 14

*HDC Medical, Inc. v. Minntech Corp.*,
474 F.3d 543 (8th Cir. 2007) ................................................................................ 36, 45

*Henry Law Firm v. Cuker Interactive, LLC*,
950 F.3d 528 (8th Cir. 2020) ....................................................................................... 16

*Henry v. Chloride, Inc.*,
809 F.2d 1334 (8th Cir. 1987) .......................................................................... 41, 42, 65

*Houck v. Substitute Tr. Servs., Inc.*,
791 F.3d 473 (4th Cir. 2015) ....................................................................................... 46

**Page**

*Illinois Brick Co. v. Illinois,*
    431 U.S. 720 (1977) .................................................................... 55

*In re Aggrenox Antitrust Litig.,*
    199 F. Supp. 3d 662 (D. Conn. 2016) ............................................ 38, 40

*In re Canadian Import Antitrust Litig.,*
    470 F.3d 785 (8th Cir. 2006) ........................................................ 52, 53

*In re China Nat'l Chem. Corp.,*
    No. C-4610 (FTC June 16, 2017) .................................................. 45

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
    No. 2:00-md-01361 (D. Me.) ......................................................... 60

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.,*
    44 F.4th 959 (10th Cir. 2022) ....................................................... 65

*In re Generic Pharms. Pricing Antitrust Litig.,*
    605 F. Supp. 3d 672 (E.D. Pa. 2002) ............................................ 47

*In re Google Play Store Antitrust Litig.,*
    No. 3:21-md-02981-JD (N.D. Cal. Jan. 15, 2024) ........................ 59, 60

*In re Impax Labs., Inc.,*
    2019 WL 1552939 (FTC Mar. 28, 2019), *aff'd sub nom. Impax Labs., Inc. v. FTC,*
    994 F.3d 484 (5th Cir. 2021) ......................................................... 39

*In re Ins. Antitrust Litig.,*
    938 F.2d 919 (9th Cir. 1991) ......................................................... 48

*In re Nexium (Esomeprazole) Antitrust Litig.,*
    968 F. Supp. 2d 367 (D. Mass. 2013) ........................................... 39, 44

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.,*
    622 F. Supp. 3d 22 (E.D. Penn. 2022) .......................................... 32

*In re Surescripts Antitrust Litig.,*
    608 F. Supp. 3d 629 (N.D. Ill. 2022) ............................................ 31

Page

*In re Zetia(Ezetimibe) Antitrust Litig.*,
2021 WL 6689718 (E.D. Va. 2021)................................................................. 39, 40, 41

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) ........................................................................ 37

*International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v.*
*Philip Morris, Inc.*,
196 F.3d 818 (7th Cir. 1999) ........................................................................ 56

*It's My Party, Inc. v. Live Nation*, *Inc.*,
811 F.3d 676 (4th Cir. 2016) ........................................................................ 39

*Jacobs v. Global Tel\*Link Corp.*,
2016 WL 5953128 (W.D. Ark. May 17, 2016) ............................................. 68

*Jien v. Perdue Farms, Inc.*,
2020 WL 5544183 (D. Md. Sept. 16, 2020) ................................................. 46

*K-V Pharm. Co. v. J. Uriach & CIA, S.A.*,
648 F.3d 588 (8th Cir. 2011) ........................................................................ 14

*Kaliannan v. Liang*,
2 F.4th 727 (8th Cir. 2021) ........................................................................... 16

*Kansas v. UtiliCorp United, Inc.*,
497 U.S. 199 (1990)................................................................................. 49, 50

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ........................................................................ 57

*Lackie Drug Store, Inc. v. Arkansas CVS Pharmac*y,
LLC, 2022 WL 16635130 (E.D. Ark. Nov. 2, 2022)................................... 67

*LeMay v. Mays*,
18 F.4th 283 (8th Cir. 2021) ........................................................................ 37

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014).................................................................................. 54, 55

**Page**

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (11th Cir. 2009) ................................................. 38, 39

*Lovett v. General Motors Corp.*,
  975 F.2d 518 (8th Cir. 1992) ..................................................... 56

*Lyons v. Philip Morris, Inc.*,
  225 F.3d 909 (8th Cir. 2000) ..................................................... 53

*Maple Flooring*, *Mfrs. Ass'n v. United States*
  268 U.S. 563 (1925) ................................................................ 35

*McAvoy v. Texas Eastern Transmission Corp.*,
  185 F. Supp. 784 (W.D. Ark. 1960) ............................................ 27

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .................................................... 34

*Meijer, Inc. v. Barr Pharms., Inc.*,
  572 F. Supp. 2d 38 (D.D.C. 2008) .............................................. 44

*Minn. Made Hockey, Inc. v. Minn. Hockey, Inc.*,
  789 F. Supp. 2d 1133 (D. Minn. 2011) ........................................ 14

*Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*,
  850 F.2d 1286 (8th Cir. 1988) .................................................... 49

*New York v. Facebook, Inc.*,
  549 F. Supp. 3d 6 (D.D.C. 2021) *aff'd sub nom. New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) ............................................... 47, 48

*New York v. Microsoft Corp.*,
  209 F. Supp. 2d 132 (D.D.C. 2002) ............................................ 48

*Paschall v. Kan. City Star Co.*,
  695 F.2d 322 (8th Cir. 1982) ..................................................... 54

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,
  458 U.S. 592 (1982) ........................................................ 2, 47, 48

**Page**

*S.D. Collectibles, Inc. v. Plough, Inc.*,
  952 F.2d 211 (8th Cir. 1991) ................................................................. 57, 58

*Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*,
  2007 WL 9701128 (W.D. Tex. Feb. 16, 2007)........................................... 46

*State ex rel. Bryant v. R & A Inv. Co.*,
  336 Ark. 289, 985 S.W.2d 299 (Ark. 1999) ...................................... 3, 68, 69

*State of Ga. v. Penn. R.R. Co.*,
  342 U.S. 439 (1945)................................................................................... 47

*State v. Google*,
  No. 4:20-cv-00957-SDJ (E.D. Tex. Aug. 4, 2021) ................................... 60

*Steinbuch v. Cutler*,
  518 F.3d 580 (8th Cir. 2008) (Mot. ) ........................................................ 21

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ................................................................... 39

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953)................................................................................... 44

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)................................................................. 38, 41

*Union Carbide & Carbon Corp. v. White River Distributors, Inc.*,
  224 Ark. 558, 275 S.W.2d 455 (Ark. 1955) .............................................. 64

*UniStrip Techs., LLC v. LifeScan, Inc.*,
  153 F. Supp. 3d 728 (E.D. Pa. 2015) ........................................................ 31

*United Food & Commercial Workers Local 1776 & Participating Emps.' Health &
  Welfare Fund v. Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 (N.D. Cal. 2017) ..................................................... 39

*United Food & Commercial Workers Unions, Emps. Health & Welfare Fund v. Philips
  Morris, Inc.*,
  223 F.3d 1271 (11th Cir. 2000) ................................................................. 53

- xi -

Page

*United States v. Am. Express Co.*,
   838 F.3d 179 (2d Cir. 2016) ................................................................................. 40

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ...................................................................................... 42, 47

*United States v. H&R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ................................................................ 45, 46

*United States v. Scophony Corp. of America*,
   333 U.S. 795 (1948) ............................................................................................. 26

*United States v. Socony-Vacuum Oil Co.*,
   310 United States 150, 218-225 (1940) .............................................................. 54

*Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*,
   646 F.3d 589 (8th Cir. 2011) .............................................................................. 21

*Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*,
   319 Ark. 214, 891 S.W.2d 30 (Ark. 1995) ........................................................ 65

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ................................................................... 30, 32, 34

## STATUTES, RULES, AND REGULATIONS

7 U.S.C.
   § 136, *et seq.* ................................................................................................. 7, 10

15 U.S.C.
   § 22 ............................................................................................................... 15, 25

25 U.S.C.
   § 26 .................................................................................................. 47, 51, 52, 53

Page

28 U.S.C.

    § 1391 ...................................................................................................... 25

    § 1391(b)(1) ............................................................................................. 28

    § 1391(b)(1)-(3) ...................................................................................... 28

    § 1391(b)(2) ............................................................................................. 29

    § 1391(b)(3) ............................................................................................. 28

    § 1391(b)-(d) ........................................................................................... 28

    § 1391(c)(2) ............................................................................................. 28

    § 1391(c)(3) ............................................................................................. 28

    § 1391(d) ................................................................................................. 28

Arkansas Code Annotated

    § 4-75-301 .............................................................................................. 63

    § 4-75-301, *et seq.* .......................................................................... 27, 58

    § 4-75-309 ......................................................................................... 59, 62

    § 4-75-315(b) .......................................................................................... 49

    § 4-75-319 .............................................................................................. 25

    § 4-88-107 .............................................................................................. 58

    § 4-88-107, *et seq.* ................................................................................ 27

    § 4-88-107(a)(10) ................................................................................... 68

    § 16-4-101(B) ......................................................................................... 16

Federal Rules of Civil Procedure

    Rule 9(b) ................................................................................................. 67

    Rule 12(b) ............................................................................................... 37

    Rule 12(b)(2) .......................................................................................... 14

    Rule 12(b)(6) .......................................................................................... 13

Federal Rules of Evidence

    Rule 201 ................................................................................................. 37

**SECONDARY AUTHORITIES**

14D Charles Alan Wright & Arthur R. Miller,
    *Federal Practices & Procedure* (4th ed. 2023)

    § 3818 ..................................................................................................... 28

21B Charles A. Wright & Arthur R. Miller,
    *Federal Practice and Procedure* (2d ed.)

    § 5108 ..................................................................................................... 37

## I.    INTRODUCTION

Defendants[1] ask the Court to dismiss the State's First Amended Complaint ("Complaint") (ECF No. 72).[2] Defendants assert, first, that the Court lacks personal jurisdiction over Defendants and that the Eastern District of Arkansas is not a proper venue. These assertions are contradicted – and should, therefore, be rejected – by the State's robust Complaint allegations (along with additional exhibits submitted herewith)[3] detailing Defendants' longstanding, open, and well-documented connections to and presence in the State of Arkansas and the Eastern District, both related to their crop-protection business and, specifically, in conjunction with the case-related marketing, sale, and distribution of the very crop-protection active ingredients ("AIs") involved here.

Next, Defendants raise a series of antitrust-specific challenges to application of the rule-of-reason standard to the anticompetitive scheme alleged here, the plausibility of the product market pleaded attendant thereto, and whether the State properly pleads causation in this case. As an initial matter, Judge Schroeder of the Middle District of North Carolina thoroughly considered and rejected months ago these same arguments from these same Defendants – that their preferred price-cost test displaces the proper rule-of-reason standard

---

[1]    "Defendants" are Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva, Inc. ("Corteva").

[2]    Plaintiff the State of Arkansas is herein referred to as the "State," "Arkansas," or "Plaintiff."

[3]    It is appropriate for a party to submit, and for a court to consider, additional exhibits in relation to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *See Hawkeye Gold, LLC v. China Nat'l Materials Indus. Import & Export Corp.*, 89 F.4th 1023, 1030 (8th Cir. 2023).

4863-4931-5264.v1

as applied to the scheme alleged here. *See FTC v. Syngenta Crop Prot. AG*, 2024 WL 149552, at *12-19 (M.D.N.C. Jan. 12, 2024) ("*FTC* Action"). Likewise, Judge Schroeder thoroughly considered and rejected Defendants' challenge to the plausibility of the pleaded product market, finding that the identical product market the State alleges here is plausibly pleaded. *Id*. at *8-12. Judge Schroeder has already resolved these questions. Defendants' try for a second bite at the apple here should be rejected.

Moreover, the State properly pleads causation. The State has "a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982). Here, Arkansas alleges that, as a direct and intended consequence of Defendants' anticompetitive activities, Arkansas farmers pay inflated prices for crop-protection products, which higher prices are, in turn, passed along to Arkansas consumers. Arkansas farmers' harm was proximately caused by Defendants' Loyalty Program conspiracies because the farmers' harm is their own harm, not (as Defendants contend) harm derived from injury to someone else. In other words, farmers themselves were directly injured because they paid more for crop-protection products because of Defendants' anticompetitive conduct. Defendants' reliance on the "indirect purchaser" rule to claim that the State cannot pursue injunctive relief under the federal antitrust laws is also flawed. Case law echoes this: the law is crystal clear that it is of no moment whether Arkansas farmers are fashioned as direct or indirect purchasers for the purpose of claims brought by the State.

Finally, the Court should reject Defendants' argument that neither Arkansas's Unfair Practices Act ("AUPA") nor the State's Deceptive Trade Practices Act ("ADTPA")

apply here. The plain language of Section 309 of the AUPA is not limited to horizontal agreements, as Defendants assert, but prohibits any agreement between *any* two parties to regulate, fix or maintain prices, or fix or limit the amount or quantity of virtually "any article or thing." Here, the Complaint's central allegation is that Defendants do precisely that – regulate by their anticompetitive conduct the prices of certain crop-protection AIs, and fix or limit the amount of competing generic products in the market. Such conduct is specifically the type of misconduct the AUPA is intended to eliminate.

The State's ADTPA claim is also proper. Indeed, putting aside the well-accepted policy that the ADTPA is to be given a "liberal construction," *Curtis Lumber Co. v. La. Pac. Corp.*, 618 F.3d 762, 780 (8th Cir. 2010); *Baptist Health v. Murphy*, 365 Ark. 115, 129, 226 S.W.3d 800, 811 (Ark. 2006) (ADTPA is broad enough to cover "conduct violative of public policy or statute."); *State ex rel. Bryant v. R & A Inv. Co.*, 336 Ark. 289, 295, 985 S.W.2d 299, 302-03 (Ark. 1999) (ADTPA's purpose is "to protect the interests of both the consumer public and the legitimate business community."), courts have found virtually ***identical conduct*** to that alleged here to fit comfortably within the scope of the ADTPA. *See, e.g.*, *Antoon v. Securus Techs., Inc.*, 2017 WL 2124466, at *6 (W.D. Ark. May 15, 2017) (anticompetitive exclusive provider contracts subject to ADTPA).

Accordingly, for the reasons set forth more fully below, the State respectfully requests that Defendants' Motion be denied Dismiss the Amended Complaint ("Motion" or "Mot.").

## II.     FACTUAL BACKGROUND

### A.     Crop-Protection Products with Unique Active Ingredients Are Critical to Arkansas's Economy and a Stable Food Supply

Both Syngenta and Corteva have deep roots in Arkansas. ¶¶25, 34.[4] For example, recently, in the wake of an enforcement action under a law prohibiting foreign (Chinese) ownership of land in Arkansas, a Syngenta executive explained, "In the 35 years Syngenta has been a proud part of the Arkansas community, we have developed strong and lasting personal and professional relationships . . . in addition to helping Arkansas agriculture through their work." ¶32; *see also* ¶29 (Syngenta Crop Protection, LLC's president has touted that, while Syngenta has a "global footprint," it still focusses on the "local needs" of their customers). Indeed, as described by a former Syngenta employee, at relevant times, over 38 Americans have been employed by Syngenta in Bay, Arkansas, with an annual payroll of $2.1 million. ¶33.

Similarly, among other contacts discussed herein, Corteva and its subsidiaries, Corteva Agriscience LLC and Corteva Agriscience MCS, are registered with the Arkansas Secretary of State to conduct business in Arkansas and are currently listed as active companies in "good standing" with the State. ¶34. Corteva's principal business address is listed as 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201, and all three Corteva entities' registered agent for service of process is listed as CT Corporation System, 320 South Izard Street, Little Rock, Arkansas 72201. *Id.* Corteva has also appeared in this

---

[4]     Citations to "¶__" refer to paragraphs in the Complaint.

District on at least two occasions without moving to dismiss on the basis of the Eastern District's jurisdiction in connection with claims surrounding a different crop-protection product. ¶35. As a member of the Arkansas community, Corteva also participates in marketing endeavors in the community, including sponsoring scholarships for students at the University of Arkansas for students majoring in crop science and related fields. ¶268.

Defendants' connections to Arkansas are not surprising, given the State's history, geography, demographics, and economy. Agriculture is Arkansas's largest industry, contributing $16 billion annually to the State's economy and employing 243,000 citizens. ¶1. Arkansas farmers rely heavily on crop-protection products (a collective term for products commonly known as "pesticides," "herbicides," "insecticides," and "fungicides") to improve crop yields and quality, contributing to a stable food supply and the State's economy. ¶¶2, 42, 78. Arkansas farmers specifically spend tens of millions of dollars each year on crop-protection products manufactured by Defendants, who are two of the world's largest chemical companies. ¶¶3, 22-25.

Here in Arkansas, as is true throughout the United States, crop-protection products contain at least one AI,[5] which is a chemical substance that provides the pesticidal action – *i.e.*, is designed to kill or control the targeted pest. ¶44. AIs are combined with inert components, or, in some cases, other AIs to formulate finished crop-protection products. ¶44. AIs are distinguished from each other, and preferred by particular farmers, for

---

[5]    Active Ingredients are referred to as AIs, and the AIs relevant to this action are "Relevant AIs" throughout.

numerous reasons, including the pest(s) targeted by an AI, the effectiveness of an AI at controlling the targeted pest, the crops upon which an AI is suited and registered to be used, the stage of the growing cycle at which an AI may be used, and the performance of an AI under certain climate, and weather conditions. ¶¶46-47, 78.

In conjunction therewith, Defendants and their employees are members of the Arkansas Crop Protection Association ("ACPA"), which, among other things, seeks to monitor and influence state policy regarding the pesticide industry. ¶¶255-256, 261. Defendants have also appeared directly before the Arkansas State Plant Board regarding their crop-protection products and undertaken action to register products with the Relevant AIs so that they can specifically be sold in Arkansas. ¶¶269-277.

## B.    The Crop-Protection Product Industry Relies on the "Traditional Distribution Channel"

There are two types of crop-protection product manufacturers: "basic" manufacturers like Defendants, who research, develop, patent, market, and sell new AIs; and "generic" manufacturers who, after patent and regulatory exclusive-use periods have expired for an AI, market and sell generic, off-patent or post-patent crop-protection products with the same AI. ¶¶49-56.

Neither basic nor generic manufacturers generally sell directly to farmers, but instead to distributors that in turn sell to retail outlets throughout the country, including in Arkansas. ¶¶60, 267. This "traditional distribution channel" accounts for 90% of all crop-protection product sales in the United States. It is also heavily concentrated, with the biggest seven crop-protection product distributors in the United States. accounting for over

90% of sales through the traditional channel. ¶¶62-66. Basic manufacturers, like Defendants, exercise control over retailers through sales representatives who help retailers develop and implement business plans to influence farmer demand and who monitor retailer sales to farmers in Arkansas, as well as throughout the United States. ¶¶61, 257, 259, 263-265.

The distribution channel here acts as "choke point" for farmers' access to crop-protection products. ¶¶11-12, 82. By controlling crop-protection product distributors, Defendants effectively control market access to crop-protection products.

### C.    Defendants Operate Loyalty Programs and Supply Agreements to Exclude Generic Competition

Once patent and regulatory exclusive-use periods on AIs expire, generic manufacturers are legally able to enter the market, which should result in lower prices for farmers. ¶¶55, 67-70. Indeed, Congress enacted a comprehensive regulatory regime for the crop-protection industry (Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq.*), which was designed to promote active competition by generic manufacturers of AIs once a brand (basic) manufacturer's patent and regulatory exclusive-use protection ended and, by that competition, to lower prices for American farmers, including in Arkansas. ¶¶5-7, 54-55 (FIFRA's objective is, *inter alia*, to facilitate generic entry, thus, encouraging competition and lowering prices). Here, however, Defendants use the challenged "Loyalty Programs" and supply agreements to severely limit the development and distribution of competing generic products and, ultimately, Arkansas's farmers' ability to purchase more affordable generic pesticides. ¶72. To cut off competition

- 7 -

early, AIs are typically added to a Loyalty Program either shortly before or upon the expiration of the patent or the regulatory exclusive-use period. ¶80.

Under their respective Loyalty Programs, Defendants offer substantial exclusion payments to distributors and retailers **expressly conditioned** on distributors and retailers (collectively, "Distributors") limiting purchases of generic crop-protection products containing specific AIs. ¶73. These Loyalty Programs make annual payments to their participants and are structured in an intentionally obscure manner that considers the percentage of the Distributor's total purchases or sales of a Defendant's brand name crop-protection product containing the Relevant AI as compared with total sales of products with the Relevant AI. ¶¶74, 87-88, 95-96. Defendants' Loyalty Programs limit the amount of generic equivalent crop-protection products to, at most, 15% of the Distributor's sales for a particular formulation, and in many cases, much less. ¶¶76, 86, 101. Therefore, Distributors are discouraged from competing on price and incentivized to sell less of generic versions of crop-protection products with a particular AI, because selling more generic product would decrease, if not eliminate, their "loyalty payments." ¶77. Significantly, Defendants' payments to the Distributors don't translate into lower consumer prices. Rather, Defendants' schemes facilitate maintenance of supra competitively inflated prices and severely impede access by farmers to less expensive generic AIs. *See, e.g.*, ¶¶3, 18, 72, 81, 94, 99, 117, 189, 208, 211, 239-252.

Syngenta's Loyalty Program is known as the "Key AI" program. ¶83. In or about 2014, Syngenta adopted a post-patent, generic-defense strategy to "aggressively defend [its] azoxystrobin share position while upholding market value" in the face of impending

generic entry, which resulted in the inclusion of the Relevant AI in the Key AI program beginning in or around the 2013-2014 market year, which in turn caused two generic manufacturers to leave the azoxystrobin market, one generic manufacturer not to enter the market, and one generic manufacturer not to market an innovative product containing azoxystrobin. ¶¶115-119.

Similarly, in the 2014-2015 market year, Syngenta added the Relevant AI mesotrione to the Key AI program, which has led one generic manufacturer to leave the mesotrione market because of unfair competition, two generic manufacturers to delay or terminate planned mesotrione entry, and another generic manufacturer to drop a mixed-ingredient product. ¶¶126-130. Moreover, with mesotrione, Syngenta also faced the threat of entry by Corteva's predecessor company and leveraged its ability to prevent Distributors from purchasing significant quantities of products containing mesotrione from generic manufactures to enter into a supply agreement with Corteva. ¶¶132-133, 183-184.

Syngenta also added the Relevant AI metolachlor (and now including its S-metolachlor variant) to its Key AI program in the early 2000s, which made it difficult for generic manufacturers to achieve market success or stopped them from entering the market at all. ¶¶140-146. As with mesotrione, Syngenta also obtained a separate agreement for the supply of metolachlor used in Corteva-branded products. ¶¶147-148, 183-184.

Similarly, Corteva operates two related Loyalty Programs that condition exclusion payments to Distributors on meeting loyalty thresholds. ¶93. The first program is known as the "Crops, Range & Pasture and Industrial Vegetation Management (IVM) Loyalty Program" ("CRPIVM"), which is implemented through written agreements with

- 9 -

participating distributors. *Id*. Corteva also operates a Corporate Distributor Offer program (collectively with CRPIVM, the "Corteva Loyalty Programs") through written offers that participating distributors accept through performance. *Id*. According to one Corteva employee, the "primary objective" of the Loyalty Programs is to prevent "value" deterioration associated with generic entry, in other words, to maintain high prices and market shares. ¶94. The Corteva Loyalty Programs typically contain a term that if the Distributor does not meet its thresholds for every one of the products in the loyalty offer, it completely forfeits its loyalty payments for all products. ¶98.

Corteva added the Relevant AI rimsulfuron to its Loyalty Programs in the 2017-2018 crop year, which has impeded generic manufacturers from providing effective competition in the sale of rimsulfuron to Arkansas farmers, leading one Corteva employee to observe, "We have many growers who put generic on the bid but buy Matrix [Corteva's rimsulfuron brand] because nobody sells generic." ¶¶155-160.

Due to threat from generic competition, the Relevant AI oxamyl was added to Corteva's Loyalty Programs, an action that was so effective that one Corteva product manager commented, "[O]ur team truly has done an A+ job blocking generics." ¶¶166-169.

In direct response to reports that a generic manufacturer was planning to introduce an acetochlor product in the United States, Corteva implemented an acetochlor generic-defense strategy, including the use of its Loyalty Programs to "keep the channel locked up," defend market share while holding the "value" of acetochlor products in the

marketplace, and "battle [the generic] in our core market and push them out" with the help of the Distributors. ¶¶175-180.

As noted, Defendants have maintained Loyalty Program agreements with the Distributors that collectively comprise approximately 90% or more of all crop-protection sales in the United States, including in Arkansas.[6] ¶100. These programs are effective. ¶106.

Defendants use messaging to their channel partners (*i.e.*, the Distributors) emphasizing that other Distributors are adhering to the Loyalty Programs rules. ¶¶102-104. Defendants also regularly enforce the terms of the Loyalty Programs to withhold exclusion payments, cancel contracts, delay access to new products, or withhold product allocation during a supply shortage. ¶105. Moreover, since the exclusion payments are usually made as a single payment at the end of year, and the specific eligibility and payment calculations are complex, the lack of transparency and uncertainty of receiving an exclusion payment make it less likely that a Distributor will lower its prices in anticipation of receipt of a future (uncertain) exclusion payment. ¶¶107-108.

Defendants regularly make backwards-looking assessments of the impact of their Loyalty Programs that have concluded that Loyalty Program implementation and Distributor compliance have successfully curtailed generic entry and sustained higher prices than would otherwise have prevailed. ¶¶244-245.

---

[6]   Significantly, the Distributors actively participate with Defendants in the anticompetitive conduct alleged in this action and, while not specifically named as parties to the action, they are alleged co-conspirators with Defendants. ¶17 n.12.

4863-4931-5264.v1

Comparative analyses with other countries where Loyalty Programs are not used also show the effectiveness of the Loyalty Programs at blocking generic manufacturers and maintaining high prices. ¶247. For example, in Germany, the price of Syngenta's Relevant AI azoxystrobin product is only 23% higher than the price of generic azoxystrobin products, whereas in the United States, Syngenta artificially maintains a price that is 116% higher than the generic azoxystrobin. ¶248. Analysis suggests that if generic manufacturers were able to put the same pressure on prices of Syngenta's azoxystrobin products as they do in Germany, prices in the United States would fall 43%, or nearly half. ¶¶250-252.

### D.    Defendants Directed Activity to Arkansas and Have Harmed Arkansas Farmers

These Loyalty Programs have a direct impact on Arkansas farmers, who have paid at least 40% higher prices for the crop-protection products with the Relevant AIs than they would have paid in a competitive market. ¶¶189, 240, 246. The impact on Arkansas farmers is unsurprising given all the actions that Defendants have taken to facilitate the purchase of their crop-protection products in the State.

Defendants have also worked more directly to convince Arkansas farmers to purchase their products, including those with the Relevant AIs. For example, both Defendants have sales and service representatives that directly seek to induce Arkansas farmers to purchase Defendants' crop-protection products by any means, including a podcast. ¶¶257, 259-260, 263, 265. The responsibilities of sales representatives include demanding generation of crop-protection products and require those employees to work closely with retail personnel as well as growers and area crop consultants to promote the

company portfolio. ¶263. A recently advertised Syngenta service representative position based in Little Rock would work with both farmers and Syngenta's channel partners to assist in the development and delivery of Syngenta products and the company's agronomic story in the marketplace. ¶264. An Arkansas retailer, Farmers Co-op, has test plots to show the effectiveness of Corteva weed-control products. ¶267. Syngenta has repeatedly advertised crop-protection products containing the Relevant AI azoxystrobin, including featuring a smiling Arkansas farmer on the 3Q 2021 cover of its *thrive* magazine and explaining how Trivapro, which includes azoxystrobin, "results in health benefits and stronger stalk strength on his farm in Lincoln County, Arkansas." ¶¶278-282.

## III.    MOTION TO DISMISS STANDARDS

### A.    Arkansas's Allegations Are Plausible on Their Face

In considering Defendants' Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the Court must accept the factual allegations of the Complaint as true and view the allegations in the light most favorable to Arkansas. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013).

The State need only include sufficient factual allegations to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 US 662, 678 (2009). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Moreover, the plausibility standard is not a "probability requirement." *Id.* at 594 (quoting *Iqbal*, 556 U.S. at 678).

A court should not grant a motion to dismiss unless "there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). The inquiry is not "whether the plaintiff will ultimately prevail," but whether a plaintiff should be allowed to present evidence of their claim. *Freeman v. Toyota Motor Sales, USA, Inc.*, 2020 WL 7041810, at *1 (E.D. Mo. Nov. 30, 2020).

Courts are generally hesitant to dismiss antitrust actions like this before the parties have had an opportunity for discovery, "because the proof of illegal conduct lies largely in the hands" of the perpetrators of anticompetitive schemes. *See Minn. Made Hockey, Inc. v. Minn. Hockey, Inc.*, 789 F. Supp. 2d 1133, 1141 (D. Minn. 2011).

### B.    Jurisdiction and Venue Are Proper in This Court

On a motion to dismiss pursuant to Rule 12(b)(2), "the plaintiff need only make a *prima facie* showing that personal jurisdiction exists by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state, which may be shown by submitting affidavits and exhibits supporting or opposing the motion." *Hawkeye Gold*, 89 F.4th at 1030 (cleaned up). Courts "view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in its favor in deciding whether the plaintiff made the requisite showing." *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011).

Similarly, when reviewing a motion to dismiss for improper venue, "the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in

the complaint must be taken as true. Ambiguities must be resolved in favor of the nonmoving party." *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1174 (E.D. Ark. 2019).

## IV. ARGUMENT

### A. This Court Has Personal Jurisdiction over All Defendants

Under Supreme Court and Eighth Circuit precedent, the Complaint's allegations and the evidence attached to this opposition demonstrate that all Defendants are subject to personal jurisdiction in this case.[7]

#### 1. Personal Jurisdiction Is Established by Defendants' Contacts with Arkansas Under the Due Process Clause and Arkansas's Long-Arm Statute

##### a. Personal Jurisdiction over All Defendants Is Authorized by the Due Process Clause and Arkansas's Long-Arm Statute

Setting aside briefly whether personal jurisdiction is authorized under the Clayton Antitrust Act of 1914 ("Clayton Act") for the corporate Defendants,[8] personal jurisdiction is authorized for all Defendants under Arkansas's long-arm statute and the Due Process Clause. *See Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012). Arkansas's long-arm statute authorizes "personal jurisdiction of all

---

[7] Plaintiff does not argue that general personal jurisdiction over Defendants exists in the State. Its arguments are limited to specific or "case-linked" jurisdiction. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017).

[8] The Court's jurisdiction in this action is not dependent on the Clayton Act's nationwide service of process provision (15 U.S.C. § 22). However, because this Court properly exercises jurisdiction in this action, and venue is proper in this District under the Clayton Act, as well as the general venue statute, *see infra* § II.A.2.a, Defendants' Clayton Act service-of-process argument is a nonstarter. Defendants' contacts here exceed any minimum required for both jurisdictional and venue requirements.

persons, and all causes of action or claims for relief, to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." Ark. Code Ann. § 16-4-101(B). Accordingly, the question presented in this case is whether the exercise of personal jurisdiction is consistent with the Due Process Clause. *See Henry Law Firm v. Cuker Interactive, LLC*, 950 F.3d 528, 532 (8th Cir. 2020).

"In analyzing whether specific jurisdiction comports with due process, [the court] must decide whether the defendant has certain minimum contacts with the forum state and whether the plaintiffs' claims arise out of or relate to the defendant's contacts." *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (internal quotations omitted). "The [defendant's] contacts must be the defendant's own choice and not random, isolated, or fortuitous." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (citation and internal quotations omitted). For there to be specific jurisdiction, a plaintiff's suit must "'arise out of or relate to the defendant's contacts with the forum.'" *Id.* at 362 (emphasis removed).

Courts in the Eighth Circuit utilize five factors to determine whether specific jurisdiction exists: "(1) the nature and quality of [defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Brothers & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022) (alteration in original). Additionally, "[t]he first three factors are of 'primary importance' and the 'fourth and fifth factors carry less weight.'" *Id.* Moreover, because the first three factors are closely related, they can be considered together. *See Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519 (8th Cir. 1996).

- 16 -

*The nature, quality, and quantity of Defendants' contacts support jurisdiction.*
The Complaint's allegations and the exhibits in support thereof demonstrate that personal jurisdiction is appropriate in this case over all Defendants. Syngenta has numerous case-related contacts with Arkansas. For example, Syngenta recently posted numerous crop-protection-related job listings for Arkansas-related positions on Arkansas government websites. PExs. 1-5.[9] Many of these positions list Defendant Syngenta Crop Protection, LLC as the hiring entity. PExs. 6-7; *see* ¶30; Notably, while Syngenta denies that Syngenta Corp. and Syngenta Crop Protection AG transact business, have employees, own land, apply for crop-production product registrations, or have been members of the ACPA – conspicuously leaving out any such assertions concerning Syngenta Crop Protection, LLC s*ee* Declaration of Cheryl Quain in Support of Motion to Dismiss Defendants Syngenta Corporation and Syngenta Crop Protection AG ("Quain Declaration"), DEx. 17), Plaintiff submits direct evidence that Syngenta Crop Protection, LLC, does have employees in Arkansas and that it also has registered crop-protection products in the State. ¶¶257, 263; PEx 8-9.

*Plaintiff's claims relate to Defendants' contacts with Arkansas.* Defendants' analysis of the relatedness of their contacts with the State is thoroughly contradicted by, among other sources, the Supreme Court's decision in *Ford*. In that case, Ford made precisely the same sort of arguments Defendants make in their Motion, in which they claim

---

[9]    Citations to "PEx.__" refer to plaintiffs' exhibits file herewith. Citations to "DEx. __" refer to exhibits attached to Defendants Motion and Memorandum of Law in Support of Defendants' Motion (ECF Nos. 81-82).

they cannot be sued in Arkansas because they did not design the allegedly illegal rebate program in the State. Mot. at 26. The Supreme Court dispatched such reasoning:

> Ford contends that jurisdiction is improper because the particular car involved in the crash was not first sold in the forum State, nor was it designed or manufactured there. We reject that argument. When a company like Ford serves a market for a product in a state and that product causes injury in the State to one of its residents, the State's courts may entertain the resulting suit.

*Ford*, 592 U.S. at 355.

So too here. Plaintiff alleges that Arkansas farmers "have paid at least 40% higher prices for the crop-protection products in the Relevant Markets than they would have paid in a competitive market." ¶189; *see also, e.g.*, ¶208 ("Through operation of its so-called Loyalty Programs, each Defendant has directly harmed competition and consumers, including Arkansas farmers and the State's residents."); ¶¶212, 225.

Defendants also ignore specific allegations connecting their contacts to Plaintiff's claims. For example, Syngenta does not address the public statements regarding the importance to Arkansas's agriculture, as well as Syngenta's awareness of and interest in that the 160 acres of land that it owned in Bay, Arkansas, during the relevant time period here, were a source of pride for Syngenta, which the court in *Anderson v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004), found supported jurisdiction. *Id.* at 453-55 ("[T]he acknowledged importance of Arkansas's production site and Falcon customers to both companies' success, leads us to conclude that an Arkansas court's assertion of jurisdiction over the instant action would be reasonable and fair.") ¶¶32-33; PExs. 15-16. Additionally, Syngenta does not address the allegations and exhibits submitted herewith, directly tying

the Bay site to Arkansas's claims, which demonstrate that Acuron, Trivapro, and Quadris – all of which use Relevant AIs – were tested at that site. ¶¶279-280; PExs. 17-18.

Similarly, all Defendants ignore the allegations and cannot deny the evidence attached hereto showing numerous Syngenta and Corteva sales and service representatives committed to serving Arkansas customers. ¶¶257-261, 263-265. In *Dassault*, the Eighth Circuit found that such employees supported the assertion of personal jurisdiction. *Dassault*, 361 F.3d at 454. The Supreme Court, too, found that extensive sales and servicing efforts supported the assertion of personal jurisdiction. *Ford*, 592 U.S. at 354-56, 363-68, 371. The *Ford* court also emphasized that advertising for products supports the assertion of jurisdiction in a particular forum. *Id.* Here, for example, Syngenta specifically emphasized the use of Trivapro in Arkansas in its national magazine as a form of advertisement, including specifically featuring an Arkansas farmer on the cover of the magazine. ¶281; PEx. 20.

Defendants also misconstrue the relevance of Plaintiff's allegations regarding Syngenta and Corteva and their employees' involvement in and leadership of the ACPA. ¶¶255-261; PExs. 10-14, 19, 21-27.[10] First, the ACPA's conventions in North Little Rock, Arkansas and Defendants' participation therein show Defendant-related activities in this State (and District). Moreover, as alleged, each Defendant is an active sustaining member

---

[10] Corteva's defense that "Corteva Agriscience" is listed as a sustaining corporate member of the ACPA. Given the allegations in the Complaint ACPA fails to acknowledge that Corteva's own materials, *see supra*, refer to the consolidated Corteva entities as "Corteva Agriscience." PEx. 28.

of the ACPA, Defendants' employees have held significant ACPA leadership roles, and ACPA's government advocacy (including having a representative on the Arkansas State Plant Board) show how "the defendant purposefully avails itself of the privilege of conducting activities within the Forum State, thus, invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

***The State's interest in providing a forum for this action and the convenience of the parties also support the assertion of jurisdiction.*** As to the latter two Eighth Circuit personal jurisdiction factors, which Defendants do not address in their Motion, the Court has already expressly determined, in rejecting Defendants' efforts to transfer the action out of Arkansas, that "the convenience factors do not weigh heavily" against this forum and recognized the importance of Arkansas's "choice of venue in antitrust suits." ECF No. 50 at 4, 5 (denying Defendants' motion to transfer).

Given the allegations in the Complaint and exhibits attached to this Opposition, Plaintiff has a made the requisite *prima facie* case of personal jurisdiction against all Defendants.

### b.    The Closely Intertwined Nature of the Syngenta and Corteva Entities, Respectively, Also Supports Personal Jurisdiction over All Defendants

Unable to deny as a factual matter their long history and case-related contacts in the State, Defendants make "group pleading" and piercing the "corporate veil" arguments that simply do not control the personal jurisdiction inquiry. Mot. at 14-17.

Personal jurisdiction is a requirement of the Due Process Clause and is fundamentally a doctrine about whether it is fair to subject a particular defendant to a suit

in a particular forum. *See Ford*, 592 U.S. at 360. It is not necessary, as Defendants contend, to pierce the corporate veil among the various Syngenta and Corteva entities to find there is personal jurisdiction in Arkansas over each. In *Dassault*, the Eighth Circuit addressed a similar situation where a foreign parent argued that there was no personal jurisdiction over it in Arkansas for personal injuries suffered in a jet assembled by a domestic subsidiary in Little Rock. *See* 361 F.3d 449. Indeed, the Eighth Circuit noted that the district court had unduly relied upon a piercing the corporate veil theory. *Id*. at 542.[11] Rather, the court found the foreign parent had sufficient contacts with Arkansas based upon its own actions and touting the activities of itself and the local subsidiary as an integrated business. *Id.* at 453.

> We have stated that a foreign manufacturer that successfully employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market. Dassault Falcon Jet not only marketed and sold products in Arkansas, but it operated the Dassault Aviation Group's largest production facility there. We conclude that Dassault Aviation purposefully directed its products to the United States, and specifically to Arkansas, where most Falcon jets are completed, through the distribution system it set up in this country.

*Id.* at 454 (cleaned up).

A similar set of facts as those that supported the assertion of jurisdiction in *Dassault* is present here. Both Syngenta and Corteva present themselves as integrated businesses,

---

[11] Indeed, the *Dassault* court explicitly rejected the interpretation of *Epps v. Stewart Information Services Corp.*, 327 F.3d 642 (8th Cir. 2003), advanced by Defendants (Mot. at 15) that assertion of personal jurisdiction over a parent corporation requires piercing the corporate veil, as was recognized in *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011), which was also cited by Defendants (Mot. at 15-16). *Dassault*, 361 F.3d at 452. Nor does Defendants' citation to *Steinbuch v. Cutler*, 518 F.3d 580, 589 (8th Cir. 2008) (Mot. at 16) require a different result since Arkansas alleges far more than "mere ownership of [a] subsidiary" between Defendant entities.

without differentiating among their various entities. They have set up distribution networks that include the distribution of their products in Arkansas and, thus, have intended to reap the benefits of selling in the Arkansas market. It would not be unfair to assert personal jurisdiction over them here. Even the "evidence" that Defendants present undermines their own argument for dismissal based on technicalities about different corporate affiliates. In connection with their Motion, Syngenta submits the Quain Declaration, describing Cheryl Quain ("Quain") as "Global Head Compliance [sic] and Risk Management and Head North America Corporation Legal" without much more specificity. DEx. 17. The Quain Declaration focuses on the non-dispositive issue of whether or not certain of the Syngenta Defendants had a physical presence in Arkansas, specifically Syngenta Corp. and Syngenta Crop Protection AG. Indeed, notable for its absence in her declaration is Syngenta Crop Protection LLC, which, as discussed *supra* at § IV.A.1.a., had job listings on official Arkansas websites for Arkansas positions. *See* PExs. 1-5. The head of Syngenta Crop Protection LLC, Vern Hawkins ("Hawkins"), lists his employer as another Dutch Syngenta entity. ¶29; PExs. 29-30 Moreover, in their initial disclosures, filed on behalf of all the Syngenta Defendants, Hawkins, along with three other individuals, were listed as individuals likely to have discoverable information. PEx. 31. Notably, all of these individuals were given functional titles, ***without any indication of which Syngenta entity they perform services for***. For example, Hawkins was listed as "North American Regional Director, Crop Protection." Similarly in the Quain Declaration, Ms. Quain explains that she herself has "responsibility over Syngenta's ethical compliance function in the United States and globally and Syngenta's corporate legal function in North America" and

- 22 -

describes the Syngenta Defendants as "several entities within Syngenta," further illustrating the interconnectedness of the Syngenta entities. DEx. 17; *see also* ¶31; PExs. 32-33 (discussing the same with respect to head of United States Crop Protection Corporate Communications).

Thus, even in the declarations Syngenta submits in support of its Motion, it is unable to demarcate the boundaries between the various Syngenta entities. That is precisely why they should each be subject to personal jurisdiction here, since, just as in *Dassault*, they are integrated business groups taking advantage of doing business in Arkansas.[12]

Additionally, allegations in the Complaint (¶¶22-31) demonstrate that the result reached in *Dassault* is the same result that should be reached here. For example, in addition to all the foregoing, Syngenta has publicly "acted to consolidate the image and operations of the" various Syngenta entities by using a common name and logo and sharing a website (*Dassault*, 361 F.3d at 454; *see, e.g.*, ¶28; PEx. 34), and job listings for **Arkansas** crop-protection positions explain that "Syngenta Crop Protection is headquartered in Switzerland." ¶30; PExs. 6-7.

Likewise, Corteva's assertions that it is not responsible for any Corteva-related contacts are equally unavailing. *See* Declaration of Dana Eddis in Support of Motion to Dismiss Defendant Corteva, Inc. ("Eddis Declaration"), DEx. 18. Like Syngenta's Quain Declaration, Corteva's Eddis Declaration focuses on the non-dispositive issue of physical

---

[12]   Defendants' citations to out-of-circuit, unpublished opinions cannot change the result required by *Dassault*. *See* Mot. at 17.

presence. At the same time, the Eddis Declaration goes even further and suggests that even though Corteva Agriscience has multiple relevant employees in Arkansas, those contacts should not count in the jurisdictional analysis because they report to another location. This assertion, though, has no basis in law.

The Eddis Declaration also notes that "EIDP, Inc. is legal owner of the research station located in West Memphis, Arkansas." DEx. 18. Without context, it is unclear what the specific relationship between "EIDP, Inc." is to Corteva the parent entity. However, Bloomberg notes that "EIDP, Inc. (formerly known as E.I. du Pont de Nemours and Company) is *a direct subsidiary of Corteva*." PEx. 35[13] Indeed, Corteva has publicly asserted that, "Corteva currently conducts substantially all of its operations through EIDP." *See* PEx. 37 (May 6, 2022 EIDP, Inc. Preliminary Prospectus Supplement) at S-1. The very documents that Corteva has produced and their public statements demonstrate the appropriateness of considering the actions of Corteva Agriscience LLC, Corteva Agriscience MCS and EIDP, Inc. in the jurisdictional inquiry relating to Corteva.

Moreover, as with Syngenta, Corteva has publicly "acted to consolidate the image and operations of the" Corteva entities by using a common name and logo and sharing a website. *Dassault*, 361 F.3d at 454. The website, www.corteva.com evidences that Corteva markets itself as "Corteva Agriscience." PEx. 28. Corteva Agriscience LLC is a subsidiary of Corteva as is Corteva Agriscience MCS LLC. PEx. 38. There is no distinguishing

---

[13]   As Corteva's securities filing makes clear, "Corteva owns 100% of the outstanding common stock of EIDP. . . EIDP is a subsidiary of Corteva, Inc." PEx. 36.

between Defendant Corteva and Corteva Agriscience LLC in company documents. PEx. 39. In January 2021, Corteva changed the name of "Dow AgroSciences LLC" to "Corteva Agriscience LLC" "to make it easier to do business with us." PEx. 40.

Defendants' attempts to shroud their presence in Arkansas and the fundamental fairness of this Court's exercising jurisdiction in this case through vague and easily refutable claims about corporate formalities and machinations provide them no support.

### 2.    Venue Is Proper in This District

#### a.    Venue Is Proper Under the Clayton Act Against the Corporate Defendants

Under Section 12 of the Clayton Act, 15 U.S.C. § 22, venue is proper in any district where a corporation is an inhabitant, where it may be found, or transacts business.[14] Plaintiff does not claim that any of the corporate Defendants is an inhabitant of Arkansas. As the Supreme Court made clear, the addition of "transacts business" as a statutory category for venue was "to enlarge the local jurisdiction of the district courts so as to establish the venue of such a suit not only, as theretofore, in a district in which the corporation resides or is 'found,' but also in any district in which it 'transacts business.'" *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 372 (1927). Moreover, the Supreme Court held that a "corporation is engaged in transacting business in a district,

---

[14]    Defendants make no independent argument that Ark. Code Ann. § 4-75-319, which provides that any AUPA claim by the Attorney General "part of an action containing claims of federal law violations . . . shall be brought in the appropriate federal court" does not apply aside from the arguments they make under the Clayton Act, 15 U.S.C. § 22, and the general venue statute, 28 U.S.C. § 1391. Mot. at 28 n.14. Since those arguments fail, venue is also proper under Ark. Code Ann. § 4-75-319.

within the meaning of this section, in such sense as to establish the venue of a suit –
***although not present by agents carrying on business of such character and in such
manner that it is 'found' therein and is amenable to local process*** – if, in fact, in the
ordinary and usual sense, it 'transacts business' therein of any substantial character." *Id.* at
373. Thus, Defendants' suggestion that the named corporate Defendants must have agents
or employees within the State for venue to be appropriate is wrong.

In a subsequent case, cited by Defendants, the Supreme Court in *United States v.
Scophony Corp. of America*, 333 U.S. 795 (1948), recognized that *Eastman Kodak:*

> By substituting practical, business conceptions for the previous
> hairsplitting legal technicalities . . . the Court yielded to and made effective
> Congress' remedial purpose. Thereby it relieved persons injured through
> corporate violations of the antitrust laws from the 'often insuperable
> obstacle' of resorting to distant forums for redress of wrongs done in the
> places of their business or residence.

*Id.* at 808. In *Scophony*, the Supreme Court found that Section 12 was intended to defend
against attacks on proper venue by precisely the means advanced by Defendants here,
namely "artful arrangement of agents' authority, or of their comings and goings, or of the
geography of minute incidents in contracting." *Id.* at 808 n.19.

In *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998), the panel held
venue can be asserted over a parent company on the basis of a subsidiary's business
activities when there is "[s]ufficient control over the operations of a subsidiary [that]
renders the subsidiary the instrument, rather than merely the investment, of the parent, and
supports the conclusion that the parent is transacting business in a district, despite the
formal separation of corporate entities." *Id.* at 1173. *Campos* explicitly rejected reliance on

the sort of affidavits that Defendants have produced in this case, that the defendant owned no property and had no bank accounts or offices in the district, because they were inapplicable to the venue standards they had enunciated. *See id.* at 1173-74.

Here, for example, the Quain Declaration confirms that the Syngenta entities have an integrated legal function in addition to other operational synergies discussed *supra*. DEx. 17. Corteva does not deny its affiliation with Corteva Agriscience, LLC, Corteva Agriscience MCS, or EIDP, which, according to the Eddis Declaration, owns the research station in West Memphis, Arkansas, which is in the Eastern District. Mot. at 17 n.12. Similarly, the Eddis Declaration concedes that Corteva Agriscience LLC employees had responsibilities within eastern Arkansas, presumably within this District. DEx. 18.[15]

Accordingly, venue is proper against all Defendants. "[A]n independent basis for venue over the state-law claims is unnecessary" on the basis of the doctrine of pendent venue. *Bredberg v. Long*, 778 F.2d 1285, 1288 (8th Cir. 1985).[16]

---

[15]  In *Bruner v. Republic Acceptance Corp.*, 191 F. Supp. 200 (E.D. Ark 1961), which Corteva relies upon (Mot. at 19), it was undisputed that the defendant was "never qualified to do business in Arkansas, maintains no office here, and has never designated an agent for service in Arkansas," which is not the case here. Nor does Defendants' extended discussion of *McAvoy v. Texas Eastern Transmission Corp.*, 185 F. Supp. 784 (W.D. Ark. 1960), require a different result (Mot. at 19-20). In that case, the defendant at issue was similarly never qualified to do business in Arkansas, and the cause of action arose from a product sold to a co-defendant in Louisiana and an incident that occurred in Kentucky, which is distinguishable from the Arkansas-focused claims here. *McAvoy*, 185 F. Supp. at 790. Additionally, the *McAvoy* court interpreted Arkansas state law as not going as far as the limits of the due process clause, which is explicitly provided for by statute now, and decided the case on those grounds rather than the constitutional limit. *Id.* at 788-90.

[16]  Given that personal jurisdiction over the corporate Defendants is proper for Plaintiff's federal claims, personal jurisdiction is also proper for Plaintiff's claims under the AUPA (Ark. Code Ann. § 4-75-301, *et seq.*) and the ADTPA (Ark. Code Ann. § 4-88-107, *et seq.*),

- 27 -

**b.    Venue Also Is Proper Under the General Venue
Statute (28 U.S.C. § 1391(b)-(d))**

Venue is also supported by the general venue statute for all claims against the corporate Defendants, as well as Syngenta Crop Protection LLC. *See* 14D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3818 (4th ed. 2023) (noting that venue sections of the Clayton Act are not exclusive and that general venue statute applies in antitrust cases).[17] In this case, venue is proper in this District under 28 U.S.C. § 1391(b)(1)-(3).

Under 28 U.S.C. § 1391(b)(1), venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Under 28 U.S.C. § 1391(c)(2), entities like the domestic Defendants "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." For the reasons discussed above, all Defendants are subject to personal jurisdiction in Arkansas and, therefore, the Eastern District.[18] As for the domestic corporate defendants, Syngenta.

---

under the doctrine of pendent personal jurisdiction. *FTC v. BINT Operations LLC*, 595 F. Supp. 3d 740, 752-53 (E.D. Ark. 2022) ("The federal common law doctrine of pendent personal jurisdiction allows a court to exercise personal jurisdiction over a defendant if a pendent state-law claim arises out of the same common nucleus of operative facts as a federal claim derived from a statute authorizing national service of process.").

[17]  As Defendants recognize, venue is proper against the foreign Defendant, Syngenta Crop Protection AG, in any district. *See* 28 U.S.C. § 1391(c)(3); see Mot. at 29 n.15.

[18]  For this same reason, as an alternative, venue would be proper in the Eastern District under 28 U.S.C. § 1391(b)(3) for the same reasons discussed above: "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction."

4863-4931-5264.v1

and Corteva, under 28 U.S.C. § 1391(d), the Eastern District is where most of the contacts discussed above were made, and accordingly, their "contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State"; or, in the alternative, the Eastern District is where Defendants have "the most significant contacts." *See* ¶¶264-268, 280-281.

Venue is also proper in this District under 28 U.S.C. § 1391(b)(2), since this "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Chief Judge Baker recently found that Section 1391(b)(2) was satisfied in a similar antitrust case in *BINT Operations*, 595 F. Supp. 3d at 756-57. As here, the defendants in that case transacted business in this District, encouraged sales in this District, and led to the charging of supracompetitive prices to customers in this District.

Venue is proper in the Eastern District of Arkansas against all Defendants in this case.

### B.    The Complaint States a Federal Antitrust Claim

#### 1.    Arkansas's Antitrust Claims Are Properly Analyzed Under the Rule-of-Reason Standard

Pretending that this issue hasn't already been fully briefed and decided against them in the Middle District of North Carolina, Defendants march out the same incorrect price-cost argument rejected by Judge Schroeder based on the same mischaracterizations by Defendants of the actual facts and claims alleged. *See FTC*, 2024 WL 149552, at *12-17. They insist – again – that their respective loyalty agreements with the Distributors can only be found anticompetitive if they fail the price-cost test. Put simply, because the challenged

conduct includes payments to the Distributors, Defendants incorrectly assert the price-cost test applies here.

The price-cost test applies when a plaintiff brings a claim based on predatory pricing – *i.e.*, pricing that is so low that it excludes rivals from the market. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) (The price-cost test applies when "a plaintiff seek[s] to establish competitive injury resulting from a rival's low prices."). In predatory-pricing cases, a plaintiff alleges that a defendant's low prices are temporary and that the defendant's plan is to drive its rivals out of the market, attain a monopoly thereby, and then raise prices to supracompetitive levels. *See id*. at 224. Predatory pricing is potentially anticompetitive, depending on the facts of any given case. At the same time, in the short term, predatory pricing may look consumer-friendly due to apparent low pricing but may, indeed, be anticompetitive and bad for consumers in the long run. *See id.* at 226. In a situation like that, the price-cost test is intended to ferret out those circumstances in which a company *is charging so little* that it is running at a loss, is using such pricing to exclude rivals, and will later raise prices.

However, the price-cost test only applies where a defendant's pricing "is the *clearly* predominant mechanism of exclusion." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 269 (3d Cir. 2012). Arkansas alleges that Defendants used a number of anticompetitive exclusion mechanisms – not solely price – to exclude competing generic AIs. Indeed, the challenged scheme here is not a matter of a defendant aggressively discounting its product below competitor products in order to induce the users of that product to choose them. Rather, the opposite is true. Arkansas alleges that Defendants, for all intents and purposes,

bribe the Distributors to not sell competing generic products, which limits Arkansas farmers' access to generic AIs. This does not result in savings for those farmers, but it allows Defendants to maintain artificially inflated prices for the AIs. In other words, absent fair competition, which the Loyalty Program rebates are intended to eliminate, Arkansas farmers are simply paying too much (not too little) for the AIs.[19] *See also* ¶¶239-252 (specifically illustrating how Defendants achieve and maintain supracompetitively high prices through their Loyalty Program scheme).

That fact alone ends application of the price-cost test. *See, e.g.*, *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 642 (N.D. Ill. 2022) (The "predatory pricing rubric is . . . inappropriate" where a plaintiff "[n]owhere … allege[s] that [defendants'] prices are now, or ever were, too low."); *UniStrip Techs., LLC v. LifeScan, Inc.*, 153 F. Supp. 3d 728, 736-37 (E.D. Pa. 2015) (price-cost test does not apply to exclusive dealing claim where plaintiff never alleged that price was the means of exclusion); *see also FTC*, 2024 WL 149552, at *17-18.

---

[19]   *See, e.g.*, ¶3 ("Defendants . . . inflate crop-protection product prices"); ¶18 ("Loyalty Programs [designed] to maintain . . . [the] price [of] crop-protection products above competitive levels while retaining a predominant market share"); ¶72 ("maintaining higher market prices and higher branded market shares than would otherwise prevail in a competitive market after the expiration of FIFRA and patent exclusivity periods"); ¶¶81, 94 ("According to one Corteva employee, the 'primary objective' of the Loyalty Programs is to prevent the 'value' deterioration associated with generic entry, in other words, to maintain high prices and market shares"); ¶99 ("Corteva accomplishes these profits by restricting access to the traditional distribution channel for generic products, thereby elevating both its market prices and share."); ¶117 ("Syngenta's Key AI Loyalty Program has substantially impeded generic manufacturers from providing effective competition . . . and as a result has maintained supracompetitive prices"); ¶¶189, 208, 211.

When price isn't the sole means of exclusion, the harm is caused "not by the price [but] rather by the condition limiting rivals' sales." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 768b4 (2023). "In these [cases], simply querying whether the fully discounted price is above cost often misses important elements of exclusion." *Id*. Thus, when a defendant's practices are challenged on exclusive-dealing grounds, they may be held illegal "irrespective of below-cost pricing." *ZF Meritor*, 696 F.3d at 281.

Thus, "the price-cost tests cases are inapposite, and the rule of reason is the proper framework within which to evaluate [the] claims." *Id*. at 277-78 ("Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a per se rule of non-liability under the antitrust laws for all contractual practices that involve above-cost pricing."); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 65-66 (E.D. Pa. 2022); *see also FTC*, 2024 WL 149552, at *19 (applying rule of reason to identical claims). "Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful." *ZF Meritor*, 696 F.3d at 278.

Indeed, after a careful and thorough examination of virtually the same allegations laying out Defendants' anticompetitive scheme here, as well as careful consideration of Defendants' identical argument that the price-cost test applies, Middle District of North Carolina denied Defendants' motions to dismiss. *See FTC,* 2024 WL 149552, at *17-19. No matter how Defendants' strain to make this case solely about above-cost pricing, it just is not. As Judge Schroeder held: "The complaint alleges that Defendants are dominant

suppliers who have entered into de facto exclusive dealing arrangements ***that include plausibly significant mechanisms of exclusion beyond price-cutting***." *Id*. at *19 (emphasis added). In other words, where a plaintiff alleges coercive or other mechanisms of exclusion in addition to purported loyalty-program pricing, the price-cost test does not apply. *See id*. at *17 ("Plaintiffs have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at this pleading stage.").

Here, pricing clearly is not what is doing the work of exclusion. *See id.* at *16 ("[T]he price-cost test [applies] where a pricing practice is clearly doing the work of exclusion and the rule of reason ***where there are mechanisms beyond price-cutting*** that exclude competition by imposing unilateral costs on competitors."). Indeed, the Complaint specifically alleges, *inter alia*:

- that Defendants use their monopoly power and the market's high barriers to entry for generic manufacturers to sell crop-protection products, including costly and time-consuming federal regulatory approval, costly original-registration-holder data payments, high AI sourcing and manufacturing costs, block generic entry, cause generic exit, and impede innovation in the market (¶¶194, 231-238);

- that generic manufacturers are denied fair and competitive access to the distribution channel by Defendants' Loyalty Programs, which allow Defendants to "lock up" the channel and, thereby, maintain their market shares, as well as maintaining a "significant 'price premium to generics (at all levels)'" (¶166, 195);

- the coercive aspects of Defendants' programs for distributors' or retailers' deviation from the Programs' exclusivity terms, including, inter alia, the withholding and forfeiture of exclusion payments, cancellation of distribution contracts, limiting necessary access to crop-protection products (both new and existing), and other forms of retaliation (¶¶98, 100-109, 140, 209), as well as the long-term effects of such threats (¶¶214-230); and

- 33 -

- that Syngenta and Corteva entered into a supply agreement for mesotrione and metolachlor and how that agreement enhances the exclusivity effects of Defendants' Loyalty Programs (¶¶132-134).

As Judge Schroeder explained, "Plaintiffs have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at [the] pleading stage." *FTC*, 2024 WL 149552, at *17. Concerning Defendants' effective blockage of the distribution channel and high barriers to entry, "[w]hile high entry barriers alone may not trigger the rule of reason, Plaintiffs have plausibly alleged that Defendants' use of the loyalty discounts – as alleged monopolists relating to production of the AIs – exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution." *Id.* (citing *McWane, Inc. v. FTC*, 783 F.3d 814, 836 (11th Cir. 2015); *ZF Meritor*, 696 F.3d at 284-85 (applying rule of reason where high barriers existed in high-concentration market)). Likewise, Defendants' coercive and retaliatory conduct goes well beyond being solely a predatory pricing scheme. *See id.* at *17-18 (threats to restrict supply and defer payments are non-price mechanisms of exclusion). The Syngenta-Corteva supply agreement also serves as a non-price mechanism that "enhances the exclusive effect of the loyalty programs."[20] *Id.* at *18.

---

[20] Defendants' entire argument attacking their supply agreement as not being an actionable market-allocation agreement is a red herring. *See* Mot. at 35-37. The significance of the agreement is the conspiratorial effect it has, as Judge Schroeder described it, in "enhanc[ing] the exclusive effect of the loyalty programs" as part of an overall scheme that, when operating in totality, is clearly not a predatory pricing action subject to the price-cost test. *Id.* at *18.

While each antitrust case "must be determined upon the particular facts disclosed by the record" (*Maple Flooring*, *Mfrs. Ass'n v. United States* 268 U.S. 563, 579 (1925)), the non-price mechanisms of exclusion alleged in this action are akin to those found by courts around the country to take challenged loyalty-program schemes out of the realm of price-cost test application:

> In other loyalty discount cases, courts have observed a number of non-price mechanisms of exclusion, such as provisions aggravating existing barriers to enter the market; whether the buyer insists on exclusive dealing; contractual obligations to purchase a set percentage of products from the defendant; discounts involving tying or bundling; threats to retract unpaid rebates or claw back discounts from prior years; threats to cut off supply from a monopolist; requirements to exclude competitors from marketing materials; and the length of time of the discounting agreements.

*FTC*, 2024 WL 149552, at *17 (internal citations omitted).

All of these non-price exclusions are features of Defendants' Loyalty Programs. The price-cost test does not apply.

## 2.    Product Market

Again, Defendants pretend here that the issue of proper market pleading hasn't already been thoroughly and carefully analyzed by another court. *See id.* at *8-12 (finding Syngenta and Corteva AI product markets plausibly alleged). The facts in this case are identical in substance, and so are the Defendants, the alleged product markets, and just as importantly, so is the law.[21] Both this Court and the Fourth Circuit (and the Supreme Court

---

[21]    With respect to the product markets themselves, Arkansas pleads product markets that are identical for the Relevant AIs as those analyzed and found plausible by the Middle District of North Carolina. *Cf.* 196, and Amended Complaint ¶155, *FTC v. Syngenta Crop Protection AG*, No. 1:22-cv-00828-TDS-JEP (M.D.N.C. Oct. 5, 2023), ECF No. 149 (alleging identical product markets).

for that matter) require a plaintiff to plausibly allege a cognizable relevant market. *See* Mot. at 37 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962), and *Double D Spotting Serv., Inc. v. Supervalue, Inc.*, 136 F.3d 554, 560 (8th Cir. 1990)); *see also FTC*, 2024 WL 149552, at *8-9 (citing *Brown Shoe*, 370 U.S. at 325, and *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011)). Because the Middle District of North Carolina has already found that the same AI product markets are plausibly alleged, the same results should follow here – and Defendants provide no reason they should not.

### a. The Court Should Decline Defendants' Invitation to a Judicial Fact-Finding Mission

As an initial matter "[t]he relevant product market is a question of fact." *HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007); *see also FTC*, 2024 WL 149552, at *9 (citing *Kolon*, 637 F.3d at 442). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Kolon*, 637 F.3d at 443 (collecting cases, including *Double D*, 136 F.3d at 560).

Notwithstanding this, Defendants plow ahead, delving into the highly technical universe of crop-protection products and asking this Court to consider *16* voluminous exhibits and their "facts" to bootstrap their arguments. However, Defendants improperly seek to incorporate facts from far outside Arkansas's Complaint. Defendants ask the Court to interpret government regulations, scientific and industry publications, and filings in other court cases, synthesize all of that information (which requires expert testimony),

determine scientific validity and applicability to this case, weigh evidence, and make fact determinations wholly improper at the motion-to-dismiss stage.[22]

### b. Under Any Standard, Plaintiff's Product Markets Are Adequately Pleaded

The Complaint alleges that Defendants have harmed competition in antitrust product markets corresponding to six individual Relevant AIs. ¶48. Three sets of allegations converge to this market definition:

First, Defendants structured their programs around markets for individual AIs. Second, a pesticide's price is affected much more by pesticides with the same AI than by other products. Third, each AI's unique chemical properties and consistent user base

---

[22] While Defendants broadly (but with no proffered argument or support) suggest that the Court **could** judicially notice the various exhibits they submit in conjunction with their Motion, they make no explicit request that the Court do so, nor do they identify what facts they want the Court to take notice of. *See* ECF No. 82 at 40-41; ECF No. 81-1 – 81-18. To the extent Defendants are heard to request judicial notice of any of their exhibits pursuant to Fed. R. Evid. 201, the Court should reject their request. A bald request without argument or support fails to meet their required burden on such a request. See 21B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 5108 (2d ed.) (burden is on the party requesting judicial notice). Of note, Defendants **did** seek judicial notice of exhibits in support of their motion to dismiss in the *FTC* Action but the court there declined to take such notice, stating that denial of Defendants' motion to dismiss **would not be materially altered even if it took notice of the documents**. *See FTC*, 2024 WL 149552, at *11. In any case, documents and alleged facts outside the four corners of a complaint should not be considered on a Rule 12(b) motion to dismiss when a defendant seeks to draw fact inferences therefrom. Indeed, "[s]uch evidence may not . . . be viewed for the truth of the matters asserted." *LeMay v. Mays*, 18 F.4th 283, 289 (8th Cir. 2021); *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 n.4 (8th Cir. 2015) ("judicial notice is inappropriate to the extent [a party] offers these documents for the 'truth of the matters within them and inferences to be drawn from them – matters which [the other party] disputes.'"); *Gannon Int'l, Ltd. v. Blocker*, 2011 WL 111885, at *7 n.10 (E.D. Mo. Jan. 13, 2010) (stating the parties' references to authorities outside the pleadings "essentially force this Court to rule on a battle of the experts, which is improper for a motion to dismiss").

confirm that it belongs in a separate market. Any of these sets of allegations would on their own make the Complaint's market definitions plausible. The three together are more than enough.

Defendants' response is to argue that Arkansas fails to disprove the existence of broader markets containing multiple AIs. However, their arguments misconstrue the law, ignore the factual allegations of the Complaint, and at best present a factual dispute that cannot be resolved at the motion to dismiss stage. Arkansas has alleged plausible relevant markets, and the motion should be denied.

### (1)    Principles of Market Definition

Antitrust courts define a market to assess whether a given arrangement has the potential for genuine adverse effects on competition. *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (11th Cir. 2009); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002). A group of products forms a relevant market if a firm that controlled all those products could profitably raise prices above the competitive level. This is so when the products are more reasonably interchangeable with each other than with products outside the market. *Brown Shoe*, 370 U.S. at 325.

Market analysis often begins with the conduct at issue. *See In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 663 (D. Conn. 2016); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 205 (2d Cir. 2001) (collecting cases). The conduct can indicate both a defendant's own conception of the market, *Todd*, 275 F.3d at 205, and that the defendant has market power within that market, *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013).

For example, where the challenged conduct involves the alleged restraint of competition between branded and generic pharmaceuticals, courts have frequently found that "a brand-name [product] and its generic analogs" can constitute a relevant market. *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 388 (D. Mass. 2013) (collecting cases); *see United Food & Commercial Workers Local 1776 & Participating Emps.' Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017); *FTC v. Shkreli*, 581 F. Supp. 3d 579, 630-32 (S.D.N.Y. 2022); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6689718, at *13 (E.D. Va. 2021); *In re Impax Labs., Inc.*, 2019 WL 1552939, at *26-28 (FTC Mar. 28, 2019), *aff'd sub nom. Impax Labs., Inc. v. FTC*, 994 F.3d 484 (5th Cir. 2021).

From this starting point, a court defining the relevant market seeks to "identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Products do not belong in the same market just because they have the same use. Instead, they belong in a market when they "qualify as economic substitutes because they enjoy reasonable interchangeability of use and cross-elasticity of demand." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989); *see also Brown Shoe*, 370 U.S. at 325; *Little Rock*, 591 F.3d at 597. "Cross-elasticity of demand" refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." *It's My Party, Inc. v. Live Nation*, *Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).

- 39 -

The hypothetical monopolist test assesses reasonable interchangeability and cross-elasticity of demand to evaluate whether an identified group of products constitutes a relevant product market. U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines § 4.1.1 (2010) ("Guidelines")[23]; *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019). For a given proposed market, the test asks whether sellers in that market, "if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level." *United States v. Am. Express Co.*, 838 F.3d 179, 198-99 (2d Cir. 2016).

Where, as here, a defendant is alleged already to be monopolizing a market, courts can answer this question by comparing prices in the market before and after a new competitor enters. *See Shkreli*, 581 F. Supp. 3d at 630 ("The high degree of cross-elasticity in demand . . . is demonstrated . . . by [a drop in prices in] reaction to . . . [the] first-to-market generic."). If prices would fall significantly upon new entry (here, by a generic manufacturer), this shows that the proposed market is well-defined. *See Aggrenox*, 199 F. Supp. 3d at 667 (if competitive prices were being charged before generic entry, then entry "would not result in a substantial change in price."). The price reaction indicates that other potential substitute products (here, other AIs) were not sufficiently close substitutes to prevent a monopolist from sustaining supracompetitive prices. *See Zetia*, 2021 WL 6689718, at *15 (price drop upon entry of generic competition established market

---

[23] U.S. Dep't of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, § 4.1.1 (Aug. 19, 2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010; PEx. 41.

consisting of branded and generic versions of the same drug); *Shkreli*, 581 F. Supp. 3d at 630 (same).

In addition to the hypothetical monopolist test, courts may consider the so-called "*Brown Shoe* factors" to define antitrust markets. These factors include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. Because market definition turns on the details of substitutability, response to pricing movements, and the defendant's own behavior, it is a "deeply fact-intensive inquiry," and rarely suitable for dismissal at the pleading stage. *See Kolon*, 637 F.3d at 443-44; *see also Double D*, 136 F.3d at 560.

### (2)    The Relevant AI Markets Are Properly Pleaded

For each of the six Relevant AIs (azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, and acetochlor) Arkansas's Complaint alleges two alternative markets. The first consists of the Relevant AI itself, and the second consists of the finished pesticide products that contain the Relevant AI. ¶48. Ample factual allegations support these markets.

***Defendants design their loyalty programs around Relevant AIs.*** The market definition exercise begins with the challenged conduct itself: Defendants' Loyalty Programs. *See Todd*, 275 F.3d at 205; *see also Henry v. Chloride, Inc.*, 809 F.2d 1334, 1342 (8th Cir. 1987) (considering "evidence that the industry itself viewed route sales as a

- 41 -

separate market"). The programs are designed to thwart competition at the AI level, and specifically to hinder generic products and maintain high prices after a Relevant AI has gone off patent. *See, e.g.*, ¶¶71, 73. The programs measure distributor loyalty in AI-specific markets (but not in larger markets) and penalize distributors that purchase the Relevant AIs (but not other AIs) from rivals. ¶¶86, 95. Defendants, thus, recognize the competitive importance of the Relevant AI markets. These allegations establish the "commercial realities" around which markets are defined. *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966).

**The markets satisfy the hypothetical monopolist test.** Defendants ignore the allegations that each Relevant AI market satisfies the hypothetical monopolist test. Absent Defendants' Loyalty Programs, if a generic firm entered the market for a particular Relevant AI, prices would fall substantially. ¶201. This shows that the market was one in which a hypothetical monopolist could (and did) charge prices above the competitive level.

Arkansas's Complaint supports this contention for each Relevant AI, including by reference to Defendants' own market assessments. For example, Syngenta "anticipated that generic entry would . . . erode [its] azoxystrobin prices." ¶115. As for mesotrione, Syngenta did, in fact, lower prices in response to the presence of generic competition (though it still kept prices significantly above the competitive levels that would have prevailed if generic products were able to compete in a fair and open market), only to leverage its Loyalty Program and supply agreements with Corteva to leverage its ability to prevent distributors from purchasing significant quantities of products containing mesotrione from generic manufacturers. ¶¶126-134. With respect to Corteva, it expected a "downward price spiral"

upon unconstrained generic rimsulfuron entry. ¶155. It expected acetochlor prices to fall by 10-15% if a generic version entered the market. ¶175. Generic entry indeed resulted in a drop in oxamyl prices. ¶170; *see also* ¶146 (same for Syngenta's metolachlor).

These allegations, which Defendants simply ignore, show that for each Relevant AI, other ingredients are "not reasonably interchangeable" with Defendants' product from the point of view of the end-user, resulting in prices "above competitive levels." ¶¶197-199. This more than suffices to plausibly allege that each AI defines a separate market.

***The Relevant AIs have distinct characteristics and uses.*** Finally, the Complaint alleges that each Relevant AI has distinct "characteristics and uses" and "industry or public recognition." *Brown Shoe*, 370 U.S. at 325. Azoxystrobin has "growth-enhancing effects not proven in other active ingredients." ¶48(a)(i). Mesotrione has "superior efficacy and crop safety" "[c]ompared to other, similar herbicide active ingredients." ¶48(a)(ii). Metolachlor "has superior water solubility" and "outperforms other active ingredients" in warmer and drier conditions. ¶48(a)(iii). Rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" than similar chemicals. ¶48(b)(i). Oxamyl, unlike "similar insecticide active ingredients," "can be sprayed directly onto crops." ¶48(b)(ii). Acetochlor "tends to perform better" than similar herbicides "in wetter and cooler conditions," and has "better weed control early in the growing season." ¶48(b)(iii). For these and other reasons, often "one [AI] cannot readily replace or be interchangeable with another [AI] for a given application or in a given condition." ¶47. Farmers who have success with one active ingredient prefer it over others. *Id.* Therefore, again, each Relevant AI with other active ingredients are "not reasonably interchangeable with Defendants'

- 43 -

products from the point of view of the end-user," resulting in prices "above competitive levels." ¶¶197-199.

**The markets are not too narrow.** Defendants argue that the relevant markets must be broader than a single AI because other AIs have "overlapping uses." However, products do not belong in the same market just because they have overlapping uses: "For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953); *see also* Guidelines § 4.1.1 (a properly defined antitrust market need not include the "full range of substitutes from which consumers choose").

While "functional interchangeability" may be evidence that products share a market, "it is certainly not dispositive." *Meijer, Inc. v. Barr Pharms., Inc.*, 572 F. Supp. 2d 38, 58 (D.D.C. 2008). Rather, the "essential inquiry is whether the amount of actual or potential substitution" between products "constrain[s] the pricing behavior" of the defendant. *Id.*

For example, in *Nexium*, the court found that pricing allegations were enough to plausibly allege a market comprising a particular brand-name drug and its generic equivalents. It was "immaterial" that "other drugs may be used to treat [the same] conditions." 968 F. Supp. 2d at 388. So too here. By including allegations of the price impact of generic entry as discussed above, the Complaint plausibly alleges that generic entry constrains Defendants' Relevant AI pricing substantially beyond the constraint imposed by other active ingredients.

- 44 -

Grasping at straws, Defendants also reference market definitions used in past FTC and Department of Justice merger investigations (some more than 20 years old) that are not specific to the State's allegations here. Those cases, which again, are outside the record, only show that market definition is context-dependent and that broader and narrower markets may be appropriate in different circumstances. Moreover, fact determinations as to product market in the present case are fact questions that will be determined on a post-discovery basis, including expert discovery. *See HDC Medical, Inc.*, 474 F.3d at 547 ("[R]elevant product market is a question of fact.")

Unsurprisingly, the competitive effects of mergers between chemical companies with product overlaps in broader, functional markets (*e.g.*, corn herbicides) may be assessed with reference to those broader markets. However, where a merger presented product overlaps between brand and generic manufacturers of a particular AI, as did China National Chemical Corporation's 2017 acquisition of Syngenta (which neither Defendant references), the FTC alleged narrower markets at the active-ingredient level. *See* Complaint ¶6, *In re China Nat'l Chem. Corp.*, No. C-4610 (FTC June 16, 2017).[24]

**The Relevant AI markets are not too broad.** The flipside of Defendants' narrowness argument is their broadness argument. It is well established that the existence of a broad market (say, all fungicides) for some purposes does not preclude the existence of a narrower market (say, azoxystrobin fungicides) for other purposes. *See United States v.*

---

[24] *See* Complaint, *In re China Nat'l Chem. Corp.*, No. C-4610 (FTC June 16, 2017) at ¶6, https://www.ftc.gov/system/files/documents/cases/1610093_china_national_syngenta_complaint_final.pdf; PEx. 42

*H&R Block, Inc.*, 833 F. Supp. 2d 36, 51 (D.D.C. 2011) ("A broad, overall market may contain smaller markets which themselves 'constitute product markets for antitrust purposes.'" (quoting *Brown Shoe*, 370 U.S. at 325)); *see also FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD, ECF No. 549 at 21 (N.D. Cal. Jan. 31, 2023)[25] (a larger market "in no way precludes the existence of a submarket . . . for antitrust purposes"). In pleading a relevant market, "[p]laintiffs need not disprove alternative relevant markets proposed by the Defendant." *Jien v. Perdue Farms, Inc.*, 2020 WL 5544183, at *11 (D. Md. Sept. 16, 2020); *cf. Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (at pleading stage, district court "incorrectly undertook to determine whether a lawful alternative explanation appeared more likely").

Defendants also briefly argue that one set of alleged alternative markets is too broad, because it includes pesticides that are not substitutes for each other. Here again, Defendants rely not on the Complaint's allegations, but on their own interpretation of EPA registrations and other extraneous documents, which should be disregarded for the reasons discussed above.

In any event, Defendants' factual assertions do not defeat the alleged markets. Alleging that every product in the market is wholly interchangeable "is not necessary to survive a motion to dismiss." *Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*, 2007 WL 9701128, at *4 (W.D. Tex. Feb. 16, 2007). In particular, goods that share a

---

[25]  Order at 21, *FTC v. Meta Platforms Inc.*, No. 5:22-cv-04325-EJD (N.D. Cal. Jan. 31, 2023), ECF No. 549; PEx. 43.

common component and common features may be grouped in a single market for purposes of antitrust analysis even if they are not functional substitutes. For example, non-substitutable office supplies may be grouped where they pass through the same vendors. *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117-18, 122-25 (D.D.C. 2016); *see also Grinnell*, 384 U.S. at 572 (grouping distinct services that rely on same equipment); Areeda & Hovenkamp, *Antitrust Law* ¶565c (5th ed. 2020) (non-substitutable surgical services may be grouped in a market where they rely upon a single facility). In similar fashion, the Complaint groups pesticides containing a given Relevant AI, and so sharing common characteristics. This is "the most pragmatic and realistic description" of the market, even if the markets include some number of non-interchangeable goods. *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805-06 (8th Cir. 1987).

### 3.    Arkansas Has Properly Pleaded Causation

It has long been the case that a state may seek injunctive relief under Section 16 of the Clayton Act, 25 U.S.C. § 26, as *parens patriae* on behalf of its citizens, to enjoin violations of the antitrust law that has injured the economy of the state. *State of Ga. v. Penn. R.R. Co.*, 342 U.S. 439, 447, 450 (1945); *Burch v. Goodyear Tire & Rubber Co.*, 554 F.2d 633, 635 (4th Cir. 1977); *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 680 (E.D. Pa. 2002). States have a quasi-sovereign interest in the health and well-being – both physical and economic – of its residents in general.[26] *Snapp & Son*, 458 U.S. at 607. Relatedly:

---

[26]    *See also, e.g.*, *New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 22-23 (D.D.C. 2021) ("the lower courts have consistently held that states have *parens patriae* standing to seek

> [T]he State has an interest in securing observance of the terms under which it participates in the federal system. In the context of *parens patriae* actions, this means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system. Thus, the State need not wait for the Federal Government to vindicate the State's interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce.

*Id.* at 607-08.

Here, Arkansas alleges that Defendants' anticompetitive activities have resulted in Arkansas farmers paying inflated prices for crop-protection products, higher prices which are, in turn, passed along to Arkansas consumers. ¶¶208-213, 239-252. Arkansas further alleges that Defendants' Loyalty Programs have stifled innovation for new crop-protection products, which could allow Arkansas farmers to have more choices in selecting crop-protection products. ¶¶235-238. As a matter of common sense, if farmers pay more to produce their crops, consumers pay more for their vegetables at the supermarket, which harms both Arkansas farmers' and consumers' economic well-being, and the State's economy generally, since if consumers are paying more at the supermarket, they have less money to spend elsewhere.

---

injunctions under Section 16 against antitrust violations the effects of which are widely felt within their borders"), *aff'd sub nom. New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023); *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150-52 (D.D.C. 2002) ("significant[ ] hamper[ing] [of] competition" by a monopolist is enough); *In re Ins. Antitrust Litig.*, 938 F.2d 919, 927 (9th Cir. 1991) ("The state's interest in preventing harm to its citizens by antitrust violations is, indeed, a prime instance of the interest that the *parens patriae* can vindicate by obtaining . . . an injunction."); *Commonwealth v. Russell Stover Candies, Inc.*, 1993 WL 145264, at *8 (E.D. Pa. May 6, 1993) ("[A] state may . . . seek injunctive relief for harm to its general economy that is caused by a violation of federal antitrust law.").

- 48 -

Defendants acknowledge that Arkansas is not seeking damages under its federal antitrust claim (*see* Mot. at 51, 54), but they nonetheless attempt to apply the standards for damages claims to the State's claims for injunctive relief. In addition, Defendants attempt, contrary to law, to divide their conspiracy with Distributors to keep generic competitors out of the market into tiny pieces to try to separate themselves from the harm they have caused and continue to cause. However, Defendants' actions cannot be viewed in isolation from the context in which they occurred. *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1302 (8th Cir. 1988) (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699.

As a starting point, Defendants' arguments relating to the indirect-purchaser rule – to the extent they apply to all – are targeted solely at Arkansas's federal antitrust claims for injunctive relief. The AUPA expressly provides that the Attorney General can sue "to secure monetary relief as provided under this section for injury, directly or indirectly sustained by those persons because of any violation of this subchapter." Ark. Code Ann. § 4-75-315(b). Thus, for purposes of Arkansas's claim for damages and restitution under AUPA claims, it is irrelevant whether farmers and consumers are direct or indirect purchasers from Defendants.[27] As explained below, it is likewise irrelevant whether

---

[27]  For purposes of this motion, Arkansas assumes *arguendo* that its farmers are indirect purchasers. However, in fact, they did deal directly with Defendants' co-conspirator Distributors. A direct purchaser is an "'immediate buyer[] from the alleged antitrust violators.'" *Apple Inc. v. Pepper*, 587 U.S. __, 139 S. Ct. 1514, 1520 (2019) (quoting

Arkansas farmers and consumers are direct or indirect purchasers for purposes of injunctive relief under federal antitrust laws.

### a.    Defendants' Conspiracy Reaches Arkansas Farmers and Consumers

Both Defendants operate Loyalty Programs with Distributors of their products that tie receipt of rebate payments to selling only a small amount of their total sales of a given AI made by a generic competitor. Arkansas alleges that these Loyalty Programs constitute a conspiracy between Defendants and crop-protection product Distributors to exclude from the marketplace generic producers' crop-protection products that are substantially identical to Defendants' branded products, thus, artificially inflating prices for Arkansas consumers of these crop-protection products. ¶¶72-186.

The Distributors control 90% of sales through the "traditional channel" of distribution and 70% of total sales of crop-protection products. ¶¶63-64. The Distributors, in turn, own approximately 80% of the retail locations selling crop-protection products. ¶60. Thus, contrary to Defendants' characterization of Arkansas's allegations, the conspiracy reaches all the way to the retail level, where Arkansas farmers purchased Defendants' crop-protection products. The conspiracy also has tied up most of the market, making it uneconomical for generic manufacturers to attempt to enter. ¶¶183-186, 194-195.

---

*Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990)). That said, it is not necessary for present purposes for the Court to engage in a determination as to whether Arkansas farmers in this case are direct or indirect purchasers.

Moreover, the issue is not whether, in the but-for world without Defendants' rebate programs, the **Distributors** would buy more lower priced generic crop-protection products, the issue is whether **farmers** could and would buy lower priced generic products. The Distributors are part of the conspiracy to exclude generic competition, and Defendants have made it in Distributors' economic interest to go along with the conspiracy. If generic competition existed – as it does not now – Arkansas alleges that prices generally would drop in order to meet the generic competition, thus, saving farmers and consumers money, and boosting Arkansas's economy generally by allowing farmers and consumers to spend on other things.

### b.    The Indirect-Purchaser Rule Does Not Apply To Injunctive Relief

Defendants contend that Arkansas cannot seek declaratory or injunctive relief on behalf of Arkansas farmers and consumers because farmers and consumers are, they assert, indirect purchasers from Defendants. Mot. at 56-57. The Eighth Circuit rejects this contention:

> Indirect purchaser status does not bar the plaintiffs from seeking injunctive relief under § 16 of the Clayton Act. The concerns of the direct purchaser rule have mainly to do with the complexities of incidence analysis, complexities that do not arise when the courts must consider the propriety of injunctive relief. As Professors Areeda and Hovenkamp explain, "An equity suit neither threatens duplicative recoveries nor requires complex tracing through the distribution chain. There are no damages to be traced, and a defendant can comply with several identical injunctions as readily as with one. *Illinois Brick* has not therefore barred an indirect purchaser's suit for an injunction."

*Campos*, 140 F.3d at 1172 (quoting Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law* ¶ 371d, at 259 (1995)).[28] Plainly, Arkansas can pursue injunctive relief under federal antitrust laws without regard to whether Arkansas farmers and consumers are deemed direct or indirect purchasers.

Defendants' argument that Arkansas is not entitled to injunctive relief because Defendants could not have proximately caused Arkansas farmers' and consumers' injuries because they are not direct purchasers simply cannot be squared with well-established law to the contrary. That is because, contrary to Defendants' contention, whether a Section 16 plaintiff can sue for injunctive relief depends on whether the plaintiff – or in the case of a sovereign, its citizens – suffered an antitrust injury that was proximately caused by the defendant, not on whether the plaintiff was a direct purchaser from a defendant. *See, e.g.*, *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (citing *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111-13 (1986)). For example, in *Canadian Import*, the court held the plaintiffs were not entitled to injunctive relief because plaintiffs'

---

[28] Indeed, Defendants cite *Campos* in a footnote, but attempt to distinguish the extraordinarily clear language in *Campos* from the instant case, citing *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010). However, *InBev* repeated *Campos*' holding that "***indirect purchasers are private parties who may sue for injunctive relief under § 16 of the Act***." 623 F.3d at 1233 (citing *Campos*, 140 F.3d at 1172). Rather, *InBev* held that the plaintiffs there were not entitled to injunctive relief of ***divesture***, *i.e.*, undoing the merger between InBev and Anheuser-Busch. Specific to that case, the court held that in balancing the equities, including the "inexcusable delays" of plaintiffs there waiting until after the merger had been consummated to seek injunctive relief, the hardships in forcing defendants to undo the merger far outweighed any "speculative and localized" antitrust injury plaintiffs might be able to prove. *InBev*, 623 F.3d at 1235-36. The *InBev* facts are entirely dissimilar to those present here.

- 52 -

harm was caused by the United States statutory and regulatory scheme rather than defendants' actions, not because plaintiffs were not direct purchasers.[29] *See id.*

Indeed, *B-S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653 (10th Cir. 2006), which is relied upon by Defendants, recognized the standing analysis under Section 16 of the Clayton Act was different from the analysis under Section 4. "[S]ection 16 has been applied more expansively, both because its language is less restrictive than that of § 4 . . . and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy." *B-S Steel*, 439 F.3d at 666-67 (alteration in original).

### c.    Arkansas Farmers and Consumers Suffered Antitrust Injury

"The requisite antitrust injury must reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation, and represent the type of loss that the claimed violations . . . would be likely to cause." *Canadian Import,* 470 F.3d at 791 (internal quotations omitted; alteration in original). Increased prices as a result of the elimination of competition have long been held to be the type of injury the

---

[29]    In *Lyons v. Philip Morris, Inc.*, 225 F.3d 909, 914-15 (8th Cir. 2000), which is cited several times by Defendants, the Eighth Circuit joined a number of other circuits in holding that an ERISA health plan could not sue cigarette manufacturers for tobacco-related harm suffered by plan beneficiaries because the plan had not suffered a direct injury. Those cases followed the common law rule that health care providers have no direct cause of action in tort against one who injures the provider's beneficiary and, thus, imposing increased costs on the provider. *See, e.g.*, *United Food & Com. Workers Unions, Emps. Health & Welfare Fund v. Philips Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000) (citing *Anthony v. Slaid*, 52 Mass. 290, 290-91 (1846)). *Lyons* has nothing to do with the issues before this Court.

antitrust laws were intended to redress. *See, e.g.*, *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 218-225 (1940); *Paschall v. Kan. City Star Co.*, 695 F.2d 322, 327-334 (8th Cir. 1982) (refusal to deal with independent dealers led to increased retail prices); *Cmty. Publishers, Inc. v. Donrey Corp.*, 892 F. Supp. 1146, 1167 (W.D. Ark. 1995) ("As the threat of raised prices due to market power is a primary concern of Section 7, the court believes that Shearin has demonstrated antitrust injury.").

Arkansas farmers suffered an antitrust injury by paying higher prices for crop-protection products as a result of Defendants' conspiracy to exclude generic competition from the crop-protection market, and Arkansas consumers paid more for food because it was more expensive for the farmers to produce it. *See* ¶¶42, 212.

> ### d.    Arkansas Farmers' and Consumers' Harm Was Proximately Caused by Defendants' Conspiracy

The next question is whether the antitrust injury suffered by Arkansas farmers in the form of higher prices for crop-protection products was proximately caused by Defendants. The answer is, of course, yes. *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) – cited extensively by Defendants – stands for the unremarkable proposition that a plaintiff asserting a statutory cause of action must show that their injuries were proximately caused by the defendant. *Lexmark* does not hold, as Defendants would like the Court to believe, that proximate cause and the direct purchaser

rule are equivalent.[30] *See* Mot. at 55. Rather, *Lexmark* followed traditional proximate cause rules:

> The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so. Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.

> Put differently, the proximate-cause requirement generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct. That is ordinarily the case if the harm is purely derivative of misfortunes visited upon a third person by the defendant's acts.

*Lexmark*, 572 U.S. at 133 (cleaned up). Thus, the proximate cause test enunciated by *Lexmark* is not, as Defendants contend, whether the plaintiff dealt directly with the defendant, but whether plaintiffs themselves were directly harmed by a defendant's actions or their harm is derivative of harm to others.[31]

---

[30] *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983), is cited in *Lexmark*, along with other cases, for the general proposition that federal statutes incorporate a proximate-cause requirement. *Lexmark*, 572 U.S. at 132. However, the *Lexmark* court also explained that in setting forth *Associated General Contractors'* test for antitrust standing, the Court "sought to ascertain, as a statutory-interpretation matter, the scope of the private remedy created by Congress in Section 4 of the Clayton Act, and the class of persons who [could] maintain a private damages action under that legislatively conferred cause of action." 572 U.S. at 126 (internal quotations omitted; alteration in original). Whether a plaintiff's damages were proximately caused by the defendant's actions is different from whether the plaintiff has standing to sue for damages under Section 4 of the Clayton Act (an issue which is irrelevant here), which is a further separate issue whether the plaintiff is a direct purchaser under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) (which is also irrelevant here).

[31] Defendants suggest that Arkansas farmers weren't directly harmed because they could have purchased generic crop-protection products directly online. Mot. at 57-58. Defendants ignore the fact that their Loyalty Programs have made it uneconomical for many potential generic competitors to even enter the market. ¶¶194-195. More to the point, however,

- 55 -

This is precisely the test used by the cases (mis)cited by Defendants in arguing that Arkansas consumers were not proximately harmed by Defendants' Loyalty Program conspiracy. In each of them, the plaintiff suffered a derivative injury rather than a direct injury. As is explained above, in *Lyons*, the ERISA health plans' harm was derivative of their members' health problems caused by smoking. *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 822 (7th Cir. 1999)[32], is the same as *Lyons*, an ERISA benefit plan seeking damages for their insured's health problems caused by smoking.

> For more than 100 years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victim's rights.

*Id.*

In *Lovett v. General Motors Corp.*, 975 F.2d 518 (8th Cir. 1992), the plaintiff was the sole shareholder of a GM dealership that the plaintiff claimed GM conspired with another dealership to put out of business. The court held that the shareholder was not

---

Arkansas has never alleged that Defendants completely eliminated generic competition. Rather, Arkansas alleges that Defendants occupy so much of the market that they can raise prices above competitive levels with impunity.

[32]  Defendants misquote *Teamsters* as saying "'The direct-purchaser doctrine of Illinois Brick and the direct-injury doctrine of [AGC]' present 'independent obstacle[s]' to antitrust plaintiffs." Mot. at 55-56. *Teamsters* actually says, "The direct-purchaser doctrine of *Illinois Brick* and the direct-injury doctrine of *Associated General Contractors* are analytically distinct." 196 F.3d at 828. This is the exact opposite of Defendants' contention that the direct-purchaser rule and proximate cause are the same.

- 56 -

directly harmed because his harm was derivative of the harm inflicted on the dealership. The plaintiffs in *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), were end-users of computers asserting antitrust claims against Microsoft alleging that it monopolized four software product markets.[33] The court identified a myriad of problems with plaintiffs' claims there, including that they were indirect purchasers, their claimed damages were too generalized and speculative, were not the type of injuries covered by the antitrust laws, and there were "insuperable problems in measuring and allocating damages." 444 F.3d at 319-25.

It would be anomalous and illogical to give states the ability under their *parens patriae* power to seek injunctive relief to stop antitrust violations but deny that injunctive relief because the harm suffered by those citizens bearing the economic brunt of those violations was too indirectly caused. Here, Arkansas farmers' and consumers' harm was proximately caused by Defendants' Loyalty Program conspiracies because their harm is their own harm, not harm derived from injury to someone else. They themselves were directly injured because they paid more for crop-protection products and for food because of Defendants' conspiracy.[34] The purpose of crop-protection products is to kill weeds and

---

[33]   *Kloth* did note, contrary to Defendants' position, that "[a]lthough courts sometimes blend the indirect purchaser rule of *Illinois Brick* and the requirement of § 4 standing under *Associated General Contractors*, the Supreme Court has explained, '[T]he question of which persons have been injured by an illegal overcharge for purposes of § 4 is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4.'" 444 F.3d at 323.

[34]   Defendants also cite *S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991), and *Alpha Shoe Serv. v. Fleming Cos.*, 849 F.2d 352, 354 (8th Cir. 1988), in support of their contention that they could not have proximately caused Arkansas consumers' harm.

pests, for example, on a farmer's farm, not to sit in a distributor's warehouse or on a retailer's shelf. Distributors aren't harmed because Defendants have no generic competition. In fact, they are better off participating in the conspiracy because they are making higher profits on Defendants' brand-name products, plus getting rebates as an incentive to not sell generic competitors' products. Likewise, the retailers owned by the Distributors, also co-conspirators, are making higher profits as a result of the lack of generic competition for pest control products.

### C. The State's Claims Under State Law Are Properly Pled

The Complaint sufficiently states a claim for violation of the AUPA, Ark. Code Ann. § 4-75-301, *et seq.*, and the ADTPA, Ark. Code Ann. § 4-88-107. Defendants' proposed readings of the statutory requirements for these claims are incorrect and should be rejected as such.

---

Neither case supports them. In *S.D. Collectibles*, the court held the plaintiff, a sales representative, did not have standing because "standing is generally limited to actual market participants, that is, competitors or **consumers**. Collectibles is neither." 952 F.2d at 213 (emphasis added; internal citations omitted). Likewise, in *Alpha Shoe*, the court held that plaintiffs, who were tenants in a shopping center complaining they lost business, did not have standing to sue defendant, who closed the anchor grocery store in the shopping center, because they were "not competitors, participants, or **consumers** in that relevant market." 849 F.2d at 354 (emphasis added). In neither of these cases were the plaintiffs actual consumers in the relevant market. More importantly, neither of these cases is relevant to the State's prosecution of antitrust claims here. Consumers are quintessentially participants in the marketplace. As discussed herein, there is no question that Arkansas absolutely has standing in this action to protect its citizens, including its consumers.

4863-4931-5264.v1

1.    **The Complaint States a Claim Under the Arkansas Unfair Practices Act**

   a.    **Section 309 Is Not Limited to Horizontal Agreements**

The language of the AUPA is broad and does not limit its reach solely to agreements between competitors but, rather, explicitly prohibits ***any*** agreement between ***any*** two corporations, partnerships, individuals, associations, or persons (or any combinations thereof) to: (1) "regulate or fix" prices; (2) "maintain" regulated or fixed prices; or (3) "***fix or limit . . . the amount or quantity*** of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, . . . ***or any article or thing whatsoever***[.]" Ark. Code Ann. § 4-75-309. Specifically;

> Any corporation[,] . . . or any partnership or individual, or other association or persons whatsoever, who is, or creates, enters into, or becomes a member of, or a party to, any pool, trust, agreement, combination, confederation, or understanding, . . . with any other corporation, partnership, individual, or any other person or association of persons, [1] to regulate or fix . . . the price of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, . . . or any article or thing whatsoever, … or [2] to maintain the price when so regulated or fixed, or . . . [3] to fix or limit . . . the amount or quantity of any article of manufacture, mechanism, merchandise, commodity, convenience, repair, . . . or any article or thing whatsoever, . . . shall be deemed and adjudged guilty of a conspiracy to defraud and be subject to the penalties as provided by this subchapter.

*Id.*

Notably missing from this statutory definition is any suggestion that the corporations entering into the agreement must, as Defendants suggest, be "competitors at the same level in the chain of production and distribution." Mot. at 61-62.[35] Defendants

---

[35]   Indeed, antitrust actions alleging AUPA violations with no such limitation are routinely litigated. *See, e.g.*, Second Amended Complaint,  *In re Google Play Store Antitrust Litig.*,

- 59 -

read this limiting language into the statute based solely on a conspicuously clear misreading of a 114-year-old Arkansas Supreme Court in *Ft. Smith Light & Traction Co. v. Kelley*, 94 Ark. 461, 127 S.W. 975, 981 (Ark. 1910). In fact, a closer reading of the case makes clear that the decision had little to do with the competition between the parties and everything to do with the lack of any demonstrable negative impact on competition or consumers.

The *Ft. Smith Light & Traction* case involved a contract between Ft. Smith Light & Traction and Kelley for the sale and distribution of natural gas. Prior to the contract between the parties, Kelley had a franchise to furnish natural gas to the citizens of Fort Smith. Kelley and Ft. Smith Light & Traction entered into the contract at issue to allow Ft. Smith Light & Traction to sell natural gas to the citizens of Fort Smith. Pursuant to the terms of the contract, Kelley, through his related company, would provide natural gas and could set the price of the natural gas, but only to the extent that Kelley was the cheapest available supplier. According to the contract, "[Ft. Smith Light & Traction] may contract for and purchase natural gas from other parties or corporations when such parties or corporations will furnish, supply and deliver the same to [Ft. Smith Light & Traction] at

---

No. 3:21-md-02981-JD (N.D. Cal. Jan. 15, 2024), ECF No. 906 (challenging, *inter alia*, Google's anticompetitive agreements with original equipment manufacturers that unreasonably restrict competition in the mobile phone app distribution market); Second Amended Complaint, *State v. Google*, No. 4:20-cv-00957-SDJ (E.D. Tex. Aug. 4, 2021) , ECF No. 138 (challenging, *inter alia*, Google's price regulation with regard to online advertising); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. 2:00-md-01361 (D. Me.) (challenging, *inter alia*, vertical agreements between music CD distributors and retailers to fix prices); *cf.* Areeda and Hovenkamp, *Antitrust Law* § 1402b (3d ed. 2010) (Collaboration between non-competitors typically involves a *quid pro quo,* and can involve collaboration between a manufacturer and distributor in restraint of trade – "***[T]he usual vertical case[] involv[es] restricted distribution, tying, and exclusive dealing***.").

lower figures than [Kelley] will do" as long as Ft. Smith Light & Traction allowed Kelley an opportunity to meet the lower price. *Id.* at 980. Ft. Smith Light & Traction did eventually find a lower supplier and sought to invoke this provision of the contract. Kelley attempted to retaliate by selling natural gas directly to Fort Smith consumers and Ft. Smith Light & Traction filed a lawsuit seeking to enjoin Kelley.

On appeal, Kelley[36] argued that the contract was void because it constituted an impermissible combination to fix the price of natural gas, but the Arkansas Supreme Court rejected this argument stating, "The contract did not violate the anti-trust law of 1905. There was no combination between appellant and appellees to fix the price of natural gas to the consumer." *Id.* at 981-82. In explaining its conclusion, the Court noted that under the contract, Kelley had the option of fixing the price of the gas but "only so long as there was no competitor in the field 'beating down' the price. When natural gas was offered [to Ft. Smith Light & Traction] at a reduced price, then [Kelley] had to meet these reduced prices." *Id.* at 982. The Court further noted, "The anti-trust law of 1905 was to prevent a combination among producing competitors to fix the prices to the detriment of consumers. . . . We find no elements of an unlawful combination to fix the price of natural gas."[37] *Id.*

---

[36] Defendants mistakenly attribute this argument to "the distributor" (presumably referring to Ft. Smith Light & Traction) but, in fact, it was Kelley who argued that the contract at issue was an anticompetitive restraint on trade.

[37] This goal of lowering consumer prices is precisely what is at issue in the present action, as well as Defendants' scheme is specifically aimed at impeding competition and maintaining super competitive inflated crop-protection prices to the detriment of Arkansas farmers.

- 61 -

In short, contrary to Defendants' suggestion, the law of Arkansas does ***not*** prohibit only horizontal price fixing agreements, and Defendants' use of the *Ft. Smith Light & Traction* case to suggest otherwise is faulty. The critical fact of the *Ft. Smith Light & Traction* case had nothing to do with the respective positions of the parties in the supply chain and rather was wholly based on the fact that the contract at issue was in no way anticompetitive or detrimental to consumers. This case cannot be read to limit prohibited price fixing agreements to horizontal agreements and instead, this Court should give force and effect to the plain language of the statute, prohibiting ***any*** corporation entering into any agreement or understanding with ***any other corporation*** to regulate or fix the price of a consumer product. Where the words of a statute are plain and unambiguous, judicial construction is limited to what was said. *Ark. Dep't of Fin. & Admin. v. Trotter Ford, Inc.*, 2024 Ark. 31, 685 S.W.3d 889, 895 (Ark. 2024).

> **b.** **The Complaint Alleges Defendants' Attempts to Regulate the Price of Their Products and Amount of Generic Products in the Market**

Defendants again attempt to impermissibly limit the scope of the AUPA in suggesting that violations under the section are limited to instances where defendants have express agreements to set a price or output of product. However, the language of the AUPA is decidedly broader and prohibits any attempts to ***regulate*** the price or amount of product whatsoever. *See* Ark. Code Ann. § 4-75-309. The State's complaint sufficiently alleges Defendants' attempts to create a monopoly through artificial regulation of the price of their product and the amount of generic product available in the market. The AUPA defines a "monopoly" as:

[A]ny union or combination or consolidation or affiliation of capital, credit, property, assets, trade, customs, skill, or acts of any other valuable thing or possession, by or between persons, firms, or corporations, or association of persons, firms, or corporations, whereby any one (1) of the purposes or objects mentioned in this subchapter is accomplished or sought to be accomplished, or whereby any one (1) or more of the purposes are promoted or attempted to be executed or carried out, or whereby the several results described herein are reasonably calculated to be produced. A monopoly, as thus defined and contemplated, includes not merely a combination by and between two (2) or more persons, firms, and corporations, acting for themselves, but is especially defined and intended to include all aggregations, amalgamations, affiliations, consolidations, or incorporations of capital, skill, credit, assets, property, custom, trade, or other valuable things or possessions, whether effected by the ordinary methods of partnership or by actual union under the legal form of a corporation or any incorporated body resulting from the union of one (1) or more distinct firms or corporations, or by the purchase, acquisition, or control of shares or certificates of stock or bonds or other corporate property or franchises; and all partnerships and corporations that have been or may be created by the consolidation or amalgamation of the separate capital, stock, bonds, assets, credit, property, customs, trade, corporate, or firm belongings of two (2) or more firms or corporations or companies are especially declared to constitute monopolies within the meaning of this subchapter, if so created or entered into for any one (1) or more of the purposes named in this subchapter.

Ark. Code Ann. § 4-75-301.

In this case, the State has alleged that "Defendants promise distributors or retailers a complex set of incentive payments based on their purchases of Defendants' branded crop-protection products, under the critical condition that distributors or retailers must honor their commitment to exclude or limit their purchases of comparable generic products for sale." ¶13. The State has also alleged that Defendants colluded with each other in an agreement to supply specific Relevant AIs to each other rather than create generic AIs or purchase AIs from a generic provider, further limiting the quantity of generic product in the market. ¶185. The State need not allege that Defendants agreed with each other or their

- 63 -

Distributors regarding a specific price for their branded products or a specific limited quantity of generic products. It is sufficient that Defendants have made these agreements with the purpose of restricting and/or entirely generic entrants to the market.

The Arkansas Supreme Court has expressed its disapproval for precisely these types of predatory schemes wherein a manufacturer seeks to maintain artificially inflated pricing at the expense of Arkansas consumers. In *Union Carbide & Carbon Corp. v. White River Distributors*, *Inc.*, the Court struck down a section of the Arkansas Fair Trade Act as creating an unconstitutional restraint on trade through artificial price maintenance. 224 Ark. 558, 275 S.W.2d 455 (Ark. 1955). The opinion quoted with favor from the Report of the Federal Trade Commission on Resale Price Maintenance:

> Minimum resale price maintenance was originally advocated by manufacturers of highly individualized, trade-marked, trade-named, or branded products as a means of protecting them from unrestrained price cutting among dealers to whom the products were sold outright. When finally enacted by the states, and by the Congress, however, its enactment was urged almost entirely by a few well organized dealer groups as a means of eliminating price competition both of dealers using the same method of distribution and of dealers using new and different methods of distribution.

*Id.* at 459. The Court noted:

> [T]he effort to "fix prices" is made by groups who desire to sell something for more than the sponsoring group believes that the purchasing public would pay for that "something" without an enforced fixed price. It would seem apparent that the principal objective of minimum price maintenance *is the protection of profit margins for retailers and distributors unable or unwilling to meet the pressure of competition*.

*Id*. at 461 (emphasis added).

The allegations in the Complaint show that Defendants put in place aggressive and predatory Loyalty Programs in an attempt to regulate the price of their branded product

- 64 -

and restrict quantities of generic products in the market. It is widely recognized that such loyalty programs can "hurt or threaten to hurt consumers through reduced output or increased prices." *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 985 (10th Cir. 2022). These allegations are sufficient to show a violation of the AUPA.

> ### c.    The Complaint States Predatory Intent to Damage and Destroy Competition and Exceeds Defendants' Common Law Privilege to Compete

The State has alleged sufficient facts to show that Defendants implemented their Loyalty Programs with intent to damage and destroy competition for their branded products and that their actions were not within their common law privilege to compete. The existence of specific intent must be determined by "weighing all of the circumstances in the particular case, including the nature of the conduct, its consistency and duration, the conditions of the market, and characteristics of the defendant." *Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*, 319 Ark. 214, 223, 891 S.W.2d 30, 35 (Ark. 1995). The Eighth Circuit has recognized that predatory intent can be demonstrated "expressly, from statements, documents, and the like, or implicitly, usually from defendant's conduct, such as below-cost or unprofitable pricing for extended periods and unfair business practices, but also from circumstantial factors, such as defendant's relative size, entry barriers, etc." *Henry*, 809 F.2d at 1344.

In this case, the State has alleged sufficient facts to allow an inference that Defendants' Loyalty Programs were put in place with a predatory intent. For example, the Complaint alleges that, in response to reports that a generic manufacturer was planning to

- 65 -

launch a competitive product, Corteva indicated its intent to use its Loyalty Programs to "keep the channel locked up" and to "battle [the generic] in our core market and push them out." ¶176. A Corteva employee has confirmed that the "primary objective" of Corteva's Loyalty Programs is to prevent the "value" deterioration associated with the entry of a generic product into the market. ¶94. To this end, Corteva requires its distributors to source a certain percentage, at least 85%, from Corteva-branded products to be eligible for the discounts and exclusionary payments. ¶95.

Syngenta similarly tied its Loyalty Program to the exclusion of generics from the market, stating that the intent of the program was to "[r]eward Retailers for their support of Syngenta products where a generic alternative exists" and "defend[] Syngenta's market share position." ¶90. With regard to one particular Relevant AI, Syngenta's Loyalty Program initially required a massive 99% market share threshold for Syngenta-branded products. A decade later, the necessary market share threshold is still set at 92%, leaving only 8% of open market space for a Distributor to purchase generics. ¶126. The State's allegations are sufficient to allow an inference of a predatory intent to damage and destroy competition. Such conduct is not within Defendants' common law right of competition but is, in fact, evidence of a violation of the AUPA.[38]

---

[38] The State's allegations here – for the same reasons discussed regarding the federal claims – are sufficient to define a plausible product market. *See supra* at § IV.B.2.

**2.    The State's Deceptive Trade Practices Act Claim Is Proper**

In their challenge to the State's ADTPA claim, Defendants improperly attempt to restrict the broad scope of the State's authority to enforce the ADTPA. Without explanation or elaboration, Defendants argue that the State has not alleged a deceptive consumer-oriented act. However, Defendants have simply omitted that the State has specifically pled violations of the Clayton Act, the Sherman Antitrust Act of 1890, and the AUPA, all in addition to violations of the ADTPA. The ADTPA should be given a "liberal construction." *Curtis Lumber*, 618 F.3d at 780. In keeping with that liberal construction, the Arkansas Supreme Court has affirmed the conclusion that the ADTPA is broad enough to cover "conduct violative of public policy ***or statute***." *Baptist Health*, 226 S.W.3d at 811. As this Court has acknowledged in other cases, specific accusations of violations of particular laws that also constitute actionable conduct under the ADTPA are sufficient to meet the pleading standard. *Allcare Specialty Pharmacy, LLC v. OptumRX, Inc.*, 2017 WL 5571356, at *5 (E.D. Ark. Apr. 6, 2017); *see also Lackie Drug Store, Inc. v. Arkansas CVS Pharmac*y, LLC, 2022 WL 16635130, at *4 (E.D. Ark. Nov. 2, 2022) (holding the same). More specifically, the federal courts have recognized "while that Rule 9(b)'s heightened pleading standard applies to claims under the ADTPA that sound in fraud, it does not apply to ADTPA claims like the instant one which are premised on conduct like usury or the improper exploitation of economic leverage." *Antoon v. Securus Techs., Inc.*, 2017 WL 2124466, at *6 (W.D. Ark. May 15, 2017).

Defendants further seek to transform the ADTPA into some variant of a fraud claim by arguing the absolute necessity of misleading conduct. The State, however, has alleged that Defendants violated Section 4-88-107(a)(10) – a statutory subsection satisfied by unconscionable, false, or deceptive acts or practices in business. Nothing in the text of this provision requires that the alleged conduct be unconscionable **and** false **and** deceptive. Even though the State has, in fact, alleged deceptive acts by Defendants in deceiving consumers and conspiring to monopolize the market for their products to the exclusion of potential generic competitors *see* ¶¶291, 319, 322, unconscionable conduct, itself, is sufficient to state a claim under the ADTPA. The Arkansas Supreme Court has made it clear the ADTPA was meant to reach a broader scope of conduct than an ordinary fraud claim, and that "the General Assembly could not be expected to envision every conceivable violation under the DTPA." *R & A Inv.*, 985 S.W.2d at 299, 302-03.

The Western District of Arkansas has concluded that conduct similar to that alleged by the State here was sufficient to state an ADTPA claim:

> [The plaintiff] has alleged that Securus obtained exclusive contracts to provide ICS at correctional facilities where he has been incarcerated, and then exploited those monopolies by charging him oppressive rates for ICS. Regarding § 4-88-107(a)(10), which prohibits "engaging in any other unconscionable . . . act or practice in business," the Court would simply reiterate its observation in *Jacobs* that "the Arkansas Supreme Court has held that" this subsection "may be violated by charging usurious interest rates, or by improperly exploiting economic leverage resulting from exclusive-provider contracts."

*Antoon*, 2017 WL 2124466, at *6 (citing *Jacobs v. Global Tel\*Link Corp.*, 2016 WL 5953128 (W.D. Ark. May 17, 2016); *R & A Inv.*, 985 S.W.2d 299; and *Baptist Health*, 226 S.W.3d 800) (alterations in original). Improper exploitation of economic leverage resulting

- 68 -

from the use of anticompetitive and exclusive provider contracts is virtually identical to what the State has alleged in this case, and such conduct fits comfortably within the broad scope of the ADTPA.

Lastly, Defendants argue that because they do not sell their products directly to consumers, they are somehow immune from the reach of the ADTPA. Again, however, Defendants contort the meaning of the protection that the ADTPA was meant to provide. The purpose of the ADTPA is "to protect the interests of both the consumer public and the legitimate business community." *R & A Inv. Co.*, 985 S.W.2d at 302. Throughout the Complaint, the State alleges that Defendants have conspired to increase sales of their products at supercompetitive prices. Defendants' entire gambit is to increase sales of Defendants' products to Arkansas consumers by unfairly and illegally excluding potential competitors from entering the consuming market. Arkansas consumers have paid the price for this conduct – literally. *See, e.g.*, ¶¶3, 11, 327. The facts of this case parallel those in *Baptist Health*, 226 S.W.3d 800, *supra*, wherein a hospital denied staff appointments and clinical privileges to persons who were direct or indirect owners of a competing hospital. The healthcare providers argued that Baptist's application of its credentialing policy was unconscionable and brought a claim seeking relief under the ADTPA. In affirming the circuit court's finding that Baptist's actions were a violation of the ADTPA, the Arkansas Supreme Court noted with approval the circuit court's finding that Baptist's practice used the patients "as pawns in its economic chess game with a facility it deems a competitor." *Baptist Health*, 226 S.W.3d at 811. Importantly, the Court affirmed the lower court's finding of an ADTPA violation despite the fact that Baptist's actions were directed at the

- 69 -

doctors and healthcare providers and not directly targeting the patient consumers. So too here, it is of no moment that Defendants are not directly targeting consumers because the end result is to use Arkansas farmers "as pawns in [their] economic chess game" with other potential competitors. Defendants' conduct is aimed at the consumer market, meant to stifle and choke off competitors from engaging in the consumer market, and is ultimately oriented toward manipulating the consumer market to Defendants' advantage. Defendants' blithe assertion that this conduct is not sufficiently "consumer-oriented" to satisfy the ADTPA is unpersuasive and inconsistent with the liberal construction that is to be given to the ADTPA.

## V.    CONCLUSION

The State respectfully submits that no lawful grounds exist to grant Defendants' Motion. Consequently, their Motion should be denied in all respects.

DATED:  May 24, 2024

TIM GRIFFIN
**Attorney General**

By: _____

AMANDA WENTZ, ABN 2021066
Assistant Attorney General
Telephone:  (501) 682-1178
(501) 682-8118 (fax)
amanda.wentz@arkansasag.gov

TIM GRIFFIN, ABN 95110
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone:  (501) 682-2007
(501) 683-2520 (fax)
Tim.Griffin@ArkansasAG.gov

4863-4931-5264.v1

Charles J. Harder, ABN 86080
Deputy Attorney General
Telephone:  (501) 682-4058
(501) 682-8118 (fax)
Chuck.Harder@ArkansasAG.gov

Brittany Edwards, ABN 2016235
Senior Assistant Attorney General
Telephone:  (501) 682-8114
(501) 682-8118 (fax)
Brittany.Edwards@ArkansasAG.gov

REDDICK LAW, PLLC
BRIAN REDDICK, ABN 94057
HEATHER ZACHARY, ABN 2004216
One Information Way, Suite 105
Little Rock, AR  72202
Telephone:  (501) 943-1456
(501) 907-7793 (fax)
brian@reddicklawfirm.com
hzachary@reddicklawfirm.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON *
Florida Bar No. 84824
DOROTHY P. ANTULLIS *
Florida Bar No. 890421
LINDSEY H. TAYLOR *
Florida Bar No. 1027908
ALEXANDER C. COHEN *
Florida Bar No. 1002715
ANNY M. MARTIN *
Florida Bar No. 1000491
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  (561) 750-3000
(561) 750-3364 (fax)
sdavidson@rgrdlaw.com
dantullis@rgrdlaw.com
ltaylor@rgrdlaw.com
acohen@rgrdlaw.com
amartin@rgrdlaw.com

- 71 -

ROBBINS GELLER RUDMAN
   & DOWD LLP
ARTHUR L. SHINGLER III *
California Bar No. 181719
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
(619) 231-7423 (fax)
ashingler@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
JACOB G. GELMAN *
California Bar No. 344819
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  (415) 288-4545
(415) 288-4534 (fax)
jgelman@rgrdlaw.com

THE LANIER LAW FIRM, P.C.
W. MARK LANIER *
Texas Bar No. 11934600
ALEX J. BROWN *
Texas Bar No. 24026964
ZEKE DeROSE III *
Texas Bar No. 24057421
SARA E. ABSTON *
Texas Bar No. 24131972
10940 West Sam Houston Parkway North,
Suite 100
Houston, TX  77064
Telephone:  (713) 659-5200
(713) 659-2204 (fax)
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com
zeke.derose@lanierlawfirm.com
rebecca.phillips@lanierlawfirm.com

4863-4931-5264.v1

THE LANIER LAW FIRM
K. RACHEL LANIER *
California Bar No. 343171
2829 Townsgate Road, Suite 100
Westlake Village, CA  91361
Telephone:  (310) 277-5100
rachel.lanier@lanierlawfirm.com

*Attorneys for Plaintiff State of Arkansas*

\* Admitted *Pro Hac Vice*