**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| STATE OF ARKANSAS, *ex rel.*<br>TIM GRIFFIN, ATTORNEY GENERAL,<br><br>*Plaintiff*,<br><br>vs.<br><br>SYNGENTA CROP PROTECTION AG,<br>SYNGENTA CORPORATION,<br>SYNGENTA CROP PROTECTION, LLC,<br>and CORTEVA, INC.,<br><br>*Defendants*. | Case No. 4:22-cv-1287-BSM |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ............................................................................................................5

I. THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS ..............5

A. The Clayton Act Does Not Authorize Personal Jurisdiction Over Any Defendant..............5

B. This Court Lacks Personal Jurisdiction Over Defendants Under Arkansas' Long-Arm Statute ..............6

II. VENUE DOES NOT LIE IN THIS DISTRICT FOR DOMESTIC DEFENDANTS.......12

A. Venue Does Not Lie Under Section 12 of the Clayton Act..............12

1. Venue Does Not Lie for Syngenta Under Section 12 ..............12

2. Venue Does Not Lie for Corteva Under Section 12 ..............15

B. Venue Does Not Lie for Domestic Defendants Under the General Venue Statute ..............18

III. THE AMENDED COMPLAINT FAILS TO STATE A FEDERAL ANTITRUST CLAIM..............19

A. Plaintiff Fails to Plead Anticompetitive Exclusive Dealing Under the Price-Cost Test ..............19

B. Plaintiff Fails to Plead a Plausible Product Market ..............24

1. Defendants Do Not Invite a "Judicial Fact-Finding Mission"..............25

2. Plaintiff's Factual Allegations Do Not Rescue Its Relevant Markets........28

3. Plaintiff's Other Arguments that the Relevant Markets Are Not Too Broad or Too Narrow Lack Merit ..............31

C. Plaintiff's Federal Antitrust Claims Should Be Dismissed for Failure to Plead Proximate Causation ..............33

1. Proximate Causation Is an Essential Element of Plaintiff's Federal Antitrust Claims Seeking Injunctive Relief..............33

2. Plaintiff Concedes, Through Its Silence, That It Has Failed to Plead Harm to State Entities Proximately Caused by Defendants.............34

3. Plaintiff's Opposition Shows That the Alleged Harm to Arkansas Food Consumers Was *Not* Proximately Caused by Defendants..............34

4. Plaintiff's Opposition Confirms That the Alleged Harm to Arkansas Farmers Was *Not* Proximately Caused by Defendants .............35

5. Plaintiff's Opposition Confirms That the Alleged Harm Is Speculative .............37

IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER STATE LAW .............39

A. The Arkansas Unfair Practices Act (AUPA) Claim Fails .............39

1. Subsection 309 Is Limited to Horizontal Agreements, Which Plaintiff Has Not Pleaded .............39

2. Subsection 309 Is Limited to Agreements That Fix Price or Restrict Output, Which Plaintiff Has Not Pleaded .............42

3. Defendants Lack the "Predatory Intent to Damage and Destroy Competition" Necessary to Violate Arkansas Law .............44

4. Defendants' Alleged Conduct Does Not Exceed the Defendants' Common Law Privilege to Compete .............46

B. The Arkansas Deceptive Trade Practices Act Claim Fails .............47

CONCLUSION .............50

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*Acre v. Spindletop Oil & Gas Co.*,
2009 WL 4016116 (E.D. Ark. Nov. 18, 2009) .......... 45, 47

*In re Aggrenox Antitrust Litig.*,
199 F. Supp. 3d 662 (D. Conn. 2016) .......... 30

*Allcare Specialty Pharmacy, LLC v. OptumRX, Inc.*,
2017 WL 5571356 (E.D. Ark. Apr. 6, 2017) .......... 48

*Anderson v. Dassault Aviation*,
361 F.3d 449 (8th Cir. 2004) .......... 9, 10, 11, 15

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018) .......... 40

*Antoon v. Securus Techs., Inc.*,
2017 WL 2124466 (W.D. Ark. May 15, 2017) .......... 49

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) .......... 36

*Arnold v. AT&T, Inc.*,
874 F. Supp. 2d 825 (E.D. Mo. 2012) .......... 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 3, 22, 47

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) .......... 33

*Baptist Health v. Murphy*,
365 Ark. 115, 226 S.W.3d 800 (2006) .......... 48, 49, 50

*Baptist Health v. Murphy*,
2010 Ark. 358, 373 S.W.3d 269 (2010) .......... 50

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011) .......... 24, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 47

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*,
582 U.S. 255 (2017) .......... 1, 6, 8

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) .......... 46

*Campos v. Ticketmaster*,
140 F.3d 1166 (8th Cir. 1998) .......... *passim*

*In re Canadian Imp. Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006) .......... 37

*Chapman v. New York State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) .......... 24, 25

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
138 F. Supp. 2d 25 (D. Me. 2001) .......... 41

*Concord Boat Corp. v. Brunswick Corp*,
207 F.3d 1039 (8th Cir. 2000) .......... 20

*Davis v. St. John's Health Sys., Inc.*,
348 Ark. 17, 71 S.W.3d 55 (2002) .......... 6

*Dickinson v. SunTrust Mortg. Inc.*,
2015 WL 1868827 (E.D. Ark. Apr. 23, 2015) .......... 47, 49

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
273 U.S. 359 (1927) .......... 13

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......... 3

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
821 F.3d 394 (3d Cir. 2016) .......... 19

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig*,
44 F.4th 959 (10th Cir. 2022) .......... *passim*

*Epps v. Stewart Information Services Corp.*,
327 F.3d 642 (8th Cir. 2003) .......... 11

*Everett v. Dykes*,
2021 WL 4148068 (E.D. Ark. Sept. 13, 2021) .......... 47

*Fastpath, Inc. v. Arbela Techs. Corp.*,
760 F.3d 816 (8th Cir. 2014) .......... 6

*Ferman v. Jenlis, Inc.*,
224 F. Supp. 3d 791 (S.D. Iowa 2016) .......... 6

*Fidelity Union Tr. Co. v. Field*,
311 U.S. 169 (1940) .......... 40

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ........ 6, 7

*Ft. Smith Light & Traction Co. v. Kelley*,
94 Ark. 461, 127 S.W. 975 (1910) ........ 39, 40, 41

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ........ 30

*FTC v. Sanford Health*,
926 F.3d 959 (8th Cir. 2019) ........ 30

*FTC v. Shkreli*,
581 F. Supp. 3d 579 (S.D.N.Y. 2022) ........ 30

*FTC v. Staples, Inc.*,
190 F. Supp. 3d 100 (D.D.C. 2016) ........ 32

*FTC v. Swedish Match*,
131 F. Supp. 2d 151 (D.D.C. 2000) ........ 31

*FTC v. Syngenta Crop Prot. AG*,
2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ........ *passim*

*FTC v. Whole Foods Market,*
548 F.3 1028 (D.C. Cir. 2008) ........ 31

*Gannon International, Ltd v. Blocker*,
2011 WL 111885 (E.D. Mo. Jan. 12, 2011) ........ 28

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir. 1987) ........ 32

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) ........ 37

*Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*,
196 F. Supp. 3d 985 (D. Minn. 2016) ........ 10

*Grappone, Inc. v. Subaru of America, Inc.*,
403 F. Supp. 123 (D.N.H. 1974) ........ 17

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ........ 38

*Health Care Equalization Comm. of the Iowa Chiropractic Soc. v. Iowa Med. Soc.*,
501 F. Supp. 970 (S.D. Iowa 1980), *aff'd*, 851 F.2d 1020 (8th Cir. 1988) ........ 16

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ........ 7

*Henry v. Chloride, Inc.*,
809 F.2d 1334 (8th Cir. 1987) .......... 29, 46

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) .......... 24

*In re HIV Antitrust Litig.*,
2022 WL 22609107 (N.D. Cal. Sept. 27, 2022) .......... 48

*Ill. Brick Co. v. Illinois*,
43 U.S. 730 (1977) .......... 33

*Impax Labs., Inc. v. FTC*,
994 F.3d 484 (5th Cir. 2021) .......... 30

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
797 F.3d 538 (8th Cir. 2015) .......... 28

*International Brotherhood. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) .......... 33

*Jacobs v. Global Tel*Link Corp.*,
2016 WL 5953128 (W.D. Ark. May 17, 2016) .......... 49

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) .......... 35

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*,
725 F.3d 718 (7th Cir. 2013) .......... 15

*Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*,
2022 WL 16635130 (E.D. Ark. Nov. 2, 2022) .......... 48

*LeMay v. Mays*,
18 F.4th 283 (8th Cir. 2021) .......... 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) .......... 33, 36

*In re Lidoderm Antitrust Litig.*,
103 F. Supp. 3d 1155 (N.D. Cal. 2015) .......... 48

*Little Rock Cardiology Clinic PA v. Baptist Health*,
591 F.3d 591 (8th Cir. 2009) .......... 24, 28

*London Luxury, LLC v. Walmart, Inc.*,
2024 WL 1025125 (W.D. Ark. Mar. 8, 2024) .......... 50

*Lovett v. Gen. Motors Corp.*,
975 F.2d 518 (8th Cir. 1992) .......... 35, 36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .......... 3, 44

*Midwest Commc'ns v. Minnesota Twins, Inc.*,
779 F.2d 444 (8th Cir. 1985) .......... 35

*MNG 2005, Inc. v. Paymentech, LLC*,
2020 WL 6582660 (E.D. Mo. Nov. 9, 2020) .......... 15

*Morgan Distrib. Co. v. Unidynamic Corp.*,
868 F.2d 992 (8th Cir. 1989) .......... 22

*NicSand, Inc. v. 3M Co.*,
507 F.3d 442 (6th Cir. 2007) .......... 20

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) .......... 30

*Parnell v. FanDuel, Inc.*,
2019 Ark. 412, 591 S.W.3d 315 (Ark. 2019) .......... 47

*Porous Media Corp. v. Pall Corp.*,
186 F.3d 1077 (8th Cir. 1999) .......... 24

*Ports Petrol. Co. of Ohio v. Tucker*,
323 Ark. 680, 916 S.W.2d 749 (Ark. 1996) .......... 44, 45

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997) .......... 24, 29

*Se. Mo. Hosp. v. C.R. Bard, Inc.*,
642 F.3d 608 (8th Cir. 2011) .......... 23, 29

*Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*,
2007 WL 9701128 (W.D. Tex. Feb. 16, 2007) .......... 32

*Skalla v. Canepari*,
2013 Ark. 415, 430 S.W.3d 72 (2013) .......... 47

*Stahl v. U.S. Dept. of Agric.*,
327 F.3d 697 (8th Cir. 2003) .......... 27

*State ex rel. Bryant v. R & A Inv. Co., Inc.*,
336 Ark. 289, 985 S.W. 2d 299 (1999) .......... 49

*State ex rel. Means v. Chicago, R. I. & P Ry.*,
95 Ark. 114, 128 S.W. 555 (1910) .......... 40

*State v. Frank*,
114 Ark. 47, 169 S.W. 333 (1914) .......... 39, 40

*Stern Fish Co. v. Century Seafoods, Inc.*,
254 F. Supp. 151 (E.D. Pa. 1966) .......... 16

*Steve's Auto Ctr. of Conway, Inc. v. Ark. State Police*,
2020 Ark. 58, 592 S.W.3d 695 (2020) .......... 43

*In re Surescripts Antitrust Litig.*
608 F. Supp. 3d 629 (N.D. Ill. 2022) .......... 19

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) .......... 29

*United States v. Great Am. Ins. Co. of New York*,
738 F.3d 1320 (Fed. Cir. 2013) .......... 5

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966) .......... 32

*United States v. Scophony Corp. of Am.*,
333 U.S. 795 (1948) .......... 13, 15

*Union Carbide & Carbon Corp. v. White River Distributors, Inc.*,
224 Ark. 558, 275 S.W.2d 455 (1955) .......... 43

*UniStrip Techs., LLC v. LifeScan, Inc.*,
153 F. Supp. 3d 728 (E.D. Pa. 2015) .......... 19

*United Food & Commercial Workers Local 1776 & Participating Emps.' Health & Welfare Fund v. Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) .......... 30

*Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*,
646 F.3d 589 (8th Cir. 2011) .......... 10, 11

*Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*,
319 Ark. 214, 891 S.W.2d 30 (1995) .......... 39, 45, 46

*Walden v. Fiore*,
571 U.S. 277 (2014) .......... 8

*Williams v. Emps. Mut. Cas. Co.*,
845 F.3d 891 (8th Cir. 2017) .......... 27

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) .......... 7

*Yanmar Co. v. Slater*,
2012 Ark. 36, 386 S.W.3d 439 (2012) .......... 11

*Zean v. Fairview Health Servs.*,
858 F.3d 520 (8th Cir. 2017) .......... 26

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2021 WL 6689718 (E.D. Va. Nov. 1, 2021) .............................................................. 30

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .............................................................................. 19

STATUTES & RULES

15 U.S.C. § 22 .............................................................................................. *passim*

28 U.S.C. § 1391 ........................................................................................... 2, 18

Ark. Code Ann. § 4-75-309 ................................................................................ 42

Ark. Code Ann. § 4-75-319 .................................................................................. 5

Ark. Code Ann. § 4-88-107 ............................................................................ 47, 49

Ark. Code Ann. § 17-92-507 .............................................................................. 48

Fed. R. Evid. 201 ........................................................................................... 28

OTHER AUTHORITIES

Black's Law Dictionary 1538 (11th ed. 2019) ....................................................... 43

Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (together, "Syngenta" or the "Syngenta Defendants")[1] and Corteva, Inc. ("Corteva"; together with Syngenta, "Defendants") respectfully submit this reply memorandum of law in further support of their motion to dismiss the amended complaint filed by the Attorney General of Arkansas on behalf of Plaintiff State of Arkansas ("Plaintiff").

## PRELIMINARY STATEMENT[2]

Plaintiff's opposition fails to rebut any of the several bases for dismissal of the amended complaint that Defendants have shown—even after Plaintiff amended its complaint in response to Defendants' initial motion to dismiss. Because Plaintiff has failed to fix the defects in its complaint, its claims should be dismissed in their entirety with prejudice.

*First*, personal jurisdiction may not be exercised over any Defendant. Plaintiff's opposition confirms that it seeks to establish personal jurisdiction solely on a theory of specific jurisdiction under Arkansas's long-arm statute, but Plaintiff is unable to identify a single ***claim-related*** contact with the state of Arkansas. Instead, Plaintiff focuses on allegations concerning Defendants' activities unrelated to the rebate programs at issue, but in the absence of claim-related contacts "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 264 (2017).

*Second*, venue does not lie in this District for any Defendant under Section 12 of the Clayton Act, and does not lie in this District for any Defendant other than Syngenta Crop

[1] In most places, the amended complaint does not differentiate between the three Syngenta entities, but rather refers to them together as "Syngenta." *See infra* Point I.A.

[2] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted. Citations in the form "¶ _" or "¶¶ _" refer to the amended complaint (ECF No. 72). "Ex." refers to an exhibit to Defendants' Motion to Dismiss the Amended Complaint (ECF No. 81).

Protection AG under the general venue statute, 28 U.S.C. § 1391. Plaintiff emphasizes supposed conduct within this District by Defendant Syngenta Crop Protection, LLC, and non-parties Corteva Agriscience, LLC and Corteva Agriscience MCS, LLC, to satisfy Section 12's venue clause. In doing so, Plaintiff asks this Court to disregard deep-rooted concepts of corporate separateness and impute the contacts of these subsidiaries to their Defendant parents. But governing Eighth Circuit precedent establishes that Section 12 authorizes venue over a corporation based on its subsidiary's activities only if there is "[s]ufficient control over the operations of a subsidiary [that] renders the subsidiary the instrument … of the parent." *Campos v. Ticketmaster*, 140 F.3d 1166 (8th Cir. 1998). Plaintiff's amended complaint alleges no facts concerning the relationship between the relevant subsidiaries and parents, much less supporting the degree of control required by *Ticketmaster*. This defect is fatal to venue under Section 12.[3] Plaintiff's arguments with respect to the general venue statute follow its personal jurisdiction arguments and fail accordingly.

*Third*, Plaintiff's federal antitrust claims should be dismissed because Plaintiff has not alleged that Defendants' rebate programs have any non-price, coercive feature or that the challenged rebates lower prices below Defendants' costs. In these circumstances, the governing price-cost test framework requires dismissal of Plaintiff's claims. Indeed, as decades of precedent establishes, a market-share rebate program without coercive features is ***procompetitive as a matter of law.*** Plaintiff is unable to identify a single case holding otherwise. Instead, Plaintiff points to conclusory allegations in the amended complaint—and equally conclusory allegations introduced in the opposition—that parrot generalized descriptions of coercive

---

[3] Personal jurisdiction under Section 12 fails as to each Defendant for these same reasons, although Plaintiff has disclaimed reliance on Section 12 as a basis for personal jurisdiction.

features identified in ***other*** cases. But those allegations are precisely the types of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" that do not state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ultimately, Plaintiff's attempt to condemn Defendants' programs threatens to upend a bedrock principle of antitrust law—that "cutting prices to increase business is 'the very essence of competition.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 478 (1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)).

*Fourth*, Plaintiff's federal antitrust claims should be dismissed for failure to define a plausible product market. A complaint must be dismissed when it alleges a proposed relevant market that does not include all reasonably interchangeable substitute products. Plaintiff was required to allege sufficient facts about potential competing alternatives to render its proposed market definition plausible. Plaintiff's amended complaint not only fails to allege such facts, but actually supports the existence of numerous competing alternatives because the documents embraced by the pleading reveal a universe of potential substitutes that Plaintiff ignores wholesale. Moreover, Plaintiff has failed to take on any of Defendants' arguments, premised on the materials cited by Plaintiff itself, which support a broader relevant market. These failures are fatal to Plaintiff's alleged relevant market.

*Fifth*, Plaintiff's federal antitrust claims should be dismissed for lack of proximate causation. Plaintiff's opposition confirms that Defendants' rebates to distributors are several causal steps removed from the alleged harm to Arkansas farmers (who do not buy crop protection products from Defendants) and consumers (who do not buy crop protection products at all), with nothing more than speculation of higher prices being "passed on" providing the connective tissue. Plaintiff agrees that proximate causation is not satisfied where the alleged

harm is "derivative" and not direct, yet is unable to dispute that that is precisely the conclusion required by its speculative theory of harm.

*Sixth*, the amended complaint fails to state a claim under state law. Subsection 309 of the AUPA prohibits only horizontal price-fixing or output-limitation agreements between competitors, which Plaintiff does not purport to have alleged here. Instead, Plaintiff asks this Court to adopt an expansive interpretation of Subsection 309 that is in direct conflict with controlling Arkansas Supreme Court precedent and prior interpretation by a predecessor Arkansas Attorney General, and not supported by a single decision identified by Plaintiff. Plaintiff takes the same approach with respect to its claim under the ADTPA, ignoring that controlling precedent requires allegations of a deceptive, consumer-oriented act or practice, which is not alleged here.

## ARGUMENT

## I. THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

### A. The Clayton Act Does Not Authorize Personal Jurisdiction Over Any Defendant

As demonstrated in Defendants' moving brief, venue is not proper under Section 12 of the Clayton Act for any Defendant, and therefore the Court may not exercise personal jurisdiction over any Defendant pursuant to Section 12.[4] Mem. 11-12. Plaintiff relegates its response to a footnote, in which Plaintiff disclaims reliance on Section 12 to establish personal jurisdiction, but nonetheless asserts that it satisfies Section 12 based on its separate venue argument. Opp. 15 n.8. Under these circumstances, Plaintiff has abandoned Section 12 as a basis for personal jurisdiction. *See, e.g.*, *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

In any event, Section 12 is unavailing to Plaintiff. Plaintiff does not dispute that Section 12 applies ***only*** to corporate defendants, and thus affords no basis for personal jurisdiction over limited liability companies such as Syngenta Crop Protection, LLC. Mem. 11. Nor does Plaintiff dispute that the exercise of personal jurisdiction under Section 12 depends on satisfying the provision's venue requirements. As explained below, Plaintiff cannot satisfy Section 12's venue requirements. *See infra* Point II.A.

[4] Because venue is improper under the Clayton Act, general venue statute, and 15 U.S.C. § 22, and because there is no personal jurisdiction over Defendants, the Eastern District of Arkansas is not an "appropriate federal court" under Ark. Code Ann. § 4-75-319 and venue is not proper pursuant to that statute either.

### B. This Court Lacks Personal Jurisdiction Over Defendants Under Arkansas' Long-Arm Statute

Plaintiff disclaims "general personal jurisdiction over Defendants" and asserts only "specific or 'case-linked' jurisdiction." Opp. 15 n.7. But, as explained below, because none of the allegations Plaintiff points to in its opposition link to the claims in this case, Plaintiff fails to meet its burden. *See*, *e.g., Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) ("When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that jurisdiction exists."); *see also Ferman v. Jenlis, Inc*., 224 F. Supp. 3d 791, 797 (S.D. Iowa 2016) ("[T]he party seeking to establish the court's personal jurisdiction carries the burden of proof and that burden does not shift to the party challenging jurisdiction."); *Davis v. St. John's Health Sys., Inc.*, 348 Ark. 17, 22, 71 S.W.3d 55, 57 (2002) ("If the complaint does not allege sufficient facts on which personal jurisdiction can rest, then the complaint is factually deficient. Mere conclusory statements devoid of a factual foundation do not suffice in this inquiry.").

Plaintiff correctly lays out the Eighth Circuit's five-factor test for exercising specific jurisdiction, but fails to grapple with the *sine qua non* for exercising specific jurisdiction: the relation of the cause of action to the contacts.[5] Opp. 17-20. Supreme Court precedent makes clear that, absent sufficient claim-related contacts, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co.*, 582 U.S. at 264. Moreover, the Supreme Court made clear that the requirement that a plaintiff's claims must "arise out of or relate to" the defendant's contacts with the forum "incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co. v. Mont.*

[5] The five factors are: (1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties. *Bros. and Sisters in Christ, LLC v Zazzle, Inc.*, 42 F4th 948, 952 (8th Cir 2022).

*Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). And although Plaintiff asserts that "[t]he nature, quality, and quantity of Defendants' contacts support jurisdiction" (Opp. 17), it fails to reference a single allegation concerning Defendant's contacts that are claim-related.

Instead of explicating the connection between its jurisdictional allegations and its claims, Plaintiff conclusorily avers that its "claims relate to Defendants' contacts with Arkansas." Opp. 17. Plaintiff also claims that the Supreme Court's decision in *Ford* supports the exercise of personal jurisdiction over Defendants by virtue of in-state product sales, despite the fact that Defendants did not design and do not administer the allegedly illegal rebate programs in the state. Opp. 18. But contrary to Plaintiff's suggestion, *Ford* did not hold that companies can be sued in any state in which their products are sold. Instead, the Court leaned on prior Supreme Court precedent establishing that jurisdiction attaches when a company actively markets a product in the forum state and the product malfunctions there. *See Ford*, 592 U.S. at 363 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). Under those circumstances, there is an obvious "relationship among the defendant, the forum, and the litigation." *Id.* (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). But there is no such relationship here. Plaintiff makes no allegation that their alleged injuries arose from the Defendant-manufacturers' products. Rather, Plaintiff's claim arises from the alleged effects of rebate programs (i.e., commercial arrangements) between the manufacturers and their downstream distributors that exist wholly outside Arkansas. And Plaintiff has failed to plead any facts tying Defendants' contacts with Arkansas to the commercial arrangements that give rise to its alleged claims.

Indeed, Plaintiff adduces ***nothing*** suggesting that the rebate programs at issue have any nexus with Arkansas. The State has pleaded no facts concerning negotiations, administration, or

operation of the rebate programs between Defendants and their distributors that are alleged to have occurred in Arkansas.[6] *Cf. Walden v. Fiore*, 571 U.S. 277, 284 (2014) (reasoning that only "contacts that the defendant ***himself*** creates with the forum" state potentially support jurisdiction) (emphasis in original). Moreover, Plaintiff has pleaded nothing to suggest that the alleged injury—that Defendants "perpetuate an unlawful exclusionary scheme that suppresses generic competition and maintains their monopolies" (¶ 4)—has anything to do with the Defendants' limited contacts with Arkansas.[7]

Plaintiff argues that "Defendants also ignore specific allegations connecting their contacts to Plaintiff's claims," but the only allegations Plaintiff raises in its opposition are those regarding: (i) Defendants' involvement in the ACPA; (ii) Defendants' "sales and service representatives committed to serving Arkansas customers"; and (iii) land previously owned in Arkansas by a company ***not named as a Defendant here***. Opp. 18-19. That Plaintiff characterizes Defendants' participation in ACPA conventions as "Defendant-related" activities, rather than ***claim-related*** activities (*id.* at 19) makes clear the wrong-headedness of its argument. It is ***not*** merely that the activity is related to Defendant that matters for specific jurisdiction; rather, it is the tie between Defendants' activity and Plaintiff's claim that justifies the exercise of specific jurisdiction. Plaintiff's complaint fails to allege facts supporting this connection. The same is true for Plaintiff's allegations concerning Defendants' employees, which evince no connection to the rebate programs at issue in this case. And the same is also true with respect to

[6] In fact, the alleged conduct at issue in this case involves commercial arrangements between crop protection manufacturers and their downstream distributors that occurs outside Arkansas. *See Bristol-Myers Squibb Co.*, 582 U.S. at 264 (holding that absent sufficient claim-related contacts, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.").

[7] Plaintiff has also failed to draw an adequate connection between Defendants' alleged activities in Arkansas and the AIs at issue in this case, which is another gap between Plaintiff's allegations and its claims.

"the Bay site," which—as the Attorney General himself has publicly acknowledged—was owned by an entity that is not a party to this lawsuit. *See* Mem. 14-15. Plaintiff has not alleged or otherwise shown that the site has anything to do with any rebate programs. Plaintiff protests that crop protection products were "tested at that site" (Opp. 19), but Plaintiff's claims have nothing to do with product development or testing.

Plaintiff cites yet another products liability case, *Anderson v. Dassault Aviation*, 361 F.3d 449 (8th Cir. 2004), to assert that the presence of Defendants' "sales and service representatives committed to serving Arkansas customers" supports the exercise of personal jurisdiction, notwithstanding the absence of any allegation that those representatives play a role in Defendants' loyalty programs. Opp. 19. But *Dassault* supports no such conclusion; rather, the court's analysis turned largely on the ***claim-related contacts*** with the state resulting from Dassault "operat[ing] the [company's] largest production facility" in Arkansas, which produced the very products that allegedly injured the plaintiff. *Id.* at 454. Stressing "the acknowledged importance of Arkansas's production site," the court held that exercising jurisdiction "would be reasonable and fair." *Id.* at 455. Moreover, the Eighth Circuit's endorsement of the exercise of jurisdiction in *Dassault* was expressly motivated by the fact that "[the plaintiff] likely has no other forum available to her in this country for her suit against Dassault Aviation." *Id.* at 455. The same cannot be said here, as shown in Defendants' motion to transfer this Action to the Middle District of North Carolina—which Plaintiff opposed, but not on the basis that venue would be improper in the Middle District of North Carolina. *See* Dkt. Nos. 19, 20, 36, 50.

Plaintiff also challenges Defendants' objection to the "group pleading" and "corporate veil" aspects of Plaintiff's amended complaint because these factors "do not control the personal jurisdiction inquiry." Opp. 20. This misstates the nature of Defendants' argument—namely, that

even those contacts alleged as against Defendants' subsidiaries (which Plaintiffs allege no basis for being attributed to the named corporate parents) fail to properly relate to the claims at issue.[8]

In any event, because Plaintiff disclaims reliance on veil piercing, the subsidiaries' contacts are irrelevant. *See Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589 (8th Cir. 2011) ("Our cases consistently have insisted that personal jurisdiction can be based on the activities of a nonresident corporation's in-state subsidiary … only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego."). Plaintiff misstates the governing standard with respect to imputing the contacts of a subsidiary to its parent for purposes of establishing personal jurisdiction. Plaintiff embraces *Dassault*, and argues that personal jurisdiction can be established in this Circuit by alleging that "integrated business groups [are] taking advantage of doing business in Arkansas." Opp. 21-25. Plaintiff ignores, however, that the Eighth Circuit subsequently in *Viasystems* "cautioned against" precisely the "misapplication of *Dassault*" that Plaintiff exhibits in its opposition, and clarified that "attribution of subsidiary conduct to a parent entity for jurisdictional purposes requires a degree of parental control and domination." *Arnold v. AT&T, Inc.*, 874 F. Supp. 2d 825, 835 (E.D. Mo. 2012) (citing *Viasystems,* 646 F.3d at 596); *see also*, *e.g.*, *Goodbye Vanilla, LLC v. Aimia Proprietary Loyalty U.S. Inc.*, 196 F. Supp. 3d 985, 991 (D. Minn. 2016) ("The Eighth Circuit has cautioned against overreliance on [*Dassault*] … [and in] *Viasystems* essentially clarified that the close, synergistic relationship between a foreign

[8] What's more, Plaintiff does not even attempt to allege that the facts it hopes to attribute to Corteva through its subsidiary actually have a nexus with its proposed venue. *See*, *e.g.*, Opp. 27 ("Similarly, the Eddis Declaration concedes that Corteva Agriscience LLC employees had responsibilities within eastern Arkansas, ***presumably within this District***.") (emphasis in original). Plaintiff's indifference to the relevant legal standards is fatal to its amended complaint.

corporation and its in-state subsidiary does not transfer the subsidiary's contacts to the parent."). Plaintiff claims that the Eighth Circuit has "explicitly rejected the interpretation of *Epps v. Stewart Information Services Corp.*, 327 F.3d 642 (8th Cir. 2003), advanced by Defendants" (Opp. 21 n.11), but ***precisely the opposite is true***. *Viasystems*, 646 F.3d at 596 ("We are not free to adopt [a theory] of jurisdiction [that] is inconsistent with [*Epps*]," which "insisted that "personal jurisdiction can be based on the activities of [a] nonresident corporation's in-state subsidiary ... only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego") (quoting *Epps*, 327 F.3d at 648-49); *see also*, *e.g.*, *Yanmar Co. v. Slater*, 2012 Ark. 36, 12-13, 386 S.W.3d 439, 447 (2012) ("[M]ore recently, in [*Viasystems*], the Eighth Circuit revisited its decision in [*Dassault*] and cautioned against a misapplication of that decision," and "equated the parental relationship necessary to attribute the conduct of a subsidiary to its parent corporation with the alter ego relationship required by *Epps*"—i.e., "that jurisdiction over a nonresident parent corporation can be based on the actions of a resident subsidiary corporation only if the parent so controlled and dominated the affairs of the subsidiary that the latter's corporate existence was disregarded so as to cause the residential corporation to act as the nonresidential corporate defendant's alter ego") (quoting *Epps*, 327 F.3d at 649). Plaintiff ultimately must satisfy the standard set forth in *Epps* and confirmed in *Viasystems*—that attribution of a subsidiary's contacts to a foreign parent "always require[s] a degree of control and domination by the parent corporation." *Viasystems*, 646 F. 3d at 596. Plaintiff has failed to plead any such facts here.

## II. VENUE DOES NOT LIE IN THIS DISTRICT FOR DOMESTIC DEFENDANTS

### A. Venue Does Not Lie Under Section 12 of the Clayton Act

#### 1. Venue Does Not Lie for Syngenta Under Section 12

Section 12 of the Clayton Act does not support venue for the federal antitrust claims against any Syngenta Defendant. Again, Plaintiff does not dispute that Section 12, by its express terms, applies ***only*** to antitrust actions “against a corporation,” and thus affords no basis for venue for claims against limited liability companies such as Syngenta Crop Protection, LLC. Mem. 11.

Nor does Section 12 confer venue as to the claims against Syngenta Corp. or Syngenta Crop Protection AG. Plaintiff agrees that for Section 12 to confer venue, Syngenta Corp. and Syngenta Crop Protection AG must either (1) be “inhabitants” of the Eastern District of Arkansas, or (2) transact business of a substantial and continuous nature in this District. Opp. 25; *accord* Mem. 13; 15 U.S.C. § 22.

Plaintiff admits that neither Syngenta Corp. nor Syngenta Crop Protection AG is an inhabitant of Arkansas. Opp. 25. And Plaintiff does not contend that either company itself transacts business of any nature here. Moreover, Syngenta’s uncontroverted declaration in support of this Motion establishes that neither Syngenta Corp. nor Syngenta Crop Protection AG maintains ***any*** business operations in the state of Arkansas (much less within this District). Mem. 14; Quain Decl. at ¶¶ 4-6. And, as Plaintiff also does not dispute, ***none*** of the alleged contacts with Arkansas that Plaintiff attributes to “Syngenta” is, in fact, attributable to either Syngenta Corp. or Syngenta Crop Protection AG. Mem. 14-15; Quain Decl. at ¶¶ 4-9. In sum, Plaintiff has not identified a ***single activity*** that either Syngenta Corp. or Syngenta Crop Protection AG has ever conducted within this District.

Under these circumstances, the United States Supreme Court's decisions in *Kodak* and *Scophony* are unavailing to Plaintiff—and instead highlight the types of business activities that are necessary for venue under Section 12 and that are missing here. Opp. 26. Neither case upheld venue in the absence of ***any*** contact with the forum district. Rather, in *Kodak*, the Court observed that while the defendant did not have a place of business, office, or resident agent in the district, the defendant ***itself*** carried out a continuous course of business with a number of dealers in the forum, to whom it ***directly*** sold and shipped products. *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co*., 273 U.S. 359, 370 (1927). In addition, traveling salesmen and other employees of the defendant would visit the forum several times a year to solicit orders from dealers located there and exhibit and market the defendant's product. *Id.*

In *Scophony*, the defendant was a foreign corporation that opened an office in the forum district, negotiated and executed contracts there, and offered demonstrations of its products in the district, while also conducting other activities to prepare to establish a business in the United States. *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 797 (1948). As the Supreme Court emphasized, the foreign corporation was, within the district, "carrying on largely, if not exclusively, the only business in which it could engage at the time" because World War II had interrupted its business in its home country. *Id.* at 810; *see also id.* ("Scophony's operations in New York were a continuous course of business before and throughout the period in question here. They consisted in strenuous efforts … to salvage and resuscitate Scophony's whole enterprise from the disasters brought upon it by the war.").

The contrast between the activities within the district of the defendants in *Eastman Kodak* and *Scophony* and the absence of any activities of Syngenta Corp. or Syngenta Crop Protection

AG in this District confirms that Section 12 does not authorize venue in this District for the claims against these Syngenta entities.

Having failed to establish that Section 12 supports venue as to any of the Syngenta Defendants individually, Plaintiff tries to obscure their corporate separateness. In their moving brief, Defendants showed that Plaintiff's initial gambit—improperly lumping together the three entities as "Syngenta" in the amended complaint in an attempt to impute *sub silentio* the contacts of one entity (Syngenta Crop Protection, LLC) to its affiliates—cannot satisfy Plaintiff's burden of pleading facts showing venue (and jurisdiction) with respect to each defendant. Mem. 14. Plaintiff makes no attempt to defend its impermissible group pleading. Opp. 20. Defendants also showed that Plaintiff's allegations fall far short of establishing a basis to "pierce the corporate veil" under principles of corporate law and, on that basis, to impute the in-state contacts of an entity to its affiliate. Mem. 14-16; *supra* Point I.B. Plaintiff disclaims any attempt to "pierce the corporate veil." Opp. 21.

Instead, Plaintiff cites *Ticketmaster* for the proposition that Section 12 authorizes venue over a corporation based on its subsidiary's activities if there is "[s]ufficient ***control over the operations of a subsidiary*** [that] renders the subsidiary the instrument … of the parent, and supports the conclusion that the parent is transacting business in a district." Opp. 26 (quoting *Ticketmaster*, 140 F.3d at 1173). But, tellingly, Plaintiff is silent about how its allegations satisfy *Ticketmaster*'s control standard. In particular, Plaintiff pleads no facts showing that Syngenta Corp. or Syngenta Crop Protection AG "exercises continuing supervision of and intervention in [Syngenta Crop Protection LLC's] affairs," much less that either "exercises [any] ability ... to influence major decisions of [Syngenta Crop Protection, LLC] which lead or could lead to violations of the antitrust laws." *Ticketmaster*, 140 F.3d at 1173. In fact, Plaintiff says nothing

in its amended complaint or its opposition about the nature of the corporate relationships among Syngenta Crop Protection AG, Syngenta Corp., and Syngenta Crop Protection, LLC. Once again, therefore, a case cited by Plaintiff highlights the holes in Plaintiff's allegations.

Shifting the focus away from its missing allegations, Plaintiff argues that *Ticketmaster* "explicitly rejected reliance on the sort of affidavits that Defendants have produced in this case." Opp. 26-27. But the court in *Ticketmaster* merely observed that an affidavit regarding a parent corporation's activities (or lack thereof) in the forum district is not necessarily determinative if a plaintiff can make a sufficient showing of control over a subsidiary that transacts business in the district. *See* 140 F.3d at 1173. Plaintiff has made no such showing here.[9]

### 2. <u>**Venue Does Not Lie for Corteva Under Section 12**</u>[10]

Plaintiff agrees that Corteva is not an inhabitant of Arkansas and fails to plead allegations demonstrating that Corteva transacts business of a substantial character in the Eastern District. For these reasons, the amended complaint also fails to establish Section 12 venue over Corteva. *See*, *e.g.*, *MNG 2005, Inc. v. Paymentech, LLC*, 2020 WL 6582660, at *3 n.3 (E.D. Mo. Nov. 9, 2020) (citing *Scophony*, 333 U.S. at 807 (declining to find venue where a plaintiff's complaint

---

[9] *Dassault* is a due process case that provides no support for Plaintiff's argument that venue lies under Section 12 of the Clayton Act. In *Dassault*, the Eighth Circuit concluded that, on the facts before it, "it would not violate traditional notions of fair play and substantial justice for an Arkansas court to assert personal jurisdiction" over the parent under Arkansas's long-arm statute, 361 F.3d at 455, but the Eighth Circuit did not disturb the district court's finding that the foreign parent was not "doing business" in Arkansas. *Id*. at 452. Therefore, *Dassault* does nothing to support Plaintiff's contention that Syngenta Corp. and Syngenta Crop Protection AG "transac[t] business" in Arkansas for purposes of Section 12's venue requirement. *See*, *e.g.*, *KM Enters., Inc. v. Glob. Traffic Techs., Inc*., 725 F.3d 718, 730-31 (7th Cir. 2013) (holding that exercising personal jurisdiction would comport with due process and that Section 12's venue requirement was not satisfied).

[10] For the same reasons discussed above, Section 12 does not afford a basis for venue over Corteva Agriscience, LLC or Corteva Agriscience MCS, LLC, because Section 12 does not apply to limited liability companies. *See supra* at 5. Neither Corteva Agriscience, LLC or Corteva Agriscience MCS, LLC is named as a defendant.

lacked allegations that defendant transacted business "of any substantial character" in the district")).

Business of a "substantial character" is "certainly more than a few isolated and peripheral contacts with the particular judicial district." *Health Care Equalization Comm. of the Iowa Chiropractic Soc. v. Iowa Med. Soc.*, 501 F. Supp. 970, 980 (S.D. Iowa 1980), *aff'd* 851 F.2d 1020 (8th Cir. 1988) (quoting *Stern Fish Co. v. Century Seafoods, Inc.*, 254 F. Supp. 151, 153 (E.D. Pa. 1966)); *see also Scophony,* 333 U.S. at 807 ("[T]he practical, everyday business or commercial concept of doing or carrying on business of any substantial character [is] the test of venue."). Plaintiff's allegations against Corteva fail to meet this standard.

While Plaintiff asserts that "[t]he nature quality, and quantity of Defendants' contacts support jurisdiction" (Opp. 17), it fails to reference a single allegation concerning Corteva's contacts with the Eastern District in that section of its briefing. *Id.* The contacts that Plaintiff reasserts against Corteva appear limited to: (i) its registration with the Arkansas Secretary of State (Opp.4); (ii) prior appearances in the Eastern District (Opp.5); (iii) Corteva "sales and services representatives committed to serving Arkansas customers" (Opp. 19); (iv) involvement of Corteva employees in the ACPA (Opp. 19); and (v) EIDP, Inc.'s ownership of a research station West Memphis, Arkansas (Opp. 24).[11] *See also* Mem. 20-24. But Corteva's state registration and prior appearance in lawsuits in this District do not approach establishing business of a substantial character. Mem. 20-22. And Plaintiff's other jurisdictional allegations—namely, the presence of employees in Arkansas, participation in the ACPA, and ownership of a research station—have no connection to the named Defendant, Corteva, Inc., but

---

[11] Plaintiff also notes that "[a]s a member of the Arkansas community," Corteva sponsors "scholarships for students at the University of Arkansas for students [sic] majoring in crop science and related fields." Opp. 5. Plaintiff does not explain the connection between this allegation and the relevant jurisdictional standards.

only its subsidiaries: Corteva Agriscience, LLC, Corteva Agriscience MCS, LLC, and EIDP, Inc. Eddis Decl. ¶¶ 3-5.

Plaintiff attacks Corteva's supporting affidavit as "unavailing." Opp. 23. Plaintiff suggests that *Ticketmaster* rejected "reliance on the sort of affidavits that Defendants have produced in this case … because they were inapplicable to the venue standards they had enunciated." Opp. 26-27. But this distorts *Ticketmaster* outright. In reality, the Court held that while the defendant's affirmations "may have been enough to resolve the venue issue under the standard applied by the district court[,]" (which it deemed "the wrong standard for venue"), the affirmations did not "resolve the question ***under the standard we have explained here***." *Id.* at 1173-74. The Court clarified the appropriate standard is not whether the parent controlled the day-to-day activities of the subsidiary, but rather whether the parent exercised the "ability … to influence major decisions of the subsidiary which lead or could lead to violations of the antitrust laws." *Id.* at 1173 (quoting *Grappone, Inc. v. Subaru of America, Inc.*, 403 F. Supp. 123, 131 (D.N.H. 1974)).

But Plaintiff has pleaded no allegations concerning the degree of control Corteva, Inc. exercises over its subsidiaries, Corteva Agriscience, LLC, Corteva Agriscience MCS, LLC, or EIDP, Inc., in Arkansas. This is fatal to its ability to attribute the contacts of the latter group to the former, named Defendant. Plaintiff's question-begging assertion that Corteva's submitted documents and public statements "demonstrate the appropriateness" of considering the actions of its subsidiaries "in the jurisdictional inquiry relating to Corteva" simply assumes what needs to be pleaded. Opp. 24. Likewise, the observation that "Corteva Agriscience LLC is a subsidiary of Corteva as is Corteva Agriscience MCS LLC" (Opp. 24) pleads nothing in support of a

finding that Corteva influences major decisions of either subsidiary.[12] Plaintiff's threadbare jurisdictional allegations, and stubborn refusal to grapple with the relevant legal standards—both as to Corteva, Inc.'s contacts in the Eastern District, and any basis to attribute the contacts of its subsidiaries to Corteva, Inc. itself—forecloses any proper exercise of venue under Section 12. And Plaintiff's half-hearted attempt to augment its pleadings by reference to securities filings, Bloomberg, and Corteva's website, among others (Opp. 24-25), does not satisfy this standard either.

### B. Venue Does Not Lie for Domestic Defendants Under the General Venue Statute

As shown above, Plaintiff has failed to plead facts showing that any Defendant is subject to personal jurisdiction in Arkansas. *See supra* Point I. It follows, as a matter of law, that Plaintiff has failed to establish that any Defendant "resides" in this District, is a "resident" of Arkansas, or "is subject to the court's personal jurisdiction with respect to [this] action" for purposes of Section 1391(b)(1) or (b)(3).

For the same reasons, Plaintiff has failed to plead facts showing that "a substantial part of the events or omissions giving rise to the claim occurred" in this District for purposes of Section 1391(b)(2). *See* Mem. 28-29;*supra*, Point I.B. Accordingly, these provisions are not a basis for venue for any domestic Defendant.

[12] *See* discussion *supra* at 10.

## III. THE AMENDED COMPLAINT FAILS TO STATE A FEDERAL ANTITRUST CLAIM

### A. Plaintiff Fails to Plead Anticompetitive Exclusive Dealing Under the Price-Cost Test

As shown in Defendants' moving brief, claims of *de facto* exclusive dealing are subject to the price-cost test where "price is the clearly predominant mechanism of exclusion." Mem. 30-35 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 273-75 (3d Cir. 2012)); *accord* Opp. 30. "This is usually the case when"—as is undisputedly alleged here—"a firm uses a single-product loyalty discount or rebate to compete with similar products." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 409 (3d Cir. 2016). Plaintiff does not contend that Defendants' prices are set below cost, and agrees that, where the price-cost test applies, it mandates dismissal of a plaintiff's claims absent allegations of below-cost pricing. Opp. 30.

Plaintiff misportrays Defendants as invoking the price-cost test because "the challenged conduct ***includes*** payments to the Distributors" (Opp. 29-30)—implying that Plaintiff has alleged additional challenged conduct beyond price-cutting through rebates. Plaintiff has not, and the price-cost test applies not only because of the ***presence*** of rebates that reduce prices to dealers, but also because of the ***absence*** of any non-price, coercive mechanisms of exclusion.

This critical distinction is demonstrated by the very cases on which Plaintiff relies. In *UniStrip Techs., LLC v. LifeScan, Inc.*, 153 F. Supp. 3d 728 (E.D. Pa. 2015), the court recognized that "generally, a claim that rebate programs … condition the rebate on the c[u]st[o]mer's purchasing of its products should be analyzed under the price-cost test." *Id.* at 737. But the test was inapplicable because the complaint pleaded "anticompetitive behavior," including mandatory total exclusivity, multiyear contract terms, bundling, and threats. *Id.* And in *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629 (N.D. Ill. 2022), Surescript's loyalty program featured "long-term exclusivity commitments" and a "clawback" that "penal[ized]" any

customer using a competitor by requiring repayment of all loyalty discounts ever received. *Id.* at 637; *see also*, *e.g.*, *FTC v. Syngenta*, 2024 WL 149552, at *17 (M.D.N.C. Jan. 12, 2024) (application of the price-cost test is foreclosed only where a plaintiff has "alleged sufficient non-price mechanisms of exclusion").

By contrast, in *Concord Boat Corp. v. Brunswick Corp*, 207 F.3d 1039 (8th Cir. 2000), the Eighth Circuit rejected a challenge to market-share based discounts—that, like Defendants' rebates—lack coercive mechanisms of exclusion, applying "the general rule that above cost discounting is not anticompetitive." *Id.* 1061-63; *see also, e.g.*, *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 1000 (10th Cir. 2022) (same); *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (same).

Plaintiff's reliance on the Middle District of North Carolina's decision on Defendants' motions to dismiss a Federal Trade Commission complaint joined by several States is misplaced.[13] Opp. 29, 32-35. As shown in Defendants' moving brief, that decision ***supports*** dismissal of Plaintiff's amended complaint by highlighting the types of crucial allegations that are missing from it. Mem. 35. Plaintiff's amended complaint is devoid of allegations of fact showing exclusionary threats to distributors (much less allegations of Defendants "follow[ing] through on [such] threat[s]"). *FTC v. Syngenta*, 2024 WL 149552, at *17.

Nor can Plaintiff dispute that its own allegations confirm that distributors and retailers are ***not*** coerced into qualifying for Defendants' voluntary rebates, but rather have an independent profit motive for selling Defendants' branded products instead of generics in Arkansas. Mem.

---

[13] Despite Defendants' repeated discussion of Judge Schroeder's decision in their moving brief (Mem. 3, 35; *see also id.* at 30-33, 45 n. 24), Plaintiff accuses Defendants of "[p]retending that this issue hasn't already been fully briefed and decided against them in the Middle District of North Carolina." Opp. 29. Because the allegations are different in North Carolina, Plaintiff is wrong that "this issue" has been decided previously.

35; *see also id.* 3, 33, 53. Tellingly, Plaintiff's opposition disregards the admissions in its amended complaint that, rebates aside, dealers earn a "greater profit on the name-b[r]and product" than on generic products, and that "Arkansas farmers do not buy more if the price of crop-protection products drops or less if the price goes up." ¶¶ 78-79.

Further, Plaintiff's amended complaint expressly analogizes Defendants' rebates to rebates paid by brand-name drug manufacturers to payors for prescription drugs (PBMs). ¶¶ 10-11. This analogy undermines Plaintiff's federal antitrust claims. Following the price-cost test precedents cited above, the Tenth Circuit has held, in a decision cited by Plaintiff (Opp. 65), that a drug manufacturer's above-cost rebate "payments exemplified vigorous price competition—something we strenuously protect." *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th at 1000. The Tenth Circuit concluded that there was no coercion "because the loss of an additional discount was the only consequence PBMs faced for rejecting [a drug manufacturer's] exclusive rebate agreements." *Id.* at 998. The same reasoning applies to Defendants' rebates, as Plaintiff's analogy confirms.

These dispositive differences between Plaintiff's allegations and the allegations in the FTC action pending in North Carolina undermine Plaintiff's reliance on Judge Schroeder's decision on the motion to dismiss in that case. Having chosen to proceed separately from the thirteen government agencies prosecuting the North Carolina action, and to craft a separate complaint with materially different allegations, Plaintiff cannot simply ride the coattails of those other plaintiffs.

In its opposition, Plaintiff argues that Defendants' rebate programs contain "coercive aspects" in the form of "the withholding and forfeiture of exclusion payments, cancellation of distribution contracts, limiting necessary access to crop-protection products (both new and

existing), and other forms of retaliation." Opp. 33. But that argument merely illustrates the conclusory nature of Plaintiff's allegations. Those supposed "aspects" of Defendants' rebate programs are drawn from a single, unsupported allegation (¶ 105) that merely recites features of rebates found to be coercive in the case law, while failing to identify a single factual detail. Thus, Plaintiff resorts to precisely the "[t]hreadbare recita[l] of the elements of a cause of action, supported by mere conclusory statements" that does not suffice to state a claim. *Iqbal*, 556 U.S. 678. Devoid of factual details, the allegations of coercion are not plausible—and do not even provide notice which specific Defendants they concern.

Similarly, Plaintiff baldly insists that "all of th[e] non-price exclusions" listed in an excerpt from *FTC v. Syngenta*—in which Judge Schroeder used generalized descriptions to summarize various "non-price mechanisms of exclusion" found ***in other cases***—"are features of Defendants' Loyalty Programs." Opp. 35. The features to which Plaintiff refers include:

> provisions aggravating existing barriers to enter the market; whether the buyer insists on exclusive dealing; contractual obligations to purchase a set percentage of products from the defendant; discounts involving tying or bundling; threats to retract unpaid rebates or claw back discounts from prior years; threats to cut off supply from a monopolist; requirements to exclude competitors from marketing materials; and the length of time of the discounting agreements.

*Id.* (quoting 2024 WL 149552, at *17). But Plaintiff alleges no facts concerning ***any*** such coercive conduct in its amended complaint.[14] These features are not part of ***Defendants'*** rebate programs, Plaintiff's confusion notwithstanding. Thus, rather than supporting Plaintiff's claims, Plaintiff's cribbing of Judge Schroeder's high-level summary exposes the factual bankruptcy of Plaintiff's "allegations" of coercion.

[14] Moreover, "it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989).

Laid bare, Plaintiff's allegations merely demonstrate that Defendants, unsurprisingly, typically ***do not pay rebates to dealers that don't qualify for them***. Plaintiff refers to this feature of Defendants' programs—i.e., the condition on which Defendants' conditional rebate offers are premised—as "threats," but that rogue characterization defies common sense and applicable case law. *See, e.g.*, *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 612 (8th Cir. 2011) (that a distributor "simply lost its negotiated discount" does not amount to non-price coercive conduct); *EpiPen*, 44 F.4th at 998 (explaining that a plaintiff "fails to demonstrate coercion [where] the loss of an additional discount was the only consequence PBMs faced for rejecting [a drug manufacturer's] exclusive rebate agreements").

In an effort to avoid the weight of applicable case law, Plaintiff obfuscates the applicable legal standard and conflates the question of whether the price-cost ***applies*** with whether it is ***satisfied***. Plaintiff asserts, for instance, that the "price-cost test applies when a plaintiff brings a claim based on predatory pricing" and that the amended complaint's allegations that Arkansas farmers ***over***pay for Defendants' products "alone ends application of the price-cost test." Opp. 30-31. Plaintiff's invented (and inverted) formulation of the governing framework directly contradicts applicable case law, including the decision in *FTC v. Syngenta*. Indeed, despite Plaintiff's suggestion to the contrary (Opp. 31), Judge Schroeder ***did not*** find the absence of below-cost pricing allegations to be dispositive—or even relevant—in determining whether price is the predominant means of exclusion, and thus whether the price-cost test applies. Indeed, on the very pages of the opinion that Plaintiff cites, Judge Schroeder confirmed that it is only allegations of "sufficient non-price mechanisms of exclusion [that may] foreclose application of the price-cost test as a matter of law at this pleading stage." 2024 WL 149552, at *17-18.

### B. <u>Plaintiff Fails to Plead a Plausible Product Market</u>

A complaint should be dismissed when it "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018). Here, "[a]lthough [Plaintiff] need not address every conceivable, far-fetched alternative to [the Relevant AIs], it must allege sufficient facts about ***other*** [active ingredients] to make its proposed product market plausible." *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 577 (S.D.N.Y. 2011). Not only does Plaintiff fail to allege any facts to exclude these other active ingredients, Plaintiff's amended complaint embraces their existence, including their similarity to the Relevant AIs in chemical structure, mode of action, site of action and overall function—facts that Plaintiff does not (and cannot) dispute in its opposition or amended complaint.

Instead, the thrust of Plaintiff's opposition is that "[b]ecause the Middle District of North Carolina has already found that the same AI product markets are plausibly alleged, the same results should follow here." Opp. 36. Plaintiff then offers a re-tread of the FTC's arguments from the Middle District action, utterly failing to engage with the differentiating features of the amended complaint in this Action—i.e., that documents "necessarily embraced by the pleadings" reveal the broad universe of potential substitutes that Plaintiff fails to exclude. *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999). In these circumstances, where the unexcluded alternatives are identified by the amended complaint itself, it is proper to dismiss the federal antitrust claims for failure to plausibly allege a relevant market under Eighth Circuit law. *See Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009)

(dismissing federal antitrust claims where the complaint "provide[d] the answer" as to an alternative product market and rejecting argument that doing so "disregard[ed] the well-pleaded allegations in the complaint"); *see also*, *e.g.*, *Bayer Schering*, 813 F. Supp. 2d at 578 & n.10 (dismissing for "fail[ure] to address other available treatments" and noting that counterclaimant "admit[ted] in its counterclaims" the availability of such alternative treatments); *Chapman*, 546 F.3d at 238-39 (noting that "plaintiffs readily admit[ted]" a broader product market in their complaint and dismissing for failure to plead a plausible relevant market). The fact that Judge Schroeder declined to dismiss a different complaint out of deference to controlling Fourth Circuit precedent is of no moment here. *See FTC v. Syngenta*, 2024 WL 149552, at *11 (explaining that "the Fourth Circuit has suggested that such scrutiny [of the relevant market] is misguided on a motion to dismiss").

Plaintiff's federal antitrust claims should therefore be dismissed. Plaintiff's arguments to the contrary are unpersuasive for the reasons set forth below.

### 1. <u>**Defendants Do Not Invite a "Judicial Fact-Finding Mission"**</u>

Defendants do not invite a "judicial fact-finding mission" for the simple reason that there are no facts to be found: every fact about the composition, function, and labeling of the relevant products and active ingredients is undisputed. Defendants referenced three categories of documents that Plaintiff claims should be ignored: (1) documents cited in the amended complaint,[15] (2) materials published by state and federal agencies, including the Environmental Protection Agency ("EPA") and Department of Agriculture, such as product labels, fact sheets

[15] *See* ¶¶ 272-277; Exs. 14-16; *see also* Mem. 48-50 nn.25-28 (identifying Syngenta and Corteva web pages cited in the amended complaint).

and memoranda;[16] and (3) a complaint from a prior FTC action.[17] All of these materials are fairly considered on a motion to dismiss.

*First*, Plaintiff's argument that documents cited in the amended complaint are not judicially noticeable is a red herring. These materials are "necessarily embraced by the complaint" because they are "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); Mem. 40, 48-49 nn.25-27 (identifying amended complaint paragraphs citing the documents). Since "documents necessarily embraced by the complaint are not matters outside the pleading," they are properly considered on a motion to dismiss irrespective of any question of judicial notice. *Zean*, 858 F.3d at 526.

These documents cited in the amended complaint alone are sufficient to dismiss Plaintiff's federal antitrust claims. The 2024 University of Arkansas' Recommended Chemicals for Weed and Brush Control (the "MP44") (*see* ¶¶ 275-277), the 2024 University of Arkansas' Insecticide Recommendations for Arkansas (the "MP144") (*see* ¶ 274) and the 2024 University of Arkansas Division of Agriculture Research & Extension Program's Plant Disease Control Products Guide (the "MP154") (*see* ¶¶ 272-273) defeat Plaintiff's overly narrow primary relevant market by showing the many other active ingredients with the same modes of action, sites of action and functions that Plaintiff fails to address in the amended complaint. *See* Mem. 41-42. These documents (in conjunction with Defendants' product webpages) also defeat

[16] *See* Exs. 2-10, 12-13.

[17] *See* Ex. 11.

Plaintiff's overly broad alternative relevant market by showing the substantial overlap in active ingredients across mixture products. Mem. 48-49.

*Second*, the EPA and Department of Agriculture materials, as well as the FTC's complaint in *In re Novartis AG*, are judicially noticeable because "[t]he district court may take judicial notice of public records and may thus consider them on a motion to dismiss." *Stahl v. U.S. Dept. of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003). In *Stahl*, for example, the Eight Circuit found the district court did not err by taking notice of a Department of Agriculture regulation. *Id.* The labeled uses for crop protection products, as regulated by the EPA, are no different.

Most significantly, none of the facts disclosed by Defendants' proffered exhibits are disputed by Plaintiff. Plaintiff does not engage with the substance of these exhibits ***at all*** in its Opposition, let alone dispute the scientific and regulatory facts identified in the exhibits. That is because these facts are indisputable. For example, Plaintiff cannot contest that metolachlor is a Group 15 herbicide from the acetamide family labeled for use on corn. *See* Mem. 42. Consistent with Federal Rule of Evidence 201, the "court may take judicial notice" of such facts because they are "not subject to reasonable dispute [and] because [they] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Williams v. Emps. Mut. Cas. Co.*, 845 F.3d 891, 904 (8th Cir. 2017) (finding district court properly "took judicial notice of the fact that Radium is a solid that emits alpha particles").

Plaintiff's cited authorities are not to the contrary, as they reflect situations where a party sought to establish a ***disputed*** fact by way of judicial notice. For example, in *LeMay v. Mays*, 18 F.4th 283 (8th Cir. 2021), the key issue was whether a police officer acted reasonably when shooting the plaintiff's dogs. *Id.* at 286. The plaintiff specifically alleged that the dogs acted non-threateningly, and the defendant officer sought judicial notice of materials demonstrating the

dogs acted threateningly. *Id.* at 286, 289. Because the defendant sought to establish a disputed fact through judicial notice, dismissal on that basis was improper. *Id.* at 289. Similarly, in *Gannon International, Ltd v. Blocker*, 2011 WL 111885 (E.D. Mo. Jan. 13, 2011), the parties offered conflicting "interpretations of Vietnamese law," which the court found improper to resolve on a motion to dismiss. *Id.* at *7 n.10; *see also Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 n.4 (8th Cir. 2015) ("Federal Rule of Evidence 201(b) allows this court to take judicial notice of public documents for the purpose of noting ***undisputed*** adjudicative facts" but not of "matters which [Plaintiff] disputes.").[18]

Defendants ask the Court only to consider undisputed facts that do not contradict the facts asserted in the amended complaint. At this stage, the problem with the amended complaint is not that it asserts incorrect facts about substitutes for the active ingredients at issue, but that it asserts ***no facts*** about these substitute products whatsoever. The Court is permitted to consider the existence of these alternative products and to dismiss Plaintiff's federal antitrust claims for failure to exclude these alternatives. *See Little Rock Cardiology*, 591 F.3d at 597.

### 2. **<u>Plaintiff's Factual Allegations Do Not Rescue Its Relevant Markets</u>**

Plaintiff offers three sets of factual allegations in support of its single-AI relevant market: (1) "Defendants design their loyalty programs around Relevant AIs" (Opp. 41), (2) "The markets satisfy the hypothetical monopolist test" (Opp. 42), and (3) "The Relevant AIs have distinct characteristics and uses" (Opp. 43). Plaintiff's factual allegations as to the Relevant AIs' characteristics, which merely provide two sentences of differentiating features for each AI

[18] Plaintiff also asserts a half-hearted procedural argument that Defendants have not properly sought judicial notice. Opp. 37 n.22. Defendants need not formally move for judicial notice, as Federal Rule of Evidence 201 is clear that "the court ***may*** judicially notice a fact that is not subject to reasonable dispute" and "[t]he court … ***may*** take judicial notice on its own." Fed. R. Evid. 201(b), (c).

without identifying a single alternative AI by name, are addressed in Defendants' moving brief. Mem. 39, 46 (citing ¶ 48(a)). Plaintiff's remaining arguments also lack merit.

*First*, Plaintiff asserts that its allegations that Defendants design their rebate programs around the Relevant AIs "establish[es] the commercial realities around which markets are defined." Opp. 42. In other words, rather than making any effort to exclude reasonably interchangeable substitutes, Plaintiff seeks to define the market by reference to the terms of the challenged rebate programs themselves. But "[a] court making a relevant market determination looks not to the contractual restraints assumed by a particular [party] when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." *Se. Mo. Hosp.*, 642 F.3d at 617 n.4 (quoting *Queen City Pizza*, 124 F.3d at 438, 441). As Plaintiff's cited authority demonstrates, though industry recognition is a relevant factor to consider when defining a market, a party's attempting to define a market by reference to the challenged conduct itself creates a risk of "bootstrapping." *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). "Evidence of industry recognition, therefore, would not save an alleged market that was clearly implausible otherwise." *Id.* Because Plaintiff's single-AI relevant market is clearly implausible, bootstrapping the market to the challenged conduct will not save Plaintiff's claims.

The sole Eighth Circuit precedent identified by Plaintiff does not counsel otherwise. In *Henry v. Chloride, Inc.*, the plaintiff challenged the defendant's refusal to sell plaintiff batteries on antitrust grounds. 809 F.2d 1334, 1337 (8th Cir. 1987). In concluding that the plaintiff had established a relevant market, the Eighth Circuit considered not only evidence of industry recognition, but "extensive evidence" of other *Brown Shoe* factors. *Id.* at 1342. And, with respect to industry recognition, the Eighth Circuit did not look to the refusal to sell itself, but to

collateral documents and testimony regarding the defendant's conception of the relevant market. *Id.* Thus, Plaintiff's assertion that the challenged conduct sufficiently establishes the relevant market is unpersuasive.[19]

*Second*, Plaintiff points to "Defendants' own market assessments" suggesting that the entry of generic versions of the Relevant AIs would result in price declines. Opp. 42-43. Plaintiff asserts that these assessments show their single-AI product market "satisf[ies] the hypothetical monopolist test." Opp. 42. "The test asks whether a hypothetical monopolist could impose a small but significant nontransitory increase in price ["SSNIP"] in the proposed market. If consumers would defeat the price increase by switching to products outside of the proposed market, then the market definition is too narrow and must be redefined." *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019). Thus, the relevant inquiry here is whether consumers would switch to the many alternative AIs in response to a SSNIP on the Relevant AIs. *Cf. Zetia*, 2021 WL 6689718, at *15 ("Plaintiffs' expert evidence … show[s] lack of cross-price elasticity with any other drugs by demonstrating (1) that patients did not switch from other cholesterol-lowering

---

[19] Plaintiff also relies on a number of pharmaceutical cases for the unremarkable proposition that "a brand-name product and its generic analogs can constitute a relevant market." Opp. 39. Many of the cases relied upon by Plaintiff involved reverse payments. *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 2021 WL 6689718, at *12 (E.D. Va. Nov. 1, 2021) ("[W]hat this focused inquiry makes clear is that pharmaceutical companies, like Merck and Glenmark, are 'vanishingly unlikely' to agree to reverse payments if they do not already have market power (because otherwise the disputed patent would be worthless).") (quoting *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 666 (D. Conn. 2016)). It is therefore unsurprising that, consistent with binding Supreme Court precedent, allegations of reverse payments can be indicative of a product market. *See, e.g.*, *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 375 ("Plaintiffs contend that [defendants] entered into reverse payment agreements[.]"); *see also Impax Lab'ys., Inc. v. FTC*, 994 F.3d 484, 493 n.4 (5th Cir. 2021) ("Impax does not argue that it lacked market power—it held a patent after all—so we need not address that issue further."). Even in Plaintiff's cited reverse payment cases (and, of course, non-reverse payment cases), courts still look to evidence of industry recognition beyond the conduct itself and only in concert with substantial evidence of cross-elasticity of demand. *FTC v. Shkreli*, 581 F. Supp. 3d 579, 630-32 (S.D.N.Y. 2022) (finding that, in addition to "[t]he high degree of cross-elasticity in demand …, [g]eneric drug companies also assessed the relevant market to be [the branded and generic version of a drug]."); *United Food & Com. Workers Loc. 1776 & Participating Emps.' Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1176 (N.D. Cal. 2017) ("In sum, plaintiffs present evidence that price data and sales data show that during the relevant time there was no significant cross-elasticity of demand between Lidoderm and any product other than generic Lidoderm. Those analyses are generally supported by defendants' own documents and analyses.").

medications to cheaper ezetimibe when it first became available, and (2) that availability of cheaper generics for other cholesterol-lowering medication … did not cause patients to switch from more expensive Zetia.").

Plaintiff has not pleaded facts showing that consumers would not switch to the many alternative AIs identified by Defendants. At best, the assessments cited by Plaintiff suggest that branded and generic versions of each AI belong in the same market; but Plaintiff has not pleaded any facts suggesting why—even if branded and generic versions of each AI are in the same market—they are the ***only*** products in the market. It does not follow that because branded and generic versions of one AI are within the same product market, all other AIs are excluded. In any event, the hypothetical monopolist test "facilitates th[e] analysis" of which products are reasonably interchangeable, *FTC v. Whole Foods Market*, 548 F.3d 1028, 1038 (D.C. Cir. 2008); it does not allow Plaintiff to avoid this analysis entirely. *See FTC v. Swedish Match*, 131 F. Supp. 2d 151, 158-61 (D.D.C. 2000) (considering whether products are reasonably interchangeable, and after concluding they are, turning to the HMT).

### 3. Plaintiff's Other Arguments that the Relevant Markets Are Not Too Broad or Too Narrow Lack Merit

With respect to Plaintiff's overly narrow single-AI product market, Plaintiff does not dispute that there are many other functionally interchangeable AIs with "overlapping uses." Opp. 44. As explained above and in Defendants' moving brief, this concession is fatal to Plaintiff's claims: the failure to allege facts excluding obvious potential substitutes warrants dismissal. Plaintiff seeks to avoid this result by again resorting to the "allegations of the price impact of generic entry" (*id.*), but those allegations are unpersuasive for the reasons discussed above.

As to Plaintiff's overly broad alternative market consisting of all EPA-registered crop protection products containing the same Relevant AI, Plaintiff asserts that non-interchangeable goods "may be grouped in a single market for purposes of antitrust analysis" if they share "a common component and common features." Opp. 46-47. But such products may only be grouped together "where that combination reflects commercial realities." *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). For example, though individual tools are different, if buyers "tend to purchase a package of tools rather than individual tools" such that "customer demand" is directed to the package, the package could qualify as its own market. *See Silicon Servs. Consortium, Inc. v. Applied Materials, Inc.*, 2007 WL 9701128, at *4 (W.D. Tex. Feb. 16, 2007); *see also FTC v. Staples, Inc.,* 190 F. Supp. 3d 100, 124 (D.D.C. 2016) ("Here, the record evidence shows that large B-to-B customers do not view any alternative sources for bulk procurement of basic office supplies that would retain the current competitive conditions of the market."). Likewise, if products are united by a single use, those products may be grouped together. *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir. 1987) (noting pet products are used by the same customers); *Grinnell*, 384 U.S. at 572 (noting there is "a single use" of all alarm products, "i.e., the protection of property, through a central station that receives signals"). Here, Plaintiff does not allege any reason for grouping products together solely because the products have one overlapping AI. Indeed, if Plaintiff sought to define the market based on a single overarching use or supply chain, like the markets in the cases Plaintiff cites, the market would include ***all*** crop protection products sold through the "traditional distribution channel." ¶¶ 62, 66.

Moreover, Plaintiff completely ignores Defendants' argument that this alternative market cannot account for mixture products. As explained in Defendants' moving brief, many mixture

products include more than one Relevant AI, such that Corteva's Resicore, for example, would fall into both the acetochlor and mesotrione finished product markets. Mem. 48. Plaintiff provides no explanation of how such products should be classified. The fact that Plaintiff's alternative market yields this nonsensical result underscores Plaintiff's failure to account for commercial realities when defining the market. Absent a principled basis for this alternative market, this market should be rejected.

### C. Plaintiff's Federal Antitrust Claims Should Be Dismissed for Failure to Plead Proximate Causation

#### 1. Proximate Causation Is an Essential Element of Plaintiff's Federal Antitrust Claims Seeking Injunctive Relief

Plaintiff acknowledges that "whether a Section 16 plaintiff can sue for injunctive relief depends on whether the plaintiff—or in the case of a sovereign, its citizens—suffered an antitrust injury that was ***proximately caused by the defendant***." Opp. 52; *see*, *e.g.*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132, 135 (2014) (holding that antitrust causes of action "incorporate a requirement of proximate causation," which "must be met in every case").[20] Plaintiff further acknowledges that the governing test of proximate causation is "whether plaintiffs themselves were directly harmed by a defendant's actions or their harm is ***derivative of harm to others***." Opp. 55 (citing *Lexmark*). As shown in Defendants' moving brief (Mem. 56-60), and as further demonstrated below, the amended complaint alleges—at

---

[20] Plaintiff incorrectly insists that "Defendants would like the Court to believe[] that proximate cause and the direct purchaser rule are ***equivalent***." Opp. 54-55. But, as Defendants' moving brief makes clear, the doctrines present "independent obstacles" to antitrust plaintiffs. Mem. 56. Relatedly, Plaintiff claims that Defendants misquote *International Brotherhood. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999). Opp. 56 & n.32. *Teamsters* states: "Multiple rules of antitrust law interdict plaintiffs' efforts to enlist the Sherman Act in their campaign. The most obvious is the direct-purchaser rule," citing *Illinois Brick Co. v. Illinois*, 43 U.S. 720 (1977), and its progeny, and adding at the end of the same discussion that "difficulty in calculating damages because the plaintiff's injury is remote from the antitrust violation is an independent obstacle to recovery," citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). *Teamsters,* 196 F.3d at 823. Thus, Defendants' parenthetical accurately encapsulates *Teamster*'s reasoning concerning an "independent obstacle."

most—only indirect, derivative harm. Thus, Plaintiff fails to satisfy the proximate cause requirement for its federal antitrust claims.

### 2. Plaintiff Concedes, Through Its Silence, That It Has Failed to Plead Harm to State Entities Proximately Caused by Defendants

In their moving brief, Defendants showed that "the claimed injuries to end users (individual farmers and ***state entities***) on whose behalf [Plaintiff] sues are too remote from the alleged restraint of trade to establish proximate causation." Mem. 57. In its opposition, Plaintiff does not—and cannot—contend that it has pleaded facts showing any injury to a state entity that was proximately caused by Defendants' challenged rebates. Indeed, Plaintiff's amended complaint is devoid of allegations of fact regarding ***any*** purchase of crop protection products by a state entity. Therefore, Plaintiff has abandoned any claim for injunctive relief in its proprietary capacity.

### 3. Plaintiff's Opposition Shows That the Alleged Harm to Arkansas Food Consumers Was *Not* Proximately Caused by Defendants

Plaintiff contends that "Defendants' anticompetitive activities have resulted in Arkansas farmers paying inflated prices for crop-protection products, higher prices which are, ***in turn, passed along*** to Arkansas consumers." Opp. 48; *see* ¶ 212 (alleging an "inflated cost to Arkansas farmers—which, ***ultimately***, is ***passed*** to consumers in this State through higher ***affected*** produce costs"). Plaintiff explains that "[a]s a matter of common sense, if farmers pay more to produce their crops, ***consumers pay more*** for their vegetables ***at the supermarket***." Opp. 48; *see also id.* 54 ("Arkansas consumers ***paid more for food*** because it was more expensive for the farmers to produce it.").

The alleged harm to Arkansas food consumers—paying higher prices for food because ***farmers*** allegedly pay inflated prices for ***one of innumerable inputs*** to crop production—is the epitome of "harm [that] is derivative of harm to others," which cannot sustain an antitrust claim,

as opposed to harm directly caused by Defendants' challenged rebates. Opp. 55; *see also, e.g.*, *Kloth v. Microsoft Corp.*, 444 F.3d 312, 323-35 (4th Cir. 2006) (holding that the alleged price increases "passed on" through a distribution chain were not a "direct antitrust-type injury" as required by *AGC*).

Indeed, there are numerous links in the chain of causation between inflated prices for crop protection products allegedly ***charged by Defendants to distributors*** (Mem. 56-59) and inflated prices for food allegedly ***paid by Arkansas consumers at the supermarket***—making causation highly attenuated. Against this backdrop, Plaintiff's insistence that food consumers are "***directly*** injured because they paid more … for food because of Defendants' conspiracy" (Opp. 57) fundamentally mischaracterizes proximate causation. Under Plaintiff's position, a person is "directly" injured by a butterfly flapping its wings if the person is "directly" injured by a tornado that the butterfly allegedly caused. But proximate causation does not focus on the directness of the ***last*** link in the chain to the alleged injury; it focuses on whether there are intervening causal steps between the ***first*** link and the injury.

### 4. Plaintiff's Opposition Confirms That the Alleged Harm to Arkansas Farmers Was *Not* Proximately Caused by Defendants

In its opposition, Plaintiff expressly concedes that "Defendants are ***not*** directly targeting consumers" of their products, but insists that the lack of targeting "is of no moment … because ***the end result*** is to use Arkansas farmers as pawns in [Defendants'] economic chess game with other potential competitors." Opp. 70. Plaintiff's concession is fatal to its argument that it has pleaded harm to Arkansas farmers proximately caused by Defendants' rebates. Under *AGC*, an antitrust plaintiff "must have been the target of the anticompetitive activity, not one who has merely suffered indirect, secondary, or remote injury …." *Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520 (8th Cir. 1992); *accord Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444,

451 (8th Cir. 1985). Likewise, Plaintiff's description of the alleged harm to farmers as "the end result" of Defendants' rivalry with generic manufacturers confirms that the harm is "indirect, secondary [and] remote." *Lovett*, 975 F.2d at 520.

Further, Defendants showed in their moving brief that, as alleged by Plaintiff, the "supracompetitive prices" charged by Defendants were paid directly by ***distributors***, and were passed on by distributors and retailers to end users such as farmers. Mem. 56-59; *see also* ¶ 239 ("Each Defendant's Loyalty Program(s) have resulted in higher prices to retailers and, ***in turn***, to farmers, for crop-protection products containing applicable Relevant AIs than would prevail in competitive markets.").[21] Plaintiff confirms in its opposition that Defendants do not "generally sell directly to farmers, but instead to distributors that in turn sell to retail outlets throughout the country, including in Arkansas." Opp. 6. Thus, the passed on overcharges allegedly paid by farmers are—in Plaintiff's words—"derivative of harm to others," and farmers are not "directly harmed by a defendant's actions." Opp. 55.

Under these circumstances, Plaintiff is not helped by *Ticketmaster*, in which the Eighth Circuit held that plaintiffs who allegedly paid an overcharge ***directly*** to the alleged antitrust violator may pursue injunctive relief. 140 F.3d 1172. Plaintiff advances a sweeping interpretation of dicta in *Ticketmaster*, under which a plaintiff's indirect purchaser status is irrelevant to the availability of injunctive relief. Opp. 51–52. But Plaintiff's interpretation is contrary to *Lexmark*'s holding that all causes of action under the federal antitrust laws "incorporate a requirement of proximate causation." *Lexmark*, 572 U.S. at 132; *see also Apple*

[21] Plaintiff does not dispute that Arkansas "farmers are indirect purchasers" of Defendants' crop protection products. Opp. 49 n.27. This is consistent with Plaintiff's concession that manufacturers of crop protection products sell "to distributors that in turn sell to retail outlets" that in turn sell to farmers (Opp. 6-7), and with the absence of any alleged direct purchasers from Defendants by farmers.

*Inc. v. Pepper,* 139 S. Ct. 1514, 1520 (2019) ("[I]ncorporating principles of proximate cause into § 4, we have ruled that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue."); *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) ("[I]njunctive relief under § 16 of the Clayton Act is … available only to plaintiffs who have suffered an injury cognizable under § 4."). Plaintiff's boundless interpretation of *Ticketmaster* also is contrary to *Ginsburg v. InBev NV/SA*, 623 F.3d 1229 (8th Cir. 2010), in which the Eighth Circuit held that the plaintiffs were not entitled to the injunctive relief at issue—divestiture—substantially because of the remoteness of their alleged injuries in a "three-tier distribution system." Mem. 56 n.31.

#### 5. Plaintiff's Opposition Confirms That the Alleged Harm Is Speculative

Defendants also showed in their moving brief that the alleged overcharges to farmers are speculative, at best—including because, as Plaintiff's allegations show, distributors and retailers have an ***independent*** economic interest to sell Defendants' branded products instead of "lower priced" generic products, even absent rebates. Mem. 33-34, 53, 59–60 (citing ¶¶ 78–79). In its opposition, Plaintiff argues that "the issue is not whether, in the but-for world without Defendants' rebate program, the ***Distributors*** would buy more lower priced generic crop-protection products, the issue is whether ***farmers*** could and would buy lower priced generic products." Opp. 51.

Plaintiff's attempt to shift the focus away from sales to dealers and onto sales to farmers disregards Plaintiff's unequivocal allegations that rebates influence purchases of generic products ***by distributors and retailers***:

- The alleged "critical condition" for receiving rebates is that "***distributors or retailers*** must honor their commitment to exclude or limit ***their purchases*** of comparable generic products for sale to farmers to a set percentage share." ¶ 13; *accord* Opp. 63.

- "Defendants' Loyalty Programs incentivize ***distributors*** to meet applicable loyalty thresholds by ***forgoing or severely limiting purchases*** from generic manufacturers." ¶ 219.

- "Because of Defendants' respective Loyalty Program, ***distributors or retailers have declined to buy*** more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers …." ¶ 227.

- "[I]n the absence of the applicable [rebate programs], generic manufacturers would make significantly ***more sales to distributors or retailers***, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which ***in turn*** would benefit Arkansas farmers." ¶ 228.

Further, Plaintiff acknowledges in its amended complaint that if a dealer sells a generic product instead of a branded product, then the dealer "loses … sales that would count toward its [rebate] payment, ***plus*** the greater profit on the name-brand product." ¶ 79.[22] This "greater profit" on higher-priced products would continue to exist absent the rebates that Plaintiff seeks to eliminate. Under these circumstances, Plaintiff's hypothesis that dealers would sell meaningfully more lower-priced crop protection products absent rebates is speculative. *See*, *e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 492-93 (1968) (holding that the pricing decisions of intermediaries in the supply chain in a "hypothetical" alternative scenario are "virtually unascertainable"). And Plaintiff's argument that the relevant focus should be farmers' purchases rather than distributors' sales emphasizes Defendants' point that generic manufacturers can—and do—sell directly to farmers, including online. Opp. 55 & n.31.

[22] In its opposition, Plaintiff backpedals from these allegations, and argues instead that it is in dealers' economic interest to "participat[e] in the [alleged] conspiracy." Opp. 58.

## IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER STATE LAW

### A. The Arkansas Unfair Practices Act (AUPA) Claim Fails

As demonstrated in Defendants' moving brief, Plaintiff's AUPA Subsection 309 claim fails for at least five reasons. *See* Mem. 60-68.[23] All of Plaintiff's arguments in opposition are unavailing.[24]

#### 1. Subsection 309 Is Limited to Horizontal Agreements, Which Plaintiff Has Not Pleaded

The law in Arkansas has long been settled: Subsection 309 prohibits only ***horizontal*** agreements between competitors. *See Ft. Smith Light & Traction Co. v. Kelley*, 94 Ark. 461, 476, 127 S.W. 975, 982 (1910); *see also* Mem. 61-63. Plaintiff does not dispute that it has failed to allege any horizontal agreement in support of its Subsection 309 claim.

Instead, Plaintiff mischaracterizes *Fort Smith Light & Traction*, and advocates for a "broad" reading of Subsection 309. Opp. 59. Plaintiff's call for a "broad" interpretation is contrary to binding precedent from the Arkansas Supreme Court. *See State v. Frank*, 114 Ark. 47, 169 S.W. 333, 335 (1914) ("In construing this act we must bear in mind that it is highly penal, and as such must receive a strict construction."); *see also Wal-Mart Stores, Inc. v. Am. Drugs, Inc.*, 319 Ark. 214, 219, 891 S.W.2d 30, 34 (1995) (holding that the AUPA "is penal in nature and must be strictly construed in favor of those upon whom the burden of the penalty is sought to be imposed"). As one of the Arkansas Attorney General's predecessors concluded—in

---

[23] Plaintiff implicitly concedes, through its silence, that it does not assert a claim under subsection 310 of the AUPA. Mem. 61 n.35.

[24] Defendants demonstrated that Plaintiff's AUPA claim fails for the additional reason that Subsection 309 requires Plaintiff to define plausible product markets. Mem. 65. Plaintiff does not dispute this requirement, but summarily states that its allegations satisfy this requirement. Opp. 66 n.38. As shown above, however, Plaintiff has not defined plausible product markets. *See supra* Point III.B.

a formal opinion that Plaintiff ignores—Subsection 309 is "an archaic and little-used statute that has been given ***narrow*** applicability by the courts." Op. Ark. Att'y Gen. No. 96-271, at 3 (1996) (citing *Ft. Smith Light & Traction*, *Frank*, and *State ex rel. Means v. Chicago, R. I. & P. Ry.*, 95 Ark. 114, 128 S.W. 555 (1910)).[25]

In resting its "broad" reading of Subsection 309 solely on "the language of the AUPA" (Opp. 59), Plaintiff is, in effect, asking the Court to start from a clean slate. However, Arkansas Supreme Court precedents bind not only the lower Arkansas state courts, but also this Court on issues of state law. *See*, *e.g.*, *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 44 (2018) ("If the relevant state law is established by a decision of the State's highest court, that decision is binding on the federal courts."); *Fidelity Union Tr. Co. v. Field*, 311 U.S. 169, 177 (1940) ("The highest state court is the final authority on state law.").

Plaintiff's interpretation of *Fort Smith Light & Traction* is also untenable. In that case, the Arkansas Supreme Court held that an agreement between a supplier and a distributor of natural gas did ***not*** violate Subsection 309 of the AUPA. *See* 94 Ark. at 477, 127 S.W. at 982. The court rejected the argument that the agreement violated Subsection 309 because it "was a combination to fix the price of natural gas." *Id.* In applying to the challenged agreement "the elements" of the statute's prohibition of "an illegal combination" to fix prices, the court reasoned:

> The anti-trust law of 1905 was to prevent ***a combination among producing competitors*** to fix the prices to the detriment of consumers. ***There was no competition here … between [the distributor] and [the supplier] in the supply of natural gas***. [The distributor] had no natural gas, and the contract was concerning natural gas. The artificial gas that was then being supplied by [the distributor] could not … be brought into competition with natural gas. We find no elements of an unlawful combination to fix the price of natural gas.

---

[25] *Available at* https://ag-opinions.s3.amazonaws.com/uploads/96-271.html.

*Id.* This holding is irreconcilable with Plaintiff's assertion that the decision "had nothing to do with the respective positions of the parties in the supply chain." Opp. 62.[26]

To the contrary, the court's reasoning had everything to do with the parties' respective positions in the supply chain. The court described the statute's prohibition on combinations to fix prices by express reference to (hypothetical) parties at the same level of the supply chain: "producing competitors." Applying that prohibition to the challenged agreement, the court observed that there was "no competition" between the parties "in the supply of natural gas" because the distributor "had no natural gas." 94 Ark. at 477, 127 S.W. at 982. The court even considered that the natural gas distributor occupied a ***different*** position in the supply chain for ***artificial*** gas—that is, a supplier—but rejected the relevance of that position to liability under the statute because artificial gas did not compete with natural gas. *Id.*

Tellingly, Plaintiff does not identify a single case finding that Subsection 309 extends beyond horizontal agreements. Plaintiff instead resorts to a string cite of ***complaints*** demonstrating that other plaintiffs have sought to apply the AUPA ***as a whole*** to conduct other than horizontal agreements to fix prices. Opp. 59 n.35.[27] But ***none*** of the complaints that Plaintiff cites sought specifically to apply Subsection 309 to vertical agreements. And there is ***no*** decision in those cases (or elsewhere) that has applied Subsection 309 to a vertical agreement.[28]

---

[26] Plaintiff's correction that Kelley (the supplier), not the Fort Smith Light & Traction Company (the distributor), "argued that the contract at issue was an anticompetitive restraint on trade" (Opp. 61 n.36) is not material to the Arkansas Supreme Court's holding or Defendants' arguments.

[27] Although Plaintiff characterizes the Second Amended Complaint in *State v. Google* as challenging "Google's price regulation with regard to online advertising" (Opp. 60 n.35), the key allegations in that complaint related to "agreements with horizontal competitors to entrench [Google's] monopoly position." Second Amended Complaint, *State v. Google*, No. 4:20-cv-00957-SDJ (E.D. Tex. Aug. 4, 2021), ECF No. 138, ¶¶ 311, 320.

[28] *See, e.g.*, *In re Google Play Store Antitrust Litig.*, No. 3:21-md-02981-JD (N.D. Cal.) (settlement reached prior to any dispositive decision regarding the AUPA claims); *State v. Google*, No. 4:20-cv-00957-SDJ (E.D. Tex.) (defendant's motion to dismiss remains pending); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*,

### 2. Subsection 309 Is Limited to Agreements That Fix Price or Restrict Output, Which Plaintiff Has Not Pleaded

Plaintiff concedes that the amended complaint fails to plead any illegal price-fixing or output limitation agreement. Opp. 62. As shown in Defendants' moving brief, this failure is independently fatal to Plaintiff's AUPA claim. Mem. 63-65.

Plaintiff argues that Subsection 309 is "decidedly broader" than "express agreements to set a price or output of a product," and that the statute "prohibits any attempts to ***regulate*** the price or amount of product whatsoever." Opp. 62 (emphasis in original). Thus, Plaintiff's argument rests on the term "regulate" in Subsection 309. *See also id.* ("The Complaint Alleges Defendants' Attempt to ***Regulate*** the Price of Their Products and Amount of Generic Products in the Market."); *id.* ("The State's complaint sufficiently alleges Defendants' attempts to create a monopoly through artificial ***regulation*** of the price of their product and the amount of generic product available in the market.").

There are two principal defects in Plaintiff's argument that the statutory term "regulate" saves its claim under Subsection 309. First, Subsection 309 does not prohibit "regulat[ing]" the amount or quantity of a product. Speaking to amount or quantity, Subsection 309 prohibits "agreement[s] … to ***fix or limit*** … the amount or quantity," Ark. Code Ann. § 4-75-309, not "regulat[ing] the … amount of product" (Opp. 62), as Plaintiff misleadingly states. Thus, Plaintiff's theory that Defendants "regulate" the amount or quantity of crop protection products is not cognizable under Subsection 309. And Defendants already have shown that there are no plausible allegations that they have agreed with dealers to "fix or limit" supply. Mem. 63-65.

---

138 F. Supp. 2d 25, 28 (D. Me. 2001) (without analysis of the AUPA claim, holding that the court's decision with respect to the federal law claims was determinative of the state law claims because "defendants do not argue that any different analysis applies to the state law claims").

Second, although Plaintiff's argument turns on "regulate," Plaintiff does not offer any definition of that statutory term.[29] According to the Arkansas Supreme Court, "[t]he word 'regulate' is defined as follows: 'To control (an activity or process) esp. through the implementation of rules.'" *Steve's Auto Ctr. of Conway, Inc. v. Ark. State Police*, 2020 Ark. 58, 6, 592 S.W.3d 695, 699–700 (2020) (quoting *Black's Law Dictionary* 1538 (11th ed. 2019)). Nowhere in its amended complaint does Plaintiff plausibly allege that Defendants impose any form of control (or even influence) over the prices independently set by distributors and retailers to growers—let alone the prices set by growers to consumers. Plaintiff posits that "[i]t is sufficient that Defendants have made [rebate] agreements with the purpose of restricting and/or entirely [sic] generic entrants to the market." Opp. 64. But Plaintiff does not cite any authority for that sweeping, atextual interpretation of Subsection 309, which would condemn business agreements based on their potential effect on prices or quantities, no matter how indirect.

Instead, Plaintiff cites cases, decided under other statutes, that affirmatively undermine its arguments. The Arkansas Supreme Court's decision in *Union Carbide* turned on express price fixing: the manufacturer "***require*[*d*]** all retailers in Arkansas to sell [its antifreeze product] to consumers at the price of $3.75 per gallon." *Union Carbide & Carbon Corp. v. White River Distributors, Inc.*, 224 Ark. 558, 559-60, 275 S.W.2d 455, 456 (1955); *see also id.* at 461 (describing "minimum price maintenance" as "an enforced fixed price") (quoting Report of the FTC on Resale Price Maintenance). As Plaintiff has conceded, express price fixing is absent here. Mem. 63-65; Opp. 62.

[29] Instead, Plaintiff quotes the statute's definition of a monopoly, which neither defines nor uses the term "regulate." Opp. 62-63.

*EpiPen* similarly defeats Plaintiff's argument. In *EpiPen*—a case under Section 2 of the Sherman Act—the Tenth Circuit noted that the appeal presented the ***question*** "***whether*** [a drug manufacturer's] exclusive rebate agreements hurt or threaten to hurt consumers through reduced output or increased prices." *EpiPen*, 44 F.4th at 986. Plaintiff misleadingly suggests that the Tenth Circuit concluded that there was such harm. Opp. 65.[30] To the contrary, the Tenth Circuit held, as noted above, that the challenged rebate "payments exemplified vigorous price competition—something [courts] strenuously protect." 44 F.4th at 1000. Further, the court cautioned that "mistaken inferences in a case driven by price-cutting activities can be especially costly, because they chill the very conduct the antitrust laws are designed to protect: slashing prices." *Id.* (citing *Matsushita*, 475 U.S. at 594). Thus, *In re EpiPen* not only offers no support for Plaintiff's misinterpretation of the AUPA, but further bolsters Defendants' arguments regarding the procompetitive nature of their rebate programs. *See supra* at Point III.A.

#### 3. Defendants Lack the "Predatory Intent to Damage and Destroy Competition" Necessary to Violate Arkansas Law

Plaintiff concedes that predatory intent to damage and destroy competition is necessary to plead a violation of Subsection 309 of the AUPA. Opp. 65. Plaintiff also does not dispute that the essential element of predatory intent is informed by the distinction between "permit[ting] vigorous price competition" and "protect[ing] firms from losing profits due to competition." *See Ports Petrol. Co. of Ohio v. Tucker*, 323 Ark. 680, 689, 916 S.W.2d 749, 754 (1996). Nor does Plaintiff contest that "vigorous price competition" falls within the "broad" common law privilege

[30] Plaintiff also misleadingly suggests that *EpiPen* stands for the proposition that market share rebates are an attempt to "regulate" prices and quantities. Opp. 64-65. But the Tenth Circuit's decision does not speak to that issue, or even use the term "regulate."

to compete. *See*, *e.g.*, *Acre v. Spindletop Oil & Gas Co.*, 2009 WL 4016116, at *5 (E.D. Ark. Nov. 18, 2009).

To attempt to plead "predation," Plaintiff relies on a handful of quotations, allegedly from Defendants' internal documents, that Plaintiff characterizes as demonstrating predatory intent to harm competition. Opp. 65-66. But comments about preventing deterioration of "value" (¶ 176) or "defend[ing] … market share position" (¶ 90) go no farther than demonstrating "vigorous price competition," well within Defendants' privilege to compete. *See Ports Petrol. Co. of Ohio*, 323 Ark. at 689, 916 S.W.2d at 754. Similarly, statements referencing "keep the channel locked up" (¶ 176), "push them out" (¶ 176), or "[r]eward Retailers for their support … where a generic alternative exists" (¶ 90) at most demonstrate Defendants' awareness of its ***competitors***, but cannot plausibly support an inference that Defendants sought to harm ***competition***. The Arkansas Supreme Court observed in a case cited by Plaintiff itself that "legitimate competition … often doe[s] result in economic injury to ***competitors***." *Wal-Mart Stores, Inc.*, 319 Ark. at 223, 891 S.W.2d at 35-36 .[31] But injury to competitors is distinct from injury to competition, as the Arkansas Supreme Court recognized when it concluded that Wal-Mart had not "crossed the line with regard to predatory prices and purposeful destruction of ***competition***." *Id.* Similarly, here, Plaintiff's allegations do not support the conclusion that Defendants acted with predatory intent. Rather, Plaintiff's allegations more plausibly support a more innocuous and unsurprising conclusion: that Defendants have competitors in the crop

[31] The Arkansas Supreme Court held that even loss-leader strategies—which are not alleged here—are "readily justifiable as a tool to foster competition and to gain a competitive edge as opposed to simply being viewed as a stratagem to eliminate rivals altogether." *Wal-Mart Stores, Inc.*, 319 Ark. at 225, 891 S.W.2d at 35. Plaintiff admits that it does not—and cannot—allege that Defendants acted "to eliminate rivals altogether," and instead, acknowledges that "Arkansas has never alleged that Defendants completely eliminated generic competition." Opp. 55 n.31.

protection product business (*see*, *e.g.*, ¶ 49), and that they vigorously compete against those competitors (*see*, *e.g.*, ¶¶ 90, 176).

Under these circumstances, Plaintiff falls short of meeting its "burden" of pleading predation. *Henry*, 809 F.2d at 1345-46. Although cited by Plaintiff, *Henry*—like *Wal-Mart*—illustrates why Plaintiff has not pleaded anticompetitive predation. In *Henry*, the Eighth Circuit approvingly recognized the then-"growing consensus … that the issue of 'predatory intent' should focus on what the defendant did and on whether it could lead to the evil feared, ***since non-predatory price cuts are to be encouraged under the antitrust laws***." *Id.* at 1344 ("This Court is among those that have recognized the hazards of using evidence of desire to prevail competitively to forecast economic harm. Even in the presence of direct evidence of intent, we think a separate showing of predatory or anticompetitive conduct is necessary. Evidence of intent alone can be ambiguous or misleading.") Therefore, the Eighth Circuit held that "prices above average total cost are legal *per se*"; there is a presumption, rebuttable by plaintiffs, that prices below average total cost but above average variable cost are legal; and there is a presumption, rebuttable by defendants, that prices below average variable cost are illegal. *Id.* at 1346; *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) (holding, in case challenging rebates, that one "prerequisite" to liability for anticompetitive predation was proof that the alleged predator's prices were below an appropriate measure of costs). Here, Plaintiff does not—and cannot—allege that Defendants' prices net of rebates are below cost. Mem. 31.

#### 4. Defendants' Alleged Conduct Does Not Exceed the Defendants' Common Law Privilege to Compete

Plaintiff concedes that Defendants enjoy a common law privilege to compete. Opp. 65. Consistent with this common law privilege, a defendant "may cut rates or prices, allow discounts

or rebates … or even refuse to deal with third parties unless they cease dealing with the [competitor], all without incurring liability." *Acre*, 2009 WL 4016116, at *5. As Defendants demonstrated in their moving brief, Defendants' rebates are the "essence of competition" because they offer distributors and retailers lower prices as an incentive for buying more of Defendants' crop protection products. Mem. 66-67. In opposition, Plaintiff does not cite a single case showing that competitive price-cutting is not squarely within Defendants' common law right to compete.

## B. The Arkansas Deceptive Trade Practices Act Claim Fails

The law as set forth by this Court and the Arkansas Supreme Court is clear: claims under the ADTPA[32] "***must allege*** … a ***deceptive*** consumer-oriented act or practice which is ***misleading in a material respect***." *Parnell v. FanDuel, Inc.*, 2019 Ark. 412, 4, 591 S.W.3d 315, 318 (2019) (citing *Skalla v. Canepari*, 2013 Ark. 415, 14, 430 S.W.3d 72, 82 (2013)); *accord Dickinson v. SunTrust Mortg. Inc.*, 2015 WL 1868827, at *1-2 (E.D. Ark. Apr. 23, 2015) (Miller, J.). Ignoring this precedent, Plaintiff argues that because the ADTPA is afforded a "liberal construction," it extends to any violation of a statute or "improper exploitation of economic leverage," both of which Plaintiff claims to have alleged here. Opp. 67. Plaintiff's reading of the ADTPA is incorrect, but more significantly, Plaintiff does not even attempt to argue that the conduct alleged in the Complaint qualifies as deceptive or materially misleading.[33] Because

---

[32] Ark. Code Ann. § 4-88-107 *et seq.*

[33] Plaintiff points only to conclusory allegations that Defendants "engage[d] in unconscionable, false, and deceptive acts" and "unconscionable and deceptive acts" (¶¶ 319, 322), but Plaintiff offers no explanation of how the conduct alleged is false or deceptive. Opp. 68. These recitations of legal conclusions unsupported by factual allegations are insufficient to withstand a motion to dismiss. *See Everett v. Dykes,* 2021 WL 4148068, at *2 (E.D. Ark. Sept. 13, 2021) (citing *Iqbal*, 556 U.S. at 678-79; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiff does not meaningfully argue that it has alleged any deceptive or misleading acts, its ADTPA claim should be dismissed.

Plaintiff insists that any statutory violation qualifies as an ADTPA violation, relying primarily on *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006). Opp. 67. But Plaintiff omits that the cited portion of *Baptist Health* merely quotes the observation of a lower court, which the Arkansas Supreme Court found not to be "clearly erroneous." *Id.* at 811. Plaintiff offers no authority suggesting that violations of the antitrust statutes at issue here automatically violate the ADTPA. For example, Plaintiff identifies two cases finding that violations of Act 900 (Ark. Code Ann. § 17-92-507) violated the ADTPA, but Act 900 itself provides that "failure to follow the law is a deceptive and unconscionable trade practice under the ADTPA." *Lackie Drug Store, Inc. v. Ark. CVS Pharmacy, LLC*, 2022 WL 16635130, at *4 (E.D. Ark. Nov. 2, 2022); *see also Allcare Specialty Pharmacy, LLC v. OptumRX, Inc.*, 2017 WL 5571356, at *5 (E.D. Ark. Apr. 6, 2017) (citing Ark. Code. Ann. § 17-92-507(g)(1)).

By contrast, federal courts regularly conclude that "the ADTPA does not extend to the monopoly and price inflation claims" before them. *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2015) (collecting cases); *see also, e.g.*, *In re HIV Antitrust Litig.*, 2022 WL 22609107, at *17 (N.D. Cal. Sept. 27, 2022) (finding price-fixing allegations did not qualify as unconscionable under the ADTPA). In any event, because Plaintiff fails to state a claim under any statute for the reasons explained above, it cannot state a claim under the ADTPA.

Plaintiff's argument that any improper exploitation of economic leverage violates the ADTPA lacks merit. The Arkansas Supreme Court has never endorsed this standard; in fact, the Arkansas Supreme Court has acknowledged only that the statute prohibits unconscionable

conduct. In one case, the Arkansas Supreme Court interpreted the term "unconscionable" in light of Arkansas contract law, considering "whether there is a gross inequality of bargaining power between the parties to [a] contract and whether the aggrieved party was made aware of and comprehended the provision in question." *State ex rel. Bryant v. R & A Inv. Co., Inc.*, 336 Ark. 289, 296, 985 S.W. 2d 299, 303 (1999). In another, the Arkansas Supreme Court upheld a lower court's decision finding the defendant's conduct unconscionable where the conduct "would reduce the number of available beds for treatment of Plaintiffs' patients, with the inevitable consequence that it will from time to time happen in a ***critical life-or-death situation***." *Baptist Health*, 365 Ark. at 128, 226 S.W.3d at 128. Neither circumstance applies here. Plaintiff does not allege that farmers are a party to the challenged agreements; rather, Plaintiff alleges that distributors are parties to the agreements and, far from being unfairly exploited, willingly benefit from and participate in the alleged scheme. Opp. 11 n.6 (citing ¶ 17 n.12). Moreover, Plaintiff nowhere alleges (nor could it) that the alleged supracompetitive prices for crop-protection products implicate "critical life-or-death situation[s]." As this Court has aptly observed, "[t]he phrase 'unconscionable, false, or deceptive' used in subsection (a)(10) of section 4-88-107 cannot be converted into a general reference to any unlawful conduct." *Dickinson*, 2015 WL 1868827, at *2. Plaintiff's attempt to so expand the ADTPA here should not be countenanced.[34]

Lastly, Plaintiff argues that the alleged conduct is sufficiently consumer-oriented to state a claim under the ADTPA. Plaintiff analogizes to *Baptist Health*, asserting that, because *Baptist Health* refused to dismiss claims involving conduct between doctors and a hospital indirectly

---

[34] Plaintiff's prisoner cases involved an element of exploitation critical to the unconscionability inquiry. In *Antoon*, the court allowed plaintiff prisoners to proceed with a claim under § 4-88-107(a)(8) on the theory that incarceration was an "incapacitating condition" "tak[en] advantage of" by defendant. *Antoon v. Securus Techs., Inc.*, 2017 WL 2124466, at *7 (W.D. Ark. May 15, 2017). The same is true of *Jacobs*, which also permitted claims by prisoners to proceed under section 107(a)(8). *See Jacobs v. Global Tel*Link Corp.*, 2016 WL 5953128, at *7 n.1 (W.D. Ark. May 17, 2016).

affecting consumers, Plaintiff's claim should survive as well. Opp. 69-70. Again, Plaintiff's reliance on *Baptist Health* is misplaced. *Baptist Health* did not consider whether the conduct at issue was consumer-oriented; it only considered whether the conduct was unconscionable. 365 Ark. at 810-12, 226 S.W.3d at 128-29. And even if *Baptist Health* had addressed the issue, its facts are inapposite. There, the patients still had a direct relationship with the defendant's hospitals—indeed, as noted above, the gravamen of the alleged harm was that patients would lose access to beds in the defendant's hospitals. *Id.* at 811.[35] The alleged harm here is closer to that asserted in *London Luxury*, where the plaintiff alleged that the conduct "deprived the consuming public of London Luxury's gloves." *London Luxury, LLC v. Walmart, Inc.*, 2024 WL 1025125, at *22 (W.D. Ark. Mar. 8, 2024). As in *London Luxury*, Plaintiff's claim that "Defendants effectively pay distributors or retailers to restrict farmers' access to lower-priced generic products" (¶ 3) reflects a "strained interpretation of consumer-oriented acts" and is not actionable under the ADTPA. 2024 WL 1025125, at *22.

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed in its entirety, with prejudice, as to each Defendant.

[35] The relationship was sufficiently close that, in seeking dismissal of tortious interference claims, the defendant invoked the "stranger doctrine," *id.* at 807-08, whereby the defendant "specifically maintain[ed] that it [wa]s not a stranger to the interwoven relationship whereby a Plaintiff would treat a patient at a Baptist facility." *Baptist Health v. Murphy*, 2010 Ark. 358, 18, 373 S.W.3d 269, 283 (2010).

Date: June 7, 2024

KUTAK ROCK LLP

/s/ Andrew King
Andrew King, Ark. Bar No. 2007176
McKenzie L. Raub, Ark. Bar No. 2019142
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201-3706
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
andrew.king@kutakrock.com
mckenzie.raub@kutakrock.com

Paul S. Mishkin
paul.mishkin@davispolk.com
David B. Toscano
david.toscano@davispolk.com
Daniel J. Thomson
daniel.thomson@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Telephone: (212) 450-4292
Facsimile: (212) 701-5292

*Attorneys for Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC*

QUATTLEBAUM, GROOMS & TULL PLLC

/s/ Steven W. Quattlebaum

Steven W. Quattlebaum, Ark. Bar No. 84127
John E. Tull III, Ark. Bar No. 84150
Laura L. O'Hara, Ark. Bar No. 2021150
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
squattlebaum@qgtlaw.com
jtull@qgtlaw.com
lohara@qgtlaw.com

David R. Marriott
dmarriott@cravath.com
Margaret T. Segall
msegall@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Defendant Corteva, Inc.*