IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

STATE OF ARKANSAS, *ex rel.*                                    PLAINTIFF
TIM GRIFFIN, ATTORNEY GENERAL

v.                          CASE NO. 4:22-CV-01287-BSM

SYNGENTA CROP PROTECTION AG, *et al.*                   DEFENDANTS

## ORDER

Defendants' motion to dismiss [Doc. No. 81] the amended complaint is denied, and

their first motion to dismiss [Doc. No. 69] is denied as moot.

## I. BACKGROUND

The State of Arkansas ("State") is suing Syngenta Crop Protection AG, Syngenta

Corporation, Syngenta Crop Protection, LLC, (collectively, "Syngenta") and Corteva, Inc.,

alleging that their loyalty programs for their crop-protection products violate federal and state

antitrust and consumer-protection laws.  The facts viewed in the light most favorable to the

State are as follows.

A.      Crop Protection Industry

The Syngenta Group is a global company based in Switzerland.  First Am. Compl. ¶

25, Doc. No. 72 ("Compl.").    Defendants Syngenta Crop Protection AG, Syngenta

Corporation, and Syngenta Crop Protection, LLC are each part of the Syngenta Group.  *Id.*

Syngenta Crop Protection AG is a Swiss public limited company based in Basel, Switzerland

with North American headquarters in Greensboro, North Carolina; Syngenta Corporation is

a corporate affiliate of Syngenta Crop Protection AG organized under Delaware law with

headquarters in Wilmington, Delaware; and Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG, organized under Delaware law with headquarters in Greensboro, North Carolina. *Id.* ¶ 22–24. Syngenta Crop Protection, LLC is licensed to do business in Arkansas and is in "good standing" with the Secretary of State. *Id.* ¶ 24. The Syngenta Group does business as a part of a single enterprise, both structurally and operationally. *Id.* ¶ 25. The companies that are part of the Syngenta Group, share a name, a common logo, a common website, and utilize a common market strategy. *Id.* ¶ 28. Links between the affiliates are evidenced by the president of Syngenta Crop Protection, LLC, publicly displaying that he works for Syngenta Crop Protection B.V., a Dutch entity, multiple job listings in Arkansas stating that Syngenta Crop Protection is headquartered in Switzerland, and one person being listed as a corporate contact for three Syngenta affiliates. Compl. ¶¶ 29–31.

Corteva, Inc. is a publicly held, for-profit corporation organized under the laws of Delaware and headquartered in Indianapolis, Indiana. *Id.* ¶ 34. Corteva is registered to conduct business in Arkansas and is in "good standing" with the Secretary of State. *Id.*

Syngenta and Corteva (collectively, "defendants") manufacture crop-protection products, commonly referred to as "pesticides" that repel, destroy, or control pests or regulate plant growth. *Id.* ¶¶ 3, 40. Crop-protection products contain at least one active ingredient. *Id.* ¶ 44. Each active ingredient is distinguishable from the other by the type of pest it is targeted to treat, its effectiveness at controlling the pest, the crops for which it is suited, the stage cycle at which it can be used, and its performance. *Id.* ¶ 46. These differences are why

2

one active ingredient may not be readily interchangeable with another. Compl. ¶ 47.

The crop-protection industry has traditionally been divided into "basic" manufacturers who research, develop, patent, market, and sell new active ingredients and "generic" manufacturers who market and sell generic products with the same active ingredients. *Id.* ¶ 49. Basic manufacturers are required by the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) to register newly developed crop-protection products with the U.S. Environmental Protection Agency. *Id.* ¶ 54. FIRFA also provides the developer with a ten-year exclusive period. *Id.* Once the ten-year period is up, generic manufacturers may enter the market and use the basic manufacturer's research and data to make crop-protection products with the same active ingredients which are generally sold at a much lower price than the non-generic product. *Id.* ¶¶ 55, 67. Defendants are two of the largest basic crop-protection manufacturers. Compl. ¶ 50.

Traditionally, manufacturers sell crop-protection products to distributors, who then sell to retailers, who then sell to farmers. *Id.* ¶ 59. The seven largest crop-protection distributors in the United States account for over 90% of sales through the traditional channel. *Id.* ¶¶ 63–64. The State alleges that selling through distributors is the most efficient way for crop-protection products to reach farmers. *Id.* ¶ 66. It also alleges that selling directly from manufacturer to retailers or farmers does not allow for meaningful competition. *Id.*

3

B.    <u>Loyalty Programs</u>

The State alleges that each defendant operates loyalty programs that are designed to hinder the ability of competing generic manufacturers from entering the market and therefore limit Arkansas farmers' access to more affordable generic crop-protection products. *Id.* ¶ 72. Under the programs, defendants offer payments to distributors or retailers conditioned on the distributor or retailer limiting its purchase of generic crop-protection products with specific active ingredients. *Id.* ¶ 73. The amount of generic product a retailer or distributor is allowed to sell and still get the loyalty payment is referred to as "open space." Compl. ¶ 76. Defendants allow, at most, 15% open space for any given active ingredient generic equivalent. *Id.* The State claims that due to these programs, retailers and distributors are incentivized to sell less of a generic product because selling more will decrease or eliminate their loyalty payment. *Id.* ¶ 77. Defendants ordinarily add active ingredients to their respective loyalty program upon the expiration of FIRFA exclusivity. *Id.* ¶ 80.

Syngenta's loyalty program is known as "Key AI" and is operated through written marketing agreements with distributors. *Id.* ¶¶ 83, 85. Loyalty performance is calculated by dividing the amount of relevant active ingredients contained in products purchased or sold by a distributor, including Syngenta products and certain non-Syngenta products for which the relevant active ingredient is sourced from Syngenta, by the same number plus the amount of non-Syngenta relevant active ingredient purchased or sold by distributors. *Id.* ¶ 87. To qualify for a payment for a given relevant active ingredient, a distributor must source a certain percent of its purchases from Syngenta rather than from other manufacturers. *Id.* ¶

86.  If a distributor meets the threshold required for the specific relevant active ingredient, it will be eligible for a special marketing bonus.  Compl. ¶ 88.  If the threshold is not met, the distributor stands to lose the payment entirely.  *Id.*  A similar program is offered by Syngenta for retailers.  *Id.* ¶¶ 90–91.

Corteva operates two loyalty programs. First, Corteva operates the Crops, Range & Pasture and Industrial Vegetation Management Loyalty Program (CRPIVM).  *Id.* ¶ 93.  This program is implemented through written agreements with distributors.  *Id.*  To qualify for a payment for a given relevant active ingredient under CRPIVM, a distributor must source a certain percentage of its purchases of a relevant active ingredient from Corteva.  *Id.* ¶ 95.  The distributor must reach the minimum threshold to receive a payment and may reap a larger payment for meeting a second higher threshold.  Compl. ¶ 95.  Second, Corteva operates the Corporate Distributor Offer which permits distributors to accept offers by performance.  *Id.* ¶ 93.  Under both programs, a distributor's loyalty is calculated by measuring the distributor's purchases of the relevant active ingredient from Corteva as a percentage of the distributor's total purchases of the relevant active ingredient.  *Id.* ¶ 96.

Most leading distributors and retailers enter into Loyalty Program agreements with defendants.  *Id.* ¶ 102.  Due to this, distributors and retailers are given increased confidence that no significant competing distributor or retailer will undercut them by partnering with a generic manufacturer.  *Id.*  Corteva has, for example, assured distributors that all channel partners are adhering and have adopted the defense strategy: if "we stay together we won't fail."  *Id.* ¶ 103.

5

The State focuses on three active ingredients from Syngenta: (1) azoxystrobin, (2) mesotrione, and (3) metolachlor. Compl. ¶ 110. Azoxystrobin's relevant patent and FIFRA exclusive period expired no later than 2014, around the same time it was added to the loyalty program. *Id.* ¶¶ 112, 115. The loyalty threshold for azoxystrobin is currently 92%. *Id.* ¶ 116. Mesotrione's exclusive period expired no later than 2014, around the same time it was added to the loyalty program. *Id.* ¶¶ 123, 126. The loyalty threshold for mesotrione is currently 92%. *Id.* ¶ 126. Metolachlor's relevant patent and FIFRA period expired no later than 2010, and it was added to the loyalty program in the early 2000s. *Id.* ¶¶ 137, 140. The loyalty threshold for metolachlor is 90%. Compl. ¶ 140. In order to meet this loyalty threshold and get a payment for each of these active ingredients, the State alleges that distributors strictly manage purchases from generic manufacturers. *Id.* ¶¶ 118, 129, 143.

The State further alleges that generic manufacturers have attempted to enter the market but have had no success because distributors would not purchase the generic, due to Syngenta's Key AI program. As to azoxystrobin, at least two generic manufacturers have exited the market entirely and another has been hindered in its attempt to market an innovative product. *Id.* ¶¶ 119–20. As to mesotrione, two generic manufacturers have delayed or terminated their planned entry into the market and another quickly left the market after entering. *Id.* ¶¶ 128, 130. As to metolachlor, a generic manufacturer thwarted its attempt to innovate a product due to fear of not being able to gain market share and other generic manufacturers that introduced products were unable to achieve significant market

success.  *Id.* ¶ 144–45.  These practices have resulted in Arkansas farmers having to pay higher prices for crop-protection products.  *Id.* ¶ 121, 131, 146.

The State focuses on three active ingredients from Corteva: (1) rimsulfuron, (2) oxamyl, and (3) acetochlor.  Compl. ¶ 149.  Rimsulfuron's patent and FIFRA exclusive period expired no later than 2007 and it was added to the loyalty program in 2017-2018.  *Id.* ¶¶ 151, 155.  Oxamyl's exclusive period ended no later than 1987 and it was added to the loyalty program in 2017.  *Id.* ¶¶ 163, 166.  Acetochlor's exclusive period ended no later than 2007 and it was added to the loyalty program in 2016-2017.  *Id.* ¶¶ 173, 177.  The loyalty threshold for each of Corteva's active ingredients is at least 85%.  *Id.* ¶ 95.

The State alleges that due to the loyalty programs, distributors carefully managed and allocated their purchases and sales of the generic versions of the active ingredient in order to get the loyalty payment.  *Id.* ¶¶ 159, 168, 178.  Further, the State alleges that generic manufacturers have attempered to enter the market but have not been successful due to Corteva's loyalty programs.  As to rimsulfuron, at least one generic manufacturer withdrew its product and others have canceled or deferred entry plans despite requests by farmers for lower-priced generic products.  *Id.* ¶ 160.  As to oxamyl, generic manufacturers have been eliminated from the market due to the implementation of the loyalty program.  Compl. ¶ 167.  As to acetochlor, generic manufacturers have been substantially impeded from providing effective competition.  *Id.* ¶ 178.

The complaint further alleges that Syngenta and Corteva entered into an agreement to not produce each other's active ingredients and would instead supply them for one another.

7

*Id.* ¶ 183.  This is allegedly to prevent other generic manufacturers from providing Syngenta or Corteva with the other's active ingredients at a lower price.  *Id.*

    C.    <u>Market Power</u>

The State alleges that Syngenta has a monopoly and market power as to azoxystrobin, mesotrione, and metolachlor and that Corteva has a monopoly and market power as to rimsulfuron and oxamyl, and market power as to acetochlor.  *Id.* ¶¶ 187–88.  The State alleges two relevant product markets.

First, a relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States; and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States.  *Id.* ¶ 196.

Second, a relevant product market also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.  *Id.* ¶.  Each relevant active ingredient works better under certain conditions and has characteristics that differentiate it from the other.  Compl. ¶ 198.  Thus, each relevant active ingredient is not reasonably interchangeable with other products that kill or control the same pests.  *Id.*  For this reason, the State alleges there is no cross-elasticity of demand between relevant active ingredients and other active ingredients with a similar purpose based on price point.  *Id.* ¶ 199.  Absent defendants' loyalty programs, unconstrained competition would have the effect of lowering the prices of crop-protection products.  *Id.* ¶ 201.

Syngenta has maintained a market share exceeding 70% every year since 2017 for azoxystrobin, mesotrione, and metolachlor. *Id.* ¶ 205. Corteva has maintained a market share exceeding 70% every year since 2017 for rimsulfuron and oxamyl and a share exceeding 40% for acetochlor. *Id.* ¶¶ 206–07.

D.     Consumer Harm

The State contends that the loyalty programs cause anti-competitive harm by foreclosing generic competitors from the market. Compl. ¶ 208. This is because generic manufacturers are almost entirely unable to utilize the traditional distribution channel, in which over 90% of all crop-protection products are sold. *Id.* ¶¶ 215–16. While distributors are not required to join defendants' loyalty programs, the prospect of receiving payment serves as sufficient incentive to participate. *Id.* ¶ 218. Defendants allegedly retaliate or threaten to retaliate if distributors do not meet the required loyalty threshold. *Id.* ¶ 209. According to a generic manufacturer, the dynamic of defendants' loyalty programs is so well known in the industry that it is futile to even approach a large distributor. *Id.* ¶ 227. The State alleges that in the absence of defendants' loyalty programs, generic manufacturers would make significantly more sales and exceed the open space allowed by the programs. *Id.* ¶¶ 228–29.

Further, the State contends that defendants' loyalty programs have prevented, delayed, and diminished the entry and expansion of crop-protection products made by generic manufacturers and have caused the exit of generic products. Compl. ¶ 231. In some cases, the loyalty programs have caused already competing generic manufacturers to completely

stop offering products.  *Id.* ¶ 233.  Defendants' loyalty programs have also reduced the incentive of generic manufacturers to bring new crop-protection products to the market, harming innovation and restricting consumer choice.  *Id.* ¶ 235.  Finally, defendants' loyalty programs have resulted in higher prices, and the State claims that defendants' internal study shows that the loyalty programs have curtailed the entry of generic products and sustained higher prices than would otherwise prevail.  *Id.* ¶¶ 239, 244.

E.    Arkansas Specific Business Transactions

Defendants are active members of the Arkansas Crop Protection Association (ACPA), a company that monitors the Arkansas state legislature for legislation that may impact the crop-protection industry.  *Id.* ¶¶ 256–57.  Defendants had representatives who were members of the Arkansas Crop Management Conference Program Committee and hosted sessions to inform Arkansas crop-protection consumers about updates to their products.  *Id.* ¶¶ 258–60. Defendants have employees located in Arkansas.  Compl. ¶¶ 263–65.  Corteva has a research facility in West Memphis, Arkansas, and Syngenta previously owned a site in Bay, Arkansas. *Id.* ¶¶ 266, 279.  Defendants have registered, sold, and promoted products with all relevant active ingredients in Arkansas.  *Id.* ¶ 270.

After defendants moved to dismiss, the State amended its complaint, rendering the first motion to dismiss moot.  *See Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 956 (8th Cir. 2002).  Defendants now move to dismiss the amended complaint.

## II.  LEGAL STANDARDS

A.    Motion to Dismiss under Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) permits dismissal when there is a lack of personal jurisdiction. Personal jurisdiction may be exercised over foreign defendants to the extent authorized by the Due Process Clause and the forum's long-arm statute. *Morris v. Barkbuster, Inc*., 923 F.2d 1277, 1280 (8th Cir. 1991).  The Arkansas long-arm statute confers jurisdiction to the fullest constitutional limit, making the inquiry whether exercise of jurisdiction would comport with due process. *See Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008); *see also* Ark. Code Ann. § 16-4-101.  Exercise of personal jurisdiction is proper so long as defendants have minimum contacts with Arkansas so as not to offend traditional notions of fair play and substantial justice. *Anderson v. Dassault Aviation*, 361 F.3d 449, 451 (8th Cir. 2004).  The minimum contacts inquiry focuses on the defendants' acts and whether they purposely availed themselves "of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  The Eighth Circuit has instructed courts to consider the following factors when resolving a personal jurisdiction inquiry, affording the first three primary importance: (1) the nature and quality of the defendant's contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interests of the forum state in providing a forum for its residents; and (5) the convenience of the parties.  *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd*., 89 F.3d 519, 522–23 (8th Cir. 1996).

11

Alternatively, in antitrust cases, section 12 of the Clayton Act provides that all process may be served in any district where venue is proper. *See* 15 U.S.C. § 22; *see also Bruner v. Republic Acceptance Corp.,* 191 F. Supp. 200, 203 (E.D. Ark. 1961).

B.    Motion to Dismiss under 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) permits dismissal when venue is improper. Venue is typically governed by 28 U.S.C. section 1391. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). For venue to be proper it must fall into one of the three categories set out in section 1391(b) or be subject to a special venue provision. *Id.* at 56. Section 1391(b) provides that venue is proper in (1) a judicial district where any defendant resides, if all defendants are residents of the State where the district is located; (2) a judicial district where a substantial part of the events or omissions giving rise to the claim occurred; or (3) if there is no district where any action may otherwise be brought, any judicial district in which any defendant is subject to personal jurisdiction. If the case falls into one of those categories or is authorized by another statute then venue is proper. If not, the case must be dismissed or transferred. *Id.*; 28 U.S.C. § 1406(a).

Section 12 of the Clayton Act has a special venue clause that deems venue proper in antitrust proceedings against corporations in any district where the corporation is an inhabitant or where it is found to transact business. 15 U.S.C. § 22. The phrase "transacts business" has been construed broadly for the purpose of establishing venue, and means to carry on business of any substantial character. *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948).

12

C.    Motion to Dismiss under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when the plaintiff fails to

state a claim upon which relief may be granted.  To meet the 12(b)(6) standard, a complaint

must allege sufficient facts to entitle the plaintiff to the relief sought. *See Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  Although detailed factual allegations are not required, threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, are

insufficient. *Id.* In ruling on a 12(b)(6) motion to dismiss, materials embraced by the

pleadings, as well as exhibits attached to the pleadings and matters of public record, may all

be considered.  *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010).

### III. DISCUSSION

Defendants' motion to dismiss is denied.  Defendants move to dismiss alleging

plaintiff failed to: (1) allege personal jurisdiction; (2) allege that venue is proper in the

Eastern District of Arkansas; (3) state a claim under federal antitrust law; and (4) state a

claim under either the Arkansas Unfair Practices Act or the Arkansas Deceptive Trade

Practices Act.

A.    Personal Jurisdiction and Venue Under the Clayton Act

The motion to dismiss for lack for personal jurisdiction over Syngenta Crop Protection

AG, Syngenta Corporation, and Coretva, Inc is denied because jurisdiction is proper under

the Clayton Act.  To avail itself of the personal jurisdiction clause under section 12 of the

Clayton Act, 15 U.S.C. section 22, the State must first satisfy the statute's venue clause.

*Bruner*, 191 F. Supp. at 203.

13

*1. Venue Clause*

The motion to dismiss is denied because venue is proper under section 12 of the Clayton Act. Syngenta argues that venue is improper for two reasons. First, section 12 does not apply to Syngenta Crop Protection, LLC because it is not a corporation. Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. at 12–13, Doc. No. 82 ("Defs.' Br."). Second, section 12 does not apply to the other Syngenta defendants because they do not transact business in the Eastern District of Arkansas and Syngenta Crop Protection, LLC's contacts cannot be imputed to them. *Id.* at 13–15.

In support of the first argument, Syngenta cites a stack of district court cases and a Third Circuit opinion that strictly interpret section 12 to apply only to corporations. *See San Francisco Comprehensive Tours, LLC v. Tripadvisor, LLC*, No. 2:20-cv-02117, 2021 WL 4394253, at *5 (D. Nev. Sept. 24, 2021) (collecting cases). If this view were adopted, the State would be precluded from relying on section 12 to assert venue over Syngenta Crop Protection, LLC. There are, however, courts that have applied section 12 to other corporate-like entities. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 321 n.5 (S.D.N.Y. 2021) (the court assumes that section 12 can serve as a basis for jurisdiction over defendant even though it is an LLC rather than a corporation); *Budicak, Inc. v. Lansing Trade Grp., LLC*, No. 2:19-CV-2449-JAR-ADM, 2020 WL 758801, at *3 (D. Kan. Feb. 14, 2020) (applies section 12 to LLC defendant). Although these cases are informative, it is not necessary to analyze them now because, as explained below, venue and

14

personal jurisdiction are proper as to Syngenta Crop Protection, LLC under 28 U.S.C. section 1391(b) and the Arkansas long-arm statute.

As for Syngenta's second argument, "transacts business" means carrying on business of any substantial character, and Syngenta Crop Protection, LLC's business contacts cannot be imputed to the other Syngenta defendants. *Scophony Corp. of Am.*, 333 U.S. at 807. When "venue is asserted over a parent corporation on the basis of a subsidiary's business activities, the question is whether the parent exercises sufficient control over its subsidiary to cause the parent to transact business in the judicial district." *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1173 (8th Cir. 1998) (cleaned up). There is no certain degree of control required, but there must be more than mere investment. *Id.* It is sufficient that the parent has continuing supervision of, and intervention in, the subsidiary's affairs, especially if the parent exercises its ability to influence major decisions of the subsidiary which could lead to violations of the antitrust laws. *Id.*

The State alleges that all defendants are active corporate sustaining members of the Arkansas Crop Protection Association which is headquartered in Little Rock and that they each have employees who are members of the Arkansas Crop Management Conference Program Committee. Compl. ¶¶ 255, 257–59. The State further alleges that all defendants have employees in the Eastern District of Arkansas and Corteva has a research station in West Memphis, Arkansas. *Id.* ¶¶ 263–66. Finally, the State alleges that defendants have registered, sold, and promoted products with the relevant active ingredients in the Eastern District of Arkansas. *Id.* ¶¶ 270–82.

15

Syngenta's primary response is an affidavit by Cheryl Quain which states that Syngenta Corporation and Syngenta Crop Protection AG have not maintained any business operations in Arkansas, have no employees based in Arkansas, are not hiring in Arkansas, and have registered no products in Arkansas.  Defs.' Mot. Dismiss Am. Compl., Ex. 17, Declaration of Cheryl Quain ¶¶ 4–6, 8, Doc. No. 81 ("MTD").  In its response, however, the State submits job listings in Arkansas for Syngenta Corporation as well as "Syngenta" generally.  Resp. Exs. 6–7, Job Listings.  Further, taking the complaint as true and viewing disputes in the light most favorable to the State; the State plausibly alleges facts showing each defendant's synergistic relationship with its subsidiaries and affiliates in a way that is not an abuse the corporate organizational form, "but is clearly relevant to the jurisdictional question."  *Anderson*, 361 F.3d at 453 (showing where a foreign company has a closely intertwined business relationship with non-foreign affiliate beyond just placing items in the stream of commerce, the corporate veil does not always have to be pierced for personal jurisdiction to be proper).  Such facts include: the Syngenta entities using a common name and logo, sharing a website, sharing a common marketing strategy, and employees not indicating that they work for one specific affiliate in their initial disclosures.  Compl. ¶ 28; *see* Pl. State of Arkansas Mem. Law Opp'n Defs.' Mot. Dismiss at 22, Ex. 32, Initial Disclosures Defs. Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC Pursuant to Fed. R. Civ. P. 26(a)(1)(A) at 3–4, Doc. No. 87 ("Resp.").

Corteva's response is that all of the allegations involve conduct by its subsidiaries, Corteva Agriscience, LLC, Corteva Agriscience MCS or EIDP.  Defs.' Br. at 20–24.  As

with Syngenta, the State alleges that Corteva uses a common name, website, and marketing for all entities such that there is no distinguishing Corteva, Inc. and Corteva Agriscience, LLC.  Resp. at 24–25.  This is enough to survive dismissal at this stage.

For these reasons, venue is proper under section 12 of the Clayton Act for Syngenta Crop Protection AG, Syngenta Corporation and Corteva, Inc.  The State, however, does not solely rely on the Clayton Act for venue or personal jurisdiction.  Resp. at 15 n.8.

### 2.  Personal Jurisdiction

Process may be served on Syngenta Crop Protection AG, Syngenta Corporation, and Corteva because venue is proper in the Eastern District of Arkansas under section 12 of the Clayton Act, 15 U.S.C. § 22.

B.    Personal Jurisdiction Under the Arkansas Long-Arm Statute and Venue Under 28 U.S.C. Section 1391

The motion to dismiss for lack of personal jurisdiction is denied because the Arkansas long-arm statute properly exercises jurisdiction over defendants and venue is proper under 28 U.S.C. section 1391.

### 1. Specific Personal Jurisdiction

Syngenta again argues that the State is impermissibly group pleading Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC to establish personal jurisdiction and that the alleged contacts are not from Syngenta Crop Protection AG or Syngenta Corporation.  Defs.' Br. at 27. As explained above, the State plausibly alleges

that each defendant has close, synergistic relationships with its subsidiaries and affiliates so as to survive dismissal. *Dassault*, 361 F.3d at 454; Compl. ¶¶ 28, 30.

All defendants argue that the state has failed to allege any claim-related contacts between themselves and Arkansas. This argument, however, is unconvincing. Also as explained above, Syngenta Crop Protection, LLC, Syngenta Corporation, Syngenta Crop Protection AG, and Corteva have minimum contacts with Arkansas and this suit arises out of, or relates to, those contacts. *See Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021).

The State has plausibly pled personal jurisdiction according to the five factors the Eighth Circuit requires to be weighed. *Digi-Tel Holdings, Inc.,* 89 F.3d at 522–23. The first and second factors which consider the nature, quality, and quantity of contacts weigh in favor of exercising personal jurisdiction. The State alleges that defendants are registered to do business in Arkansas, have employees in Arkansas, have registered crop-protection products in Arkansas, and have hosted informative sessions with the Arkansas Crop Management Conference. Compl. ¶¶ 24, 34, 258–59, 263–65, 270; Resp. Exs. 1–7, Job Listings, Exs. 8–9, Exs. 11–12, ACMC Active Member Lists Crop Protection Registrations. Additionally, EIDP, Inc, a Corteva subsidiary through which it conducts substantially all of its operations, owns a research facility in West Memphis. Compl. ¶ 266; Resp. Ex. 35, Bloomberg Website. Moreover, defendants have directly advertised, promoted, and sold their products in the Eastern District of Arkansas. Resp. Ex. 15, Opinion: Defending Syngenta amid departure from Arkansas, Ex. 17, Arkansas Site Highlights Weed Control and Root Health, Ex. 20 Syngenta Thrive Magazine. Third, the relation of the claim to the contacts weighs in favor

of exercising personal jurisdiction. Defendants argue that the State's claim is not related to the contacts defendants have with the state of Arkansas because defendants' loyalty programs were not designed or administered in Arkansas. *See* Defs.' Br. at 26. A court, however, may entertain a suit when a foreign company markets its products in the forum and the product causes injury in the forum. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct*., 592 U.S. 351, 355 (2021). Defendants are global companies that transact business everywhere. Compl. ¶¶ 22–35. Even if defendants designed their loyalty programs outside of Arkansas, because they market them in Arkansas and residents were harmed by them, the claim relates to the contacts. *See Ford Motor Co.*, 592 U.S. at 355. Fourth, the State is highly interested in providing a forum for its resident farmers. Fifth, while it is inconvenient for defendants to litigate in Arkansas, this factor is not dispositive when weighed against the other factors supporting personal jurisdiction. *See Land-O-Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d 1338, 1340 (8th Cir. 1983).

## *2. Venue*

The motion to dismiss for improper venue is denied because a substantial part of the events giving rise to the claim occurred in the Eastern District of Arkansas. 28 U.S.C. section 1391 allows cases to be brought in the judicial district where a substantial part of the events or property is located, or where a court has personal jurisdiction over the defendant if the other provisions do not apply. A substantial part of defendants' alleged wrongful conduct occurred in the Eastern District of Arkansas. Defendants used distributors and

retailers to implement their loyalty programs which in turn harmed Arkansas farmers. Compl. ¶¶ 72, 84, 102.

      C.    <u>Federal Antitrust Claims</u>

Defendants' motion to dismiss for failure to state a claim is denied because the State plausibly alleges violations of section 3 of the Clayton Antitrust Act, and sections 1 and 2 of the Sherman Antitrust Act.

Section 3 of the Clayton Act provides that it is unlawful to fix prices, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the purchaser shall not use or deal in the goods of competitors of a seller, where the effect of such sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 14.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations" is unlawful. 15 U.S.C. § 1.

Section 2 of the Sherman Act provides that it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To make a claim of monopolization, the State must prove that there is "(1) the possession of monopoly in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Monopoly

20

power is defined as "the power to control prices or exclude competition." *Id.* at 751 (citation omitted).

Defendants argue that the State: (1) failed to allege anti-competitive conduct; (2) failed to allege a proper product market; and (3) has not shown proximate causation to the alleged injury. Defs.' Br. at 30, 37, 51.

### 1. Anti-Competitive Conduct

Defendants argue that the State failed to allege anti-competitive conduct because their rebate programs are (1) procompetitive under the price-cost test, (2) predominantly price-based, and (3) there is no market-allocation agreement between Syngenta and Corteva. Defs.' Br. at 30, 32, 35. Defendants argue that the State must prove that the price of the product is set below the cost and that defendants are temporarily maintaining low prices to drive competitors out of the market. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–25 (1993); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 272 (3d Cir. 2012). The State, however, does not allege that low pricing was the means defendants used to exclude competition, but instead alleges that the rule of reason test should apply. Resp. at 29, 31; Compl. ¶ 222. The rule of reason test provides that "an exclusive dealing arrangement will be unlawful only if its 'probable effect' is to substantially lessen competition in the relevant market." *ZF Meritor, LLC*, 696 F.3d at 268 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29 (1961)). This test is applied when price-cutting is not the clearly predominate mechanism to exclude competition. *Id.* at 277.

21

The complaint plausibly alleges facts that would make the rule of reason test appropriate. Compl. ¶¶ 98, 100–09, 132–34, 140, 166, 194–95, 214–38. This is the case because the State sufficiently alleges that competition has been significantly foreclosed in the relevant markets and that it has been difficult for any generic competitor to enter the market successfully, due to defendants' loyalty programs. *Id.*

### 2. Product Markets

Defendants argue that the State has not properly alleged product markets because the proposed product markets are either too narrow or too broad. Defs.' Br. at 37–38, 49. A relevant product market is "determined by the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). This is a highly fact-intensive question. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 442 (4th Cir. 2011) (collecting cases). The State alleges two alternative product markets in the United States. Compl. ¶ 196.

In support of their argument, defendants cite to cases where claims were dismissed for failure to allege a proper market. Defs.' Br. at 44; *see Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (affirming dismissal when proposed relevant market included only the defendant's product as too narrow); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597–98 (8th Cir. 2009) (affirming dismissal when proposed relevant market omitted potential cardiology patients when further discovery would not have helped cure the deficiency).

22

The State first alleges that each relevant active ingredient, in both its finished and technical-grade form, is a market. Compl. ¶ 196. The State explains that each active ingredient has unique characteristics that differentiate it from other active ingredients. *Id.* ¶ 48. The second alleged market is finished crop-protection products that contain the relevant active ingredient. *Id.* ¶ 196. These alleged markets include more than just the relevant active ingredients as produced by defendants. Permitting discovery will allow the State to attempt to cure any defects in the proposed markets it is alleging. This point is supported by defendants' request to take notice of exhibits outside of the complaint. Defs.' Br. at 41.

There are a variety of methods used to determine if a product market is properly alleged. The State points to (1) defendants' conduct in designing their loyalty programs around the relevant active ingredients; (2) the hypothetical monopolist test; and (3) factors set out in *Brown Shoe*. The hypothetical monopolist test asks whether a small but significant non-transitory increase in price could be imposed in the market. *Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019). If the consumers would switch to a different product outside of the market because of the price increase, then the market is too narrow. *Id*. The *Brown Shoe* factors take into consideration the "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

23

First, the State alleges that defendants designed their loyalty programs around each relevant active ingredient. Compl. ¶¶ 86, 95. Second, the State alleges that price increases in the crop-protection products would not cause consumers to switch to products outside of their proposed markets. *Id.* ¶ 199. Third, the State alleges that generic entry into the market would cause prices to drop significantly. *Id.* ¶¶ 121, 131, 146, 161, 170, 181; *see Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 711 F. Supp. 3d 545, 569 (M.D.N.C. 2024) (citation omitted) ("[I]f the price of one incumbent product drops significantly in response to new entry, while the prices of other incumbents do not, then that first incumbent product, plus the new entrant, is very likely a market."). Further, the State alleges that each relevant active ingredient has distinct characteristics and uses and industry or public recognition. Compl. ¶ 48. These allegations are sufficient to overcome dismissal.

### 3. Proximate Cause

Defendants argue that the State has not properly alleged proximate cause because the consumers of their products are indirect purchasers, nor has the State shown a direct injury between the harm and defendants' conduct. Defs.' Br. at 51. The State, however, adequately alleges facts that would allow it to proceed to discovery.

Proximate cause principles were incorporated into a "direct purchaser" rule for antitrust claims in *Illinois Brick Company v. Illinois*, 431 U.S. 720 (1977). Defendants claim the direct purchaser rule should apply to bar the State from bringing antitrust claims on behalf of consumers because they are two or more steps removed from the consumers. Defs.' Br. at 52. Therefore, even if there was an injury, it would be too remote to recover. *Id.*; *see*

24

*Apple Inc. v. Pepper*, 587 U.S. 273, 278 (2019) (citing *Illinois Brick Co.*, 431 U.S. at 720). The State, however, is not seeking damages under the federal antitrust statutes and the indirect purchaser rule does not apply to claims for injunctive relief. *Campos,* 140 F.3d at 1172.

As for traditional antitrust standing rules, there are a number of factors that help determine whether a party has standing. *See State of S.D. v. Kansas City S. Indus., Inc.*, 880 F.2d 40, 45–46 (8th Cir. 1989) (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45 (1983) ("(1) the causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) the existence of an improper motive; (3) whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) the directness of the connection between the injury and the alleged restraint in the relevant market; (5) the speculative nature of the damages; and (6) the risk of duplicative recoveries or complex apportionment of damages"). The State alleges enough to support standing: citizens of Arkansas have been injured by paying higher prices for crop-protection products due to defendants' anti-competitive loyalty programs and exclusive dealing, and defendants have used such programs to discourage competition. Compl. ¶¶ 72–186.

D.    State Claims

Defendants' motion to dismiss for failure to state a claim is denied because the State plausibly alleges violations of the Arkansas Unfair Practices Act, Ark. Code Ann. section 4-

75-301 *et seq.* (AUPA) and the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. section 4-88-101 *et seq.* (ADTPA).

### 1. Arkansas Unfair Practices Act

Subsection 309 of the AUPA prohibits agreement between any two corporations, partnerships, individuals, associations, or persons to: (1) regulate or fix prices; (2) maintain regulated or fixed prices; or (3) fix or limit the amount or quantity of any article or thing whatsoever. Ark. Code Ann. § 4-75-309. Defendants make five arguments in support of dismissal. Defs.' Br. at 61–66. First, subsection 309 applies only to horizontal agreements; second, subsection 309 is limited to price fixing or output restriction agreements; third, the State failed to allege a plausible product market; fourth, defendants lack predatory intent; and fifth, defendants' conduct does not exceed their common law privilege to compete. *Id.*

Defendants cite to *Ft. Smith Light & Traction Company v. Kelley*, 127 S.W. 975 (Ark. 1910), in support of their first argument and the proposition that section 309 only applies to horizontal agreements. MTD at 61–62. They argue that dismissal is warranted because the loyalty program agreements are vertical agreements between themselves and distributors and retailers. *Id.* Neither section 309 nor the cases interpreting it seem to support this position. *See Kelley*, 127 S.W. at 981–82 (while the contract at issue did not violate the AUPA according to the Arkansas Supreme Court, it was not because it was a vertical agreement, rather it was because there was no detriment to consumers). Further, defendants argue that the horizontal agreements to supply mesotrione and s-metolachlor to one another do not violate the AUPA because there is no competition between themselves. Defs.' Br. at 63.

26

The State, however, alleges that the agreements were entered after defendants were faced with the threat of generic entry into the market, and were done for the purpose of preventing the purchasing of certain active ingredients from generic manufactures, ensuring price maintenance. Compl. ¶¶ 132–33, 147. This is sufficient to overcome dismissal.

Defendants' second argument that the State failed to plead any illegal price-fixing or output limitation is equally unconvincing. Section 309 prohibits any attempt to regulate pricing and the State sufficiently alleges that defendants have tried to control the price of relevant active ingredients by entering into agreements with distributors or retailers. Compl. ¶¶ 13, 185. Whether this is true is not an issue to be taken up in a motion to dismiss.

Defendants' third argument that the State has failed to allege a proper product market has been addressed. *See supra* section III.C.2. As for their fourth argument, defendants claim the State did not plead the necessary intent for a violation of subsection 309. Defs. Br. at 65. Due process requires proof of predatory intent to damage and destroy competition in price cutting cases. *Ports Petroleum Co. of Ohio v. Tucker*, 916 S.W.2d 749, 750 (Ark. 1996). Intent, however, can be demonstrated expressly, implicitly, and from circumstantial factors. *Henry v. Chloride, Inc.*, 809 F.2d 1334, 1344 (8th Cir. 1987). The State alleges that Corteva indicated its intent to use its loyalty program to "keep the channel locked up" and to "battle [the generics] in [its] core market and push them out" and Syngenta stated the intent of its program was to "reward retailers for their support" when generics exist and to defend its market share. Compl. ¶¶ 90, 176. This is sufficient to overcome dismissal.

Finally, the State alleges facts sufficient to overcome defendants' common-law

privilege to compete argument. Defendants cite *Acre v. Spindletop Oil & Gas Company*, for the proposition that plaintiff must allege more than conclusions to show that defendants violated the AUPA. No. 4:09CV00421 JLH, 2009 WL 4016116, at *5 (E.D. Ark. Nov. 18, 2009). *Acre* is informative but is distinguishable from the present case because the State alleges more than conclusions. Indeed, it claims that defendants have intentionally entered into agreements between themselves and retailers or distributors for the purpose of preventing generic products from entering the market and that there have been attempts by generic manufactures to enter into the market and almost all have failed due to defendants' loyalty program. Compl. ¶¶ 100–09, 117, 130, 144, 160, 168, 179. While the scope of this privilege is broad, defendants have the right to compete, and subsection 309 may have narrow applicability, the State plausibly alleges facts to overcome dismissal.

### 2. Arkansas Deceptive Trade Practices Act

The ADTPA generally prohibits deceptive and unconscionable trade practices. Ark. Code Ann. § 4-88-107(a)(10). To prove a violation of section 4-88-107(a)(10) the State must show (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act. *Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 822 (8th Cir. 2015). An unconscionable act is one that affronts the sense of justice, decency, or reasonableness. *Universal Cooperatives, Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795–96 (8th Cir. 2013). While this includes conduct violating public policy or statute, not every allegation of illegal conduct states a claim for violation of the ADTPA. *Id.*; *see Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006).

Defendants argue that the State has not met the pleading requirement under Rule 9(b). Defs.' Br. at 67. When alleging fraudulent or mistaken actions, a party must particularly state the circumstances that constitute fraud or mistake; however, this standard does not apply to claims under the ADTPA which are premised on conduct like improper exploitation of economic leverage. *Antoon v. Securus Techs., Inc.*, No. 5:17-CV-5008, 2017 WL 2124466, at *6 (W.D. Ark. May 15, 2017).

Defendants also argue that the State has not met the general pleading requirement under Rule 8 because the conduct alleged is not deceptive, misleading, or consumer oriented. Defs.' Br. at 67. The State plausibly alleges that defendants engaged in conduct that is unconscionable or deceptive. For example, the State alleges that defendants' agreements and conspiracies with their distributors and retailers harmed consumers because defendants were able to maintain artificially high prices on their products. Compl. ¶¶ 319–20. The State also alleges that defendants enforced and threatened loyalty conditions or penalties for disloyalty on distributors or retailers which caused injury to consumers in the form of higher prices. *Id.* Finally, the State alleges that defendants' rebates to their distributors and retailers, conditioned on limiting their dealings with generic manufacturers, injured consumers by allowing defendants to maintain inflated prices. *Id.*

Defendants argue that these allegations are not consumer-oriented because defendants did not directly deal with consumers. Defs.' Br. at 68. This argument is unpersuasive. *See Murphy,* 226 S.W.3d at 811 (holding that there was no clear error in the lower court finding a violation of the ADTPA when patients of a hospital were being indirectly harmed by the

29

hospital's policy that denied practitioners staff appointments for holding an interest in a competing hospital). Therefore, the State properly alleges facts that allow it the opportunity to prove its claim under the ADTPA.

## IV.  CONCLUSION

For these reasons, defendants' motion to dismiss the amended complaint is denied, and their first motion to dismiss is denied as moot.

IT IS SO ORDERED this 19th day of February, 2025.

_____
UNITED STATES DISTRICT JUDGE