IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

**STATE OF ARKANSAS, *ex rel*. TIM GRIFFIN, ATTORNEY GENERAL,**

      *Plaintiff*,

**vs.**

**SYNGENTA CROP PROTECTION AG; SYNGENTA CORPORATION; SYNGENTA CROP PROTECTION, LLC; and CORTEVA, INC.,**

      *Defendants*.

Case No. 4:22-cv-01287-BSM

**JURY TRIAL DEMAND**

## SECOND AMENDED COMPLAINT

The State of Arkansas, *ex rel.* Tim Griffin, Attorney General (the "State" or "Plaintiff"), brings this action in its proprietary capacity and in its capacity as *parens patriae*, against Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta") and Corteva, Inc. ("Corteva" and with Syngenta, "Defendants"), and alleges as follows:

## I.      INTRODUCTION

1.      Agriculture is Arkansas's largest industry, contributing $16 billion annually to the State's economy[1] and employing 243,000 citizens. The State's diverse landscape and climate produce a wide variety of agricultural products, giving it the nickname "*The Natural State.*" Ark. Code Ann. § 1-4-106. Statewide, there are approximately 49,000 farms spread across 14.5 million

---

[1]  *Agriculture Facts*, Ark. Farm Bureau, https://www.arfb.com/pages/education/ag-facts/ (last visited May 6, 2025).

acres.[2] Agriculture is prominent in all of Arkansas's counties, and 97% of Arkansas's farms are family owned.[3]

2.      The major crops in Arkansas are soybeans, rice, corn, cotton, grain sorghum, and wheat.[4] Arkansas is the largest producer of rice in the United States.[5] In fact, between 40% and 50% of rice grown in the United States is grown in Arkansas, primarily in the eastern part of the State.[6] Arkansas is in the top five in the nation in cotton production—with approximately 7% of the U.S. crop – and is the tenth largest soybean producing state.[7]

3.      Maximizing crop yields plays a significant part in improving food security for all Americans. Arkansas farmers rely heavily on crop-protection products (a collective term for products commonly known as "herbicides," "insecticides," and "fungicides") to improve crop yields, including crop-protection products that contain key active ingredients that are manufactured by Syngenta and Corteva ("Active Ingredients" or "AI"). These Active Ingredients are incorporated into crop-protection products Arkansas farmers must use to protect their crops from damage caused by weeds, insects, and fungi. Arkansas farmers annually purchase tens of millions of dollars of crop-protection products manufactured by Defendants. Defendants are two of the world's largest chemical companies. In 2022 alone, Syngenta's worldwide crop-protection

---

[2]    *Id.*

[3]    *Id.*

[4]    *The Most Important Crops in the State*, AR AGRICULTURE, https://www.aragriculture.org/most-important-crops-in-state/ (last visited May 6, 2025).

[5]    *Agriculture Facts*, *supra* note 1.

[6]    *Id.*

[7]    *Id.*

product sales were approximately $16.3 billion,[8] while Corteva's worldwide crop-protection product sales were $8.5 billion.[9] Arkansas farmers have for years paid, and continue to spend, millions of dollars more than they lawfully should for these crop-protection products because of Defendants' so-called "loyalty programs," ███████████████████ whereby Defendants effectively pay distributors or retailers to restrict farmers' access to lower-priced generic products (collectively, "Loyalty Programs"), thus allowing Defendants to inflate crop-protection product prices. Farmers buy Defendants' crop-protection products directly from distributors or retailers at unlawfully inflated prices.

4.     As alleged in detail below, Defendants use their anticompetitive Loyalty Programs to perpetuate an unlawful exclusionary scheme that suppresses generic competition and maintains their monopolies for the subject AIs in the crop-protection product market.

5.     Congress enacted a comprehensive regulatory regime for the crop-protection industry that promotes the twin goals of product innovation and price competition.[10] This regulatory scheme allows manufacturers of crop-protection products, such as Defendants, to initially develop, patent, and register the Active Ingredients used in crop-protection products. They may then profit from the commercial potential of their innovations through these lawfully obtained

---

[8]     Media Release, *Syngenta Group reports record $33.4 billion sales and $5.6 billion EBITDA in 2022*, SYNGENTA GROUP (Mar. 22, 2023), https://www.syngentagroup.com/en/media/syngenta-news/year/2023/syngenta-group-reports-record-334-billion-sales-and-56-billion-ebitda.

[9]     News Release, *Corteva Reports Fourth Quarter and Full-Year 2022 Results, Provides 2023 Guidance*, CORTEVA AGRISCIENCE (Feb. 1, 2023), https://www.corteva.com/content/dam/dpagco/corteva/global/corporate/files/pressreleases/02.01.2022_4Q_2022_Earnings_Release_Graphic_Version_Final.pdf.

[10]    *See, e.g.*, *About Pesticide Registration*, U.S. ENV'T PROT. AGENCY, https://www.epa.gov/pesticide-registration/about-pesticide-registration (last visited May 6, 2025).

exclusive rights for a pre-determined period of years. This period of exclusivity fosters product innovation, the first goal of the regulatory regime.

6.     After patent and regulatory exclusivity periods expire, however, generic manufacturers may enter the market with equivalent products containing the same Active Ingredients and rely upon the same toxicology and environmental-impact data brand that manufacturers submitted for the original product.

7.     Unimpeded competition from generic pesticide products predictably leads to dramatic price reductions for farmer-consumers. This regulatory structure, thus, incentivizes innovation, while encouraging price competition – all of which benefit Arkansas farmers.

8.     This regulatory scheme is similar to that provided by the Hatch-Waxman Act for pharmaceutical products. The Hatch-Waxman Act provides for an exclusivity period for the original developer of a drug to allow the developer to earn back its investment in developing the drug. After that exclusivity period, a generic drug manufacturer may bring to market a generic version of the drug relying on the original developer's testing that the drug is safe and effective, and showing that the proposed generic drug is therapeutically equivalent to the original drug.

9.     Many brand-name drug manufacturers have historically sought to minimize, or even eliminate, generic competition in order to maintain monopoly or near-monopoly pricing and, therefore, maintain a monopoly or near-monopoly revenue stream, unimpeded by the price reduction that results from a fair and robust competitive market.

10.     One tactic used by brand-name drug manufacturers to keep generic drug competitors off the market has been to pay massive rebates and kickbacks to pharmacy benefit managers ("PBMs") to keep generic drugs off of PBM formularies and, therefore, out of the market. "Favorable formulary placement of branded drugs encourages the use of more expensive

4

products and can lead to higher out-of-pocket costs"[11] and allows the brand-name drug manufacturer to continue to reap supracompetitive profits off its brand-name drug while the generic manufacturer is unable to make inroads in the market.

11.     Defendants here use a similar tactic to retain supracompetitive pricing for their brand-name crop-protection products by – under the guise of Loyalty Programs – paying distributors and retailers not to sell generic equivalents of their products to Arkansas farmers. When exclusivity periods for crop-protection products expire and generic manufacturers threaten to launch lower-priced competing products, Defendants employ their Loyalty Programs to exclude generic manufacturers from entering the traditional distribution channel, which serves as a critical link between manufacturers and farmers, thereby choking off farmers' access to competitively lower priced generic products.

12.     There are a limited number of distributors in the traditional distribution channel for crop-protection products. The top seven distributors garner approximately 90% of crop-protection product sales at the distributor level. The traditional distribution channel, thus, acts as a choke point for access to crop-protection products. By controlling these leading crop-protection product distributors, Defendants effectively control the market for crop-protection products.

13.     Using their respective Loyalty Programs, Defendants provide substantial payments to distributors or retailers in exchange for their commitment to sell Defendants' crop-protection products either exclusively or at specified high-volume minimum amounts, which, in turn, restricts sales to farmers of generic crop-protection products made by competing manufacturers. Defendants promise distributors or retailers a complex set of incentive payments based on their

---

[11]     Mariana P. Socal, et al., *Favorable Formulary Placement of Branded Drugs in Medicare Prescription Drug Plans When Generics Are Available*, JAMA NETWORK (Mar. 18, 2019), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2728446.

4900-0499-8729.v1

purchases or sales to growers of Defendants' branded crop-protection products, under the critical condition that distributors or retailers ***must*** honor their commitment to exclude or limit their purchases or sales of comparable generic products for sale to farmers to a set percentage share, which is, at most, 15% and, more often, less of their total sales. Defendants term this a "rebate" for "loyalty."

14.      In substance, however, these "rebates" are unlawful, anticompetitive exclusionary payments to distributors and retailers. Defendants pay a portion of their elevated profits to distributors or retailers in exchange for the distributors' or retailers' exclusion of Defendants' generic competitors, resulting in near exclusivity for Defendants. Defendants still come out ahead economically because, without generic competition, Defendants' supracompetitive profits far exceed the kickbacks they pay to distributors or retailers to not sell generic equivalents to their products.

15.      Defendants' Loyalty Programs are designed to and do hinder the market entry and expansion of generic products because it is economically unviable for generic manufacturers to try to compete for the small slice of the market available to them due to Defendants' Loyalty Programs. This results in, among other things, supracompetitive pricing which costs Arkansas farmers millions of dollars in unlawful overcharges annually.

16.      Defendants accomplish the supracompetitive pricing via their Loyalty Programs by, in effect, regulating the amount of generic competitor crop-protection products that can enter the market. By creating and enforcing the "loyalty" thresholds, Defendants restrict and sometimes prohibit distributors and retailers from providing market space to generic entrants. The "loyalty" thresholds work to eliminate any potential for competition before it starts, enabling Defendants to maintain their market dominance.

17.    Distributors and retailers participate in and comply with Defendants' Loyalty Programs because the loss of the payments distributors or retailers receive from the Loyalty Programs would have severe financial consequences.[12] ████████████████████

████████████████████████████████████████████████████████████

███████████████████████

      ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

      ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

20.    Each Defendant intentionally designs its distributor or retailer Loyalty Programs to maintain its ability to price its crop-protection products above competitive levels while retaining a predominant market share. Defendants, thus, enjoy outsized profits during the "post-patent" period, when prices would otherwise fall substantially if generic manufacturers could enter and compete in a free and fair market with Defendants. ████████████████████

---

[12]    While not specifically named as parties to this action, distributor and retailer participants in Defendants' anticompetitive Loyalty Programs at issue in this action are co-conspirators with Defendants in the unlawful conduct alleged herein.

[13]    CRTVA-CPL-00147015-023 at -018.

██████████████████████████████████████████████

██████████████████████████████████████████████

Defendants' Loyalty Programs allow Defendants to maintain out-sized profits, supracompetitive prices, and inflated market shares while costing Arkansas farmers millions of dollars annually.

21.    Absent Defendants' unlawful conduct, Defendants would face increased generic competition, which would lead to increased choices and lower prices for Arkansas farmers. Indeed, Arkansas farmers would be positioned to save millions of dollars annually when paying for essential crop-protection products if Defendants' anticompetitive Loyalty Programs ceased.

## II.    PARTIES

### A.    Plaintiff

22.    Plaintiff, State of Arkansas, is a sovereign state. Tim Griffin is the Attorney General and the chief legal officer for the State, and he brings this action in its *parens patriae* capacity on behalf of the people of the State of Arkansas to protect the State, the State's agencies and subdivisions, its general economy, and its harmed consumers and citizens. Federal and state law grants the Attorney General authority to bring this action, including, without limitation, Sections 3 and 16 of the Clayton Antitrust Act of 1914 ("Clayton Act") (15 U.S.C. §§ 14 and 26); Sections 1 and 2 of the Sherman Antitrust Act of 1890 ("Sherman Act") (15 U.S.C. §§ 1-2); the Arkansas Unfair Practices Act (Ark. Code Ann. § 4-75-301, et seq.); and the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. § 4-88-101, et seq.).

23.    The State also brings this action to protect its quasi-sovereign interest in Arkansas's economic marketplace and the well-being of its citizens. As such, the State seeks injunctive relief and to recover actual or compensatory damages, punitive damages, restitution, disgorgement, civil

---

[14]    SYT_REBATELIT_02250413-419 at -414

penalties, and any other remedy available at law for losses incurred and to prevent any further loss by the State and all natural persons residing in the State, pursuant to the Clayton Act, the Sherman Act, the Arkansas Unfair Practices Act, and the Arkansas Deceptive Trade Practices Act.

### B.    Defendants

24.    Defendant Syngenta Crop Protection AG is a Swiss aktiengesellschaft (public limited company) based in Basel, Switzerland. Crop protection is the largest business unit at Syngenta Group, and it develops and produces herbicides, insecticides, fungicides, biological controls, and seed treatments. Syngenta Crop Protection AG has its North American headquarters in Greensboro, North Carolina.

25.    Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG with headquarters in Wilmington, Delaware. Syngenta Corporation is a corporation organized and existing under the laws of the State of Delaware.

26.    Defendant Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG with headquarters in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is licensed to do business in Arkansas, is listed with the Arkansas Secretary of State as a corporation in "good standing" in Arkansas, and can be served via its registered agent, C T Corporation System, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

27.    The Syngenta Group is a global company based in Switzerland. Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC are all part of the Syngenta Group and collectively do business as part of a single enterprise. China National Chemical Company ("ChemChina") acquired Syngenta in 2017, and then ChemChina merged with Sinochem Group Co., Ltd. as of May 2021 to both be subsidiaries of Sinochem

Holdings Corporation Ltd., which is a state-owned Chinese enterprise based in Beijing, China. The Syngenta Group operates and holds itself out as an integrated enterprise, and the Syngenta Defendants have a close, synergistic relationship. Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC function as a single enterprise, both structurally and operationally.

28.     The Syngenta Group financial results, for example in its 2022 Financial Report, include crop-protection product sales for North America, which includes the United States.

29.     The Syngenta Group Environmental, Social and Governance Report for 2022 (published on May 11, 2023) makes clear that the Syngenta Group is an integrated whole with 150 subsidiaries and the crop-protection operations are based in Switzerland.

30.     The companies under the "Syngenta" umbrella share a name, a common logo, as well as a common website, utilizing a common marketing strategy. According to one Syngenta corporate document, with the file name "Syngenta Legal Entity List," Defendants Syngenta Crop Protection, LLC, and Syngenta Corporation share the same registered office address in Delaware.

31.     Vern Hawkins ("Hawkins"), the person described by Defendants as president of Syngenta Crop Protection, LLC, lists his employer on LinkedIn as "Syngenta Crop Protection B.V.," a Dutch entity, further demonstrating the integration of the Syngenta Defendants. Hawkins explains that the value of Syngenta is that "*we've got a global footprint*, which gives us the ability to generate more research and development (R&D) dollars aggregate,"[15] not distinguishing between Syngenta Crop Protection, LLC and the other Syngenta Defendants. In the same interview, Hawkins also explained the Syngenta Defendants' local focus, noting "[f]rom a

---

[15]  Dan Jacobs, *Syngenta Crop Protection President Vern Hawkins Shares Plans for Future*, AGRIBUSINESS GLOB., https://www.agribusinessglobal.com/special-sections/syngenta-crop-protection-vern-hawkins/ (last visited May 23, 2025).

technology-in-the-core-business piece, we have a very good network, which is focused on understanding, first of all, *what the local needs are in each of the countries* and then looking for the aggregation of the opportunities to build the right use patterns, which we then register the product for."[16]

32.     In multiple job listings for Arkansas crop-protection positions, Syngenta explained that "Syngenta Crop Protection is headquartered in Switzerland."

33.     Similarly, in the press release announcing the head of U.S. Crop Protection Corporate Communications, Kathy Eichlin ("Eichlin"), it was confirmed that "Eichlin will remain a key member of the Syngenta North America U.S. Crop Protection Leadership Team and the Global Protection Communications Leadership Team."[17] Additionally, Eichlin is listed as of three "Syngenta Global Corporate Contacts," further demonstrating the links between the Syngenta crop-protection defendants.

34.     The Syngenta Group has a strong relationship with and direct ties to the State. Among other examples discussed herein, until recent action by the Attorney General for violations of state law prohibiting foreign (Chinese) ownership of land in Arkansas, which resulted in, among consequences, a $280,000 fine and land divestiture within two years, Syngenta owned 160 acres of land in Craighead County that it had owned since 1988. As Eric Boeck, a Syngenta executive, explained in the wake of these actions, "In the 35 years Syngenta has been a proud part of the Arkansas community, we have developed strong and lasting personal and professional relationships, before and through our change in ownership. Our Arkansas employees have

---

[16]    *Id.*

[17]    Press Release, *Syngenta names Kathy Eichlin head of U.S. Crop Protection Corporate Communications*, SYNGENTA UNITED STATES (Apr. 5, 2023), https://www.syngenta-us.com/newsroom/news_release_detail?id=224917.

contributed to the local food bank, collected jackets and clothing for those in need, participated in toy drives, and donated office equipment locally. That's in addition to helping Arkansas agriculture through their work."[18]

35.    Similarly, Todd Martin ("Martin"), currently the Chief Executive Officer ("CEO") of the Independent Professional Seed Association, but who, for 25 years, worked at Syngenta and its predecessor companies in crop-protection, seeds, and biotechnology, also explained the close relationship between the Syngenta Defendants and Arkansas. As Martin explained, there were over 38 Americans employed by Syngenta in Bay, Arkansas, with an annual payroll of $2.1 million. In fact, Martin specifically highlighted the need for "competition in seeds, biotechnology, crop protection, seed treatment and genetics"[19] in discussing the forced sale.

36.    Defendant Corteva, Inc. is a publicly held, for-profit corporation headquartered in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"). It was spun out as a standalone company on June 1, 2019. Corteva is a corporation organized and existing under the laws of the State of Delaware. Corteva and its subsidiaries, Corteva Agriscience LLC and Corteva Agriscience MCS, are all registered with the Arkansas Secretary of State to conduct business in Arkansas and are currently listed as active companies in "good standing" with the State. Corteva's principal business address is listed as 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201, and all three Corteva entities' registered agent for service of process is listed as C T Corporation System, 320 South Izard Street, Little Rock, Arkansas 72201.

---

[18]    Eric Boeck, Opinion: Defending Syngenta amid departure from Arkansas, AGRI PULSE (Oct. 27, 2023), https://www.agri-pulse.com/articles/20176-opinion.

[19]    Todd Martin, IPSA CEO Todd Martin on Syngenta's Forced Land Sale, SEEDWORLD (Nov. 6, 2023), https://www.seedworld.com/us/2023/11/06/ipsa-ceo-todd-martin-on-syngentas-forced-land-sale/.

4900-0499-8729.v1

37. Corteva similarly has a strong relationship with the State. Corteva settled a consolidated class action in this District, *Jones v. Corteva*, No. 3:21-cv-00237-DPM (E.D. Ark.), and *Boothe Farms, Inc. v. Dow Chem. Co.*, No. 3:19-cv-00264-DPM (E.D. Ark.), alleging claims for damages based on negligent and wrongful conduct in connection with the research, design, development, manufacture, testing, promotion, marketing, advertising, distribution, labeling, or sale of a crop-protection product, Loyant. Corteva never moved to dismiss *Jones* or *Boothe Farms* for lack of personal jurisdiction.

### III.    JURISDICTION AND VENUE

#### A.    Subject Matter Jurisdiction

38. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 16 of the Clayton Act (15 U.S.C. § 26), as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because Plaintiff's state-law claims arise out of the same course of conduct, and case or controversy as its federal claims. This Court's exercise of supplemental jurisdiction over Plaintiff's state-law claims will avoid unnecessary duplication and multiplicity of actions and will promote the interests of judicial economy, convenience, and fairness.

#### B.    Personal Jurisdiction

39. This Court also has personal jurisdiction over each Defendant because each has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 22 and Ark. Code Ann. § 16-4-101(b), and Plaintiff's claims arise out of or relate to Defendants' contacts with the United States and Arkansas.

#### C.    Venue

40.     Venue in this District is proper under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b)-(d). Each Defendant is found, resides, is an inhabitant of, transacts business, and/or has agents in the State of Arkansas and this District, a substantial portion of the events described herein occurred in the State of Arkansas and this District. Based on the facts and the reasons described herein, Defendants are subject to personal jurisdiction by this Court in this District.

41.     Venue in this District is also proper under Ark. Code Ann. § 4-75-319, which provides that any action brought by the Attorney General under Title 4, Subtitle 6, Chapter 75, Subchapter 3 as part of an action containing claims of federal law violations, shall be brought in the appropriate federal court.

## IV.     INDUSTRY BACKGROUND

### A.     Crop-Protection Products

42.     The International Code of Conduct on Pesticide Management defines a "pesticide" as "any substance, or mixture of substances of chemical or biological ingredients intended for repelling, destroying, or controlling any pest, or regulating plant growth."[20] A "pest" generally includes any weed, insect, fungus, or other unwanted organism.

43.     The vast majority of pesticides sold in the United States, including in Arkansas, are used for crop protection.

44.     Farmers (or "growers") use pesticides to control pests that would otherwise harm their crops. Pesticides used for crop protection are referred to herein as "crop-protection products." Crop-protection products are vitally important inputs for Arkansas farmers. Use of effective crop-

---

[20] *See Status and Trends of Pesticide Use*, at 2, UNITED NATIONS ENV'T PROGRAMME, WORLD HEALTH ORG. & FOOD & AGRIC. ORG. OF THE UNITED NATIONS (2022) ("UN WHO-FAO Report"), https://wedocs.unep.org/bitstream/handle/20.500.11822/40351/Pesticides_Ch2.pdf.

protection products allows farmers to dramatically increase crop yields and quality, contributing to a stable food supply.

45.     Crop-protection products fall into three main categories: herbicides, which target unwanted plants or weeds; insecticides, which target insect infestations (including nematicides, which target nematodes (roundworms)); and fungicides, which target fungal diseases, but they include others as shown in Figure 1:

**<u>Figure 1</u>**[21]



▶ Figure 2.2-1 Categorization of pesticides according to the target organisms they are intended control

| Type of pesticide | | Target pest organism |
|---|---|---|
| Herbicide | | Weeds, algae |
| Insecticide | | Insects |
| Acaricide | | Mites |
| Fungicide | | Fungi |
| Bactericide | | Bacteria |
| Nematicide | | Nematodes |
| Molluscicide | | Snails, molluscs |
| Avicide | | Birds |
| Wood preservative | | Mainly fungi and insects |
| Antifoulant | | Mainly barnacles (e.g. on ship hulls or other undersea surfaces) |
| Antimicrobial | | Microbiological organisms in general, such as bacteria and viruses |

Note: The definition of pesticides under the International Code of Conduct on Pesticide Management includes plant growth regulators, however this is not included in this figure as this group of pesticides does not target pest organisms

---

[21]     *See id.* at 4.

4900-0499-8729.v1

46.     A crop-protection product contains at least one Active Ingredient that is a chemical substance that provides the pesticidal action – *i.e.*, is designed to kill or control the targeted pest. Active Ingredients are combined with inert components (or co-formulants) such as water, adjuvants, surfactants, and, in some cases, other Active Ingredients to formulate finished crop-protection products and give the product the necessary properties for application – *i.e.*, they make crop-protection products easy to handle, apply, and store. Finished crop-protection products that contain only one Active Ingredient are referred to as "straight goods," while products containing two or more Active Ingredients are called "mixtures."

47.     An Active Ingredient may also be sold in "technical grade" or for "manufacturing use," before being formulated into a finished crop-protection product. Active Ingredients sold in this form require additional processing before they can be used by farmers in finished crop-protection products.

48.     Several criteria serve to distinguish Active Ingredients from each other. These include: the pest(s) targeted by an Active Ingredient; the effectiveness of an Active Ingredient at controlling the targeted pest, which is often measured in terms of crop yield improvements; the crops upon which an Active Ingredient is suited and registered to be used, which may correlate with geography; the stage of the growing cycle at which an Active Ingredient may be used; and the performance of an Active Ingredient under prevailing climate and weather conditions.

49.     Each Active Ingredient has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While Active Ingredients that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one Active Ingredient cannot readily replace or be interchangeable with another Active Ingredient for a given application or in

16

a given condition. Farmers may prefer one Active Ingredient over another for various reasons, including the specific performance characteristics of the Active Ingredient or a farmer's past success with an Active Ingredient. As a result, a generic crop-protection product that contains a chemically equivalent Active Ingredient would be interchangeable with a given branded product, while a product containing a different Active Ingredient would not be interchangeable insofar as it would not control the same pests in the same way with the same results.

50.    Each Active Ingredient, including each of the following Active Ingredients manufactured by Defendants and at issue in this case (the "Relevant AIs"), has particular characteristics and uses that differentiate it from other Active Ingredients:

(a)    **Syngenta Relevant AIs**

i.    *Azoxystrobin.* Azoxystrobin is a broad spectrum fungicide that can be used across all major row crops to prevent fungal diseases, which simplifies pesticide management. Syngenta also claims that azoxystrobin has growth-enhancing effects not proven in other active ingredients.

ii.    *Mesotrione.* Compared to other, similar herbicide active ingredients mesotrione is a widely used corn herbicide that has superior efficacy and crop safety, and a low use rate.

iii.    *Metolachlor and S-Metolachlor.* Compared to other, similar herbicide active ingredients, metolachlor has superior water solubility, and so it tends to perform better in dry conditions. Metolachlor also outperforms other active ingredients in warmer conditions, is more "crop friendly," and can be used on a broader spectrum of crops including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets.

17

S-Metolachlor is a more concentrated and efficient version of metolachlor, meaning it is more potent and requires lower use rates to achieve the same level of weed control compared to metolachlor.

iv.    ***Fomesafen***. Fomesafen is selective in soybeans, meaning that it is effective in controlling weeds without harming the soybean crop. Fomesafen is persistent in that it remains active in the soil for an extended period of time after application. This can sometimes lead to herbicide carryover, which is when an herbicide remains in the soil long enough to affect subsequent crops planted in the same field that might be sensitive to it.

v.    ***Lambda-Cyhalothrin.*** Lambda-Cyhalothrin can be used to control a wide range of insects. Since it kills both by contact or ingestion, it can be effective even if the insect does not ingest it. It is primarily used on cotton, cereals, potatoes, and vegetables.

vi.    ***Difenoconazole.*** Difenoconazole is different from other fungicides due to its combination of properties, including broad-spectrum activity, systemic action, and the ability to disrupt fungal cell wall integrity. It is absorbed into the plant's roots and transported to other parts of the plant through its circulation system. It is effective against a wide range of fungal diseases. While it may be used on a variety of vegetable and fruit crops, it should not be used on wine grapes.

    **(b)**        **Corteva Relevant AIs**

        **i.**        ***Rimsulfuron.*** Compared to other, similar herbicide active ingredients, rimsulfuron can be used on a broader range of crops including, fruit, tree nuts, potatoes, corn, soybeans, peanuts and tomatoes to control a wider spectrum of weeds. Rimsulfuron can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate. Further, rimsulfuron is inexpensive to produce compared to other, similar herbicide active ingredients.

        **ii.**        ***Oxamyl.*** Oxamyl products can be sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil. Oxamyl is used primarily on cotton, potatoes, onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Oxamyl is also safer for crops and better for soil health than other, similar insecticide active ingredients.

        **iii.**        ***Acetochlor.*** Compared to other, similar herbicide active ingredients, acetochlor tends to perform better in wetter and cooler conditions. It is used predominantly on corn, cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Acetochlor also tends to have better weed control early in the growing season and is more effective against certain weed species.

        **iv.**        ***Cyhalofop.*** Cyhalofop is labeled for grass weed control in rice only. Most cyhalofop is used in Arkansas and California, the two largest rice producing states, accounting for approximately 70% of the national

usage. It is selective as to rice because of its rapid metabolism in rice. It is not effective at controlling broadleaf weeds.[22]

      **v.**    ***Picloram.*** Picloram is a selective herbicide that primarily targets broadleaf weeds and woody plants while leaving grasses relatively unharmed. It is known for its high persistence in the environment and its potential for off-target movement, especially in groundwater. It is known that manure from animals that eat grass in picloram fields can have broadleaf-killing potency.

      **vi.**    ***Triclopyr.*** Triclopyr likewise is selective with respect to controlling broadleaf and woody weeds while leaving grasses unharmed. It works differently from other herbicides because it mimics the effect of a natural plant hormone, auxin, which disrupts growth in the entire plant.

      **vii.**    ***Methoxyfenozide.*** Methoxyfenozide is a narrow-spectrum insecticide that differs from other insecticides in that it primarily targets the larvae of Lepidoptera insects, *i.e.*, moth and butterfly caterpillars. Due to its specificity, there is a lower risk of harm to beneficial non-target insects, such as bees and predator insects.

      **viii.**    ***Aminopyralid.*** Aminopyralid targets broadleaf weeds such as thistles and clovers but leaves grasses mostly unharmed. It disrupts plant growth pathways, leading to stunted growth, leaf cupping and deformation. This mode of action can be effective against weeds resistant to other

---

[22] Memorandum, U.S. Environmental Protection Agency, Office of Chemical Safety and Pollution Prevention, BEAD Chemical Profile (BCP) for Registration Review, Cyhalofop-butyl (082583) (May 7, 2014).

herbicide classes. Aminopyralid is persistent in the soil and plant tissues for extended periods. Aminopyralid remains active in the manure of animals who have consumed grass or hay that has been treated with aminopyralid. The hay, straw, or composted manure of animals who have eaten forage treated with aminopyralid or picloram should not be sold or moved from the farm where the herbicide was sprayed and should not be used in a garden where broad-leaf plants are to be grown.

### B.    Crop-Protection Product Manufacturers

51.    The crop-protection product manufacturing industry has traditionally been divided into two main groups of companies: "basic" manufacturers who research, develop, patent, market, and sell crop-protection products with new Active Ingredients; and "generic" manufacturers who, after patent and regulatory exclusive-use periods have expired for an Active Ingredient, market and sell generic, off-patent or post-patent crop-protection products with the same Active Ingredient. Products from generic manufacturers are sometimes known as "me too" products, since they are intended to mimic products originally sold by basic manufacturers.

52.    Defendants are basic manufacturers and are two of the four largest basic crop-protection product manufacturers in the United States and globally.[23]

53.    The six largest basic manufacturers in the world, including Defendants, collaborate extensively, including through an international association known as CropLife International ("CropLife"), which touts itself as "the voice and leading advocates for the plant science industry."[24]

---

[23]    *See* UN WHO-FAO Report, *supra* note 20, at 23.

[24]    *Helping Farmers Grow*, CROPLIFE INT'L, https://croplife.org/wp-content/uploads/pdf_files/

54.     Currently, Syngenta's Hawkins is a member of CropLife's Board of Directors,[25] while Syngenta's CEO, Jeff Rowe, and Corteva's CEO, Chuck Magro, previously served as members of CropLife's Board of Directors. Until recently, Syngenta's former CEO, Erik Fyrwald, served as Chairman of CropLife's Board of Directors.

55.     More than a dozen generic manufacturers sell crop-protection products in the United States.

### C.     The Regulatory Process for Crop-Protection Products

56.     Congress enacted the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq., which includes, *inter alia*, a process for registering pesticides with the U.S. Environmental Protection Agency ("EPA") and ensuring that the pesticide is not dangerous to humans or the environment. FIFRA also provides for a ten-year exclusivity period to the basic manufacturer for the sale and manufacture of a new formulation of a pesticide, which is separate and apart from any protection that might be available under patent laws.

57.     When the basic manufacturer's relevant patent and regulatory exclusive-use terms expire, a generic manufacturer may enter the market with crop-protection products containing the same Active Ingredient. Those products may be generic equivalents of branded crop-protection products or may combine active and other ingredients to create new mixtures. Prior to entry, a generic entrant must apply to register its product for sale in the United States under FIFRA. FIFRA also allows generic entrants to rely on data that the original registrant submitted to the EPA, in return, the original registrant may be entitled to receive "data compensation payments" from the

---

Who-We-Are.pdf.

[25]     *Board of Directors*, CROPLIFE AM., https://www.croplifeamerica.org/board-of-directors (last visited May 6, 2025).

generic firm, depending on the timing of the generic entrant's reliance on the data (FIFRA's "generic fast-track provisions").

58.    FIFRA's generic fast-track provisions arose in the late 1970s, in significant part, from concern that the then-existing registration requirements were creating stagnation in the absence of meaningful post-patent competition for AIs.[26]  Indeed, the AI-specific generic fast-track amendments were intended to have "significant impacts on the pesticide industry by promoting competition…[,]" whereas prior to the amendments, FIFRA "skewed … in favor of the largest corporations …."[27]  Congress's goal was to "eliminate the factors that led to increased concentration [and] reduced competition."[28]

59.    Thus FIFRA's objective is to facilitating generic entry of competing AIs while rewarding new innovation, which was intended to encourage competition and lower prices to downstream purchasers (including, in this case, Arkansas farmers).

**D.    The Traditional Distribution Channel**

60.    As alleged above, there are both "basic" and "generic" (or "post-patent") manufacturers of crop-protection products. Basic manufacturers: (a) research and develop new Active Ingredients; and (b) manufacture and sell crop-protection products containing those Active

---

[26]    See generally Francine Schulberg, *The Proposed FIFRA Amendments of 1977: Untangling the Knot of Pesticide Registration*, 2 HARV. ENVT'L. L. REV. 342 (1977); see also Report of the Committee on Agriculture, Nutrition, and Forestry, *Extension of the Federal Insecticide, Fungicide, and Rodenticide Act*, 95 S. Rep. 334 at 30-31 (Explaining that "streamlined" post-patent generic AI product registration intended to increase competition in the manufacture of products containing post-patent AIs).

[27]    *Id.* at 360; accord U.S. Environmental Protection Agency, Office of Pesticide Programs, *FIFRA: Impact on the Industry* (reprinted in 95 S. REP. 334 at 34-55 (1977) ( EPA advocated that "a streamlined FIFRA generic registration process] "increase[s] competition in the production and sale of technical-grade pesticides [*i.e.,* AIs] on which the patents have expired …."").

[28]    *Id.*

Ingredients. Generic manufacturers only manufacture and sell crop-protection products containing Active Ingredients that other basic manufactures have developed. As a result, basic manufacturers benefit from the exclusivity rights provided by federal law, while generic manufacturers typically only try to enter the market once the exclusivity rights belonging to basic manufacturers have expired.

61.    Defendants are among the top 20 global agrochemical companies. In Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales) and Corteva was reported to be number four (with $7.2 billion in sales).[29]

62.    There are more than a dozen generic manufacturers of crop-protection products in the United States. Generic manufacturers are capable of producing the same crop-protection products as basic crop-protection product manufacturers like Syngenta and Corteva. Generic products are essentially the same products as the name brand.

63.    In general, crop-protection product manufacturers sell to distributors that in turn sell to retail outlets dispersed across the country in close proximity to farmers, be they shops or dealers specializing in agricultural products, cooperatives, supermarkets, or household or garden retailers.

64.    In the United States, approximately 80% of retail locations selling crop-protection products are owned by distributors.[30] The remainder are independent retailers who are authorized by Defendants to sell their crop-protection products.

---

[29]    Shane Thomas, *Upstream Ag Insights - October 16th 2022*, *Essential news and analysis for agribusiness leaders*, UPSTREAM AG INSIGHTS (Oct. 16, 2022), https://www.upstream.ag/ p/upstream-ag-insights-october-16th.

[30]    Margy Eckelkamp, *8 Things to Know About the FTC Suing Syngenta and Corteva*, SCOOP (Oct. 10, 2022), https://www.thedailyscoop.com/news/retail-business/8-things-know-about-ftc-suing-syngenta-and-corteva.

65.    Basic manufacturers exercise control over retailers by having their local sales representatives work closely with the retailers. Sales representatives help retailers develop and implement business plans to influence farmer demand. The manufacturers' local sales representatives also monitor a retailer's sales to farmers in a certain area.

66.    This established path-to-market is referred to as "the traditional distribution channel." Sales through the traditional distribution channel account for approximately 90% of all crop-protection product sales in the United States.

67.    The seven largest crop-protection product distributors in the United States include: Helena Agri-Enterprises, LLC ("Helena"); Nutrien Ag Solutions, Inc. "(Nutrien"); GROWMARK, Inc.; WinField Solutions, LLC; J.R. Simplot Company; Wilbur-Ellis Agribusiness ("Wilbur-Ellis"); and CHS Inc.[31]

68.    These seven distributors account for over 90% of sales through the traditional channel and approximately 70% or more of all sales of crop-protection products in the United States.[32]

69.    Figure 2 below describes the crop-protection product traditional distribution channel in detail:

---

[31]    *CropLife Magazine Unveils Annual Ranking of Top 100 U.S. Ag Retailers*, CROPLIFE (Dec. 11, 2019), https://www.croplife.com/croplife-top-100/croplife-magazine-unveils-annual-list-top-100-u-s-ag-retailers/.

[32]    Eric Sfiligoj & Lara Sowinski, *The Big Seven of the CropLife 100: The Evolution of America's Largest Ag Retailers*, CROPLIFE (Apr. 23, 2024), https://www.croplife.com/croplife-top-100/the-big-seven-of-the-croplife-100-the-evolution-of-americas-largest-ag-retailers/.

**Figure 2**[33]



70.    Selling through distributors is the most efficient way for a crop-protection product manufacturer to reach farmers. Likewise, the traditional distribution channel is an effective means by which farmers acquire crop-protection products. Distributors typically offer services and functions such as warehousing, transportation, credit, and marketing. Additionally, distributors provide manufacturers access to a network of retail and farmer-customers, and to the logistics networks required to service widely dispersed customers. By selling through a relatively small number of distributors, a crop-protection product manufacturer can reach thousands of retailers and, in turn, hundreds of thousands of farmers. Distributors also provide scale and services that

---

[33]    UN WHO-FAO Report, *supra* note 20, at 25.

would require substantial investments for a manufacturer to replicate. Therefore, crop-protection product manufacturers cannot efficiently compete by circumventing the traditional distribution channel and focusing primarily on direct sales to local retailers or farmers.

### E.     Life Cycle Management of Crop-Protection Products

71.     As with pharmaceuticals, generic crop-protection products are generally sold at significantly lower prices than equivalent branded products. Accordingly, to the extent generic manufacturers are able to gain market access with respect to a given Active Ingredient, their entry generally sparks price competition and causes the price and sales volume of branded products containing that Active Ingredient to decline. This, in turn, causes the associated profits of basic manufacturers to decline.

72.     As the UN WHO-FAO Report explains, "[c]ompetition based on whether an active ingredient is under patent or off-patent has ***markedly influenced pesticide pricing in the last few decades***."[34]

73.     As just one example, the Active Ingredient glyphosate was introduced to the market in 1974 and became "the most used herbicide in the world."[35] The patent for glyphosate expired in 2000, which resulted in "large-scale generic production" of the ingredient.[36] Prices for crop-protection products containing glyphosate "***dropped by almost 60 per cent***" over the next 14 years.[37]

---

[34]  *Id.* at 47.

[35]  *Id.*

[36]  *Id.*

[37]  *Id.*

74. Once lower-priced generic crop-protection products enter the market, farmers are able to save money. It is that simple.

75. Nevertheless, in response to actual or expected generic entry of crop-protection products, Defendants have employed certain ███████████ strategies – ████████████████ ████ – designed solely to inhibit or block generic entry after the end of Active Ingredient patent and regulatory exclusivity period, and to minimize the competitive impact of such entry on the prices and market shares of branded products containing the same Active Ingredient.[38] Both Syngenta and Corteva have used their respective Loyalty Programs with distributors or retailers to accomplish these anti-competitive and unlawful restraints of trade.

## V.    DEFENDANTS' UNLAWFUL CONDUCT

76. Defendants each operate Loyalty Programs designed to severely limit the distribution of competing generic products and, ultimately, Arkansas farmers' ability to purchase more affordable generic pesticides. Each Defendant designed and administered – and continues to administer – each of its Loyalty Programs with the purpose, intent, and expectation of impeding generic competition, thereby maintaining higher market prices and higher branded market shares than would otherwise prevail in a competitive market after the expiration of FIFRA and patent exclusivity periods. Each Defendant does so for its own benefit and for the benefit of its distributor or retailer partners.

77. While the details of Defendants' respective Loyalty Programs may differ slightly, they are all substantially the same. Under each respective Loyalty Program, Defendants offer substantial exclusion payments to distributors or retailers conditioned on distributors or retailers

---

[38] *See* FTC-CTVA_00003831; FTC-CTVA_00001306; SYT_REBATELIT_00220795-856

limiting purchases of generic crop-protection products containing specified post-patent Active Ingredients.

78.    Those Loyalty Program-based exclusion payments are made annually and are generally calculated based upon an intentionally obscure formula that considers the percentage of the distributor's or retailer's total purchases or sales of a Defendant's brand name crop-protection product containing the specified Active Ingredient as compared with total sales of products with that Active Ingredient.

79.    Because the exclusion payments are calculated and paid in a single payment at the end of the year, distributors and retailers do not and cannot know what their exclusion payments will be until after the growing season is over. Indeed, in Corteva's case, earned payments in a given year are spread out over subsequent years under threat of losing the originally earned payments if distributors or retailers fail to meet required thresholds payments in subsequent years.[39] As a result, they are financially incentivized to maintain higher prices for brand-name products and lower percentages of sales of generic versions of an Active Ingredient in order to meet their anticipated goals in the event of some downturn during the growing season.

80.    Separate and apart from the financial incentive to refrain from selling generic versions of an Active Ingredient, each Defendant's Loyalty Program(s) limits the amount of generic equivalent crop-protection products to often 15% or less of a distributor's or retailer's sales for a the particular relevant AI formulation. This percentage allowance of a distributor's or retailer's total purchases or sales of an Active Ingredient, is referred to as "open space" or "head

---

[39]    For example, in Year 1, a retailer earns 100% of available rebate payments but is paid less than the total amount earned, the remainder being held hostage to ensure compliance with Corteva's rebate programs for Year 2 and even for Year 3. Failure to meet required thresholds in Year 2 or Year 3 can then result in complete loss of the remainder of the previously earned payment from Year 1.

space." Thus, for example, if a distributor were to sell lower-priced generic equivalent crop-protection products in excess of the "open space" permitted by Defendants' Loyalty Programs, the distributor would jeopardize its "loyalty payment" from Defendants entirely.

81.    Thus, distributors and retailers are incentivized to sell less of generic versions of crop-protection products with a particular Active Ingredient, because selling more generic product would decrease, if not eliminate, their "loyalty payments." This methodology also discourages distributors or retailers from competing with each other on price, and from distributors passing the Loyalty Program-based payments onto retailers. Indeed, passing loyalty payments onto retailers would evidently lower the competing distributor's Loyalty Program-based "loyalty payments."

82.    Moreover, demand for crop-protection products is relatively inelastic, in that farmers need and purchase only so much. Individual farmers, including in Arkansas, have a set amount of land to grow their crops, for which they would use a set amount of crop-protection products in a given season. Any variation in the use of crop-protection products would be the result of variations in the crop, the weather, and the prevalence of the pests being protected against, not variations in the price of crop-protection product. In other words, Arkansas farmers do not buy more if the price of crop-protection products drops or less if the price goes up. For example, if a farmer generally needs 100 gallons of a crop-protection product to control a particular pest, he or she may purchase more or less of the product based upon what is necessary to control that pest under then-prevalent conditions, not whether the price of the product goes up or down.

83.    Additionally, sales of generic crop-protection products doubly affect the distributor's or retailer's bottom line. If, hypothetically, a gallon of name-brand product sells for $3.00 and a gallon of the same generic product sells for $1.00, the distributor or retailer loses $3.00

worth of sales that would count toward its Loyalty Program-based payment, plus the greater profit on the name-band product.

84.     Defendants have typically added an Active Ingredient formulation to their Loyalty Programs either shortly before, or upon, the expiration of patent or FIFRA exclusivity, or if they otherwise expect generic competition. That is, once Defendants expect generic competition for an Active Ingredient, Defendants place that branded Active Ingredient in their respective Loyalty Program(s).

85.     Defendants' Loyalty Programs are plainly designed to freeze out generic manufacturers and enable Defendants to retain market share while pricing their crop-protection products above competitive levels. With respect to the Relevant AIs that are the primary focus of this Second Amended Complaint ("SAC"), each Defendant has substantially achieved these goals. Through its Loyalty Programs, each Defendant has substantially impeded generic manufacturers from providing effective competition and has maintained prices for crop-protection products above competitive levels.

86.     Defendants' Loyalty Programs are not simply good old-fashioned competition among competitors in the same market, as might be the case between two brand-name companies competing with each other on a level playing field, each with access to the traditional distribution channels. Generic manufacturers are not on a level playing field with brand-name manufacturers. Unlike smaller generic manufacturers, these already giant brand-name manufacturers (*i.e.*, Defendants) have reaped more than a decade of substantial monopoly profits and unimpeded access to consumers through the limited traditional distribution channels available to consumers to access crop-protection products. Now, Defendants have tied up virtually all distribution channels, choking off generic manufacturers' access to customers.

40   CRTVA-CPL-00819719-735 at -732.

41   FTC-CTVA_01046974-979 at -978.

42   *Id*. at -974.



## A.    Syngenta's Key AI Loyalty Program

93.    Syngenta refers to its Loyalty Program as the "Key AI" program. Syngenta operates this program with both distributors **and** retailers. Syngenta's use of loyalty programs goes back about twenty years. As early as 2004, Syngenta acted with distributors to incentivize their stocking and sale of certain brand products to American farmers.

94.    Syngenta designed its Key AI Loyalty Program to maintain supracompetitive profits, which it shares in part with its distributor and retailer partners. The supracompetitive profits achieved by Syngenta come at a great cost to Arkansas farmers. Syngenta accomplishes

---

43    *See, e.g.*, FTC-CTVA_00427455 at -455-456.

44    Videotaped Deposition of Kevin Gesse, 205:9-16 (Apr. 15, 2025).

45    SYT_REBATELIT_00276437-438 at -437.

46    *See* FTC-CTVA_00095722-723 at -722; SYT_REBATELIT_02838432-433 at -433; Videotaped Deposition of Ross Weikel, 300:16-301:24 (Mar. 18, 2025).

these profits by restricting access to the traditional distribution channel for generic crop-protection products, thereby elevating both its market prices and share.

95.    Syngenta implements its Key AI Loyalty Program for distributors through written marketing agreements with participating distributors. Defendant Syngenta Crop Protection, LLC is the Syngenta entity that signs these agreements.

96.    Among the AIs included or that have been included in the Key AI Loyalty Program are azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole.

97.    To qualify for an exclusion payment for a given Relevant AI in a given year (running from October 1 through September 30), a distributor must source and sell a certain percentage of its purchases or sales of that Relevant AI from Syngenta rather than from generic manufacturers. The specified threshold is usually 85% or more, and it can be as high as 99%, *i.e.*, the open space for generic competition is usually no greater than 15% and can be as low as 1%.

98.    Syngenta calculates a distributor's loyalty performance for a given year as follows: the numerator is the amount of Relevant AI contained in "qualification-eligible" products purchased or sold by the distributor in the year. These include Syngenta-branded products and certain non-Syngenta products for which the Relevant AI is sourced from Syngenta, either in a finished crop-protection product or as a technical-grade or manufacturing-use Relevant AI. The denominator consists of the same qualification-eligible Relevant AI amount, plus the amount of non-Syngenta (typically generic) Relevant AI purchased or sold by the distributor. In some cases, particularly where another basic manufacturer's product uses Syngenta-sourced Relevant AI, Syngenta will treat the product as "neutral" under the Key AI Loyalty Program, counting the corresponding Relevant AI amounts in neither the numerator nor the denominator.

99. By restricting its purchase or sale of generic products to satisfy the specified loyalty threshold, a distributor is eligible to reap various "special marketing bonuses" (exclusion payments) under its Syngenta marketing agreement. Although these payments differ by year, by Relevant AI, and by distributor, and are subject to complex calculations and additional conditions, they generally amount to a high single-digit or greater percentage of the distributor's purchases or sales of eligible Syngenta-branded crop-protection products during the market year. Thus, a distributor or retailer that makes a single purchase of a single product that causes it to miss an Active Ingredient threshold stands to lose exclusion payments from Syngenta associated with many purchases of several crop-protection products that contain that Relevant AI. Syngenta generally makes a single exclusion payment to each distributor at the end of the year.

100. The Relevant AIs included in distributor marketing agreements can vary by year and across distributors, as can the associated share thresholds and calculation methods, but generally Syngenta applies similar loyalty thresholds across all distributors.

101. In addition to its Key AI Loyalty Program with distributors, Syngenta also requires retailers to meet loyalty thresholds to receive exclusion payments under its Key AI Loyalty Program with retailers. The stated intent of this program is to "[r]eward Retailers for their support of Syngenta products where a generic alternative exists,"[47] and to "defend[] Syngenta's market share position."[48]

102. Syngenta's retail Key AI Loyalty Program operates in a manner that is similar to its distributor program, including conditioning additional exclusion payments on the retailer limiting generic purchases of specified Relevant AIs. The Key AI Loyalty Program with retailers

---

[47] *See, e.g.*, SYT_REBATELIT_00028843-858 at -846.

[48] *See, e.g.*, SYT_REBATELIT_01192364-371 at -366.

generally offers loyal retailers an exclusion payment of 5% of total eligible purchases of covered Syngenta products. Participating retailers accept Syngenta's offers by complying with the terms of the offers, *i.e.*, through performance.

## B. Corteva's Loyalty Programs

103.    Corteva's Loyalty Programs are, likewise, long standing. Corteva's corporate predecessor, DuPont, had similar loyalty programs at least as early as 2005. Corteva, which was spun-off as a stand-alone company in 2019, continued DuPont's programs.

104.    Corteva's loyalty agreements cover or have covered each of the Corteva Relevant AIs: rimsulfuron, oxamyl, acetochlor, cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid, implemented at both the distributor level and retailer level. Corteva operates two related published Loyalty Programs that condition exclusion payments to distributors on meeting loyalty thresholds for specified Relevant AIs. First, Corteva operates a program known as the "Crops, Range & Pasture and Industrial Vegetation Management (IVM) Loyalty Program" ("CRPIVM Loyalty Program"). Corteva implements its CRPIVM Loyalty Program through written agreements with participating distributors. Second, Corteva operates a program known as the "Corporate Distributor Offer." Corteva implements its Corporate Distributor Offer through written offers that participating distributors accept by complying with the terms of the offers, *i.e.*, through performance. Corteva's Corporate Distributor Offer covers a wide variety of products and a variety of incentives that often provide significantly substantial annual payments to distributors further binding a distributors' commitment to Corteva.

105.    Corteva's Loyalty Programs are designed to maintain "value," meaning higher prices and profits, for both Corteva and its distributor partners in the face of generic competition. According to one Corteva employee, the "primary objective" of the Loyalty Programs is to prevent

the "value" deterioration associated with generic entry, in other words, to maintain high prices and market shares.[49]

106.    To qualify for an exclusion payment for a given Relevant AI in a given market year under the CRPIVM Loyalty Program, a distributor must source a certain percentage of its purchases of that Relevant AI from Corteva. The specified threshold is generally at least 85%, and may be more, depending on the Relevant AI. In other words, the open space for competing generic products in this Corteva Loyalty Program is generally no greater than 15% and may be as low as a single-digit percentage. The CRPIVM Loyalty Program requires the distributor to reach the minimum loyalty threshold for in order to receive exclusion payments for a particular ingredient in a particular year. For most Relevant AIs, a distributor can also reap a larger payment by meeting a second, and more exclusionary higher threshold.

107.    Under its Loyalty Programs, Corteva calculates each distributor's achieved loyalty level by measuring the distributor's purchases of the Relevant AI from Corteva as a percentage of the distributor's total purchases of the Relevant AI (*i.e.*, units of Relevant AI purchased from both Corteva and non-Corteva, typically generic, sources). In some cases, such as where a product containing a given Active Ingredient is not marketed for use on crops, Corteva will treat a product as "neutral" and exclude it from this calculation.

108.    Corteva generally makes a single CRPIVM Loyalty Program exclusion payment to distributors at the end of the year. Because exclusion payments under the CRPIVM Loyalty Program are calculated as a percentage of all of the distributor's eligible purchases during the market year, a distributor that makes a single purchase of a single product that causes it to miss an Active Ingredient threshold stands to lose exclusion payments from Corteva associated with many

---

[49]    FTC-CTVA_00286316-319 at -316.

purchases of many products that contain that Relevant AI. The percentage that Corteva pays varies by year, by Relevant AI, and by that Relevant AI's threshold level.

109.    Each Corteva Loyalty Program-based offer also typically contains a term that if the distributor does not meet its thresholds for every one of the products in the loyalty offer, it forfeits its loyalty payments for all products.

110.    Corteva designed its Loyalty Programs to maintain supracompetitive profits, which it shares in part with its distributor and retailer partners. The supracompetitive profits achieved by Corteva come at a great cost to Arkansas farmers. Corteva accomplishes these profits by restricting access to the traditional distribution channel for generic products, thereby elevating both its market prices and share.

### C.    Operation of and Adherence to Defendants' Loyalty Programs

111.    For many years, each Defendant has maintained Loyalty Program agreements with a group of distributors or retailers that collectively comprise approximately 90% or more of all crop-protection product sales in the United States, including in Arkansas.

112.    Defendants' agreements with participating distributors or retailers require distributors or retailers to meet very high loyalty thresholds for each Relevant AI in exchange for receiving exclusion payments from Defendants, generally 85% or higher. Participating distributors or retailers have generally adhered to these thresholds, which provided Defendants with a substantial percentage and almost exclusive control of the crop-protection product markets. In exchange, for adherence to these high loyalty thresholds, each Defendant has made substantial exclusion payments to participating distributors or retailers.

113.    Each Defendant enters into Loyalty Program agreements with most leading distributors or retailers. This fact is widely known in the industry, and gives participating

distributors or retailers increased confidence that no significant competing distributor or retailer will undercut them by partnering closely with low-priced generic manufacturers because Defendants' Loyalty Programs make it in each distributor's or retailer's respective economic self-interest to participate in the Loyalty Programs and shun generic manufacturers from entering and competing in the crop-protection products market.

114. Moreover, both Syngenta and Corteva provide assurances to their distributors or retailers from time to time that other distributors or retailers are adhering to their obligations under their respective Loyalty Programs. One example of Corteva's Loyalty Programs messaging to distributors states that "all channel partners" (*i.e.*, partners in the distribution channel) are adhering as to a covered Relevant AI, that Corteva has "always stood with the Channel," and that, in reference to Corteva's generic defense strategy, "[i]f we stay together it won't fail."[50]

115. Defendants also enter into Loyalty-Program agreements with substantially all leading distributors, a commonly known fact in the industry. The wide-spread participation of leading distributors increases participating distributors' confidence that no competing distributor will partner with a generic manufacturer to undercut them. Defendants also promote this broad adherence and participation to distributors as a means to provide assurances that no competing distributor is breaking ranks by partnering with a generic or by selling more generic products than its permitted loyalty open space.

116. Defendants have strictly enforced the terms of their Loyalty Programs. Each Defendant regularly exercises the contractual right to withhold exclusion payments, canceling distribution contracts, delaying access to new products, or withholding product allocation during

---

[50]   FTC-CTVA_00945191-193 at -191.

a supply shortage. Each Defendant rarely grants exceptions for missed thresholds without good cause.

117.    Through these and other acts, Defendants have disincentivized distributors or retailers from dealing with generic manufacturers, lest they risk missing loyalty thresholds and, thus, Loyalty Program-based payments. In fact, in some instances, distributors will not purchase from generic manufacturers at all. Defendants have strictly enforced the terms of their Loyalty Programs. Thus, the consequences of missing a loyalty threshold can be incredibly severe. As a result, distributors often decline to purchase or promote generic products or defer purchases of generic products until the end of the season, which allows them to minimize the risk of inadvertently missing a loyalty threshold due to late-season returns or shifts in demand.

118.    Further, Defendants' Loyalty Programs were also designed to discourage distributors from passing exclusion payments on to farmers during the year in the form of lower prices. As exclusion payments are usually made as a single payment at the end of the year and eligibility and payment calculations are complex, involving multiple products with varying active ingredient contents, the lack of transparency and uncertainty of receiving exclusion payments make it less likely that a distributor will lower its prices in anticipation of receipt of a future (uncertain) exclusion payment.

119.    These Defendant-made circumstances have created an environment where distributors or retailers are incentivized to be extremely cautious in their dealings with generic manufacturers or to avoid them altogether. In dealing with generic manufacturers, distributors or retailers would risk missing loyalty thresholds, and in some instances, the consequences of missing a loyalty threshold can be so severe that distributors have even endeavored to exceed loyalty

thresholds by a healthy margin and have deferred purchases of generic products until the end of the season, in order to minimize the risk of inadvertently missing a loyalty threshold.

120.    While Defendants have described these exclusion payments as profit-enhancing "rewards" for a distributor's or retailer's loyalty performance and support of branded products over generic products, they are no such thing. Defendants' exclusion payments are not discounts – rather, they are payments to distributors or retailers in exchange for anticompetitive exclusivity.



123.

---

51    FTC-CTVA_00286020-026 at -026.

52    FTC-CTVA_00199263-264 at -264.

[53]

[53] SYT_REBATELIT_00326337-338.

[54] HAE (CID)_0014170-171 at -170.

[55] SYT_REBATELIT_02933248-252 at -249.



### D.    Relevant Syngenta Active Ingredients

128.    Syngenta's Key AI Loyalty Program applies to Active Ingredients that are threatened by generic competition. These include the six Syngenta Relevant AIs that are the primary focus of this SAC: azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole.

---

56    NUTR_00034157-159 at -157.

57    NUTR_00034160-165 at -163.

58    SYT_REBATELIT_01289650-652 at -650.

i.    *Azoxystrobin*

129.    Azoxystrobin is a broad-spectrum fungicide used to protect a wide variety of crops from fungal diseases and has annual global sales of over $1 billion.

130.    Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Both Syngenta's exclusive-use period under FIFRA and the relevant patent protection for azoxystrobin expired no later than 2014.

131.    Syngenta sells azoxystrobin as the product Quadris. Syngenta publicly touts Quadris as a superior product, claiming that it provides "complete plant protection," offers effective control of "all four classes of fungi," and "optimizes" yield and quality by helping the plant to efficiently use resources.[59] Azoxystrobin is also the sole Active Ingredient in Syngenta's product Heritage, which Syngenta describes as a "unique" fungicide with "a novel mode of action."[60]

132.    Syngenta also sells mixed-ingredient fungicide products that include azoxystrobin, such as Miravis Neo and Trivapro. Syngenta advertises Miravis Neo as setting "the standard in its class for broad-spectrum disease control and plant-health benefits."[61] Syngenta sells Trivapro as "the hardest-working, longest-lasting fungicide."[62]

---

[59]    Quadris Fungicide, SYNGENTA U.S., https://www.syngenta-us.com/fungicides/quadris (last visited May 6, 2025).

[60]    Heritage Fungicide, SYNGENTA GREENCAST, https://www.greencastonline.com/products/heritage-fungicide/turf (last visited May 6, 2025).

[61]    Miravis Neo Fungicide, SYNGENTA U.S., https://www.syngenta-us.com/fungicides/miravis-neo (last visited May 6, 2025).

[62]    Trivapro Fungicide, SYNGENTA U.S., https://www.syngenta-us.com/fungicides/trivapro (last visited May 6, 2025).

133.    In or about 2014, Syngenta adopted a post-patent strategy to "aggressively defend [its] azoxystrobin share position while upholding market value." Syngenta projected that if it did not do so, including by deploying Loyalty Programs, both it and the traditional distribution channel would lose substantial revenues and profits due to downward pricing pressure from generic entry. On the other hand, were Syngenta to succeed in securing loyalty from a critical mass of the traditional distribution channel, Syngenta projected that azoxystrobin pricing would remain flat for several years before beginning a slower descent. Syngenta anticipated that generic entry would, in any event, erode Syngenta's azoxystrobin prices and the corresponding "market value" to Syngenta, but that the erosion would be substantially more severe if it did not successfully implement its Key AI Loyalty Program and other generic countermeasures.

134.    To prevent the effects of unimpeded generic competition, Syngenta added azoxystrobin to its Key AI Loyalty Program, beginning in or about the 2013-2014 market year, with a 98% share threshold, *i.e.*, only 2% open space. The threshold was gradually reduced over time to 92%, *i.e.*, only 8% open space, where it stands today. Under its Key AI Loyalty Program, Syngenta has made, and continues to make, exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic azoxystrobin products.

135.    Syngenta's Key AI Loyalty Program has substantially impeded generic manufacturers from providing effective competition in the sale of azoxystrobin products and as a result has maintained supracompetitive prices for azoxystrobin products. Following the expiration of Syngenta's patent exclusivity, a number of generic manufacturers introduced azoxystrobin products in the United States. Generic azoxystrobin products were priced significantly below Syngenta's existing azoxystrobin crop-protection products. In spite of this, generic manufacturers

have struggled to make inroads with distributors, thus preventing accessibility to generic products and forcing Arkansas farmers to purchase Syngenta's azoxystrobin products from distributors and retailers at supracompetitive prices.

136.    To meet the Key AI Loyalty Program threshold, distributors strictly manage their generic azoxystrobin limited open space under the Loyalty Program, steer their Arkansas farmers towards Syngenta's azoxystrobin products, and stop selling generic products once their open space is used up despite continued demand from Arkansas farmers for lower-priced azoxystrobin products. As a result, generic manufacturers seeking to sell crop-protection products containing azoxystrobin have found distributors unwilling to purchase more than minimal amounts of their products because of the threshold requirements of Syngenta's Key AI Loyalty Program.

137.    At least two generic manufacturers have exited the market entirely. These two generic manufacturers abandoned azoxystrobin products after failing to achieve market success in the face of constraints imposed by Syngenta's Key AI Loyalty Program. At least one generic manufacturer decided against introducing an azoxystrobin product altogether due to the lack of market access created by Syngenta's Key AI Loyalty Program.

138.    In at least one instance, a generic manufacturer has been hindered in its attempt to market an innovative product containing azoxystrobin. This generic manufacturer sought to combine azoxystrobin with a different fungicide to target a market opportunity presented by particular crop diseases. Distributor customers were unwilling to purchase significant amounts of the product because the inclusion of azoxystrobin in the product could impact distributors' ability to meet Syngenta's loyalty threshold.

139.    The presence of generic products in the market has caused Syngenta to reduce prices of azoxystrobin products to some degree. However, Syngenta's prices for azoxystrobin

remain significantly above competitive levels than if generic products were able to compete in a fair and open market. Syngenta's Key AI Loyalty Program has resulted in higher prices for crop-protection products containing azoxystrobin than would prevail in a competitive market.

### ii.     *Mesotrione*

140.     Mesotrione is a widely used corn herbicide. Sales of crop-protection products containing mesotrione in the United States totaled over $740 million in 2020.

141.     Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Both Syngenta's exclusive-use period under FIFRA and relevant patent protection for mesotrione expired no later than 2014.

142.     Syngenta sells mesotrione as the product Callisto. Syngenta's advertising claims that Callisto provides residual broadleaf weed control, flexible timing, and "excellent" crop safety.[63]

143.     Mixed-ingredient herbicide products sold by Syngenta, such as Lumax EZ and Acuron, also include mesotrione. Syngenta sells Lumax EZ as enabling "one-pass weed control in corn with a single product for broader-spectrum control"[64] while touting Acuron as the product that "outperforms and outyields other corn herbicides."[65]

144.     Because of the danger of generic competition, Syngenta added mesotrione to its Key AI Loyalty Program. Mesotrione was first added to the program in or about the 2014-2015

---

[63]  Callisto Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/callisto (last visited May 6, 2025).

[64]  Lumax EZ Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/lumax-ez (last visited May 6, 2025).

[65]  Acuron Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/acuron (last visited May 6, 2025).

market year, with a 99% share threshold, *i.e.*, only 1% open space. Syngenta gradually lowered the loyalty threshold over time, arriving at 92% (*i.e.*, only 8% open space) for the 2020-2021 market year.

146.    Under its Key AI Loyalty Program, Syngenta has made and continues to make exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic mesotrione products to Arkansas farmers.

146.    Syngenta's Key AI Loyalty Program has substantially impeded generic manufacturers from providing effective competition in the sale of mesotrione products. A generic manufacturer first introduced a mesotrione product in or about 2016, but quickly left the market because it was unable to fairly compete against Syngenta's strict Key AI Loyalty Program restrictions.

147.    Because of the incentives created by Syngenta's Key AI Loyalty Program, major distributors have repeatedly met Syngenta's mesotrione loyalty threshold. To meet the Key AI Loyalty Program threshold, distributors strictly manage their generic mesotrione limited open space under the Key AI Loyalty Program and curtail marketing efforts associated with generic mesotrione. Some distributors have removed generic mesotrione products from their price lists altogether due to Key AI Loyalty-Program considerations. Loyalty-Program constraints have, thus, prevented distributors from purchasing more than minimal amounts of generic mesotrione (or in some cases, any at all) despite generic products being of sufficient quality and having supply availability.

148.    Two generic manufacturers delayed or terminated their planned mesotrione entry due to Loyalty Program concerns. A third developed a mixture product containing mesotrione, but

dropped the product after the manufacturer was unable to make sufficient sales in the face of Syngenta's Key AI Loyalty Program.

149.    The presence of generic products in the market has caused Syngenta to reduce prices of its mesotrione products to some degree; however, Syngenta's prices remain significantly above competitive levels than if generic products were able to compete in a fair and open market. Syngenta's Key AI Loyalty Program has resulted in these higher prices for crop-protection products containing mesotrione at the expense of Arkansas farmers.

150.    Following the expiration of the mesotrione patent and the regulatory terms protecting Syngenta's exclusivity, Syngenta was not only faced with the threat of generic entry, but also faced a threat from Corteva. Corteva's predecessor company had developed a mixture product containing mesotrione and two other Active Ingredients. In response to Corteva's threat, Syngenta leveraged its ability to prevent distributors from purchasing significant quantities of products containing mesotrione from generic manufacturers, via its Loyalty Programs, to enter into a separate supply agreement with Corteva.

151.    Under this supply agreement, Syngenta would supply the mesotrione that Corteva would then use in its mixture products at specified prices. Syngenta executives were involved in the negotiation of this supply agreement and a Syngenta Corporation executive is believed to manage Syngenta's contacts with Corteva regarding the supply agreement.

152.    Along with Defendants' other anticompetitive conduct, this mesotrione supply agreement has further harmed competition in the sale of crop-protection products containing mesotrione.

### iii.    *Metolachlor and S-Metolachlor*

153.    Metolachlor (used herein to refer to both the original metolachlor compound and the subsequent S-metolachlor variant, each as described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugarbeets. Sales of crop-protection products containing metolachlor in the United States totaled over $470 million in 2020.

154.    The original metolachlor compound was developed, patented, and registered with the EPA by a Syngenta predecessor company in or about 1976, and Syngenta's relevant patent protection for that compound expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered a variant of the original metolachlor, known as S-metolachlor.

155.    Both Syngenta's exclusive-use period under FIFRA and relevant patent protection for S-metolachlor expired no later than 2010. A patent held by Syngenta relating to S-metolachlor manufacturing processes also expired in or about July 2016.

156.    Syngenta sells metolachlor under brand names that use the term "Dual." There have been multiple iterations of Syngenta's "Dual" product, the most recent of which is the Dual II Magnum herbicide. According to Syngenta, Dual II Magnum provides season-long weed control, eliminates any early-season weed competition that threatens yield production while plants are most vulnerable, and has flexible application timing. Syngenta also sells premixes of Dual II Magnum and other herbicides.

157.    Most farmers consider the term "Dual" to be synonymous with "metolachlor."

158.    In or about the early 2000s, in response to anticipated generic competition on the original form of metolachlor, Syngenta added metolachlor to its Key AI Loyalty Program, with loyalty thresholds at or above 90% (*i.e.*, only 10% open space), and Syngenta's loyalty threshold

stands at 90% today. Syngenta counts the original metolachlor and the S-metolachlor variant, which are commonly viewed as largely interchangeable at varying use rates, as a single Active Ingredient for purposes of its Key AI Loyalty Program. This means that there is a single loyalty calculation for the two variants, and a distributor that purchases too much original metolachlor from a generic manufacturer (as a proportion of its combined metolachlor and S-metolachlor purchases) risks forfeiting payments associated with Syngenta S-metolachlor products.

159.    Under its Key AI Loyalty Program, Syngenta has made and continues to make exclusion payments to distributors and retailers to deter them from marketing significant volumes of competing, lower-priced generic metolachlor products to Arkansas farmers.

160.    Syngenta's Key AI Loyalty Program has substantially impeded generic manufacturers from providing effective competition in the sale of metolachlor products. Because of the incentives created by Syngenta's Key AI Loyalty Program, major distributors have repeatedly met Syngenta's metolachlor loyalty threshold.

161.    To meet the Loyalty Program threshold, distributors strictly manage and allocate their limited generic metolachlor open space and steer their customers toward loyalty compliant metolachlor products, despite Arkansas farmers' demand for lower-priced generic products that exceeds the available open space. Some distributors and retailers have removed generic metolachlor products from their price lists altogether because of Loyalty-Program considerations. Generic manufacturers seeking to sell crop-protection products containing metolachlor have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of Loyalty-Program requirements. Thus, Loyalty-Program constraints have prevented distributors from purchasing more than minimal amounts of generic metolachlor, despite generic products being of sufficient quality and having supply availability.

162.    Although generic manufacturers introduced products containing original metolachlor in or about 2003, they were unable to achieve significant market success. Other generic manufacturers delayed or canceled introduction of metolachlor products because of Syngenta's Key AI Loyalty Program. More recent attempts by generic manufacturers to enter the market for the sale of crop-protection products containing S-metolachlor have, likewise, been marginalized by Syngenta's Key AI Loyalty Program.

163.    In at least one instance, a generic manufacturer was thwarted in its attempt to innovate with a product containing metolachlor. The generic manufacturer considered combining metolachlor with a different herbicide to market a new mixture product. However, the manufacturer decided not to bring the product to market, because of concerns that Syngenta's Key AI Loyalty Program would prevent the manufacturer from gaining market share in the United States.

164.    The presence of generic products in the market has caused Syngenta to reduce prices of its metolachlor products to some degree, but Syngenta's prices remain significantly above competitive levels than if generic manufacturers were able to compete in a fair and open market. Syngenta's Key AI Loyalty Program has resulted in higher prices for crop-protection products containing metolachlor than would prevail in a competitive market.

165.    As is the case with mesotrione, Syngenta obtained and maintains a separate agreement with Corteva (and its predecessor DuPont) for the supply of the technical-grade and manufacturing-use S-metolachlor used in Corteva-branded products. Similarly, a specific Syngenta executive manages Syngenta's contacts with Corteva regarding the S-metolachlor supply agreement. This S-metolachlor supply agreement has also reduced Corteva's need to challenge Syngenta's Loyalty Program by sourcing generic metolachlor or S-metolachlor at lower prices.

166.    Further to Defendants' other anticompetitive conduct, this metolachlor supply agreement has harmed market competition in the sale of crop-protection products containing metolachlor.

### iv.    *Fomesafen*

167.    Fomesafen is a post-emergent herbicide used primarily on soybeans, some other bean crops and cotton. Sales of crop-protection products containing fomesafen in the United States was estimated to be $100 million in 2023.[66]

168.    Syngenta sells single-AI fomesafen products under the Flexstar and Reflex brand names, among others. It also offers mixed products under the brand name Flexstar GT 3.5, which is a combination of fomesafen and glyphosate and Prefix, which is a combination of fomesafen and S-metolachlor.[67]

169.    Reflex was first registered with the EPA by Syngenta in 1987.[68] Thus, its FIFRA exclusivity expired in 1997.

---

[66]    *Fomesafen Market Size By Product, By Application, By Geography, Competitive Landscape And Forecast*, MKT. RSCH. INTELLECT, https://www.marketresearchintellect.com/product/global-fomesafen-market-size-and-forecast/ (last visited May 6, 2025).

[67]    Flexstar Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/flexstar (last visited May 6, 2025).

[68]    Details for REFLEX HERBICIDE, U.S. ENV'T PROT. AGENCY, https://ordspub.epa.gov/ords/pesticides/f?p=PPLS:8:::::P8_PUID,P8_RINUM:3025,100-993 (last visited May 6, 2025).

[69]    *See, e.g.*, SYT_REBATELIT_00692870 at -876; *see also* SYT_REBATELIT_01039451-468 at 458.

171.    Syngenta touts that Flexstar "manages glyphosate- and ALS-resistant weeds with fact contact activity."[70]

172.    Flexstar GT 3.5 "promotes the use of two different sites of action. When used in a two-pass system with an effective preemergence herbicide, it can provide overlapping residuals to help prevent or delay herbicide resistance."[71]

173.    Reflex "offers pre- and post-emergence management of difficult weeds such as glyphosate-resistant Palmer amaranth and ALS-resistant pigweed, grass and sedges. Reflex can be used on a wide range of crops, including cotton, dry beans, snap beans, potatoes and soybeans."[72]

174.    Syngenta says of Prefix, "[a] flexible application window enables Prefix to be applied as a preemergence herbicide or, if overlapping your residuals as part of a two-pass program, an early post-emergence herbicide with residual control of up to five weeks.[73]

---

[70]   Herbicides, SYNGENTA U.S., https://www.syngenta-us.com/crop-protection/herbicides (last visited May 6, 2025).

[71]   Flexstar GT 3.5 Herbicide, SYNGENTA U.S, https://www.syngenta-us.com/herbicides/flexstar-gt-3.5 (last visited May 6, 2025).

[72]   Reflex Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/reflex (last visited May 6, 2025).

[73]   Prefix Herbicide, SYNGENTA U.S., https://www.syngenta-us.com/herbicides/prefix (last visited May 6, 2025).

[74]   SYT_REBATELIT_02960897-900.

v.    *Lambda-Cyhalothrin*

176.    Lambda-Cyhalothrin is an insecticide that is designed to mimic the properties of the naturally occurring pesticide pyrethrin which is present in chrysanthemum flowers. It is primarily used to control the larvae of Lepidoptera insects on cotton, cereal and vegetable crops.[75]

177.    Syngenta sells four products containing lambda-cyhalothrin, Warrior II with Zeon Technology, which is a single-AI product, Besiege, which contains lambda-cyhalothrin and chlorantaniliprole, and Endigo ZC and Endigo ZCX, both of which contain lambda-cyhalothrin and thiamethoxam as AIs. Syngenta formerly sold a single-AI lambda-cyhalothrin product in the Unites States under the trade name Karate.[76]

178.    Warrior was first registered with the EPA by Syngenta in 1998.[77] Thus, FIFRA exclusivity expired in 2008.

179.    Lambda-Cyhalothrin 

180.    lambda-cyhalothrin  lambda-cyhalothrin

---

[75]  Cyhalothrin, WIKIPEDIA, https://en.wikipedia.org/wiki/Cyhalothrin (last visited May 6, 2025).

[76]  U.S. Env't Prot. Agency, EPA Reg. No. 100-1097, Supplementary Label, Restricted Use Pesticide, Karate Insecticide With Zeon Technology (Oct. 19, 2007), https://www3.epa.gov/pesticides/chem_search/ppls/000100-01097-20071019.pdf.

[77]  Details for WARRIER INSECTICIDE, U.S. ENV'T PROT. AGENCY https://ordspub.epa.gov/ords/pesticides/f?p=PPLS:8:8329434553278::NO::P8_PUID,P8_RINUM:103051,CO980001 (last visited May 6, 2025).

[78]  *See, e.g.*, SYT_REBATELIT_04508935 at slide 4.

[79]  *See, e.g.*, SYT_REBATELIT_00020462-475 at -468.

██████ ██████████ ████████ lambda-cyhalothrin ██████████████████ █

██████████████████ lambda-cyhalothrin ████████████████████████████

lambda-cyhalothrin ██████████████████ █

181. Syngenta describes Warrior II with Zeon Technology as "Using a patented quick-release, micro-encapsulated formulation with a powerful UV blocker, Warrior II with Zeon Technology®, a restricted use pesticide, ensures fast knockdown and residual control of the most damaging insects in vegetables, potatoes, soybeans and fruits."[83]

182. Beseige "provides broad-spectrum control of lepidopteran, sucking and chewing insect pests by contact, ingestion and ovicidal action."[84] "Powered by three industry-leading technologies, Endigo ZCX delivers reliable protection in a single application with fast knockdown and residual control of a broad spectrum of insects, including pyrethroid-resistant pests and invasive species."[85]

---

[80]  *See, e.g.*, SYT_REBATELIT_01340548-560 at -554.

[81]  *See, e.g.*, WECCID000355-368 at 361 (indicating head space of 35%)

[82]  *See, e.g.*, SYT_REBATELIT_01809500-510 at 506 (15% head space); *see also* SYT_REBATELIT_01996569-581 at -575.

[83]  Warrior II with Zeon Technology Insecticide, Syngenta U.S., https://www.syngenta-us.com/insecticides/warrior-ii-with-zeon-technology (last visited May 6, 2025).

[84]  Beseige Insecticide, Syngenta U.S., https://www.syngenta-us.com/insecticides/besiege#:~:text=Using%20dual%20modes%20of%20action,contact%2C%20ingestion%20and%20ovicidal%20action (last visited May 6, 2025).

[85]  Endigo ZCX Insecticide, Syngenta U.S., https://www.syngenta-us.com/insecticides/endigo-zcx (last visited May 6, 2025).

###### vi.    *Difenoconazole*

183.    Difenoconazole is a broad-spectrum fungicide used primarily on fruits, vegetables, and other field crops. The total U.S. market for difenoconazole products is estimated to be $100 million in 2025.[86]

184.    Syngenta offers for sale a number of products containing difenoconazole as an active ingredient. Inspire is a single-AI product containing difenoconazole. Academy contains a mixture of difenoconazole and fludioxonil. Amistar Top contains a mixture of difenoconazole and azosystrobin. Aprovia Top contains a mixture of difenoconazole and benzovindiflupyr. Inspire Super contains a mixture of defenoconazole and cyprodinil. Inspire XT contains a mixture of defenoconazole and propiconazole.

185.    Inspire was first registered with the EPA by Syngenta in 2008.

187.    Inspire is "[a] broad spectrum fungicide with systemic and curative properties, … recommended for the control of many important plant diseases. It may be applied as a foliar spray in alternating spray programs or in tank mixes with other crop protection products."[88]

---

[86]    *Difenoconazole Azole Market Report 2025 (Global Edition),* COGNITIVE MKT. RSCH., https://www.cognitivemarketresearch.com/difenoconazole-azole-market-report#:~:text=Difenoconazole%20Azole%20market%20will%20be%20growing%20at,revenue%202025%2C%20North%20America%20market%20holds%2017.50% (last visited May 6, 2025).

[87]    *See, e.g.,* SYT_REBATELIT_01570669-686 at 675.

[88]    Inspire Fungicide, SYNGENTA U.S., https://www.syngenta-us.com/fungicides/inspire (last visited May 6, 2025).

188.    InspireSuper is "[a] combination of two fungicides for resistance management, [which] offers disease control for almond, cucurbit, grape, tomato and pome fruit crops. It also provides excellent rainfastness and flexible application options, easily fitting into existing disease control programs for optimal yield and quality."[89]

189.    InspireXT offers a "combination of two trusted triazoles, [and] provides control of Cercospora leaf spot and powdery mildew. Inspire XT offers quick rainfastness and flexible application options, easily fitting into any existing program to help achieve optimal yields."[90]

### E.    Relevant Corteva Active Ingredients

190.    Corteva's Loyalty Programs apply to Active Ingredients that are threatened by generic competition. These include eight Corteva Relevant AIs that are the primary focus of this SAC: rimsulfuron, oxamyl, acetochlor, cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid.

#### i.    *Rimsulfuron*

191.    Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Sales of crop-protection products containing rimsulfuron in the United States totaled over $100 million in 2020.

192.    Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company, DuPont. Both Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA have expired no later than 2007.

---

[89]    Inspire Super Fungicide, Syngenta U.S., https://www.syngenta-us.com/fungicides/inspire-super (last visited May 6, 2025).

[90]    Inspire XT Fungicide, Syngenta U.S., https://www.syngenta-us.com/fungicides/inspire-xt (last visited May 6, 2025).

193.    Corteva sells rimsulfuron as the herbicide product Matrix SG, which, according to Corteva, "delivers contact and extended soil residual control of grasses and broadleaf weeds."[91]

194.    Rimsulfuron is commonly known as Realm Q, which is the brand name for a mixed-ingredients product sold by Corteva. Corteva advertises Realm Q as an "excellent postemergence broadleaf weed control in corn, with a built-in crop safener and multiple modes of action for control."[92] Additional mixed-ingredient products under which Corteva sells rimsulfuron include Basis and Resolve Q. Corteva publicly claims that Basis provides "dependable, broad-spectrum weed control, even under cool, wet conditions."[93] Corteva claims that Resolve Q provides "immediate" contact control followed by a "strong" residual activity to prevent later emerging weeds and grasses from competing with corn.[94]

195.    Prior to the 2017 Dow-DuPont merger that led to the formation of Corteva, DuPont successfully maintained a very high share of rimsulfuron sales through operation of its own Loyalty Program.

196.    By the time of the merger, Corteva believed that its rimsulfuron business had become vulnerable to lower-priced generic competition. It recognized that competing on price would risk a downward price spiral, so rather than lowering price it placed rimsulfuron in its Loyalty Programs beginning in the 2017-2018 market year.

---

[91]    Matrix SG, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/matrix-sg.html (last visited May 6, 2025).

[92]    Realm Q, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/realm-q.html (last visited May 6, 2025).

[93]    Basis, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/basis.html (last visited May 6, 2025).

[94]    Resolve Q, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/resolve-q.html (last visited May 6, 2025).

197.    Corteva's strategy involved maintaining both a high Loyalty-Program threshold to maintain market share, and a price significantly higher than generic prices.

198.    Under its Loyalty Programs, Corteva has made and continues to make exclusion payments to distributors to deter them from marketing significant volumes of competing, lower-priced generic rimsulfuron products to Arkansas farmers.

199.    Corteva's Loyalty Programs have substantially impeded generic manufacturers from providing effective competition in the sale of rimsulfuron products to Arkansas farmers. Generic manufacturers have registered rimsulfuron products in the United States, but the marketing efforts of these manufacturers have generally been stifled due to Corteva's Loyalty Programs.

200.    As a result of the incentives created by Corteva's Loyalty Programs, distributors carefully manage and allocate their generic rimsulfuron open space under Corteva's Loyalty Programs, with some removing generic rimsulfuron products from their price lists altogether. Thus, generic manufacturers have been unable to make significant sales through the traditional distribution channel.

201.    At least one generic manufacturer withdrew its rimsulfuron product and others canceled or deferred entry plans. A Corteva employee observed internally that its Loyalty Programs have succeeded despite farmer demand for lower-priced generic products: "We have many growers who put generic on the bid but buy Matrix [Corteva's rimsulfuron brand] because nobody sells generic." In this way, Corteva has been able to achieve its stated generic defense objectives of maintaining volume, preserving margin, and slowing the decline in profits both for itself and for distributors.

202.    The presence of generic products in the market has caused Corteva to reduce prices of its rimsulfuron products to some degree, but Corteva's prices remain significantly above competitive levels than if generic manufacturers were able to compete in a fair and open market. Corteva's Loyalty Programs have resulted in higher prices for crop-protection products containing rimsulfuron than would prevail in a competitive market.

ii.    *Oxamyl*

203.    Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco. Sales of crop-protection products containing oxamyl in the United States totaled over $30 million in 2020.

204.    Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Both Corteva's relevant patent protection for oxamyl and the exclusive-use period under FIFRA expired no later than 1987.

205.    Corteva sells oxamyl as the product Vydate L, which it advertises as an "effective, fast-acting control" against a spectrum of yield-robbing pests across multiple life stages.[95]

206.    A Corteva plant outage between 2015 and 2017 interrupted the supply of oxamyl products from Corteva. In response to the outage, the first generic oxamyl manufacturer entered the market in or about the fall of 2017. Other generic manufacturers followed in or about 2018. Given Corteva's plant outage, generic entrants were at first relatively successful.

207.    Following the 2017 Dow-DuPont merger, a Corteva integration planning team determined that the company's oxamyl business was threatened by generic competition and planned a generic defense strategy to maintain profit margins and share. Corteva added oxamyl to

---

[95]    Vydate L, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/vydate-l.html (last visited May 6, 2025).

the new company's Loyalty Programs, with the stated objective of maintaining "the vast majority of share," while still operating at "a price premium to generics (at all levels)." As of the 2018-2019 market year, Corteva set new oxamyl thresholds and offered higher exclusion payments corresponding to these new thresholds. Corteva's Loyalty Programs allowed Corteva to make exclusion payments to distributors to deter them from marketing and selling significant amounts of lower-priced competing generic oxamyl products.

208.    Corteva was successful in the implementation of these new thresholds as its Loyalty Programs had the effect of eliminating the competition created by the recent generic entrants selling crop-protection products containing oxamyl. Corteva quickly re-established itself as the dominant market force and generic sales volumes plummeted, particularly at large distributors. Despite generic manufacturers' efforts to retain distributor business by lowering their prices even further, they simply could not compete against Corteva's Loyalty Programs, and it became clear that the potential loss of exclusion payments provided an effective control on distributor loyalty. As a Corteva product manager responsible for oxamyl observed that generic competitors had curtailed or limited oxamyl imports he declared the program a success stating, "[O]ur team truly has done an A+ job blocking generics."

209.    Because of the incentives created by Corteva's Loyalty Programs, major distributors and retailers have repeatedly met Corteva's oxamyl loyalty threshold. To meet the threshold, distributors and retailers strictly manage their generic oxamyl open space under the Loyalty Program, steer their customers toward Corteva's oxamyl products rather than generic products, and stop selling generic products once their open space is used up, even though their customers continue to demand lower-priced oxamyl products. Some distributors and retailers have removed generic oxamyl products from their price lists altogether because of Loyalty-Program

considerations. Generic manufacturers seeking to sell crop-protection products containing oxamyl have found distributors and retailers unwilling to purchase more than minimal amounts of their products because of Loyalty Program requirements.

210.    Corteva's Loyalty Programs have substantially impeded generic manufacturers from providing effective competition in the sale of oxamyl products. After Corteva placed oxamyl into its Loyalty Programs, distributors began managing their compliance with the oxamyl loyalty threshold, and drastically curtailed their purchases of generic oxamyl. Thus, Loyalty-Program constraints have prevented distributors from purchasing more than minimal amounts of generic oxamyl (or in some cases, any at all) despite generic products being of sufficient quality and supply availability.

211.    The presence of generic products in the market has caused Corteva to price its oxamyl products somewhat lower than it otherwise would have, particularly upon Corteva's return to the market following a supply interruption. Nonetheless, because of the success of its Loyalty Programs, Corteva's prices remain significantly above competitive levels than if generic manufacturers were able to compete in a fair and open market. Corteva's Loyalty Programs have resulted in higher prices for crop-protection products containing oxamyl than would prevail in a competitive market.

### iii.    *Acetochlor*

212.    Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of crop-protection products containing acetochlor in the United States totaled over $695 million in 2020.

213.    The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the United

States registration for acetochlor; its current partners are Corteva and Bayer CropScience ("Bayer"). Bayer manufactures acetochlor for both parties.

214.    Both the relevant patent protection for acetochlor and the exclusive-use period under FIFRA expired no later than 2007.

215.    Corteva sells acetochlor products that do not contain other active ingredients, such as under the brand name Surpass NXT.[96] Corteva also sells acetochlor in combination with other herbicides, such as under the brand name Keystone LA.[97]

216.    In or about 2017, Dow received reports that a generic manufacturer was planning to launch an acetochlor product in the United States. After it was spun-off as part of the Dow-DuPont merger, Corteva assessed the risk of generic acetochlor competition as potentially affecting two million acres and causing a 10-15% price devaluation across the market.

217.    Rather than lower price in response to the perceived new competitive threat, Corteva implemented an acetochlor generic-defense strategy. Corteva's strategy documents reflect its intent to use its Loyalty Programs to "keep the channel locked up," to defend market share while holding the "value" of acetochlor products in the marketplace, and to "battle [the generic] in our core market and push them out" with the help of distributors.

218.    Corteva added acetochlor to its Loyalty Programs for the 2016-2017 market year. Under its Loyalty Programs, Corteva has made and continues to make exclusion payments to distributors to deter them from marketing significant volumes of competing, lower- priced generic acetochlor products.

---

[96]    Surpass NXT, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/surpass-nxt.html (last visited May 6, 2025).

[97]    Keystone LA, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/keystone-la.html (last visited May 6, 2025).

219.    Corteva's Loyalty Programs have substantially impeded generic manufacturers from providing effective competition in the sale of acetochlor products to Arkansas farmers. Because of the incentives created by Corteva's Loyalty Programs, distributors strictly manage compliance with the acetochlor loyalty thresholds by limiting or outright refusing to purchase acetochlor products from generic manufacturers. Loyalty-Program constraints have prevented distributors from purchasing more than minimal amounts of generic acetochlor (or in some cases, any at all) despite generic products being of sufficient quality and having supply availability.

220.    Since the first generic acetochlor sales in or about 2018, generic manufacturers have made little headway with distributors. Even when one generic manufacturer offered acetochlor prices substantially below Corteva's prices, major distributors declined to purchase from the manufacturer due to Corteva's Loyalty Programs.

221.    Corteva's Loyalty Programs have deterred generic manufacturers from introducing acetochlor products in the United States or from offering innovative new products. This includes one generic firm that has achieved significant success in the sale of acetochlor products overseas, beyond the constraints of Corteva's Loyalty Programs.

222.    The presence of generic products in the market has constrained Corteva's pricing of acetochlor products to a limited degree, but Corteva's prices remain significantly above competitive levels than if generic manufacturers were able to compete in a fair and open market. Corteva's Loyalty Programs have resulted in higher prices for crop-protection products containing acetochlor than would prevail in a competitive market.

### iv.    *Cyhalofop*

223.    Cyhalofop is an herbicide used to control grassy weeds and is primarily used on rice and other cereal crops.

224.    Corteva sells Clincher SF a, single-AI product containing cyhalofop. It also sells RebelEX, which contains cyhalofop and benzenesulfonamide as AIs.[98]

225.    Clincher was first registered with the EPA by Dow AgroScience LLC in 2002.[99] Thus, FIFRA exclusivity would have expired in 2012.

███████████████████████████████████████████████████████

227.    Clincher SF "is a postemergence grass herbicide for control of a wide spectrum of annual and seedling perennial grasses in rice, including barnyardgrass (including ALS-, propanil- and quinclorac-resistant species), sprangletop, knotgrass, broadleaf signalgrass, fall panicum and junglerice."[101]

228.    RebelEX "is an early postemergence residual herbicide for broad-spectrum control of your toughest weeds, including propanil-resistant weeds. Applying RebelEX early as part of a herbicide program will provide consistent control of troublesome weeds like sprangletop, barnyardgrass, broadleaf weeds and aquatics."[102]

---

[98]    Rice Herbicides, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/rice-herbicides.html (last visited May 6, 2025).

[99]    U.S. Env't Prot. Agency, EPA Reg. No. 62719-357, Notice of Pesticide Registration (May 23, 2002), https://www3.epa.gov/pesticides/chem_search/ppls/062719-00357-20020523.pdf.

[100]    *See, e.g.*, CRTVA-CPL-00000215-229 at -223.

[101]    Clincher SF, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/clincher-sf.html (last visited May 6, 2025).

[102]    RebelEX, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/rebelex.html (last visited May 6, 2025).

4900-0499-8729.v1

### v. *Picloram*

229.    Picloram is a systemic herbicide used to control deep-rooted herbaceous weeds and woody plants in rights-of-way forestry, rangelands, pastures, and small grain crops. It is applied in the greatest amounts to pasture and rangeland, followed by forestry.[103]

230.    Corteva sells Pathway[104] and Tordon 22k,[105] which are single-AI products containing picloram. It also sells Surmount, which is a mixture of picloram and fluroxypyr as AIs.[106] GrazonPD3 is a mixture of picloram and acetic acid choline salt as AIs.[107]

231.    Corteva classifies Pathway and Tordon 22k as vegetation management products, while it classifies Surmount and GrazonPD3 as pasture management products.

232.    Corteva's predecessor, Dow, first registered Tordon 22K in 1982.[108] It also registered another product containing picloram as an AI, Tordon RDU, in 1984.[109] Thus, FIFRA exclusivity for Corteva's picloram products expired, at the latest, in 1994.

---

[103]  U.S. Env't Prot. Agency, R.E.D. FACTS, (Aug. 1995), https://www3.epa.gov/pesticides/chem_search/reg_actions/reregistration/fs_PC-005101_1-Aug-95.pdf.

[104]  Specimen Label, Pathway, CORTEVA AGRISCIENCE (Sept. 12, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Pathway_Label1m.pdf.

[105]  Specimen Label, Tordon 22K, CORTEVA AGRISCIENCE (Mar. 23, 2025), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Tordon_22K_Label1it.pdf.

[106]  Specimen Label, Surmount, CORTEVA AGRISCIENCE (July 15, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Surmount_Label1ew.pdf.

[107]  Specimen Label, GrazonPD3, CORTEVA AGRISCIENCE (Oct. 10, 2022), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/GrazonPD3_Label.pdf.

[108]  Specimen Label, Tordon22K, CORTEVA AGRISCIENCE (Mar. 1982), https://www3.epa.gov/pesticides/chem_search/ppls/000464-00323-19820324.pdf.

[109]  Specimen Label, Tordon RTU, CORTEVA AGRISCIENCE (July 30, 1984), https://www3.epa.gov/pesticides/chem_search/ppls/000464-00510-19840730.pdf.

4900-0499-8729.v1

████████████████████████████████████████████████████

234.    Pathway "is a ready-to-use cut-surface herbicide that offers long-term control of most woody plants."[111]

235.    Tordon 22K "provides all-purpose noxious weed control as well as basic invasive weed management. It also provides the best leafy spurge control available and is an excellent choice for field bindweed control."[112]

236.    GrazonPD3 "is a new, broad spectrum residual herbicide that controls more than 70 weeds, as well as suppresses select brush species. Containing 2,4-D Choline and Picloram, GrazonPD3 is backed by trusted and proven active ingredients, providing peace of mind."[113] Surmount "provides excellent broad-spectrum broadleaf weed control without 2,4-D."[114]

237.    ████████████████████████████████████████████████████

████████████████████████████████.[115]

---

[110] *See, e.g.*, CRTVA-CPL-00000215-229 at -223.

[111] Pathway, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/pathway.html (last visited May 6, 2025).

[112] Tordon 22K, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/tordon-22k.html (last visited May 6, 2025).

[113] GrazonPD3, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/grazonpd3.html (last visited May 6, 2025).

[114] Surmount, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/surmount.html (last visited May 6, 2025).

[115] CRTVA-CPL-02804728-731 at 730.

### vi.    *Triclopyr*

238.    Triclopyr is an herbicide used in non-crop areas and forestry to control broadleaf weeds and woody plants.[116]

239.    Coretva sells products containing triclopyr as an AI. Those include Garlon 3A,[117] Garlon 4 Ultra,[118] Garlon XRT,[119] Pathfinder II,[120] Remedy,[121] and Remedy Ultra,[122] which are single-AI products containing triclopyr. Capstone contains a mixture of triclopyr and aminopyralid as AIs.[123] PastureGard HL is a mixture containing triclopyr and fluroxypyr as AIs.[124]

240.    Pathfinder was first registered with the EPA by Corteva's predecessor, Dow, in 1990.[125] Thus, FIFRA exclusivity would have expired for triclopyr products in 2000.

---

[116]  Triclopyr, WIKIPEDIA, https://en.wikipedia.org/wiki/Triclopyr (last visited May 6, 2025).

[117]  Specimen Label, Garlon 3A, CORTEVA AGRISCIENCE (Mar. 18, 2025), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Garlon_3A_Label1n.pdf.

[118]  Specimen Label, Garlon 4 Ultra, CORTEVA AGRISCIENCE (Mar. 15, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Garlon_4_Ultra1p_Label.pdf.

[119]  Specimen Label, Garlon XRT, CORTEVA AGRISCIENCE (June 12, 2024), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Garlon_XRT_Label1.pdf.

[120]  Specimen Label, Pathfinder II, CORTEVA AGRISCIENCE (Aug. 3, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Pathfinder_II_Label1tr.pdf.

[121]  Specimen Label, Remedy, CORTEVA AGRISCIENCE (Apr. 5, 2022), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Remedy1f_Label.pdf.

[122]  Specimen Label, Remedy Ultra, CORTEVA AGRISCIENCE (Sept. 7, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Remedy_Ultra1m_Label.pdf.

[123]  Specimen Label, Capstone, CORTEVA AGRISCIENCE (Oct. 4, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Capstone_Label1g.pdf.

[124]  Specimen Label, PastureGard HL, CORTEVA AGRISCIENCE (Sept. 8, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/PastureGard_HL_Label1m.pdf.

[125]  Specimen Label, Pathfinder, U.S. ENV'T PROT. AGENCY (Dec. 2, 1990), https://www3.epa.gov/pesticides/chem_search/ppls/062719-00176-19900212.pdf.

4900-0499-8729.v1

███████████████████████████████████████████

242.    Corteva classifies Capstone and the Garlon products as vegetation management products and classifies PastureGard HL, Remedy, and Remedy Ultra as pasture management products.

243.    Capstone "combines long-lasting control with fast knockdown power in one easy-to-use premix formulation."[127]

244.    Garlon 3A "provides superior woody plant and broadleaf weed control while maintaining the integrity of roadsides or rights-of-way. It's the ideal solution for controlling unwanted weeds, brush and trees beneath electrical power lines; along railroad beds, roadsides and pipelines; and in forestry and wildlife openings, including grazed areas on these sites."[128]

245.    Garlon 4 Ultra "is the industry standard for basal cut-stump, basal bark and dormant-stem treatments, delivering excellent broad-spectrum control of woody plants even after other products call it quits for the season."[129]

246.    Garlon XRT "is the greenest and the most concentrated formulation in the forestry industry, offering unrivaled flexibility and the ability to be used for site prep, midrotation release, forest roadside brush removal and the establishment of wildlife openings."[130]

---

[126]  *See, e.g.*, CRTVA-CPL-00000215-229 at -223.

[127]  Capstone, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/capstone.html (last visited May 6, 2025).

[128]  Garlon 3A, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/garlon-3a.html (last visited May 6, 2025).

[129]  Garlon 4 Ultra, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/garlon-4-ultra.html (last visited May 6, 2025).

[130]  Garlon XRT, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/garlon-xrt.html (last visited May 6, 2025).

247.    PastureGard HL "gives ranchers one flexible product that takes out broadleaf weeds and brush" and "clears the way for more forage, better land utilization and increased property values — all while helping ranchers raise more pounds of beef at the lowest cost possible."[131]

248.    Remedy "is a powerful tool for brush and broadleaf weed control that can be used in Rangeland, Permanent Grass Pastures, Conservation Reserve Program Acres, Fencerows and Non-Irrigation Ditch Banks."[132] Remedy Ultra "provides convenient, flexible, long-lasting control of more than 35 brush species."[133]

██████████████████████████████████████████████

████████████████████████████████████

### vii.    *Methoxyfenozide*

250.    Methoxyfenozide is a narrow-spectrum insecticide directed at controlling the larvae of Lepidoptera insects. Methoxyfenozide is used on a wide variety of crops, including vegetables, fruits, tree nuts, beans, some cereal grains, soybeans, cotton, sugar beets, and peanuts.[135]

---

[131] PastureGard HL, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/pasturegard-hl.html (last visited May 6, 2025).

[132] Remedy, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/remedy.html (last visited May 6, 2025).

[133] Remedy Ultra, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/remedy-ultra.html (last visited May 6, 2025).

[134] CRTVA-CPL-00264163.

[135] Methoxyfenozide, XERCES SOCIETY, https://xerces.org/systemic-insecticides/methoxyfenozide#:~:text=A%20wide%20variety%20of%20agricultural,include%20trees%20and%20landscape%20plantings (last visited May 6, 2025).

251.    Corteva sells a single-AI product containing methoxyfenozide, Intrepid 2F.[136] It also sells Intrepid Edge, which contains a mixture of methoxyfenozide and spinetoram as AIs.[137]

252.    Intrepid 2F was first registered with the EPA by Corteva's predecessor, Dow AgriSciences LLP, in 2003.[138] Thus, Corteva's FIFRA exclusivity for methoxyfenozide products expired in 2013.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

254.    Corteva sells Intrepid 2F as protecting tree nuts and vegetables. Corteva sells Intrepid Edge as protecting peanuts.

255.    Intrepid 2F "is an insect growth regulator offering effective control of many species of lepidopterous insects, including navel orangeworm, peach twig borer, leafrollers, loopers, armyworms and citrus leafminer, while not disrupting beneficial insects, mites and pollinators in many crops, such as almonds, grapes, rice, soybeans, tomatoes and more."[142]

---

[136] Specimen Label, Intrepid 2F, CORTEVA AGRISCIENCE (Mar. 14, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Intrepid_2F_Labelnotext2f.pdf.

[137] Specimen Label, Intrepid Edge, CORTEVA AGRISCIENCE (Dec. 7, 2022), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Intrepid_Edge1gt_Label.pdf.

[138] Supplemental Labeling, Intrepid 2F, DOW AGRISCIENCES (June 5, 2003), https://www3.epa.gov/pesticides/chem_search/ppls/062719-00442-20030605.pdf.

[139] *See, e.g.*, FTC-CTVA_00019483-490 at 487 (2016-2017 Corporate Distributor Offer with 3% head space for methoxyfenozide);

[140] *See, e.g.*, FTC-CTVA_01157568-577 at 574; *see also* CRTVA-CPL-00000155-169 at 162.

[141] *See, e.g.*, CRTVA-CPL-00000215-229 at 223.

[142] Intrepid 2F, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-

256.    Intrepid Edge "controls troublesome peanut pests like corn earworm, fall armyworm and rednecked peanut worm. It provides fast knockdown, has proven extended residual and is an effective rotational partner to use in resistance management."[143]



### viii.    *Aminopyralid*

258.    Aminopyralid is a selective herbicide used to control broad-leafed weeds such as thistles and clover[146] in rangeland, permanent pastureland and non-cropland areas, such as rights of way and roadsides.[147]

---

protection/intrepid-2f.html (last visited May 6, 2025).

[143] Peanut Crop Protection, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/crop-protection/peanut-crop-protection.html (last visited May 6, 2025).

[144] FTC-CTVA_00751982.

[145] FTC-CTVA_01124962-963 at -962.

[146] Aminopyralid, WIKIPEDIA, https://en.wikipedia.org/wiki/Aminopyralid (last visited May 6, 2025)

[147] *Pesticide Fact Sheet*, U.S. ENV'T PROT. AGENCY, Office of Prevention, Pesticides, Environmental Protection and Toxic Substances Agency (Aug. 10, 2005), https://www3.epa.gov/pesticides/chem_search/reg_actions/registration/fs_PC-005100_10-Aug-05.pdf.

4900-0499-8729.v1

259.    Corteva sells a number of products containing aminopyralid as an AI. Milestone is a single-AI product containing aminopyralid.[148] Chaparral is a mixture containing aminopyralid and metsulfuron-methyl as AIs.[149] DuraCor is a mixture containing aminopyralid and florpyrauxifen-benzyl as AIs. GrazonNext HL is a mixture containing aminopyralid and dimethyl amine salt of acetic acid as AIs.[150] MezaVue is a mixture containing aminopyralid, picloram, and fluroxypyr.[151]

260.    Milestone was first registered with the EPA by Corteva's predecessor, Dow AgriSciences LLC, in 2005. Thus, Corteva's FIFRA exclusivity for aminopyralid products expired in 2015.



263.    Corteva classifies Milestone as a land management product. It classifies the remaining aminopyralid products as pasture management products.

---

[148] Specimen Label, Milestone, CORTEVA AGRISCIENCE (Apr. 4, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Milestone_Label1gt.pdf.

[149] Specimen Label, Chaparral, CORTEVA AGRISCIENCE (Mar. 7, 2023), https://s3-us-west-1.amazonaws.com/agrian-cg-fs1-production/pdfs/Chaparral_Label1gr.pdf.

[150] GrazonNext HL, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/grazonnext-hl.html (last visited May 6, 2025).

[151] U.S. Env't Prot. Agency, EPA Reg. No. 62719-717, Notice of Pesticide Registration (May 30, 2017), https://www3.epa.gov/pesticides/chem_search/ppls/062719-00717-20170530.pdf.

[152] *See, e.g.*, FTC-CTVA_00019208-216 at -213.

[153] *See, e.g.*, CRTVA-CPL-00000215-229 at -223.

264.    Milestone "offers excellent invasive weed control, across a wide variety of use sites. It does so with little-to-no damage to grasses, forbs or other key members of the native plant community, allowing native habitats to be restored to their full potential."[154]

265.    Chaparral "is the broadest-spectrum weed *and* brush control product available for rangeland and pastures. It is the simple answer for several significant, unique needs, such as reducing the impact of toxic fescue through seedhead suppression and improving hay quality by removing Pensacola bahiagrass from bermudagrass."[155]

266.    Corteva touts DuraCor as "[f]eaturing the first new active ingredient for pastures and rangeland in nearly 15 years" and the product "brings livestock producers and land managers the broadest-spectrum broadleaf weed control available for their grazing acres — one that's loaded with benefits."[156]

267.    GrazonNext HL "is the easiest way to get broadleaf weeds out of the way of pasture production. It provides a simple, lasting solution for the toughest pasture and rangeland weeds and clears the way for more forage, meaning greater flexibility in a grazing program and higher per-acre beef production at the lowest cost possible."[157]

268.    Corteva touts MezaVue as "[t]he new standard in pricklypear control." "Pricklypear, by nature, is notoriously slow to show symptoms, die and melt away. Faster

---

[154] Milestone, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/land-management/milestone.html (last visited May 6, 2025).

[155] Chaparral, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/chaparral.html (last visited May 6, 2025).

[156] DuraCor, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/duracor.html (last visited May 6, 2025).

[157] GrazonNext HL, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/grazonnext-hl.html (last visited May 6, 2025).

symptoms with MezaVue® herbicide deliver a piece-of-mind benefit that the herbicide is working. Faster control means native grasses are able to respond sooner to get rangeland back into production. And, the more cactus you control, the more of that area you open to grazing."[158]

### F. Syngenta and Corteva's Agreement to Restrain the Supply of Relevant Active Ingredients to Maintain Monopoly Profits

269.     Following expiration of patent and regulatory exclusivity terms protecting the Active Ingredients, Defendants faced a threat from generic manufacturers and other basic manufacturers. Once relevant patent protection expired, basic manufacturers have the capacity to replicate and produce the Active Ingredients developed by other basic manufacturers with lower cost. Alternatively, basic manufacturers can purchase the Active Ingredients from generic manufacturers with lower prices and put the Active Ingredients in their mixture products. The ability to produce generic versions of competitors' Active Ingredients or source post-patent Active Ingredients from generic manufacturers should create more competition in the crop-protection product markets leading to lower prices of the post-patent Active Ingredients, as the glyphosate experience demonstrated.

270.     To avoid downward pricing pressure from competing products containing their Active Ingredients, including some of the Relevant AIs at issue in this SAC, Syngenta and Corteva entered into an unlawful agreement to restrain trade relating to their Active Ingredients. Under this agreement, Defendants agreed not to produce each other's Active Ingredients. Instead, they would supply each other the necessary Active Ingredients, as needed. This agreement has restrained the supply of Active Ingredients by eliminating Corteva or Syngenta as source of Active Ingredients for other formulators. It also has prevented generic competitors from supplying Corteva or

---

[158] MezaVue HL, CORTEVA AGRISCIENCE, https://www.corteva.us/products-and-solutions/pasture-management/mezavue.html (last visited May 6, 2025).

Syngenta the Active Ingredients, thus, depriving generic competitors of the necessary scale to effectively compete. Finally, it ensures that products containing the Active Ingredients, whether sold by Corteva or Syngenta, will be sold at artificially high prices, because Defendants control the costs input of the Active Ingredient. Notably, Defendants are more than capable of producing these Active Ingredients at lower costs internally, and, thus, pricing their products lower. Rather than compete, Defendants, however, recognize that their supply agreements in combination with their Loyalty Programs allow them to maintain monopoly profits for their products containing the Active Ingredients.

271.    For example, a Corteva predecessor company developed a mixture product containing mesotrione and two other Active Ingredients. Instead of producing a generic version of mesotrione or purchase mesotrione from generic manufacturers at lower cost, Corteva (and its predecessor DuPont) entered into and maintained an exclusive supply agreement with Syngenta under which Corteva agreed to buy mesotrione from Syngenta for use in Corteva's mixed crop-protection product. Similarly, Syngenta and Corteva entered and maintained an exclusive supply agreement for the supply of technical-grade and manufacturing-use S-metolachlor used in Corteva-branded products.

272.    By agreeing to source branded Active Ingredients from each other, rather than manufacturing their own generic versions or purchasing generic versions from generic manufacturers, Defendants effectively control the cost input to each other's products that contain the relevant Active Ingredients and are disincentivized from pricing their finished products at levels that would put substantial downward pressure on each other's pricing.

273.    The agreement between Defendants allow them to allocate the Relevant Markets (defined below) and maintain their monopoly power. This unlawful agreement has reinforced

Defendants' respective Loyalty Program(s) by restricting the availability of lower-priced crop-protection products that contain generic Active Ingredients to Arkansas farmers. Together with Defendants' other anticompetitive conduct, the agreement harms competition in the sale of crop-protection products containing the Relevant AIs.

## VI.    DEFENDANTS' MARKET AND MONOPOLY POWER

274.    At all times relevant to this SAC, Syngenta has had monopoly and market power with respect to azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole, and with respect to crop-protection products containing those Relevant AIs.

275.    In addition, at all times relevant to this SAC, Corteva has had monopoly and market power with respect to rimsulfuron, oxamyl, cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid and with respect to crop-protection products containing those Relevant AIs. At all times relevant to this SAC, Corteva has had market power with respect to acetochlor, and with respect to crop-protection products containing acetochlor.

276.    Defendants' monopoly power in the Relevant Markets is established by direct evidence. As detailed below, Syngenta and Corteva have imposed supracompetitive prices in the Relevant Markets. As detailed above, Syngenta and Corteva use their exclusionary Loyalty Programs to exclude competition from the Relevant Markets, which has allowed Defendants to maintain their prices at artificially high levels without losing market shares to generic manufactures. As acknowledged by Defendants, they are able to maintain their products at prices significantly higher than generic prices because "nobody sells generics." Arkansas farmers have paid higher prices for the crop-protection products in the Relevant Markets than they would have

paid in a competitive market. Defendants could not maintain their prices at a supracompetitive level had they not obtained a monopoly or market power in the Relevant Markets.

277.    Syngenta's and Corteva's monopoly or market power is also shown through their market shares in each of the Relevant Markets.

278.    Syngenta maintains a dominant market share in each of the Relevant Markets for the crop-protection products that contain the Syngenta Relevant AIs. Syngenta's market share for the Relevant AIs from 2016 through 2021 was:

| Relevant AI | Year | Market Share By Spending |
|---|---|---|
| Azoxystrobin | 2016 | ■ |
| Azoxystrobin | 2017 | ■ |
| Azoxystrobin | 2018 | ■ |
| Azoxystrobin | 2019 | ■ |
| Azoxystrobin | 2020 | ■ |
| Azoxystrobin | 2021 | ■ |
| Lambda-Cyhalothrin | 2016 | ■ |
| Lambda-Cyhalothrin | 2017 | ■ |
| Lambda-Cyhalothrin | 2018 | ■ |
| Lambda-Cyhalothrin | 2019 | ■ |
| Lambda-Cyhalothrin | 2020 | ■ |
| Lambda-Cyhalothrin | 2021 | ■ |
| Difenoconazole | 2016 | ■ |
| Difenoconazole | 2017 | ■ |
| Difenoconazole | 2018 | ■ |

| Relevant AI | Year | Market Share By Spending |
|---|---|---|
| Difenoconazole | 2019 | ■ |
| Difenoconazole | 2020 | ■ |
| Difenoconazole | 2021 | ■ |
| Fomesafen | 2016 | ■ |
| Fomesafen | 2017 | ■ |
| Fomesafen | 2018 | ■ |
| Fomesafen | 2019 | ■ |
| Fomesafen | 2020 | ■ |
| Fomesafen | 2021 | ■ |
| Mesotrione | 2016 | ■ |
| Mesotrione | 2017 | ■ |
| Mesotrione | 2018 | ■ |
| Mesotrione | 2019 | ■ |
| Mesotrione | 2020 | ■ |
| Mesotrione | 2021 | ■ |
| Metolachlor/S-Metolachlor | 2016 | ■ |
| Metolachlor/S-Metolachlor | 2017 | ■ |
| Metolachlor/S-Metolachlor | 2018 | ■ |
| Metolachlor/S-Metolachlor | 2019 | ■ |
| Metolachlor/S-Metolachlor | 2020 | ■ |
| Metolachlor/S-Metolachlor | 2021 | ■ |

279.    Corteva maintains a dominant market share in each of the Relevant Markets for the crop-protection products that contain the Corteva Relevant AIs, as reflected in the following chart:

| Relevant AI | Year | Market Share By Spending |
|---|---|---|
| Acetochlor | 2016 | ■ |
| Acetochlor | 2017 | ■ |
| Acetochlor | 2018 | ■ |
| Acetochlor | 2019 | ■ |
| Acetochlor | 2020 | ■ |
| Acetochlor | 2021 | ■ |
| Aminopyralid | 2016 | ■ |
| Aminopyralid | 2017 | ■ |
| Aminopyralid | 2018 | ■ |
| Aminopyralid | 2019 | ■ |
| Aminopyralid | 2020 | ■ |
| Aminopyralid | 2021 | ■ |
| Cyhalofop | 2016 | ■ |
| Cyhalofop | 2017 | ■ |
| Cyhalofop | 2018 | ■ |
| Cyhalofop | 2019 | ■ |
| Cyhalofop | 2020 | ■ |
| Cyhalofop | 2021 | ■ |
| Methoxyfenozide | 2016 | ■ |
| Methoxyfenozide | 2017 | ■ |

| Relevant AI | Year | Market Share By Spending |
|---|---|---|
| Methoxyfenozide | 2018 | ■ |
| Methoxyfenozide | 2019 | ■ |
| Methoxyfenozide | 2020 | ■ |
| Methoxyfenozide | 2021 | ■ |
| Oxamyl | 2016 | ■ |
| Oxamyl | 2017 | ■ |
| Oxamyl | 2018 | ■ |
| Oxamyl | 2019 | ■ |
| Oxamyl | 2020 | ■ |
| Oxamyl | 2021 | ■ |
| Picloram | 2016 | ■ |
| Picloram | 2017 | ■ |
| Picloram | 2018 | ■ |
| Picloram | 2019 | ■ |
| Picloram | 2020 | ■ |
| Picloram | 2021 | ■ |
| Rimsulfuron | 2016 | ■ |
| Rimsulfuron | 2017 | ■ |
| Rimsulfuron | 2018 | ■ |
| Rimsulfuron | 2019 | ■ |
| Rimsulfuron | 2020 | ■ |
| Rimsulfuron | 2021 | ■ |

4900-0499-8729.v1

| Relevant AI | Year | Market Share By Spending |
|---|---|---|
| Triclopyr | 2016 | ██ |
| Triclopyr | 2017 | ██ |
| Triclopyr | 2018 | ██ |
| Triclopyr | 2020 | ██ |
| Triclopyr | 2021 | ██ |

280.    Although Bayer also competes in the Relevant Market for acetochlor, Bayer's participation in that market has not constrained Corteva's ability to impose artificially high prices on its products in that market, as demonstrated by Corteva's imposition of artificially high prices through its exclusionary Loyalty Programs.

281.    Demonstrating that Defendants' Loyalty Programs have worked well to block out generic competition, and as reflected in paragraph 361 below: ████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████

282.    Defendants' monopoly power in the Relevant Markets is protected by high barriers to entry. There are substantial barriers to entry for generic manufacturers to sell crop-protection products. Obtaining federal regulatory approval can be costly and time consuming, and it can be expensive to pay the manufacturer that developed an Active Ingredient for use of their data, which may be needed to obtain federal approval. In fact, farmers in the United States are prohibited from

using crop-protection products that are manufactured and labeled for use outside of the United States. Thus, sourcing ingredients and developing a process for manufacturing the Active Ingredients may also be costly. According to a former employee of the distributor Wilbur-Ellis, the cost of Active Ingredients, labor, and capital can be significant barriers to entry. According to that employee, a large basic manufacturer like Corteva can achieve "economies of scale" that are difficult for generic manufacturers to match, particularly when the ability to sell the resulting product is further artificially suppressed by a Loyalty Program.

283.    As described above, entry into the Relevant Markets is also constrained by Defendants' exclusionary Loyalty Programs, which deny generic manufacturers access to large distributors and retailers comprising the traditional channel, which is the most efficient and perhaps only relevant entry point into the market. By "keep[ing] the channel locked up," Defendants have been successfully defending their market shares in each of the Relevant Markets while holding a significant "price premium to generics (at all levels)."

284.    For the purposes of assessing the competitive effects of Defendants' conduct, each Relevant Market is defined by reference to a Relevant AI. For each of azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, difenoconazole, rimsulfuron, oxamyl, acetochlor cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid: (a) a relevant product market exists that is no broader than the Active Ingredient, consisting of (i) Active Ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (ii) technical-grade or manufacturing-use Active Ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and (b) a relevant product market(s) also exists that is no broader than EPA registered crop-protection products for sale in the United States that contain the Active Ingredient.

285.    For each Relevant AI, crop-protection products with other Active Ingredients that kill or control the same pest are not reasonably interchangeable with Defendants' products from the point of view of the end-user of those products such that a consumer would choose another product rather than a Relevant AI product based upon price. As a result, Syngenta and Corteva continue to maintain prices of crop-protection products containing the Relevant AI above competitive levels.

286.    As is described above, each Relevant AI works better under certain conditions than others, and has characteristics other than price that would be important to the consumer, *i.e.*, a farmer using that Relevant AI, which would differentiate each Relevant AI from other Active Ingredients that generally perform the same function, such as killing weeds or insects and make other Active Ingredients inappropriate for use for that farmer's particular situation. Thus, each Relevant AI is not reasonably interchangeable with other products that kill or control the same pest(s), *i.e.*, Relevant AI herbicides are not reasonably interchangeable with other herbicides and Relevant AI insecticides are not reasonably interchangeable with other insecticides.

287.    Moreover, because the efficacy and ease of use of each Active Ingredient is generally the deciding factor in a consumer selecting an appropriate herbicide or insecticide for their individual situation, there is no cross-elasticity of demand between Relevant AIs and other Active Ingredients in the same category based upon price. In other words, if a particular Active Ingredient works best for a particular farmer's situation, he or she is unlikely to switch to another Active Ingredient for the same purpose because the price of their chosen Active Ingredient goes up or the price of a different Active Ingredient goes down.

4900-0499-8729.v1

288.    As to each Relevant AI, allegations herein relating to product markets, including market share and foreclosure allegations, apply to both sets of product markets described above. As used herein, the term "Relevant Market" refers to each of the markets described above.

289.    For each Relevant AI, absent the restraints of trade imposed by Syngenta's or Corteva's Loyalty Program(s), unconstrained competition from generic crop-protection product manufacturers would have a significant and non-transitory downward effect on prices in the applicable Relevant Market. Syngenta and Corteva anticipate such potential effects on price and respond by implementing their Loyalty Programs to counter or at least slow the anticipated price effects.

290.    As detailed herein, to qualify for an exclusion payment for a given Relevant AI, distributors are required to source specified percentages of their purchases or sales of that Relevant AI from Syngenta rather than from generic manufacturers. Syngenta's own program is, thus, defined by this market categorization. Similarly, Corteva calculates distributors' achieved loyalty level by measuring their purchases of Relevant AIs from Corteva as a percentage of each distributor's total purchases of the Relevant AI (*i.e.*, units of active ingredient purchased from both Corteva and non-Corteva – typically generic – sources). While in some cases, such as where a product containing a given Relevant AI is not marketed for use on crops, Corteva will treat a product as "neutral" and exclude it from this calculation. Corteva, likewise, does not include other Active Ingredients in these exclusion payment calculations. Thus, in the same fashion as Syngenta, Corteva's program is defined by Relevant AI market categorization.

291.    Defendants' own conduct supports that each Relevant Market includes only one Relevant AI and no other Active Ingredients, because their Loyalty Programs do that exact thing – cover only individual Relevant AIs.

292.    Moreover, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████.[159]

293.    The relevant geographic market as to all products is the United States. Crop-protection products are largely sold and regulated on a nationwide basis and because the EPA must approve and register all crop-protection products prior to sale or distribution in the United States, Arkansas farmers may not lawfully use crop-protection products manufactured and labeled for use outside the United States.

294.    As is set forth in Paragraph 278 above, Syngenta has maintained dominant shares of the U.S. Relevant Markets for Relevant AIs azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole for each year from 2017 through the present.

295.    As is set forth in Paragraph 279 above, Corteva has maintained dominant shares of the U.S. Relevant Markets for Relevant AIs rimsulfuron, oxamyl, cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid for each year from 2017 through the present. During that time period, Corteva's sales in each of these markets exceeded 70% of the market.

296.    Corteva has maintained a substantial share of the U.S. Relevant Market for Relevant AI acetochlor for each year from 2017 through the present, with Bayer accounting for

---

[159]    *See, e.g.*, Videotaped Deposition of Jeff Cecil, 47:13-48:12 (Mar. 31, 2025); Videotaped Deposition of Jaret Fipps, 134:18-135:22 (Apr. 2, 2025); 442:13-443:24 (Apr. 3, 2025); SYT_REBATELIT_01536524 at slide 4 ("████████"); SYT_REBATELIT_00492525 at slide 1 ("████████"); SYT_REBATELIT_01785178 at slide 2 ("████████" and "███████████"); CRTVA-CPL-01108161 at slide 30 ("████████"); CRTVA-CPL-00078571 at slide 8 ("████████████"); CRTVA-CPL-00079931 at slide 3 ("████████"); CRTVA-CPL-00238390 at slide 2 ("████████████").

another 50% of the market. Notwithstanding Bayer's presence in this market, Corteva's Loyalty Programs have enabled it to maintain prices above a competitive level.

## VII.    EACH DEFENDANT'S CONDUCT HAS HARMED COMPETITION AND CONSUMERS

297.    Through operation of its so-called Loyalty Programs, each Defendant has directly harmed competition and consumers, including Arkansas farmers and the State's residents. Each Defendant has also harmed competition through other anticompetitive conduct deployed in conjunction with their respective Loyalty Program(s). Each Defendant's anticompetitive conduct has resulted in substantial foreclosure of generic competitors from the applicable Relevant Markets, has caused generic competitors to exit the applicable Relevant Markets or to abandon plans to enter, and has significantly impaired the competitiveness of generic competitors that have been able to enter. Each Defendant's anticompetitive conduct has led to higher prices and reduced innovation and choice for farmers in the applicable Relevant Markets.

298.    Each Defendant's anticompetitive conduct, including Defendants' supply agreements with each other, and the actual or threatened retaliation against distributors or retailors that do not meet the thresholds and requirements of the Loyalty Programs has substantially lessened competition and creates or maintains monopolies in the Relevant Markets.

299.    Each Defendant's anticompetitive conduct has harmed competition and end-consumers, including Arkansas farmers, both within and outside the applicable Relevant Markets.

300.    Each Defendant's anticompetitive conduct is not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, of which there are none. Defendants' anticompetitive conduct has led to higher prices and reduced innovation at the expense of Arkansas farmers who have to pay higher prices and are restricted in their choices in the applicable Relevant Markers. Defendants could

4900-0499-8729.v1

reasonably achieve any procompetitive goals through less restrictive alternatives but have opted to employ their Loyalty Programs to maintain inflated profits through supracompetitive prices and circumvent the work of fairly competing in an open and competitive market.

301.    The State has an overarching interest in the well-being of its populace and the continuing prosperity and integrity of its general economy. Defendants' anticompetitive and deceptive conduct detailed herein, and such conduct's attendant adverse effects on competition and innovation, as well as the resulting supracompetitive prices of the Relevant AIs and inflated cost to Arkansas farmers – which, ultimately, is passed to consumers in this State through higher affected produce costs – significantly hampers competition in this State and harms Arkansas residents.

302.    Each Defendant's unlawful conduct is ongoing. Each Defendant continues to operate its Loyalty Programs, including by enforcing loyalty thresholds and making exclusion payments to distributors and retailers for meeting these thresholds. Absent injunctive relief by this Court, each Defendant will likely continue to harm competition and the public interest.

**A.      Each Defendant's Unlawful Conduct Has Substantially Foreclosed Generic Manufacturers from Each Applicable Relevant Market**

303.    A seller can harm competition and consumers in circumstances such as those present here by foreclosing actual or potential competitors from access to distribution services, or by foreclosing actual or potential competitors from access to efficient distribution services.

304.    The most efficient channel of distribution for each Relevant Market is the traditional distribution channel, as defined above. Each Defendant's so-called Loyalty Programs have almost entirely foreclosed generic manufacturers from access to the traditional distribution channel. This exclusion of generic competitors from the traditional distribution channel has

harmed the ability of any would-be generic competitors to compete in each Relevant Market by severely limiting their ability to achieve efficient, lower-cost distribution.

305.    By excluding generic competitors from the traditional distribution channel, each Defendant's Loyalty Program(s) have foreclosed a substantial share of each applicable Relevant Market to generic competition. This is because a high percentage of all crop-protection product sales are made through the traditional distribution channel (over 90%), a high proportion of the traditional distribution channel participates in Defendants' Loyalty Programs, and Defendants' Loyalty Programs have high market share thresholds. Thus, each Defendant's Loyalty Program(s) have effectively foreclosed generic competitors from a substantial percentage of each applicable Relevant Market.

306.    Defendants' Loyalty Programs for each of the Relevant AI have been in place – with near complete distributor compliance – since at least 2017. As a result, generic manufacturers of crop-protection products containing the applicable Relevant AIs have been substantially foreclosed from the Relevant Markets for at least the last five years.

307.    A seller's program of offering and providing exclusion payments to distributors can foreclose equally efficient competitors from the market and harm competition in circumstances such as those present here. This is true even when distributors do not agree or otherwise commit, in advance, to meet the share threshold that the seller specifies as a condition to payment. The prospect of receiving a payment, as well as the prospect of other profit opportunities associated with the market-wide exclusion of generics, can, in circumstances such as those present here, serve as a sufficient incentive to induce distributors to participate in the Loyalty Programs and to limit or forgo purchases from competitors.

308.   Distributors adhere to Defendants' Loyalty-Program thresholds in significant part because it is in their economic self-interest to do so, due to the prospect of receiving substantial payments under these programs. In addition, structural features of each Defendant's Loyalty Program(s) promote adherence because all participating distributors know that all other participating distributors are adhering to the relevant Loyalty Program. Taken together with Defendants' strict enforcement efforts, Defendants' Loyalty Programs incentivize distributors to meet applicable loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers. Defendants know distributors profit more when prices to retailers and farmers are higher, and the distributors' collective participation in the Loyalty Programs has the effect of maintaining higher prices to retailers and farmers. In short, Defendants' Loyalty Programs make it more profitable for distributors to participate in their Loyalty Programs than to compete on price in each Relevant Market. The same holds true for retailers of crop-protection products.

309.   A seller's program of offering and providing exclusion payments to distributors or retailers can benefit the participating distributors or retailers and harm end-consumers (Arkansas farmers), including by enabling distributors or retailers to retain exclusion payments, in circumstances such as those present here. There are several scenarios in which distributors or retailers will not pass on exclusion payments to end-consumers. There are also various means by which a seller can, and each Defendant does, discourage distributors or retailers from passing on exclusion payments to end-consumers.

310.   Each Loyalty Program's complexity, lack of transparency to participants in the traditional distribution channel, and deferred payment timing both discourage and aid distributors or retailers in retaining exclusion payments as profit rather than passing them on to Arkansas farmers in the form of reduced downstream pricing.

311.    A seller's program of offering and providing exclusion payments to distributors or retailers can, and in the in circumstances present here, have excluded equally efficient competitors from the market and harmed competition even when Defendants' net price for the product, after accounting for the payments, is not below their cost of producing the product. Indeed, because Defendants' respective Loyalty Programs have successfully limited or eliminated generic competition for each Relevant AI, Defendants' profits for each Relevant AI are far greater than Defendants would earn in a competitive market, even taking into account the kickbacks paid to distributors or retailers under their Loyalty Programs.

312.    The prospect of receiving an exclusion payment from a Defendant – as well as the prospect of other profit opportunities associated with the market-wide exclusion of generics – can, and does, serve as a sufficient incentive to induce distributors or retailers to participate in the Loyalty Programs and to limit or forgo purchases from generic competitors. Distributors or retailers adhere to Defendants' loyalty thresholds due to the prospect of receiving substantial payments under the Loyalty Programs. Additionally, structural features of each Defendant's Loyalty Program promote compliance and long-term commitments. These include the spreading of exclusion payments (and the risk of losing those payments): (a) over an extended period of time, with a single, conditional, "all units" payment occurring at the end of the year; and (b) across multiple crop-protection products containing the same Active Ingredient.

313.    Indeed, when a distributor or retailer makes a purchase or sale of a generic crop-protection product that causes it to miss the loyalty threshold for a given Relevant AI, it risks incurring a disproportionately large financial loss, calculated as a percentage of all eligible transactions for the year, including past transactions.

314.    Distributors or retailers also risk provoking retaliation from basic manufacturers, like Defendants, in the forms discussed above. Further still, Distributors' incentive to comply with the Loyalty-Program requirements is enhanced by the reality that substantially all major distributors participate in the programs. Ultimately, distributors or retailers profit more when prices to farmers are higher, and their collective participation in the Loyalty Programs has the effect of maintaining higher prices for Arkansas farmers.

315.    Because of Defendants' respective Loyalty Program, distributors or retailers have severely limited their purchase, promotion, and sale of generic crop-protection products containing each applicable Relevant AI. To meet applicable loyalty thresholds, distributors or retailers have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward Defendants' branded products.

316.    Because of Defendants' respective Loyalty Program, distributors or retailers have declined to buy more than minimal amounts of crop-protection products containing each applicable Relevant AI from generic manufacturers even though: (a) generic products are of like quality and availability; (b) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (c) absent Defendants' Loyalty Programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under Defendants' respective Loyalty Programs. This unwillingness is caused by the restrictive and limited open space available under the applicable Syngenta or Corteva Loyalty Programs. According to one generic manufacturer, this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements. In contrast, when selling products containing active ingredients that are not subject to Loyalty Programs,

generic manufacturers are able to make all or nearly all of their sales through traditional-channel distributors or retailers.

317.    With respect to each Relevant AI, in the absence of the applicable Syngenta or Corteva Loyalty Program, generic manufacturers would make significantly more sales to distributors or retailers, which would enable them to realize distribution efficiencies and scale benefits. These benefits would increase price competition, innovation, and choice in Relevant Markets, which in turn would benefit Arkansas farmers.

318.    In the absence of Defendants' respective Loyalty Programs, sales of generic crop-protection products containing the Relevant AIs subject to the programs would be significantly higher and would exceed the open space allowed by the programs. Arkansas farmers would benefit from having an increased amount of lower-price generic products available in Relevant Markets.

319.    In the applicable Relevant Markets for each Syngenta Relevant AI (azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole), Syngenta has added an additional layer of foreclosure to that created by its distributor Loyalty Program through its retail Loyalty Program. As with the distributor program, the retail program has substantially foreclosed generic manufacturers from efficient distribution of their products, given the participation of leading retailers in the program.

**B.    Each Defendant's Unlawful Conduct Has Prevented Generic Entry and Expansion and Caused Generic Exit**

320.    Each Defendant's Loyalty Program(s) have prevented, delayed, and diminished entry and expansion by generic manufacturers of crop-protection products containing applicable Relevant AIs, and caused generic exit as to products containing applicable Relevant AIs, even when generic manufacturers can otherwise satisfy regulatory conditions and overcome other barriers to entry.

94

321.    Multiple generic manufacturers that have assessed the competitive landscape and evaluated whether to enter a particular Relevant Market have concluded that entry is not economically feasible due to the artificial constraints created by the corresponding Syngenta or Corteva Loyalty Programs.

322.    In some cases, Syngenta's or Corteva's Loyalty Program(s) have caused foreclosure of sales opportunities that have led a generic manufacturer already competing in a Relevant Market not to re-register its product or to completely stop offering a product containing the Relevant AI.

323.    In the absence of Defendants' respective Loyalty Program, generic manufacturers would compete more effectively for more sales in each Relevant Market and create circumstances like lower prices and increased product choice for Arkansas farmers.

## C.    Each Defendant's Unlawful Conduct Has Resulted in Fewer Innovative Products

324.    Each Defendant's Loyalty Program(s) have reduced the ability and incentive of generic manufacturers to bring new differentiated crop-protection products containing applicable Relevant AIs to market, harming innovation and restricting farmer choice.

325.    Generic manufacturers often create new Active Ingredient mixtures or other new offerings that meet farmer needs. Generic manufacturers also often innovate on the non-Active Ingredient components of crop-protection product sales in ways that are beneficial to farmers.

326.    Because of the barriers to entry created by Syngenta's and Corteva's respective Loyalty Programs, generic manufacturers have in several instances abandoned attempts to develop innovative products containing applicable Relevant AIs. Likewise, when determining whether to bring to market an innovative product, such as a new mixture, generic manufacturers have sought to avoid using Active Ingredients that are subject to either Defendant's Loyalty Program(s).

95

327.    Defendants' anticompetitive Loyalty Programs not only hamper farmer choice but hinder product innovation. Absent Defendants' respective Loyalty Programs, generic manufacturers would be motivated to introduce innovative products in the applicable Relevant Markets and provide farmers with more choices.

**D.    Each Defendant's Unlawful Conduct Has Resulted in Supracompetitive Prices**

328.    Each Defendant's Loyalty Program(s) have resulted in higher prices to retailers and, in turn, to farmers, for crop-protection products containing applicable Relevant AIs than would prevail in competitive markets. Each Defendant's anticompetitive conduct has thwarted the downward pressure that generic manufacturers' entry and expansion with access to efficient distribution would otherwise impose on prices in markets for crop-protection products containing Relevant AIs.

329.    Generic crop-protection products are generally priced lower than branded equivalents, and as to each Relevant AI, Arkansas farmers pay more for crop-protection products containing these Active Ingredients because the applicable Loyalty Program artificially limits the availability of lower-priced generic alternatives. In many cases, Arkansas farmers must buy the more expensive, branded product because that is all that is available or what the traditional distribution channel promotes, and not because that is what they prefer. Defendants' Loyalty Programs, thus, result in unmet and unrealized demand for lower priced equivalent generic products.

330.    When generic manufacturers are able to access the market for an Active Ingredient, they put downward pressure on the prices of branded products containing that Active Ingredient and exert more pressure as the access achieved increases. This downward pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing

the Active Ingredient, including higher-end mixture products. Defendants' Loyalty Programs, however, inhibit generic manufacturers' ability to access Relevant Markets for the Relevant AIs and, thus, limit downward pricing pressure from generic competition.

331.    Even where generic manufacturers enter and sell at lower prices to distributors, Defendants' Loyalty Programs result in higher prices to Arkansas farmers by limiting the amount of generic product containing Relevant AIs available. This, in turn, enables distributors or retailers to price generic products just under branded products and to maintain branded prices, thus, preventing the full benefits of generic price competition from flowing to farmers.

332.    Defendants regularly forecast in their internal planning documents and in communications with distributors that successful Loyalty Program implementation will lead to higher prices for crop-protection products containing Relevant AIs, to the benefit of both Defendants and distributors, by reducing the downward price effect of generic entry.

333.    Defendants also regularly make backwards-looking assessments of the impact of their Loyalty Programs. Those assessments have concluded that the Loyalty Program implementation and distributor compliance has successfully curtailed generic entry and sustained higher prices than would otherwise have prevailed.

334.    To be sure, an internal Corteva analysis concluded that one of its Loyalty Programs was "best in class for generic defense," effective because it "[d]elays erosion in price and volume" for products subjects to generic competition.

335.    Due to Defendants' exclusionary conduct, farmers have paid at least 40% higher prices – if not more – for products containing Relevant AIs in the Relevant Markets than they would have in a competitive market.

336.    According to allegations made against Defendants in other litigation, in countries where Loyalty Programs do not block generic manufacturers from competing in the markets associated with the Relevant AIs, Syngenta and Corteva are forced to price their products more competitively than they do in the United States. In those countries, prices for products containing the Relevant AIs are lower than they are in the United States.[160]

337.    As Figure 3 shows, in Germany the price of Syngenta's Relevant AI azoxystrobin product is only 23% higher than the price of azoxystrobin products produced by generic manufacturers. In the United States, however, the price of Syngenta's azoxystrobin product, Quadris, is 116% higher than the price of generic azoxystrobin products – more than double the generic price.

**Figure 3**



---

[160]    *See* Consolidated Class Action Complaint at 80, *In re Crop Protection Prods. Loyalty Program Antitrust Litig.*, No. 1:23-md-03062-TDS-JEP (M.D.N.C. Sept. 5, 2023), ECF No. 78.

4900-0499-8729.v1

338.    Thus, while generics put significant downward pricing pressure on the prices of crop-protection products containing the Relevant AIs in Germany, Defendants' Loyalty Programs enable Defendants to keep prices at artificially high levels in the United States.

339.    Preliminary regression analysis conducted by economist experts in other litigation against Defendants, based on a comparison between Germany and the United States, suggests that the lack of competition in the United States enables Syngenta and Corteva to maintain prices at staggeringly high levels.[161]

340.    As Figure 4 shows, if generic manufacturers put the same pressure on the prices of Syngenta's azoxystrobin products in the United States as they do in Germany, prices for Syngenta's azoxystrobin products in the United States would be 43% lower – nearly half the price they are today. Put otherwise, prices in the United States are 57% higher than they would be if the United States market was as competitive as Germany's market.[162]

**Figure 4**



---

[161] *Id.* at 81.

[162] *Id.* at 81-82.

341.    Figure 5 summarizes the results of the regression analysis underlying this conclusion. The number next to "Overcharge (log points)" represents the estimated overcharge associated on azoxystrobin products in the United States, or approximately 57%. The asterisks next to that number represent the statistical significance of those estimates. Here, the statistical significance suggests a confidence level of more than 99%. The percentage next to "Percentage," 43%, represents the estimated drop in the price of Syngenta's azoxystrobin product in the United States if the United States market operated like Germany's market.[163]

**Figure 5**

|  | (1) Azoxystrobin Overcharge |
| --- | --- |
| Overcharge (log-points) | 0.567*** |
|  | (0.202) |
| Percentage | 43% |
| Observations | 43 |
| R-squared | 0.315 |
| U.S. Fixed Effect | YES |
| Name-Brand Control | YES |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

## VIII.  EQUITABLE TOLLING AND CONTINUING VIOLATION

342.    Any applicable statute of limitations for the State has been tolled with respect to any claims and rights of action that the State has because of the unlawful combination and

---

[163] *Id.* at 82-83.

conspiracy, anticompetitive conduct, and illegal monopolistic conduct alleged herein. Defendants are engaged in an ongoing, continuous course of illegal conduct, which is inflicting new and accumulating injury upon Arkansas consumers of each Relevant AI. As a result, the statute of limitations resets upon each renewal of each Loyalty Program or each payment thereunder.

## IX.    DEFENDANTS TRANSACT CASE-RELATED BUSINESS IN THE RELEVANT FORUM

343.    Defendants serve the market for crop protection using the Relevant AIs in the relevant forums. They actively seek to serve, both directly and indirectly, the market for crop protection and related products in the United States and the State of Arkansas. As explained herein, Defendants engage in numerous promotional activities and foster an ongoing relationship between themselves and their customers.

### A.    Arkansas Crop Protection Association

344.    The Arkansas Crop Protection Association ("ACPA") is a 501(c)(5) tax exempt nonprofit agricultural, horticultural, and labor organization, with its headquarters in Little Rock, Arkansas. According to the ACPA's website, "The ACPA serves a dual purpose. The first is to promote the discussion, dissemination, and exchange of idea related to crop-protection products and their uses. The second is to promote closer coordination and understanding between the crop protection industry, agricultural business, and governmental, educational and agricultural agencies throughout Arkansas."

345.    Among other "services" provided by the ACPA, the association "monitors the Arkansas state legislature for pending legislation which may impact the crop protection industry and notifies membership if action is needed" and "[p]rovides a representative for the pesticide industry and agribusiness on the Arkansas State Plant Board."

346.    Each Defendant is an active "corporate sustaining" member of the ACPA. For example, the immediate past president of the ACPA is a Corteva sales representative and territory manager named Derek Clarkson ("Clarkson"). Similarly, a Director for Industry at the ACPA is a Syngenta sales trainer and seed-care specialist named Anthony Crocker.

347.    Corteva's Clarkson was also a member of the 2024 Arkansas Crop Management Conference Program Committee, a conference that was scheduled to take place on January 16-18, 2024 in North Little Rock, Arkansas. One of the sessions at the conference was titled "Product Update: Corteva A New Chapter: The Future of Cotton and Peanut Agronomy in Arkansas."

348.    Similarly, Keith Driggs ("Driggs"), a Syngenta agronomic service representative in the Mid-South, covering Arkansas, was also on the 2024 Arkansas Crop Management Conference Program Committee. Driggs is also the co-host of a Syngenta podcast, along with Dr. Nick Bateman, Assistant Professor and Crop Entomologist at the University of Arkansas, and Dr. Ben Thrash, an Assistant Professor at the University of Arkansas, which provides pest-related alerts directed at Arkansas farmers. Additionally, there was a session at the 2024 Arkansas Crop Management Conference titled "Product Update: Syngenta Irrigation Scheduling and Efficiency." Driggs himself gave a presentation on Syngenta at the 2020 Arkansas Crop Management Conference ("2020 AMCA"), also held in North Little Rock, Arkansas.

349.    At the 2020 AMCA, a Corteva market-development specialist named Chris McClain provided an industry update on his company. Additionally, Corteva also published a podcast called the MidSouth Minute Podcast, which was hosted by members of the MidSouth Crop Protection team, including sales representatives in Arkansas. The podcast's self-proclaimed goal is to provide valuable information regarding Corteva's crop-protection portfolio that is applicable to a wide variety of geographies within the mid-south, including Arkansas.

4900-0499-8729.v1

350. The current executive director of the ACPA, Otis Howe, worked at Corteva's predecessor companies for 37 years, and for 24 years, he served as the ACPA's nominee to the Arkansas State Plant Board.

**B.    Defendants Transact Business in and Directed to Arkansas and this District**

351. As discussed in Section IX.A, both Syngenta and Corteva have employees in Arkansas who work to sell and service crop-protection products to Arkansas farmers.

352. In addition to Driggs, a service representative, Syngenta employs multiple sales representatives in the State, including Jack "Trey" Reaper III, a Retail Sales Representative at Syngenta based in Searcy, Arkansas. The responsibilities of such sales representatives include: sales, management, and demand generation of Syngenta crop-protection and seed-care products; work closely with Syngenta retail personnel as well as growers and area crop consultants to promote the Syngenta portfolio; support and train retail personnel and crop consultants with regard to Syngenta products; and troubleshoot field problems and service products throughout the growing season while supporting the Syngenta brand.

353. Indeed, Syngenta was recently hiring for an Agronomic Service Representative for the Arkansas territory, primarily based in Little Rock, Arkansas. The role required the employee to provide agronomic support expertise within the district team, and partner with sales teams to position solutions on the farm or with Syngenta's channel partners by assisting with the development and delivery of Syngenta products and the company's agronomic story in the marketplace. Also recently, Syngenta was looking to hire a crop-protection sales representative for the Northeast Arkansas territory, based in Marion, Arkansas. The goal of the role would be to maximize sales and market share within the Northeast Arkansas territory by developing strong business relationships with customers and ensuring their support and satisfaction with Syngenta

products. In early 2024, Syngenta was also hiring a sales intern for crop-protection in West Memphis, Arkansas.

354.    Similarly, Corteva also employs numerous additional crop-protection sales and service staff, including a district sales leader, a territory manager, and a sales agronomist in Arkansas. In fact, in February 2024, Corteva posted a job opening for a retail manager to serve Northeast Arkansas (Clay and Greene Counties), to, among other responsibilities, "[u]nderstand the key Crop Protection product offerings and trait technologies in the territory."

355.    Corteva also has a research station located in West Memphis, Arkansas.

356.    In addition, Corteva crop-protection products are sold, among many other places, at Farmers Co-op, which has 19 locations in Arkansas. Indeed, the retailer even has test plots to show the effectiveness of Corteva weed-control products in five of its Arkansas locations.

357.    Corteva also sponsors scholarships for students at the University of Arkansas for students majoring in either crop science or environmental, soil, and water sciences in East Arkansas.

358.    Defendants also have invoked the protection of Arkansas's laws. Corteva has regularly appeared before the Arkansas State Plant Board regarding its crop-protection products.

**C.      Defendants Registered and Marketed Products with the Relevant AIs in the Relevant Forum**

359.    Defendants have registered, sold, and promoted products with all of the Relevant AIs in Arkansas.

360.    Pursuant to the Arkansas Pesticide Control Act, Ark. Code Ann. § 2-16-401, et seq., unless an exemption applies, all pesticides, which includes insecticides, nematicides, fungicides, and herbicides, must be registered with the State through the State Plant Board. Defendants, as

4900-0499-8729.v1

manufacturers of pesticides, apply for and receive pesticide product registrations (*i.e.*, are the registrants) from the Arkansas Department of Agriculture, Plant Industries, Pesticide Division.

361.    Defendants each registered their crop-protection products containing the Relevant AIs in Arkansas:

(a)    There are 78 crop-protection products containing acetochlor registered with the State of Arkansas. Of those, 21 were registered by Corteva.

(b)    There are 15 crop-protection products containing aminopyralid registered with the State of Arkansas. Of those, 12 were registered by Corteva.

(c)    There are 143 crop-protection products containing azoxystrobin registered with the State of Arkansas. Of those, 38 were registered by Syngenta.

(d)    There are five crop-protection products containing cyhalofop registered with the State of Arkansas. Of those, three were registered by Syngenta.

(e)    There are 178 crop-protection products containing cyhalothrin registered with the State of Arkansas. Of those, 12 were registered by Syngenta.

(f)    There are 42 crop-protection products containing difenoconazole registered with the State of Arkansas. Of those, 14 were registered by Syngenta.

(g)    There are 34 crop-protection products containing fomesafen registered with the State of Arkansas. Of those, six were registered by Syngenta.

(h)    There are 86 crop-protection products containing mesotrione registered with the State of Arkansas. Of those, 12 were registered by Syngenta.

(i)    There are 146 crop-protection products containing metolachlor registered with the State of Arkansas. Of those, 27 were registered by Syngenta.

(j)    There are 16 crop-protection products containing methoxyfenozide registered with the State of Aransas. Of those, five were registered by Corteva.

(k)    There are 10 crop-protection products containing oxamyl registered with the State of Arkansas. Of those, five were registered by Corteva.

(l)    There are 17 crop-protection products containing picloram registered with the State of Arkansas. Of those, ten were registered by Corteva.

(m)    There are 43 crop-protection products containing rimsulfuron registered with the State of Arkansas. Of those, 18 were registered by Corteva.

(n)    There are 113 crop-protection products containing triclopyr registered with the State of Arkansas. Of those, 22 were registered by Corteva.

362.    In addition, annually, the University of Arkansas Division of Agriculture Research & Extension Program releases guides for each of the categories of AIs in issue here, fungicides, insecticides, and herbicides.

363.    The Arkansas Plant Disease Control Products Guide, also known as MP154, includes lists of fungicides and nematicides registered for use in Arkansas that are used to control diseases of row (field) crops, vegetables, small fruits, turfgrass, and ornamental plants.

364.    The Insecticide Recommendations for Arkansas, MP144, lists insecticide approved for use in Arkansas and the insects upon which they are effective.

365.    The Recommended Chemicals for Weed and Brush Control, also known as MP44, lists herbicides and the weeds they are effective upon, as well as the trade names, the Active Ingredient(s), and the manufacturer of recommended products.[164]

---

[164] Each of the guides lists every fungicide, insecticide, and herbicide, respectively, that has been registered for use in the State of Arkansas, including generic products registered by companies other than Syngenta and Corteva. The 2025 MP154 and 2025 MP144 guides also disclaim that the

366.    The following Syngenta products containing Relevant AIs are listed in the 2025 MP154 guide:

- Abound is a single-AI product containing azoxystrobin

- Amistar Top is a mixture containing azoxystrobin and difenoconazole as AIs

- Elatus is a mixture containing azoxystrobin and benzovindiflupyr as AIs

- Inspire Super is a mixture containing difenoconazole and cyprodinil as AIs

- Miravis Neo is a mixture containing azoxystrobin as one of its three AIs

- Miravis Top is a mixture containing difenoconazole and pydiflumetofen as AIs

- Quadris is a single-AI product containing azoxystrobin

- Quadris Opti is a mixture containing azoxystrobin and chlorothalonil

- Quadris Top and Quadris Top SBX are mixtures containing azoxystrobin and difenoconazole as AIs

- Quilt Xcel is a mixture containing azoxystrobin and propiconazole as AIs

- Trivapro is a mixture containing azoxystrobin as one of its three AIs.

- Uniform is a mixture containing azoxystrobin and mefenoxam as its AIs.

- Vibrance RST is a mixture containing azoxystrobin as one of its four AIs.

367.    The following Syngenta insecticides containing Relevant AIs were included in the 2025 MP144:

- Besiege and Voliam Xpress are mixtures containing lambda-cyhalothrin and chlorantraniliprole as AIs.

---

listing of any product in the guide was an endorsement of a product or discrimination of other products by the University of Arkansas System Division of Agriculture.

- Endigo ZC and Endigo ZCX area mixture containing lambda-cyhalothrin and thiamethoxam as AIs.

368. The following Corteva insecticides containing Relevant AIs were included in the 2025 MP144:

- Vydate C-LV is a single-AI product containing oxamyl.

- Intrepid is a single-AI product containing methoxyfenozide.

- Intrepid Edge is a mixture containing methoxyfenozide and spinetoram.

369. Another product including oxamyl, Vydate, was included in the Insecticide Recommendations for Arkansas, also known as the 2025 MP144.

370. The 2025 MP44 listed the following Syngenta products containing Relevant AIs:

- Callisto is a single-AI product containing mesotrione.

- Resiclore XL is a mix including acetechlor and mesotrione.

- Acuron, Acuron GT and Halex GT are mixes including mesotrione and S-metolachlor as AIs.

- Dual, Dual Magnum, and Pennant Magnum are single-AI products containing S-metolachlor.

- Tavium is a mixture containing S-metolachlor and dicamba as AIs.

- Sequence is a mixture of S-metolachlor and glyphosate.

- Prefix is a mixture of S-metolachlor and fomesafin.

- Bicep II Magnum and Bicep Lite II Magnum, are mixtures containing S-metolachlor and atrazine as AIs.

- Boundary is a mixture of S-metolachlor and metribuzin as AIs.

- Tendovo is a mixture of S-metolachlor and two other AIs.

- Storen is mixture of S-metolachlor and three other AIs.

- Authority Elita/BroadAxe SC is a mixture containing S-metolachlor and sulfentrazone as AIs and is jointly sold by Syngenta and FMC.

- Flexstar and Reflex are single-AI products containing fomesafen.

- Flexstar GT 3.5 is a mixture containing fomesafen and glyphosate as AIs.

371. According to Syngenta's website, Lumax EZ, which also includes mesotrione or S-metolachlor, is registered for use in Arkansas. Additionally, Dual and Dual Magnum, which use metolachlor, specifically S-metolachlor, are discussed throughout MP44.

372. Similarly, the 2025 MP44 listed the following Corteva products that contain Relevant AIs:

- Matrix and Resolve Q are single-AI products containing rimsulfuron

- LeadOff, Resolve Q, Steadfast Q and Realm Q are mixtures containing rimsulfuron as an AI.

- SureStart II is a mixture containing acetochlor as one of its three AIs.

- Degree Xtra and Keystone are mixtures containing acetochlor and altrazine.

- Resicore XL is a mixture of acetochlor and two other AIs.

- Clincher is a single-AI product containing cyhalofop.

- Tordon K and Tordon 22K are single-AI products containing picloran.

- Surmount is a mixture containing picloram and fluroxypyr as AIs.

- Grazon P + D and Pathway are mixtures containing picloram and 2,4-D as AIs.

- Garlon, Forestry Garlan 4, Grandstand R, Pathfinder II, Remedy Ultra, Turfton Ester are all single-AI products with triclopyr as the active ingredient.

- PastureGard HL is a mixture containing triclopyr and fluroxypyr as AIs.

- Confront is a mixture containing triclopyr and clopyralid as AIs.

- Crossbow is a mixture containing triclopyr and 2,4-D as AIs.

- Redeem R & P is a mixture containing triclopyr and clopyralid.

- Milestone is a single-AI product containing aminopyralid.

- GrazonNext HL is a mixture containing aminopyralid and 2,4-D as active ingredients. Chaparral is a mixture containing aminopyralid and metsulfuron as AIs.

- DuraCor is a mixture containing aminopyralid.

- Surpass NXT and Keystone LA, which include the Relevant AI acetochlor, are listed in MP44. Corteva's Basis, which includes the Relevant AI rimsulfuron, is registered for use in Arkansas.

373.    A Syngenta Sales Trainer based in Jonesboro, Arkansas, was quoted in a Syngenta news release touting the launch of "Vibrance RST rice seed treatment" and the product's use of "four different fungicidal modes of action to control seedborne, soilborne and seedling diseases." Among those "fungicidal modes" is the Relevant AI azoxystrobin, which Syngenta claims "protects against Rhizoctonia and Pythium species and some soilborne and seedborne diseases, including rice blast."[165]

374.    At the Bay, Arkansas, site that Syngenta was required to divest, the Syngenta Defendants conducted new product introductions of Acuron and Trivapro, in addition to improved

---

[165] *Syngenta launches seed treatment with 4 modes of action*, RICEFARMING (Feb. 19, 2020), https://www.ricefarming.com/departments/industry-news/syngenta-launches-seed-treatment-with-4-modes-of-action/.

4900-0499-8729.v1

performance of other soybean and cotton seed treatment products, from base fungicide to fungicide, insecticide, and nematicide combinations.

375.    Similarly, Syngenta conducted trials in Northeast Arkansas (specifically the Bay, Arkansas site) for its Quadris Top SBX fungicide, which contains the Relevant AI azoxystrobin.

376.    Syngenta knew that Arkansas farmers used its crop-protection products that included Relevant AIs and targeted advertising in Arkansas to increase those numbers. Indeed, the 3Q 2021 cover of Syngenta's thrive magazine featured a smiling Arkansas farmer, who was described within the magazine as having "found that his use of Trivapro fungicide on corn results in health benefits and stronger stalk strength on his farm in Lincoln County, Arkansas." Another Arkansas farmer was quoted in the same issue as noting that after using Trivapro, "We saw a definite improvement in the overall health of the corn as well as stronger stalk strength…. We also noticed less dust and debris, reduced filter clogging and cleaner corn in the hopper, with improved yields."

377.    It is well-known that Quadris has been used in Arkansas for a while to manage sheet blight in rice. Additionally, Driggs conducted a study on Quadris in Arkansas on soybeans in 2008. In 2009, Syngenta recommended that farmers in Arkansas, among other states, use Quadris Top Fungicide to control aerial blight in soybean.

## X.    EFFECT ON INTRASTATE AND INTERSTATE COMMERCE

378.    The crop-protection products containing the Relevant AIs at issue in this case are sold in interstate commerce and Defendants' conduct set forth herein substantially affected interstate commerce throughout the United States, including within Arkansas. Since Defendants began marketing and selling the Relevant AIs, Defendants have promoted, marketed, distributed,

sold, and shipped in a continuous and uninterrupted flow of commerce across state lines and sold to customers located outside its state of manufacture, including in Arkansas.

379.    Defendants' anticompetitive conduct occurred in part in trade and commerce within Arkansas. At all relevant times, Defendants shipped their crop-protection products containing Relevant AIs into Arkansas and marketed and sold the products to customers in Arkansas. Defendants' conduct resulted in farmers in Arkansas paying artificially inflated prices for the crop-protection products containing the Relevant AIs.

380.    In addition, Defendants' conduct has and continues to have substantial interstate and intrastate effects throughout the United States, including within Arkansas, because distributors and retailers within Arkansas have been coerced by Defendants' Loyalty Programs to refrain from purchasing generic crop-protection products that compete with Defendants' Relevant AIs. As a result, farmers in Arkansas have been forced to pay supracompetitive prices for the crop-protection products containing the Relevant AIs, which, in the absence of Defendants' anticompetitive scheme, would have been reduced as a result of competition from generic manufacturers.

## CLAIMS FOR RELIEF

### COUNT I
### UNLAWFUL CONDITIONING OF PAYMENTS
### IN VIOLATION OF SECTION 3 OF THE CLAYTON ANTITRUST
### ACT OF 1914 (15 U.S.C. § 14)

381.    The State restates, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 380 as if fully set forth herein.

382.    Each Defendant has provided payments in the form of rebates in the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in accordance with "loyalty" terms. This conduct may substantially lessen

competition or tend to create monopolies in each applicable Relevant Market, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

383.    The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as enjoining Defendants from engaging in similar conduct in the future.

## COUNT II
## UNREASONABLE RESTRAINTS OF TRADE
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST
## ACT OF 1890 (15 U.S.C. § 1)

384.    The State restates, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 380 as if fully set forth herein.

385.    Each Defendant's agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms or participation in Loyalty Programs are unreasonable restraints of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

386.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and distributors did those things that they combined and conspired to do, including, but not limited to, the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for crop-protection products containing the Relevant AIs principally, but not exclusively, by designing and enforcing Loyalty Programs that prevented and continue to prevent competing generic manufacturers from entering the market or efficiently distributing their products.

387.    Defendants' agreements with distributors and retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms

Case 4:22-cv-01287-BSM    Document 184-1    Filed 07/14/25    Page 114 of 125

artificially raise, fix, maintain, or stabilize prices for crop-protection products, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

388.     Each Defendant's agreements with distributors or retailers for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" terms has had the following effects, among others:

(a)     price competition in the sale of crop-protection products has been restrained, suppressed, or eliminated throughout the United States, including Arkansas;

(b)     prices for crop-protection products sold by Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States, including Arkansas; and

(c)     consumers, including Arkansas farmers, who purchased Defendants' crop-protection products have been deprived of the benefits of free and open competition.

389.     Consumers, including Arkansas farmers, who purchased crop-protection products have been injured and damaged, and will continue to be injured and damaged, in their business by having paid more for crop-protection products than they would have paid and will pay in the absence of Defendants' Loyalty Programs.

390.     The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as enjoining Defendants from engaging in similar conduct in the future.

### COUNT III
### UNLAWFUL MONOPOLIZATION
### IN VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST
### ACT OF 1890 (15 U.S.C. § 2)

391.     The State restates, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 380 as if fully set forth herein.

4900-0499-8729.v1

392.    At all times relevant to assessing its conduct, Syngenta has had monopoly power in Relevant Markets for azoxystrobin, mesotrione, metolachlor, S-metolachlor, fomesafen, lambda-cyhalothrin, and difenoconazole.

393.    At all times relevant to assessing its conduct, Corteva has had monopoly power in Relevant Markets for cyhalofop, picloram, triclopyr, methoxyfenozide, and aminopyralid.

394.    Each Defendant has maintained its monopoly power through a course of anticompetitive and exclusionary conduct, including, but not limited to: (a) entering and maintaining agreements with distributors or retailers that contain loyalty requirements; (b) enforcing and threatening enforcement of loyalty requirements or otherwise threatening penalties for disloyalty; and (c) providing "rebates" for the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in all applicable Relevant Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

395.    The State is entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as enjoining Defendants from engaging in similar conduct in the future.

## COUNT IV
## VIOLATIONS OF THE ARKANSAS UNFAIR PRACTICES ACT
### (ARK. CODE ANN. § 4-75-301, et seq.)

396.    The State restates, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 380 as if fully set forth herein.

397.    The State represents itself and all natural persons residing in the State through its *parens patriae* authority and seeks relief for both herein.

398.    Each Defendant's above-described conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the State statutes set forth

below, which are sometimes referred to as "consumer protection" statutes. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, or unconscionable acts or practices, Arkansas farmers paid higher prices for crop-protection products containing the Relevant AIs than they should have.

399.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Arkansas farmers could not reasonably have avoided injury from Defendants' wrongful conduct.

400.    There was and is a disparity between the price that Arkansas farmers have paid and continue to pay for crop-protection products containing the Relevant AIs and the price they would otherwise pay if Defendants had not initiated their anti-competitive Loyalty Programs.

401.    Each Defendant's acts as alleged herein constitute an unlawful monopoly or attempt to monopolize trade or commerce in Arkansas in violation of the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.

402.    Defendants' agreements with distributors and retailers, as alleged herein, for the sale of crop-protection products that condition exclusion payments on compliance with "loyalty" are in violation of the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.

403.    Defendants' acts as alleged herein, allowed them to use and maintain their monopoly power to regulate or fix prices of crop-protection products through a course of anticompetitive and exclusionary conduct aimed at maintaining supracompetitive prices for crop-protection products in violation of the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.

404.    Defendants' acts as alleged herein, allowed them to use and maintain their monopoly power to regulate, fix, or limit the quantities of competing or potentially competing

crop-protection products being sold by major distributors and retailers in the State of Arkansas through a course of anticompetitive and exclusionary conduct to maintain their market prominence in crop-protection products in violation of the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.

405.    These violations directly or indirectly injured the State and its citizens. Accordingly, the State, on behalf of it itself and *parens patriae* for all citizens within the State, seeks all relief available under the Arkansas Unfair Practices Act.

406.    The State is entitled to and seeks relief, including a permanent injunction, actual damages, restitution, and civil penalties on behalf of the State, and actual damages and restitution on behalf of all natural persons residing in the state as *parens patriae* under the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.

## COUNT V
## VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### (ARK. CODE ANN. § 4-88-101, et seq.)

407.    The State restates, realleges, and incorporates by reference each of the allegations set forth in paragraphs 1 through 380 as if fully set forth herein.

408.    The State represents the state and all natural persons residing in the state.

409.    Defendants' acts as alleged herein violate, and the State is entitled to relief, under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.

410.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101, et seq., generally prohibits "[d]eceptive and unconscionable trade practices." Ark. Code Ann. §4-88-107.

411.    The crop-protection products containing the Relevant AIs described herein are "goods" as defined under Ark. Code Ann. § 4-88-102(4).

412.    Defendants are "person[s]" as defined under Ark. Code Ann. § 4-88-102(5). The State of Arkansas and its citizens are "person[s]" as defined under Ark. Code Ann. § 4-88-102(5).

413.    Defendants' actions alleged herein constitute deceptive and unconscionable trade practices, in violation of Ark. Code Ann. § 4-88-107(10).

414.    Defendants' have engaged, and continue to engage in unconscionable, false, and deceptive acts and practices in business, commerce, and trade by using and maintaining their monopoly power through a course of anticompetitive and exclusionary conduct, including, but not limited to: (a) entering and maintaining agreements, contracts, combinations, or conspiracies with distributors and retailers for the sale of crop-protection products that conditioned exclusion payments on loyalty; (b) enforcing and threatening enforcement of loyalty conditions or otherwise threatening penalties for disloyalty; and (c) providing "rebates" for the sale of crop-protection products on the condition that distributors and retailers not use or deal in the goods of generic competitors in all applicable Relevant Markets; in violation of Ark. Code Ann. § 4-88-107(10).

415.    Defendants' acts constitute deceptive and unconscionable trade practices as they affected, fixed, controlled, and maintained artificially high market prices or supracompetitive prices for crop-protection products and allowed Defendants to control and maintain dominant market share, all which caused ascertainable losses to the State and Arkansas farmers.

416.    Defendants' acts constitute deceptive and unconscionable trade practices as they affected, fixed, controlled, and excluded competition to control, limit, or restrict the amount or quantities of crop-protection products entering or being offered on the market, allowing Defendants to control and maintain dominant market share, all which caused ascertainable losses to the State and Arkansas farmers.

417.    Defendants' unconscionable and deceptive acts and practices were likely to, and did in fact, deceive Arkansas consumers and substantially affect commerce within the State of Arkansas.

418.    Arkansas farmers purchased crop-protection products containing the Relevant AIs within the State of Arkansas during the relevant period. But for each Defendant's conduct, as set forth herein, the price of crop-protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

419.    As a direct and proximate cause of Defendants' unlawful conduct, Arkansas farmers have been injured in their business or property by virtue of overcharges for crop-protection products containing the Relevant AIs and are threatened with further injury.

420.    By reason of the foregoing, and in its *parens patriae* capacity, the State is entitled to and seeks relief, including a permanent injunction prohibiting Defendants from engaging in any deceptive and unlawful practices pursuant to the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-104 and § 4-88-113(a)(l).

421.    The State seeks an order suspending or forfeiting Defendants' franchises, corporate charters, or other licenses, permits, or authorizations to do business in the State under Ark. Code Ann. § 4-88-113(b).

422.    But for Defendants' deceptive and unconscionable trade practices, the State and its consumers would not have expended millions of dollars on supracompetitively priced crop-protection products. As a direct and proximate cause of Defendants' conduct, Arkansas consumers have suffered ascertainable losses, for which restitution is required, along with other relief under Ark. Code Ann. § 4-88-113(a)(2)(A).

423. As a direct and proximate result of Defendants' violations, the State is entitled to civil penalties of up to $10,000 for each violation resulting from Defendants' unlawful conduct, along with investigation and litigation costs, expenses for expert witnesses, and attorneys' fees and costs under Ark. Code Ann. § 4-88-113(a)(3) and (e).

424. As a direct and proximate result of Defendants' conduct, Defendants are directly and jointly and severally liable to the State for all damages and civil penalties, the recovery of which is sought herein.

## PRAYER FOR RELIEF

**WHEREFORE,** the State of Arkansas, *ex rel.* Tim Griffin, Attorney General, prays for entry of judgment against the Defendants for all the relief requested herein and to which the State may otherwise be entitled, specifically, and without limitation as follows:

A. The Court determine that Defendants' conduct violates Section 3 of the Clayton Act, 15 U.S.C. § 14;

B. The Court determine that Defendants' conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. The Court determine that Defendants' conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

D. The Court determine that Defendants' conduct violates the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-301, et seq.;

E. The Court determine that Defendants' conduct violates the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.;

F. That each Defendant is permanently enjoined from engaging in its unlawful conduct;

G.      That each Defendant is permanently enjoined from engaging in similar and related conduct in the future as to all crop-protection products containing the Relevant AIs;

H.      The State shall recover all actual damages or restitution that may be owed to the State and its consumers affected by Defendants' conduct, pursuant to the Arkansas Unfair Practices Act, Ark. Code Ann. §§ 4-75-315(a) and (b);

I.      Require Defendants to pay all restitution that may be owed to Arkansas consumers affected by Defendants' unlawful acts and practices, pursuant to Ark. Code Ann. § 4-88-113(a)(2)(A);

J.      Impose civil penalties to be paid to the State by Defendants in the amount of up to $10,000 for each violation of the Arkansas Deceptive Trade Practices Act proven at a trial of this matter, pursuant to Ark. Code Ann. § 4-88-113(a)(3);

K.      Suspend or revoke Defendants' authorization to do business in the State of Arkansas, pursuant to Ark. Code Ann. § 4-88-113(b);

L.      The State shall recover all of the State's costs in its investigation and litigation, including but not limited to, expert witness fees and attorney's fees and costs, pursuant to Ark. Code Ann. § 4-88-113(e), and other state laws;

M.      The State shall be awarded restitution, damages, disgorgement, penalties and all other legal and equitable monetary remedies available under the state laws set forth in this SAC and the general equitable powers of this Court in an amount according to proof;

N.      The State shall be awarded punitive damages as Defendants are liable for compensatory damages and Defendants knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally and probably

result in injury or damage and that Defendants continued the conduct with malice or reckless disregard of the consequences, pursuant to Ark. Code Ann. § 16-55-206;

O.     The State shall be awarded pre-and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint; and

P.     The State shall be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

The State demands a trial by jury on all causes of action so triable.

4900-0499-8729.v1

DATED:  June  5, 2025

**TIM GRIFFIN**
**Attorney General**

By: _____

TIM GRIFFIN, ABN 95110
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone:  (501) 682-2007
(501) 683-2520 (fax)
Tim.Griffin@ArkansasAG.gov

AMANDA WENTZ, ABN 2021066
Assistant Attorney General
Telephone:  (501) 682-1178
(501) 682-8118 (fax)
amanda.wentz@arkansasag.gov

BRITTANY EDWARDS, ABN 2016235
Senior Assistant Attorney General
Telephone:  (501) 682-8114
(501) 682-8118 (fax)
Brittany.Edwards@ArkansasAG.gov

REDDICK LAW, PLLC
BRIAN REDDICK, ABN 94057
HEATHER ZACHARY, ABN 2004216
One Information Way, Suite 105
Little Rock, AR  72202
Telephone:  (501) 943-1456
(501) 907-7793 (fax)
brian@reddicklawfirm.com
hzachary@reddicklawfirm.com

ROBBINS GELLER RUDMAN
  &DOWD LLP
STUART A. DAVIDSON *
Florida Bar No. 84824
DOROTHY P. ANTULLIS *
Florida Bar No. 890421
LINDSEY H. TAYLOR *
Florida Bar No. 1027908
ALEXANDER C. COHEN*
Florida Bar No. 1002715
ANNY M. MARTIN *
Florida Bar No. 1000491
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  (561) 750-3000
(561) 750-3364 (fax)
sdavidson@rgrdlaw.com
dantullis@rgrdlaw.com
ltaylor@rgrdlaw.com
acohen@rgrdlaw.com
amartin@rgrdlaw.com

THE LANIER LAW FIRM, P.C.
W. MARK LANIER *
Texas Bar No. 11934600
ALEX J. BROWN *
Texas Bar No. 24026964
ZEKE DeROSE III *
Texas Bar No. 24057421
SARA E. ABSTON *
Texas Bar No. 24131972
10940 West Sam Houston Parkway North
Suite 100
Houston, TX  77064
Telephone:  (713) 659-5200
(713) 659-2204 (fax)
mark.lanier@lanierlawfirm.com
alex.brown@lanierlawfirm.com
zeke.derose@lanierlawfirm.com
rebecca.phillips@lanierlawfirm.com

THE LANIER LAW FIRM
K. RACHEL LANIER *
California Bar No. 343171
2829 Townsgate Road, Suite 100
Westlake Village, CA  91361
Telephone:  (310) 277-5100
rachel.lanier@lanierlawfirm.com

*Attorneys for Plaintiff State of Arkansas*

* Admitted pro hac vice

4900-0499-8729.v1